# Promega Corporation
## vs.
# Life Technologies Corporation, et al.

Deposition of
## **Charles Moehle**
## **(Highly Confidential-**
## **Attorneys' Eyes Only)**

Volume 1
12/12/2011

Reported By:  Brandon Combs
Job Number:  12244

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

## Page 1

1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF WISCONSIN

3

4    --oOo--

5    PROMEGA CORPORATION,            )

6         Plaintiff,   )

7    vs.              ) No. 10-cv-281-bbc

8    LIFE TECHNOLOGIES CORPORATION, )
     INVITROGEN IP HOLDINGS, INC., and)

9    APPLIED BIOSYSTEMS, LLC,     )
                                   )

10        Defendants.   )
     _____)

11

12

13

14    ATTORNEYS' EYES ONLY (Pages 65-149)

15

16

17    VIDEOTAPED DEPOSITION OF

18    CHARLES MOEHLE

19    _____

     December 12, 2011

20

21

22

23    REPORTED BY BRANDON D. COMBS, RPR, CSR 12978

24    Job 12244

25

## Page 2

1                  INDEX

2                  PAGE

3

4    EXAMINATION BY MR. TROUPIS ............................6

5    EXAMINATION BY MS. JOHNSON ........................190

6

7

8              EXHIBITS

9

10   EXHIBIT   DESCRIPTION           PAGE

11    1    Press Releases.        33

12    2    Opinion and Order.        56

13    3    Life Technologies Forms Team to Focus   59
          on IP Licensing for PCR, other

14        Products.

15    4    Out-Licensing Rollup.      71

16    5    Settlement Agreement.      104

17    6    Cross License Agreement.     104

18    7    License Agreement.       111

19    8    Email from Hsiaoli Chen to Charles   112
          Moehle, 12/4/2008.

20
      9    Email from Hsiaoli Chen to Stuart    112
21        Hepburn, 12/4/2008.

22    10   Amendment.          113

23    11   Letter from Traci Libby to Promega    121
          Corporation, Oct 20, 2009.

24
      12   Email from Charles Piazza, to Rolando   124
25        Brawer, 8/21/2009.

## Page 3

1    13   Email from Charles Moehle to Peter    136
          Dansky,m 9/8/2009.

2
      14   Email from Sandia Yao to Richard     139
3         Louie, 9/30/2009.

4    15   Email from Charles Moehle to Rolando   141
          Brawer, 11/3/2009.

5
      16   Email from Charles Moehle to Hsiaoli   143
6         Chen, 12/5/2008.

7    17   Letter from Traci Libby to Promega    147
          Corporate Counsel, May 4, 2010.

8
      18   Email from Charles Moehle to Randy    150
9         Dimond, Jan 8, 2007.

10   19   Letter from Lorna Quitoriano to     153
          Promega General Counsel, Feb 2, 2010.

11
      20   AmpFISTR Identifiler Direct PCR     159
12        Amplification Kit.

13   21   Spreadsheet.          164

14

15

16

17

18

19

20

21

22

23

24

25

## Page 4

1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF WISCONSIN

3

4    --oOo--

5    PROMEGA CORPORATION,            )

6         Plaintiff,   )

7    vs.              ) No. 10-cv-281-bbc

8    LIFE TECHNOLOGIES CORPORATION, )
     INVITROGEN IP HOLDINGS, INC., and)

9    APPLIED BIOSYSTEMS, LLC,     )
                                   )

10        Defendants.   )
     _____)

11

12    --oOo--

13    BE IT REMEMBERED THAT, pursuant to Notice and

14    on Monday, December 12, 2011, commencing at 9:14 a.m.

15    thereof, at 101 Lincoln Centre Drive, Foster City,

16    California, before me, BRANDON D. COMBS, a Certified

17    Shorthand Reporter, personally appeared

18    CHARLES MOEHLE,

19    called as a witness by the Plaintiff being first duly

20    sworn, testified as follows:

21              --oOo--

22    TROUPIS LAW OFFICE, LLC, 8500 Greenway

23    Boulevard, Suite 200, Middleton, WI 53562, represented

24    by JAMES R. TROUPIS, Attorney at Law, appeared as

25    counsel on behalf of the Plaintiff.

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 5

```
              1    Phone: 608-807-4096
                   Email: jrtroupis@troupislawoffice.com
              2
              3    PARSONS, BEHLE & LATIMER, 201 South Main
              4    Street, Suite 1800, Salt Lake City, UT 84111,
              5    represented by KRISTINE JOHNSON, Attorney at Law,
              6    appeared as counsel on behalf of the Defendant Life
              7    Technologies Corporation.
              8    Phone: 801-532-1234
                   Email: kjohnson@parsonsbehle.com
              9
              10   ALSO PRESENT:  Joseph Mourgos (Videographer),
              11   Randall Dimond, Daniel Ghoca, Craig Christianson.
                   --oOo--
08:44:50  12
09:13:55  13       THE VIDEOGRAPHER:  Here begins Video 1 of
09:13:58  14   Volume I in the deposition of Charles M. Moehle, in the
09:14:03  15   matter of Promega Corporation versus Life Technologies
09:14:08  16   Corporation, et al., in the United States District
09:14:10  17   Court, Western District of Wisconsin.  Case number is
09:14:16  18   10-CV-281-BBC.  Today the date is December 12, 2011, and
09:14:26  19   the time on the video monitor is 9:14 a.m.
09:14:31  20       The video operator today is Jeff Mourgos
09:14:33  21   representing Combs Reporting, 595 Market Street, Suite
09:14:34  22   620, San Francisco, California.  This video deposition
09:14:43  23   is taking place at 101 Lincoln Centre Drive, Foster
09:14:48  24   City, California, and was noticed by Troupis Law Office,
09:14:53  25   LLC.
```

Page 6

```
09:14:54   1       Counsel, please identify yourselves and state
09:14:58   2   whom you represent.
09:15:00   3       MR. TROUPIS:  I'm Jim Troupis of Troupis Law
09:15:00   4   Office, and I represent Promega Corporation.  Also
09:15:04   5   present with me from our office today is Brandon Lewis,
09:15:07   6   with our office.  Also present, at least for parts of
09:15:10   7   this deposition, are Dr. Randall Dimond of Promega
09:15:15   8   Corporation, as well as the general counsel, Craig
09:15:17   9   Christianson, and associate general counsel, Dan Ghoca.
09:15:23  10       MS. JOHNSON:  Christine Johnson of Parsons,
09:15:25  11   Behle & Latimer for the defendants.
09:15:28  12       THE VIDEOGRAPHER:  The court reporter today is
09:15:29  13   Brandon Combs of Combs Reporting, Incorporated.
09:15:32  14       Would the reporter please administrator oath.
          15       --oOo--
          16   EXAMINATION BY MR. TROUPIS
09:15:43  17       MR. TROUPIS:  Q.  Good morning, Dr. Moehle.
09:15:45  18       A.  Good morning.
09:15:47  19       Q.  To begin with, this is a deposition in the
09:15:49  20   Promega LTI litigation, and I wanted to make sure that
09:15:55  21   in the event that a question is not clear, please ask me
09:15:58  22   to clarify it.  Your counsel may object or she may ask
09:16:01  23   me to clarify.  My purposes are to get answers to the
09:16:04  24   questions, and if there's any discussion about what is
09:16:07  25   meant, please ask.  I will try to rephrase it.
```

Page 7

```
09:16:11   1       Also, we'll take breaks from time to time.
09:16:13   2   And again, if you want a break, ask and we'll certainly
09:16:18   3   take a break during today's deposition.
09:16:20   4       Let me ask you first, is there anything, any
09:16:23   5   reason why you cannot or would not able to give honest
09:16:26   6   answers today?
09:16:27   7       A.  No, there's no reason.
09:16:28   8       Q.  Have you been in a deposition before?
09:16:31   9       A.  Yes, I have.
09:16:31  10       Q.  How many times?  Under what circumstances?
09:16:34  11       A.  Maybe four or five, both as a 30(b)(6)
09:16:39  12   witness, as an expert for the company, and also as an
09:16:42  13   individual, as I call it, as myself.
09:16:45  14       Q.  When it's on behalf of the company, at both
09:16:48  15   Applied Biosystems and Life Technologies or just
09:16:51  16   recently for Life Technologies?
09:16:52  17       A.  This is the first time I've been deposed since
09:16:54  18   the merger where I'm in Life Technologies.
09:16:57  19       Q.  So those prior appearances on behalf of
09:17:00  20   companies would have been prior corporate interests or
09:17:04  21   corporations that you worked for?
09:17:05  22       A.  All for Applera or ABI, the predecessor to
09:17:11  23   Life Technologies.
09:17:13  24       Q.  What kind of personal matters would you have
09:17:13  25   been -- you said you were deposed personally, as you're
```

Page 8

```
09:17:16   1   being deposed today, as part of the company.
09:17:19   2       A.  Yes.
09:17:19   3       Q.  In all prior depositions, was it always as an
09:17:23   4   employee of a corporation or were there individual
09:17:25   5   actions against you?
09:17:27   6       A.  Always as an employee.
09:17:29   7       Q.  Okay.  Thank you.
09:17:32   8       A.  I guess if I need to speak up, let me know.
09:17:36   9       Q.  Talk for a moment, let me know a little bit
09:17:40  10   about your background.  It is Dr. Moehle, isn't it?
09:17:43  11       A.  Yes.  I usually don't go by Dr. Moehle, but I
09:17:47  12   have a Ph.D.
09:17:49  13       Q.  I was going to call you "Dr.," but I'll call
09:17:49  14   you whatever you would like.
09:17:51  15       A.  Whatever you're comfortable with.  You can
09:17:52  16   call me by my first name or Mr. Moehle, as you prefer.
09:17:58  17       Q.  Can you tell us your background, your
09:18:00  18   employment background?
09:18:01  19       A.  My employment background, as a former
09:18:06  20   academic, I started at graduate school, in my mind.  I
09:18:09  21   have a Ph.D. in yeast genetics, biology, from Carnegie
09:18:14  22   Mellon.  I spent five years at the National Institutes
09:18:18  23   of Health and a post-doctoral fellow and a -- I forget
09:18:23  24   the exact title now, but essentially post-doctoral
09:18:26  25   fellow.
```

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 9

| | |
|---|---|
| 09:18:26 1 | From there I was recruited to a biotech |
| 09:18:31 2 | company called RiboGene in Hayward, California. |
| 09:18:34 3 | Initially I was a research scientist. And as time went |
| 09:18:38 4 | on, I was partly in research and also in corporate |
| 09:18:41 5 | development, if you will. |
| 09:18:42 6 | From there I went to a company called Genelabs |
| 09:18:45 7 | Technologies, also in the Bay Area, where I was director |
| 09:18:49 8 | of business development. And from there to Chiron |
| 09:18:53 9 | Corporation, with a similar title of director of |
| 09:18:57 10 | business development, before joining Applied Biosystems |
| 09:19:01 11 | almost seven years ago. Applied Biosystems was acquired |
| 09:19:05 12 | by Invitrogen to form Life Technologies about three |
| 09:19:09 13 | years ago last month. |
| 09:19:20 14 | Q. Fair to assume you live in the area? |
| 09:19:22 15 | A. Yes. |
| 09:19:22 16 | Q. You're in Northern California? |
| 09:19:25 17 | A. Yes, I do. |
| 09:19:25 18 | Q. What is your home address? |
| 09:19:27 19 | A. 3133 Alexis Place, A-L-E-X-I-S, Castro Valley, |
| 09:19:34 20 | California 94546. |
| 09:19:43 21 | Q. What did you do for -- explain a little bit |
| 09:19:45 22 | what you did for Chiron and how long you were employed |
| 09:19:48 23 | there. |
| 09:19:49 24 | A. Sure. I joined Chiron in March -- sorry, |
| 09:19:54 25 | January of 2001 and left in October of 2004, so nearly |

Page 10

| | |
|---|---|
| 09:20:00 1 | four years. I was director of business development. At |
| 09:20:05 2 | various times, I supported different of the businesses. |
| 09:20:07 3 | We would do a little in-licensing, a little |
| 09:20:12 4 | out-licensing, collaborations, supply agreements, things |
| 09:20:16 5 | that helped the business move forward or other ways of |
| 09:20:19 6 | monetizing IP. |
| 09:20:20 7 | Q. What was Chiron's primary business at that |
| 09:20:23 8 | time? |
| 09:20:23 9 | A. It was a pharmaceutical company. The primary |
| 09:20:27 10 | business was developing and selling pharmaceuticals for |
| 09:20:31 11 | cancer and infectious business and -- yeah, cancer and |
| 09:20:35 12 | infectious disease. |
| 09:20:36 13 | Q. And tell us a little bit about how long were |
| 09:20:38 14 | you at Genelabs. |
| 09:20:39 15 | A. I was at Genelabs for about two years. It was |
| 09:20:43 16 | more of a startup-type biotech company. |
| 09:20:46 17 | Q. What was their focus? |
| 09:20:49 18 | A. They had a couple of foci, focuses. They had |
| 09:20:57 19 | a late-stage product that was for the treatment of lupus |
| 09:21:01 20 | that they were hoping to get launched as a |
| 09:21:04 21 | pharmaceutical. They also had a number of research |
| 09:21:08 22 | programs that were intended to develop new treatments, |
| 09:21:12 23 | primarily for infectious diseases. |
| 09:21:15 24 | Q. That's the follow-on to Chiron. |
| 09:21:18 25 | What about RiboGene, what did they -- |

Page 11

| | |
|---|---|
| 09:21:19 1 | A. RiboGene was very much of a startup. It was a |
| 09:21:24 2 | young company that was intended to develop new |
| 09:21:26 3 | antibiotics, primarily, and then also chemotherapeutics, |
| 09:21:31 4 | using a technology platform related to the protein |
| 09:21:36 5 | synthesis. |
| 09:21:37 6 | Q. And there you said you did research? |
| 09:21:40 7 | A. Initially, yes. I was a research scientist. |
| 09:21:43 8 | Q. You mentioned the post-doc that you did at the |
| 09:21:45 9 | National Institute of Health. |
| 09:21:47 10 | A. Uh-huh. |
| 09:21:47 11 | Q. What was the focus, if there was a specific |
| 09:21:50 12 | focus? |
| 09:21:52 13 | A. Yeast genetics, stringent response in yeast. |
| 09:21:56 14 | Q. Where was that at for NIH? |
| 09:21:59 15 | A. Child health? |
| 09:22:01 16 | Q. What is the location? |
| 09:22:03 17 | A. Bethesda, Maryland. |
| 09:22:07 18 | Q. In Bethesda? |
| 09:22:08 19 | A. Yeah, at the NIH. |
| 09:22:10 20 | Q. You mentioned that you graduated in yeast |
| 09:22:13 21 | genetics in a Ph.D. Where was your undergraduate, where |
| 09:22:16 22 | was your undergraduate school? |
| 09:22:18 23 | A. My undergraduate degree was at Northwestern |
| 09:22:25 24 | University in Evanston, Illinois. And my graduate |
| 09:22:30 25 | degree was at Carnegie Mellon in Pittsburgh, |

Page 12

| | |
|---|---|
| 09:22:33 1 | Pennsylvania. |
| 09:22:35 2 | As I recall, you're also from Northwestern. |
| 09:22:38 3 | Q. I was about to point out this, that we share |
| 09:22:41 4 | the Wildcat background. |
| 09:22:43 5 | What year did you graduate from Northwestern? |
| 09:22:45 6 | A. '77 -- sorry, '81. |
| 09:22:47 7 | Q. Oh, well, you were after me, then. |
| 09:22:52 8 | Did you grow up in Illinois, or did you grow |
| 09:22:55 9 | up in the Midwest? |
| 09:22:55 10 | A. St. Louis. |
| 09:22:59 11 | Q. Moving forward, then, in time to the |
| 09:23:01 12 | Applied Biosystems. So if you left Chiron, you went to |
| 09:23:05 13 | Applied -- and I can never get all the names right. So |
| 09:23:09 14 | it was Applied Biosystems, Applera, they were known by a |
| 09:23:14 15 | variety of names. Did your employer change during that |
| 09:23:16 16 | time, or was there a specific one of that group that was |
| 09:23:20 17 | your employer from 2004 until the merger with |
| 09:23:24 18 | Invitrogen? |
| 09:23:25 19 | A. So I just -- to clarify, start at the company |
| 09:23:30 20 | in 2005, early 2005. The structure of Applera was |
| 09:23:38 21 | always complex. So that's why I hesitate a moment. |
| 09:23:43 22 | There was a holding company called Applera that was the |
| 09:23:46 23 | holding company for Applied Biosystems and Celera, the |
| 09:23:49 24 | two main operating groups. I was hired by the Applied |
| 09:23:54 25 | Biosystems Group, and that's where my employment was |

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

**Page 13**

| | | |
|---|---|---|
| 09:23:57 | 1 | until the merger with Invitrogen, and never with Applera |
| 09:24:02 | 2 | per se and never with Celera, the other entity. |
| 09:24:08 | 3 | Q. I was aware of the problem with that |
| 09:24:13 | 4 | structure. |
| 09:24:15 | 5 | So Applied Biosystems, what was your role at |
| 09:24:19 | 6 | Applied Biosystems? How would you describe your job and |
| 09:24:22 | 7 | if it changed over time? |
| 09:24:24 | 8 | A. Sure. I was initially hired as director of |
| 09:24:28 | 9 | licensing, I believe, licensing, where I was hired to be |
| 09:24:32 | 10 | part of the licensing department. There was an |
| 09:24:36 | 11 | intention that I would roll out a new licensing program |
| 09:24:40 | 12 | with regard to Roche IP, Promega being one of those |
| 09:24:46 | 13 | licensees. |
| 09:24:47 | 14 | Shortly after I joined Applied Biosystems, the |
| 09:24:50 | 15 | gentleman that hired me retired and I was fortunate |
| 09:24:52 | 16 | enough to get his role and I was running the licensing |
| 09:24:58 | 17 | department. That was the same role that I had pretty |
| 09:25:00 | 18 | much through the end -- through the merger. |
| 09:25:10 | 19 | Q. Yeah, up till then. |
| 09:25:10 | 20 | So when you talk about the Roche IP, it would |
| 09:25:13 | 21 | be the PCR portfolio. |
| 09:25:15 | 22 | A. The PCR portfolio. |
| 09:25:17 | 23 | Q. Did Applied Biosystems have other portfolios |
| 09:25:19 | 24 | that other people would package from a patent |
| 09:25:22 | 25 | perspective or a licensing perspective? |

**Page 14**

| | | |
|---|---|---|
| 09:25:26 | 1 | A. Applied Biosystems had other patent portfolio |
| 09:25:28 | 2 | that was licensed. For the most part, it was in my |
| 09:25:32 | 3 | department. |
| 09:25:32 | 4 | Q. That's what I was after. You were overseeing |
| 09:25:35 | 5 | a variety of different licensing -- |
| 09:25:39 | 6 | A. Correct. Mostly, though, it was PCR related |
| 09:25:41 | 7 | that we spent most of our time on licensing, either |
| 09:25:49 | 8 | instrument, chemistry, or methods. |
| 09:26:00 | 9 | Q. With the merger with Invitrogen, then what |
| 09:26:06 | 10 | became your role after -- at that point, you said it |
| 09:26:09 | 11 | didn't change until then, but did it change after that? |
| 09:26:12 | 12 | A. It did somewhat. The new corporation was a |
| 09:26:18 | 13 | mixture of the two. It was a significant merger in that |
| 09:26:22 | 14 | Applied Biosystems was about twice the size of |
| 09:26:25 | 15 | Invitrogen at the time. And so there was -- with the |
| 09:26:30 | 16 | merger, there was a divisional structure. I believe it |
| 09:26:33 | 17 | was created. I don't know how Invitrogen was structured |
| 09:26:36 | 18 | prior to the merger. And there was one division, |
| 09:26:39 | 19 | Molecular Biology Systems, MBS, that was formed that was |
| 09:26:45 | 20 | about half of the company. |
| 09:26:46 | 21 | And I was in charge of the out-licensing and |
| 09:26:51 | 22 | business development functions for that division. |
| 09:26:58 | 23 | Q. What would fall under molecular -- |
| 09:27:01 | 24 | A. Largely PCR, largely PCR. A couple of other |
| 09:27:06 | 25 | small technologies. PNA, a chemistry technology, for |

**Page 15**

| | | |
|---|---|---|
| 09:27:11 | 1 | instance, but related to PCR. |
| 09:27:15 | 2 | Q. The STR technology that's the subject of the |
| 09:27:18 | 3 | ongoing litigation, does that fall within the PCR |
| 09:27:22 | 4 | because the use of PCR in the process or -- |
| 09:27:25 | 5 | A. Generally, yes. I'm trying to remember where |
| 09:27:30 | 6 | that department was. Yeah, I mean, the technology and |
| 09:27:36 | 7 | the administration of that technology would have been in |
| 09:27:38 | 8 | that same division. |
| 09:27:41 | 9 | Q. Okay. |
| 09:27:41 | 10 | A. But the products would have been in a |
| 09:27:43 | 11 | different division at the time of the merger. |
| 09:27:46 | 12 | Q. Oh, and then what happened after the merger? |
| 09:27:49 | 13 | A. Sorry? |
| 09:27:50 | 14 | Q. You distinguished between the pre- and |
| 09:27:53 | 15 | post-merger, and I appreciate your distinguishing |
| 09:27:55 | 16 | between them. |
| 09:27:57 | 17 | I'm trying to figure out where you have -- you |
| 09:27:58 | 18 | have the licensing or sublicensing or process of STR, |
| 09:28:05 | 19 | the products that come from it, did any of that fall |
| 09:28:08 | 20 | within your bailiwick within the company? |
| 09:28:14 | 21 | MS. JOHNSON: Post-merger. |
| 09:28:16 | 22 | MR. TROUPIS: Post-merger, thank you. |
| 09:28:18 | 23 | THE WITNESS: Post-merger, the legacy license |
| 09:28:21 | 24 | that I had managed, I would continue to manage, but |
| 09:28:25 | 25 | maybe new support typically would be handled by other |

**Page 16**

| | | |
|---|---|---|
| 09:28:29 | 1 | people. If any had arisen, and I don't know that any |
| 09:28:43 | 2 | actually arose during that time period. |
| 09:28:45 | 3 | MR. TROUPIS: Q. I'll come back to that in |
| 09:28:46 | 4 | just a second. Again, it's difficult from the outside |
| 09:28:50 | 5 | to know which falls in which area. So I apologize if my |
| 09:28:54 | 6 | questions are too basic. |
| 09:28:57 | 7 | How big was Invitrogen and how big was |
| 09:29:00 | 8 | Applied Biosystems at the time of the merger? |
| 09:29:02 | 9 | A. In terms of? |
| 09:29:03 | 10 | Q. Total sales. |
| 09:29:06 | 11 | A. I believe that Applied Biosystems was on the |
| 09:29:11 | 12 | order of $2.4 billion a year in sales, plus or minus. |
| 09:29:17 | 13 | And I believe Invitrogen was close to 1.2 billion. |
| 09:29:22 | 14 | Together about three and a half, 3.6 billion in sales, |
| 09:29:26 | 15 | somewhere in that range. |
| 09:29:28 | 16 | Q. Has it grown since that time? |
| 09:29:31 | 17 | A. I believe so, but I don't know the current |
| 09:29:32 | 18 | number. I know that we've been aspiring towards |
| 09:29:37 | 19 | 4 billion. I don't recall if we've made it to that |
| 09:29:40 | 20 | number. |
| 09:29:41 | 21 | Q. The original PCR license, and then there were |
| 09:29:45 | 22 | three licenses, and we'll get to those in just a little |
| 09:29:48 | 23 | bit, that Promega was involved in, those would be |
| 09:29:51 | 24 | considered legacy licenses and also PCR licenses, so |
| 09:29:55 | 25 | they would continue to fall within your area of the |

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 17

| | | |
|---|---|---|
| 09:29:58 | 1 | company? |
| 09:29:59 | 2 | MS. JOHNSON: Objection. Compound. |
| 09:30:00 | 3 | If you understand. |
| 09:30:02 | 4 | THE WITNESS: If we could maybe just separate |
| 09:30:04 | 5 | that out again. |
| 09:30:05 | 6 | MR. TROUPIS: Q. Sure, sure. |
| 09:30:06 | 7 | There's a PCR license. |
| 09:30:08 | 8 | A. Right. |
| 09:30:10 | 9 | Q. And then there's -- there's a second -- then |
| 09:30:14 | 10 | there is the cross-license involving the various |
| 09:30:18 | 11 | technologies. Do they fall in separate areas? |
| 09:30:21 | 12 | A. Sure. So the PCR license would -- at the time |
| 09:30:24 | 13 | of the merger, would have fallen into my department very |
| 09:30:27 | 14 | clearly. There wouldn't have been any confusion on |
| 09:30:31 | 15 | that. The cross-license -- and this is slightly |
| 09:30:34 | 16 | different than what I said a moment ago. This is a |
| 09:30:37 | 17 | clarification, if you will. |
| 09:30:38 | 18 | Q. Sure. |
| 09:30:39 | 19 | A. The cross-license would have been owned and |
| 09:30:41 | 20 | would have been operated by the department -- the part |
| 09:30:44 | 21 | of the business selling products, STR products. |
| 09:30:49 | 22 | Typically the division I was in -- I don't |
| 09:30:52 | 23 | know if they had any STR products, but certainly not any |
| 09:30:55 | 24 | major ones if any had fallen under that. |
| 09:30:58 | 25 | And in the same way -- I'm sorry, at the same |

Page 18

| | | |
|---|---|---|
| 09:31:00 | 1 | time, if questions had arisen, more than likely someone |
| 09:31:05 | 2 | would have come and consulted with me, because I had |
| 09:31:08 | 3 | been involved with the original license discussion. But |
| 09:31:11 | 4 | the license itself resided with the business that sold |
| 09:31:15 | 5 | the STR products. |
| 09:31:17 | 6 | Q. Is that both pre- and post-merger? So |
| 09:31:25 | 7 | cross-license existed in 2006 and then you have a merger |
| 09:31:27 | 8 | in 2008. |
| 09:31:31 | 9 | A. Right. Sorry, it's just that it's not a |
| 09:31:38 | 10 | simple answer. |
| 09:31:39 | 11 | Q. Please explain it as best you can. |
| 09:31:42 | 12 | A. Sure. Pre-merger my function was more or less |
| 09:31:44 | 13 | what you might consider corporate. My department was |
| 09:31:49 | 14 | within the legal department and then in the corporate |
| 09:31:51 | 15 | business development department, corporate functions. I |
| 09:31:55 | 16 | was not in a division or in a business. I was in the |
| 09:31:58 | 17 | corporate structure. |
| 09:31:59 | 18 | And so all of these licenses fell under my |
| 09:32:03 | 19 | department. All of the out-licenses fell under my |
| 09:32:08 | 20 | department. People that reported to me collected the |
| 09:32:10 | 21 | royalties, sent out the letters if the royalties didn't |
| 09:32:13 | 22 | come in. Other people reported to me, did the license |
| 09:32:16 | 23 | negotiations or I did them myself. |
| 09:32:20 | 24 | After the merger, I was in a business |
| 09:32:24 | 25 | division, not in corporate, immediately after the |

Page 19

| | | |
|---|---|---|
| 09:32:26 | 1 | merger. As such, the licenses that were relevant to the |
| 09:32:31 | 2 | business that I was associated with, Molecular Biology |
| 09:32:35 | 3 | Systems, were under my group's management. Licenses |
| 09:32:40 | 4 | that applied to the other divisions, I believe this |
| 09:32:44 | 5 | division would have been called applied markets, were |
| 09:32:47 | 6 | managed by those divisions. |
| 09:32:55 | 7 | The revenue from the licenses that I managed |
| 09:32:58 | 8 | would go to my division. The revenue or expense from |
| 09:33:02 | 9 | the licenses that the other divisions would manage would |
| 09:33:05 | 10 | go to their divisions. |
| 09:33:06 | 11 | Q. Their applied markets division? |
| 09:33:08 | 12 | A. Applied markets. |
| 09:33:09 | 13 | Q. Give me an example of an applied market. |
| 09:33:13 | 14 | A. HID is an applied market. Environmental |
| 09:33:16 | 15 | testing is an applied marketing. Food testing is an |
| 09:33:19 | 16 | applied market. The distinction is applied over basic |
| 09:33:25 | 17 | research, typically. |
| 09:33:29 | 18 | Q. So the 2006 cross-license, the revenue -- if |
| 09:33:35 | 19 | there was a check received for that from Promega, where |
| 09:33:41 | 20 | would it go? |
| 09:33:43 | 21 | MS. JOHNSON: Pre-merger and post-merger? |
| 09:33:46 | 22 | MR. TROUPIS: Q. I think I'm trying to |
| 09:33:48 | 23 | understand post-merger at this point. |
| 09:33:50 | 24 | A. Oh, post-merger. |
| 09:33:51 | 25 | Q. Yeah, let's stick with post-merger. |

Page 20

| | | |
|---|---|---|
| 09:33:54 | 1 | A. Post-merger, if a check would come from |
| 09:33:57 | 2 | Promega for the cross-license, is that what -- |
| 09:34:00 | 3 | Q. Yes. |
| 09:34:01 | 4 | A. That would have gone to the applied markets |
| 09:34:03 | 5 | division. Yeah, division was the structure they called |
| 09:34:06 | 6 | it. |
| 09:34:11 | 7 | Q. And within the applied markets division, do |
| 09:34:14 | 8 | you know where it would have landed, HID or? |
| 09:34:18 | 9 | A. I don't know that any checks actually arrived, |
| 09:34:20 | 10 | so it's a little harder. |
| 09:34:22 | 11 | Q. It's a hypothetical. |
| 09:34:24 | 12 | Let's step over to the PCR and ask the same |
| 09:34:27 | 13 | question. Where would that check, where would that go? |
| 09:34:34 | 14 | A. So -- |
| 09:34:36 | 15 | Q. Now, post-merger, so there's check written on |
| 09:34:39 | 16 | the PCR license, where would that go? |
| 09:34:43 | 17 | A. That would go to the MBS division, which is |
| 09:34:45 | 18 | where I reported. |
| 09:34:53 | 19 | Q. Now, who would write -- let's reverse the |
| 09:34:55 | 20 | equation of the 2006 license. Who would write the check |
| 09:35:00 | 21 | for use of that license? So now it's an in-license to |
| 09:35:06 | 22 | the company, where would that expense be, where would |
| 09:35:12 | 23 | that be expensed? |
| 09:35:15 | 24 | A. I apologize, but you asked multiple questions |
| 09:35:17 | 25 | that were not the same. |

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 21

```
09:35:18  1    Q.  I didn't mean to.
09:35:21  2        On the 2006 license, there would be a check
09:35:26  3    written.  On the cross-license, on that license, if
09:35:29  4    there was a check written, who would write that check?
09:35:35  5    A.  The in-licensing department or finance, I
09:35:38  6    believe, would write the check.
09:35:41  7    Q.  And which division would it be then applied
09:35:43  8    to?
09:35:43  9    A.  The charge would on a product-by-product
09:35:46 10    basis.  So each product that incurs a royalty we track
09:35:52 11    to the product.  And so the department that gets the
09:35:55 12    credit for the sale, gets the cost for the royalty.
09:36:04 13    Q.  Now, let's ask about the other license that
09:36:08 14    came into the company with the merger, which is the
09:36:11 15    license that IP Holdings had, that originated with
09:36:15 16    Research Genetics and Promega.
09:36:19 17    A.  Could you explain.
09:36:20 18    Q.  Sure.
09:36:20 19        In 1996 there was a license between Research
09:36:23 20    Genetics and Promega that was held by Invitrogen and
09:36:29 21    then was transferred to IP Holdings at some point.  With
09:36:35 22    the merger, that license came into this merged
09:36:41 23    Life Technologies.
09:36:42 24        How was that license handled financially
09:36:46 25    within the company?  Who had responsibility for it?
```

Page 22

```
09:36:51  1        MS. JOHNSON:  Objection.  Lack of foundation.
09:36:56  2        THE WITNESS:  I'm thinking.  So with the
09:37:03  3    merger -- I'm just repeating to make sure I
09:37:06  4    understood -- with the merger, the license,
09:37:08  5    cross-license between ResGen, as I think of it, IP
09:37:14  6    Holdings, whoever they were, and Promega.  I'm a little
09:37:20  7    reluctant to answer because I'm not certain.  I'd rather
09:37:24  8    not speculate.
09:37:30  9        MR. TROUPIS:  Q.  How are -- who decided what
09:37:36 10    would happen to licenses post-merger that came from
09:37:42 11    Invitrogen?
09:37:48 12    A.  I probably don't fully understand the answer
09:37:51 13    to that question.  I understand the question, I believe.
09:37:54 14        If you'll recall, in the merger
09:37:57 15    Applied Biosystems was acquired by Invitrogen, and so I
09:38:04 16    believe the answer to your question was determined
09:38:07 17    pre-merger to some extent, and I would not know exactly
09:38:10 18    the process.
09:38:34 19    Q.  Let me focus on the corporate structure during
09:38:37 20    the time period -- when you joined Applied Biosystems
09:38:42 21    until the merger itself.  You mentioned that you were
09:38:45 22    the director of a licensing department; is that right?
09:38:53 23    I think I said that right.
09:38:54 24    A.  Yes.  Just to clarify, at one point I was
09:38:56 25    promoted to senior director, just to be complete.
```

Page 23

```
09:39:00  1    Q.  Thank you for being complete.
09:39:03  2        And who was the supervisor that you took his
09:39:06  3    place, her place?
09:39:08  4    A.  Robert DiFranco, Bob DiFranco.
09:39:12  5    Q.  When about did that occur?
09:39:14  6    A.  I believe it was June of 2005.
09:39:23  7    Q.  Who did you report to as senior director of
09:39:28  8    licensing?
09:39:31  9    A.  In my first two and a half years at
09:39:34 10    Applied Biosystems, I had seven different managers.
09:39:38 11    Q.  Well, that had to be a joy.
09:39:41 12        And that was your only direct reporting,
09:39:43 13    straight-line reporting?
09:39:46 14    A.  My straight line, I had seven.  You wish me to
09:39:51 15    go through each of them, or were you looking for a
09:39:55 16    specific one?
09:39:55 17    Q.  I didn't know you had seven until just now.
09:39:59 18    A.  I think it was seven.  I stopped counting.
09:40:03 19    Q.  Who was the last one?
09:40:06 20    A.  The last one?
09:40:07 21    Q.  The last person to whom you reported prior to
09:40:09 22    the merger.
09:40:11 23    A.  James --
09:40:11 24    Q.  Or acquisition, whatever you call it.
09:40:14 25    A.  James Meriwether.
```

Page 24

```
09:40:21  1    Q.  Why don't you go either forward or backward
09:40:24  2    and give me the names.  I may recognize them and it may
09:40:28  3    trigger --
09:40:29  4    A.  It's easier for me to think of it forward
09:40:31  5    rather than backward.
09:40:32  6    Q.  That's fine.
09:40:34  7    A.  I was originally hired by Bob DiFranco.  When
09:40:37  8    he retired, I reported to Paul Grossman.  When Paul
09:40:43  9    changed roles within the company, I then reported, I
09:40:49 10    think, for a while to Mark Stevenson.  And then to --
09:40:58 11    I'm probably -- Jeff Frazier, Paul Grossman again, and
09:41:03 12    then Jim Meriwether.  I think there was somebody in
09:41:06 13    between, but I'm not thinking of them at the
09:41:09 14    moment.
09:41:14 15        So DiFranco, Grossman, Stevenson, Frazier,
09:41:18 16    Grossman, Meriwether.  That's six, and I'm thinking
09:41:21 17    there's a seventh that I'm not coming up with at the
09:41:21 18    moment.
09:41:21 19    Q.  So it's a bit like two marriages.  You married
09:41:26 20    Paul Grossman earlier, then he came back again.
09:41:29 21        MS. JOHNSON:  He's suggesting you're Elizabeth
09:41:31 22    Taylor.
09:41:33 23        MR. TROUPIS:  Q.  At the time of the entry
09:41:38 24    into the 2006 cross-license with Promega, I recall that
09:41:42 25    Paul Grossman was involved in those negotiations.  Was
09:41:45 26    that a time when you were directly reporting to them?
```

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 25

```
09:41:49  1    A. I think so, yes. And if not, he was involved
09:41:53  2  in the negotiations.
09:42:18  3    Q. Did Applied Biosystems produce any products
09:42:21  4  between -- in that time period, from 2006 until the
09:42:26  5  merger, that dealt with human identity, as it would
09:42:33  6  later be known, as the human identity group, did they
09:42:37  7  produce or sell any products into that segment of the
09:42:40  8  marketplace?
09:42:42  9    A. To my knowledge, yes.
09:42:43  10   Q. And what were they, if you know?
09:42:46  11   A. I could throw out a name or two, but for the
09:42:50  12  HID field, you said --
09:42:53  13   Q. Yes.
09:42:54  14   A. -- for human identification.
09:42:54  15     I was not well familiar with them, but an
09:42:59  16  example would be Profiler Identifiler.
09:43:02  17   Q. Those were products within Applied Biosystems
09:43:04  18  during that time. I want to flip it over.
09:43:10  19     Then when the merger took place -- I keep
09:43:14  20  calling it a "merger," and forgive me if it's something
09:43:21  21  else -- but those products then were moved into this
09:43:21  22  human identity group that you mentioned, HID group?
09:43:25  23   A. I don't know if they call themselves HID. It
09:43:28  24  was applied markets division.
09:43:30  25   Q. Applied markets division. Then you described
```

Page 26

```
09:43:32  1  one of them as the HID?
09:43:34  2    A. Informally I -- informally HID. I don't know
09:43:37  3  their formal title.
09:43:38  4    Q. And I'm not holding you to the formal title.
09:43:41  5  I was trying to find the kinds of products that would
09:43:45  6  have now become a part of that applied markets group
09:43:51  7  within the new company. That was -- the purpose of my
09:43:54  8  question, you mentioned a product, Profiler, similar to
09:43:57  9  those, that's what would have happened, those products
09:44:02  10  went there, went to these various divisions?
09:44:06  11     MS. JOHNSON: Objection. Vague and ambiguous.
09:44:08  12     MR. TROUPIS: Q. Not trying to be vague or
09:44:09  13  ambiguous. I really am just trying to understand where
09:44:13  14  the products land.
09:44:14  15    A. If you could just restate the question.
09:44:16  16   Q. Sure.
09:44:16  17     We have a group of human identity products or
09:44:19  18  forensic products or whatever you want to call them,
09:44:22  19  like Profiler. We've been talking about the licensing.
09:44:26  20  Now I'm talking about the products themselves. And I
09:44:29  21  was asking, did the products move into these new applied
09:44:35  22  markets groups within the new company?
09:44:39  23    A. With the caveat I'm not an expert, but to my
09:44:42  24  knowledge, those products would have gone to the applied
09:44:45  25  markets division.
```

Page 27

```
09:44:47  1    Q. And do you know anything about the process by
09:44:49  2  which it was decided how or which department they would
09:44:53  3  go to?
09:44:54  4    A. No, I don't think I have any insight into that
09:44:57  5  process.
09:45:13  6    Q. Within Applied Biosystems, who would have had
09:45:16  7  responsibility for those products? What structural part
09:45:18  8  of the company was responsible for the production and
09:45:20  9  sale of those products? Those products being these
09:45:26  10  human identity products we've just mentioned.
09:45:31  11   A. So making sure I understand the question,
09:45:34  12  under Applied Biosystems prior to the merger, two
09:45:38  13  products that I can think of the names of would have
09:45:42  14  been produced and sold under the direction of the -- we
09:45:51  15  had an applied markets group as well that we -- that
09:45:56  16  encompassed a similar scope as the applied markets
09:46:01  17  post-merger.
09:46:01  18   Q. So the products were in these applied markets
09:46:05  19  and the licensing was a separate and distinct area of
09:46:11  20  Applied Biosystems?
09:46:12  21   A. Prior to the merger and Applied Biosystems,
09:46:16  22  the licensing tended to be more of a corporate function.
09:46:20  23  And so in that sense, it was distinct from the business
09:46:26  24  of manufacturing and selling and so forth.
09:46:31  25   Q. If someone needed a license for a product that
```

Page 28

```
09:46:34  1  they were producing at Applied Biosystems, how would
09:46:38  2  they go about obtaining that license within the
09:46:42  3  corporate structure? By that I mean, did they have to
09:46:45  4  go to corporate, or were these negotiated within the
09:46:49  5  separate product areas or supplied market areas?
09:46:55  6    A. I believe there was no set mechanism for that.
09:47:04  7    Q. So there were times when it would come from
09:47:08  8  corporate and times that it would come through the
09:47:12  9  applied market's groups; is that true?
09:47:14  10   A. If the applied markets group needed --
09:47:16  11  believed that they needed an in-license, it might -- and
09:47:23  12  this is a little bit of a speculation, because I can't
09:47:26  13  think of an example specifically, but it might have come
09:47:32  14  from them or other staff, such as myself, might have
09:47:38  15  been involved. And as you know, in the cross-license
09:47:41  16  between Promega and Applied Biosystems, I was involved.
09:47:48  17   Q. And I didn't mean to be obtuse. I was simply
09:47:52  18  trying to understand how the process worked with
09:47:56  19  products for which a license is required and patents
09:48:00  20  that may have been in your own portfolio for which you
09:48:03  21  were licensing out.
09:48:07  22     Maybe it would be easier if I asked it a
09:48:11  23  little different.
09:48:12  24     Define for us what you mean by in-licensing
09:48:14  25  and out-licensing.
```

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 29

09:48:18 1   A. By "in-licensing" I mean the acquisition of a
09:48:22 2   license for the use by the company I work for. By
09:48:26 3   "out-licensing" I mean a license granted under patent
09:48:32 4   rights owned or controlled by my company for the benefit
09:48:35 5   of a different company.
09:49:10 6   Q. Again, staying with the corporate structure,
09:49:11 7   at the time, were you involved -- at the time of the
09:49:15 8   merger, were you involved in the due diligence process
09:49:20 9   as between the companies predating the actual merger?
09:49:28 10   Do you know what I mean by "due diligence"?
09:49:30 11   A. I believe I have a good approximation. I was
09:49:33 12   just checking mentally whether you could possibly be
09:49:37 13   referring to any other merger.
09:49:39 14   Q. I was only referring to the
09:49:42 15   Invitrogen-Applied Biosystems merger.
09:49:44 16   A. I did not have any role in any form of due
09:49:47 17   diligence, witting form, at any rate. People may have
09:49:54 18   asked me questions where I contributed, but I was not
09:49:57 19   part of the process.
09:49:58 20   Q. Who was overseeing that process, if you
09:49:59 21   recall?
09:50:01 22   A. I wasn't part of that process. I was unaware
09:50:05 23   of that process.
09:50:07 24   Q. When did you first learn of the merger taking
09:50:11 25   place?

Page 30

09:50:14 1   A. When it was publicly announced. I think that
09:50:18 2   was in June of 2008.
09:50:28 3   Q. What was your role, then, once it had been
09:50:31 4   announced?
09:50:32 5   A. I was senior director of licensing.
09:50:35 6   Q. And as senior director of licensing, did you
09:50:37 7   interact with people at Invitrogen prior to the formal
09:50:42 8   merger taking place?
09:50:47 9   A. I had engaged in an out-license to Invitrogen
09:50:50 10   in 2005, an occasional conversation about that license,
09:50:55 11   other matters of that type related to in-licensing and
09:50:59 12   out-licensing between the companies.
09:51:04 13   Q. Once the -- there's a time, then, that
09:51:07 14   takes place after the announcement but before the actual
09:51:14 15   merger takes place in a normal acquisition process that
09:51:18 16   would presumably involve a review of the licensing
09:51:23 17   agreements for which you were proceeding.
09:51:25 18   Was there such a process?
09:51:28 19   A. I don't know the answer to that. I agree with
09:51:33 20   you the sensibility of the statement, but I was not
09:51:37 21   involved in any way.
09:51:38 22   Q. Was there any -- prior to the merger, was
09:51:40 23   there any valuation of licenses, to your knowledge? Any
09:51:46 24   value attributed or valuation of them?
09:51:52 25   A. I'm hesitating, because to some extent your

Page 31

09:51:55 1   question is ambiguous. If I could --
09:51:59 2   Q. Please rephrase it or tell me why it's
09:52:02 3   ambiguous.
09:52:03 4   A. There had to have been such a valuation.
09:52:04 5   People don't --
09:52:07 6   Q. A fair statement.
09:52:08 7   A. But I had no knowledge or participation of
09:52:11 8   what went on to make those valuations.
09:52:17 9   Q. Is there a document that you've ever seen or
09:52:19 10   know of that does attribute those values to licenses?
09:52:26 11   A. Again, like my last answer, that document must
09:52:32 12   exist, but I do not have -- have not seen it, I don't
09:52:37 13   know anything personally about it.
09:52:39 14   Q. Great, that's fine.
09:52:56 15   (Whereupon, Exhibit 1 was marked for
09:52:56 16   identification.)
09:53:24 17   MR. TROUPIS: Q. I'm showing you what has
09:53:26 18   been marked Exhibit 1. And this is a -- I will
09:53:31 19   represent that this came off the website for
09:53:37 20   Life Technologies and is a press release related to 2009
09:53:41 21   results. I'm not asking you to go through
09:53:46 22   this in any way other than to ask the question on how
09:53:53 23   the company, that is, Life Technologies, reports its
09:53:58 24   income, expenses, and profitability.
09:54:05 25   Our understanding, and this press release

Page 32

09:54:09 1   suggests this, is that once the company is merged,
09:54:15 2   everything is reported, all income, all expenses, are
09:54:18 3   consolidated at Life Technologies. And that's the
09:54:24 4   reason for the exhibit, and that's my question.
09:54:27 5   Are, to your knowledge, all income and
09:54:30 6   expenses reported on a consolidated basis by
09:54:34 7   Life Technologies from the various divisions and other
09:54:36 8   corporate entities?
09:54:41 9   A. I don't believe I'm qualified to answer that
09:54:43 10   question.
09:54:45 11   Q. Who would be qualified to answer that
09:54:47 12   question?
09:54:47 13   A. That sounds like something I would address to
09:54:50 14   the accounting department.
09:55:05 15   Q. Do you have any role in the preparation of
09:55:08 16   financial statements for Life Technologies?
09:55:10 17   A. No, not in the preparation. Obviously, I
09:55:13 18   contribute whatever I contribute, but I don't have any
09:55:15 19   formal role.
09:55:40 20   Q. Let me ask about some people in the company
09:55:44 21   and what their roles are. You've mentioned what your
09:55:47 22   role is. What is the present role or position of Mark
09:55:47 23   Stevenson?
09:55:50 24   A. Mark is the chief operating officer of the
09:55:53 25   company.

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 33

| | | |
|---|---|---|
| 09:56:04 | 1 | Q. In your own words, how would you define his |
| 09:56:08 | 2 | role as chief operating officer? |
| 09:56:18 | 3 | A. As chief operating officer, he's a senior |
| 09:56:21 | 4 | member of the executive team. He's one of the people |
| 09:56:24 | 5 | that -- you know, the handful of people that would be |
| 09:56:26 | 6 | running the company. |
| 09:56:29 | 7 | Q. Relative to Mr. Lucere, what would his role |
| 09:56:33 | 8 | be? |
| 09:56:36 | 9 | A. I would have to say that you embarrass me by |
| 09:56:38 | 10 | that question. I'm not always clear on that |
| 09:56:41 | 11 | distinction. |
| 09:56:41 | 12 | Q. I asked it because the outside world may not |
| 09:56:44 | 13 | either. |
| 09:56:45 | 14 | A. It does not directly impact my role in the |
| 09:56:48 | 15 | company, what those distinctions are, and so I don't |
| 09:56:54 | 16 | always pay a lot of attention. |
| 09:57:00 | 17 | Q. Who do you report to now? You have direct |
| 09:57:04 | 18 | line -- |
| 09:57:04 | 19 | A. I directly report to Nicholas Ecos, Nick Ecos, |
| 09:57:10 | 20 | E-C-O-S. I think it's Nicholas. I just know him as |
| 09:57:19 | 21 | Nick, I should say. |
| 09:57:23 | 22 | Q. Do you have non-direct line reporting |
| 09:57:25 | 23 | responsibility to others? |
| 09:57:26 | 24 | A. Yes. |
| 09:57:27 | 25 | Q. And who would those? |

Page 34

| | | |
|---|---|---|
| 09:57:29 | 1 | A. Paul Grossman. |
| 09:57:32 | 2 | Q. No matter how hard you try, you can't get away |
| 09:57:35 | 3 | from Paul. What's Paul's role? |
| 09:57:38 | 4 | A. Paul is the -- I guess the VP or senior VP of |
| 09:57:43 | 5 | business development, corporate development. |
| 09:57:48 | 6 | Q. And can you describe what that role entails. |
| 09:57:50 | 7 | And, again, understanding from your point of view. |
| 09:57:54 | 8 | A. Sure. Hopefully, I understand that a little |
| 09:57:57 | 9 | better. |
| 09:57:58 | 10 | Paul is again one of the handful of people |
| 09:58:01 | 11 | that run the company, the senior executive team. His |
| 09:58:04 | 12 | role this year is to be responsible for out-licensing, |
| 09:58:08 | 13 | in-licensing, mergers, major deals with other companies, |
| 09:58:15 | 14 | and shared responsibility for perhaps legal settlements |
| 09:58:19 | 15 | if they've impacted business decisions. |
| 09:58:26 | 16 | Q. And he presumably reports to either Mark |
| 09:58:30 | 17 | Stevenson and Greg Lucere or both of them? |
| 09:58:35 | 18 | A. It's my understanding that he reports to Greg, |
| 09:58:38 | 19 | Greg Lucere. |
| 09:58:39 | 20 | Q. What is Nick's role? What is his title? |
| 09:58:43 | 21 | A. I don't know. |
| 09:58:45 | 22 | Q. What does he do? |
| 09:58:48 | 23 | A. I think Nick's role is to be the head of a |
| 09:58:51 | 24 | department we call licensing and OEM, often abbreviated |
| 09:58:55 | 25 | with the acronym of LOEM. |

Page 35

| | | |
|---|---|---|
| 09:59:02 | 1 | Q. I apologize. Say that again. He's the |
| 09:59:05 | 2 | director of licensing? |
| 09:59:06 | 3 | A. Licensing and OEM -- capital O, capital E, |
| 09:59:12 | 4 | capital M -- business development, I guess. |
| 09:59:14 | 5 | OEM is "original equipment manufacturer." |
| 09:59:18 | 6 | Q. Right, that's what I was trying to figure |
| 09:59:21 | 7 | out -- I apologize. I was trying to think through what |
| 09:59:27 | 8 | would OEM products be or licensing for |
| 09:59:33 | 9 | Life Technologies, again some examples. |
| 09:59:37 | 10 | A. Sure. An example might if a given company is |
| 09:59:42 | 11 | selling an integrated PCR solution but they're not |
| 09:59:47 | 12 | manufacturing their own instrument but they wish to have |
| 09:59:51 | 13 | one branded under their brand, we have an occasional |
| 09:59:54 | 14 | deal like that where we'll manufacture for that |
| 09:59:57 | 15 | individual. |
| 09:59:57 | 16 | Similarly, we have a lot of patented |
| 10:00:00 | 17 | technologies that we also -- we will enter into a |
| 10:00:05 | 18 | license and supply agreement. And while some industries |
| 10:00:09 | 19 | might not call that strictly OEM, for the purposes of |
| 10:00:13 | 20 | ourselves, we refer to that as OEM. |
| 10:00:15 | 21 | Q. And that's the reason I asked. It was because |
| 10:00:18 | 22 | it covers of variety of things here. |
| 10:00:21 | 23 | A. Yes. It's a term that has different meanings. |
| 10:00:25 | 24 | Q. I appreciate that. |
| 10:00:28 | 25 | Lenny Clavin, what's his position and role |

Page 36

| | | |
|---|---|---|
| 10:00:32 | 1 | today in the company? |
| 10:00:37 | 2 | A. I don't know his precise title, but I think of |
| 10:00:40 | 3 | him as being the senior person -- senior person |
| 10:00:43 | 4 | particularly responsible for human identification and |
| 10:00:47 | 5 | STR-type products. |
| 10:01:01 | 6 | Q. Do you know who Dave Oehler is, O-E-H-L-E-R? |
| 10:01:07 | 7 | A. The name sounds almost familiar, but I don't |
| 10:01:08 | 8 | know who he is. |
| 10:01:33 | 9 | Q. Elan, I could never pronounce his last name, |
| 10:01:38 | 10 | but you know who I'm referring to, Elan Foistvagn? |
| 10:01:45 | 11 | A. Foistvagn. |
| 10:01:46 | 12 | Q. Does he still work with you, or where is he |
| 10:01:50 | 13 | these days? |
| 10:01:50 | 14 | A. He's still at Life Technologies. He's still |
| 10:01:53 | 15 | an attorney. He's in the legal department. I don't |
| 10:01:56 | 16 | know the precise point you're asking. |
| 10:01:59 | 17 | Q. I was just trying to find him again. He was |
| 10:02:03 | 18 | involved originally in the negotiation of the 2006 |
| 10:02:05 | 19 | agreement. |
| 10:02:05 | 20 | A. Yes, he was. And he still works for the same |
| 10:02:08 | 21 | company. |
| 10:02:08 | 22 | Q. And he works in the legal department? |
| 10:02:11 | 23 | A. Yes. |
| 10:02:17 | 24 | Q. What is your interaction with the legal |
| 10:02:20 | 25 | department? Are you considered within legal now, or do |

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

### Page 37

10:02:23 1 you have -- are they just a branch to which you would
10:02:27 2 seek services?
10:02:29 3 A. More the latter. I'm not in the legal
10:02:32 4 department. In negotiating deals, I work closely with
10:02:37 5 the legal department and lawyers.
10:02:40 6 Q. My assumption was that.
10:02:58 7 Do you recognize a company called Invitrogen
10:03:04 8 IP Holdings, that's the name of that company?
10:03:07 9 A. I've heard the term.
10:03:08 10 Q. And what do you know about them?
10:03:10 11 A. All that I really know is it's one of the
10:03:13 12 corporate entities in Life Technologies today. Or I
10:03:17 13 believe it is, I should say. I've heard the term in
10:03:19 14 that context. I don't have any specific knowledge of
10:03:22 15 it.
10:03:32 16 Q. Life Technologies has a fair number of foreign
10:03:34 17 companies revealed in its securities statements. Do you
10:03:44 18 work with those companies in licensing, that is, foreign
10:03:48 19 subsidiaries or foreign-affiliated companies of
10:03:52 20 Life Technologies?
10:03:57 21 A. I'm not sure if I understand how to answer
10:03:59 22 that question.
10:04:02 23 Q. Let me say it a little different.
10:04:05 24 You're involved with licensing. Is that
10:04:10 25 licensing strictly onshore licensing, North American,

### Page 38

10:04:14 1 U.S., or does it include foreign subsidiaries of
10:04:17 2 Life Technologies?
10:04:24 3 A. I'm still a little perplexed by the question.
10:04:28 4 I'm not trying to be difficult. On the one hand, you're
10:04:32 5 asking is it onshore or offshore?
10:04:35 6 Q. I'm trying to understand. Normally in
10:04:37 7 licensing, because there would be different aspects of
10:04:39 8 it overseas as opposed to domestic, they might be
10:04:42 9 handled quite differently and by different people. So
10:04:47 10 in terms of those licenses as they apply to foreign
10:04:51 11 patent portfolios or foreign products, does that flow
10:04:55 12 through you?
10:05:00 13 A. Again, I'm not trying to be difficult. I'm
10:05:02 14 not sure exactly how to answer that. You're asking
10:05:10 15 about products, patents, and licenses?
10:05:13 16 Q. Let's say there was an out-license. We'll
10:05:16 17 break it back to the three component parts, an
10:05:19 18 out-license. If I wanted to out -- if a German company
10:05:25 19 came to you seeking a license, who would they talk to?
10:05:30 20 A. They would most likely end up with the
10:05:33 21 out-licensing department.
10:05:34 22 Q. Here in the United States?
10:05:36 23 A. Here in the United States.
10:05:41 24 Q. What about an in-license, where there was a
10:05:44 25 need within the company for a patent, let's say a German

### Page 39

10:05:48 1 patent, where would that come? Would that come again
10:05:51 2 through your department, or would it go through a
10:05:53 3 foreign subsidiary?
10:05:56 4 A. And just to clarify, you mean today?
10:05:58 5 Q. Today, yes.
10:06:01 6 A. We have what we call an in-licensing
10:06:03 7 department.
10:06:04 8 Q. And who heads that?
10:06:05 9 A. Traci Libby.
10:06:08 10 Q. And how long has that existed, in-licensing?
10:06:14 11 A. Pre-merger.
10:06:16 12 Q. Specific time period or just some type of
10:06:19 13 merger, if you remember?
10:06:21 14 A. It's an Invitrogen structure. I don't know
10:06:25 15 how long they've done it.
10:06:28 16 Q. So Traci came over from the Invitrogen side?
10:06:32 17 A. Yes.
10:06:34 18 Q. Were there in-licenses to Applied Biosystems
10:06:40 19 that have since become her responsibility at
10:06:43 20 post-merger?
10:06:44 21 A. Yes.
10:06:45 22 Q. Any of the -- what about product? And I said
10:06:53 23 there were three parts: Out-licensing, in-licensing,
10:06:58 24 and products. If someone wanted to license a particular
10:07:04 25 product that they were selling in a foreign country,

### Page 40

10:07:08 1 would that follow the same process? It would be
10:07:13 2 considered part of an out-license or part of an
10:07:17 3 in-license?
10:07:18 4 A. I don't understand what you mean by "license a
10:07:20 5 product."
10:07:21 6 Q. Oftentimes someone will have a specific
10:07:24 7 product that they believe may or may not require a
10:07:28 8 license. Where would their point of entry be into this
10:07:31 9 company? Through the licensing group?
10:07:35 10 A. So licensing a patent for a product?
10:07:37 11 Q. Yes.
10:07:38 12 A. If someone wishes -- and I've lost track of
10:07:42 13 which company you're referring to, but if someone within
10:07:45 14 my company is interested in getting a license for a
10:07:48 15 product that my company sells, they would do that in
10:07:52 16 consultation with attorneys, of course, and then Traci
10:07:55 17 Libby's group would be responsible for getting the
10:07:59 18 in-license, typically. There's always exceptions.
10:08:03 19 Q. And if it was a product -- if someone was
10:08:05 20 producing a product on the outside for which they needed
10:08:09 21 a license, that would come through your department as an
10:08:12 22 out-license?
10:08:14 23 A. Nick's department.
10:08:16 24 Q. Nick's department, to whom you answer?
10:08:21 25 A. Yes.

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 41

| | |
|---|---|
| 10:08:32 | 1 Q. If there is a determination by someone in the |
| 10:08:39 | 2 company that a product is being sold that violates one |
| 10:08:43 | 3 of your patents, a patent owned by Life Technologies, |
| 10:08:49 | 4 where would that go? Would it come to you? Would it go |
| 10:08:56 | 5 directly to legal? |
| 10:09:00 | 6 A. It's hard to answer that as a hypothetical. |
| 10:09:02 | 7 Multiple patents are possible. |
| 10:09:05 | 8 Q. And I expect that there were multiple patents. |
| 10:09:11 | 9 There's no specific way in which a patent |
| 10:09:19 | 10 violation is addressed, there's no specific protocol? |
| 10:09:25 | 11 Is that a fair statement? |
| 10:09:29 | 12 A. An allegation of another company's product |
| 10:09:32 | 13 violating one of our patents? |
| 10:09:33 | 14 Q. Yes. |
| 10:09:34 | 15 A. I'm not aware of a specific protocol. |
| 10:10:10 | 16 Q. In the 2006 -- I have to do pre-merger and |
| 10:10:13 | 17 post-merger, so I apologize, and if sometimes I'm not |
| 10:10:17 | 18 clear, please -- normally I'm talking about the present, |
| 10:10:20 | 19 but in this instance, I want to talk about the period |
| 10:10:24 | 20 from 2006 until the merger took place. |
| 10:10:27 | 21 Once a license was entered into by you, |
| 10:10:32 | 22 generally, how were the terms then communicated to |
| 10:10:38 | 23 others within the company? |
| 10:10:40 | 24 And I can give you more specific. We're all |
| 10:10:45 | 25 well aware of the role you described a minute ago in the |

Page 42

| | |
|---|---|
| 10:10:48 | 1 PCR, that there were a lot of negotiations with a lot of |
| 10:10:52 | 2 different companies during that time period. Once you |
| 10:10:55 | 3 had reached an agreement, what happened next within this |
| 10:10:59 | 4 company, within Applied Biosystems? |
| 10:11:01 | 5 A. So an out-license -- |
| 10:11:05 | 6 Q. An out-license has been entered into, and I've |
| 10:11:08 | 7 used PCR as example. |
| 10:11:11 | 8 A. So I'm reflecting back five years ago. |
| 10:11:15 | 9 The agreement would be executed, signed, and |
| 10:11:18 | 10 be entered into the legal database. And there was a |
| 10:11:23 | 11 group who would get the license, enter it, enter in key |
| 10:11:29 | 12 terms. A copy would be given to the accounting |
| 10:11:34 | 13 department, also, so that they were aware of it. I |
| 10:11:38 | 14 don't know if there was an SOP that was absolutely |
| 10:11:43 | 15 followed, but that was the general procedure. |
| 10:11:46 | 16 Q. What's an SOP? |
| 10:11:48 | 17 A. Sorry, standard operating -- a document that |
| 10:11:49 | 18 says step one, step two, step three. I don't recall |
| 10:11:54 | 19 there being a formal process, but there was a process |
| 10:11:58 | 20 that was followed. |
| 10:11:59 | 21 Q. Now, would that have been the same if it was |
| 10:12:02 | 22 not a PCR license but a license to other patent |
| 10:12:07 | 23 portfolios? |
| 10:12:08 | 24 MS. JOHNSON: Same period of time? |
| 10:12:09 | 25 MR. TROUPIS: Same period of time, yes. |

Page 43

| | |
|---|---|
| 10:12:12 | 1 THE WITNESS: Yes. I believe so. I'm trying |
| 10:12:16 | 2 to think of examples, but I can think of perhaps one |
| 10:12:19 | 3 example. And it would go through the same people. It |
| 10:12:22 | 4 would be entered into the legal database. Accounting |
| 10:12:25 | 5 would be made aware of it. |
| 10:12:27 | 6 There was a group that was called royalty |
| 10:12:29 | 7 accounting, or something similar to that, when the |
| 10:12:32 | 8 quarterly reports or semi-annual, whatever, came in, |
| 10:12:35 | 9 they would receive reports, check it against the |
| 10:12:38 | 10 license, to a greater or lesser extent, depending upon |
| 10:12:41 | 11 their skill, and deposit the money then into the |
| 10:12:44 | 12 accounting department. |
| 10:12:47 | 13 MR. TROUPIS: Q. Now, same time period for |
| 10:12:50 | 14 in-licensing, so would it be essentially the same |
| 10:12:53 | 15 procedure or something different? |
| 10:12:59 | 16 A. I'm thinking of in-licenses, I mean the |
| 10:13:02 | 17 cross-license with Promega would be -- |
| 10:13:05 | 18 Q. That's exactly right. |
| 10:13:11 | 19 A. -- in a similar way would be entered into the |
| 10:13:14 | 20 legal database. There would be typically a summary made |
| 10:13:18 | 21 of it. I don't know if every time that was done. And |
| 10:13:22 | 22 then the process would be a little bit different, |
| 10:13:24 | 23 because it would need to be tied to our product sales |
| 10:13:29 | 24 where we would need to be processing data every quarter |
| 10:13:36 | 25 and paying appropriately. |

Page 44

| | |
|---|---|
| 10:13:38 | 1 Q. Can you describe that process, if there was a |
| 10:13:40 | 2 standard process. |
| 10:13:46 | 3 A. At that time period, there was a database kept |
| 10:13:50 | 4 of products and royalty obligations, and then at the end |
| 10:13:54 | 5 of each quarter, that database would be tested against |
| 10:13:57 | 6 the quarterly sales and the royalty report would be |
| 10:14:00 | 7 generated. And that's about the level of my |
| 10:14:04 | 8 understanding. |
| 10:14:05 | 9 Q. That's -- let's fast-forward to the |
| 10:14:09 | 10 post-merger time period. Would an out-license be |
| 10:14:11 | 11 similarly handled, as you just described, or have there |
| 10:14:19 | 12 been changes? |
| 10:14:26 | 13 A. There have been lots of changes in everything |
| 10:14:29 | 14 since the merger. So trying to think of the last time I |
| 10:14:36 | 15 wrote an out-license. There is -- the Traci Libby that |
| 10:14:42 | 16 I referred to, her group would manage -- would receive |
| 10:14:45 | 17 the new out-license and process it through the system. |
| 10:14:50 | 18 I don't know precisely. There were some of |
| 10:14:52 | 19 the same people involved, some of the same processes, |
| 10:14:56 | 20 but I don't know their procedure so well, because I'm |
| 10:14:59 | 21 not as directly involved with it. |
| 10:15:01 | 22 Q. How are the terms of those licenses |
| 10:15:04 | 23 communicated? Is there a process by which the terms are |
| 10:15:07 | 24 communicated to somebody other than Traci? |
| 10:15:14 | 25 A. I don't know for sure. I'm not aware of a |

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 45

10:15:17 1  specific process at this time.

10:15:19 2      Q.  Okay.  What about in-licensing as to

10:15:23 3  out-licensing?  Same thing with regard to in-licensing,

10:15:25 4  so now there has been an in-licensing of some patent or

10:15:31 5  the like?

10:15:32 6      A.  I'm not knowledgeable of what we do with

10:15:36 7  in-licenses today.

10:15:45 8      Q.  Who would know?

10:15:46 9      A.  I think Traci Libby would be knowledgeable.

10:16:07 10      Q.  Maybe I asked this before, but I don't recall

10:16:10 11  the answer.  Who negotiates the out-licenses today?  You

10:16:17 12  mentioned that you aren't directly involved in the

10:16:21 13  negotiation of many of those.  Who is involved in the

10:16:24 14  negotiation of out-licenses?

10:16:26 15      A.  There are a number of people involved in the

10:16:28 16  negotiation of out-licenses.

10:16:31 17      Q.  Who would be the primary people?

10:16:35 18      A.  A list of the people, you know, primary is

10:16:43 19  kind of hard to answer, but Susan Cole is one person.

10:16:47 20  Rolando Brawer is another.  Paula Stonemetz is another.

10:16:55 21  Joshua Shinoff.  Padna, whose last name I can't spell,

10:17:04 22  Kolicu- or something, begins with a K.

10:17:09 23      Q.  Kind of like --

10:17:12 24      A.  Yeah.  Maya Tanaka.  There's probably 10

10:17:16 25  others.

Page 46

10:17:16 1      Q.  So it's a fairly large group.  I would view

10:17:19 2  that as fairly large.

10:17:20 3      A.  It's a fairly large group across the company,

10:17:24 4  and that's -- that goes beyond just PCR.  That's

10:17:27 5  company-wide.

10:17:28 6      Q.  That's why I asked it, and it wasn't intended

10:17:32 7  to be broad.  I was just trying to understand corporate

10:17:35 8  process, as it were.

10:17:37 9      So when there's an out-license, do those

10:17:41 10  people answer to you?  You mentioned your position.  Do

10:17:44 11  those people report to you?

10:17:45 12      A.  No.

10:17:46 13      Q.  Who do they report to?

10:17:50 14      A.  Either directly or indirectly to Nick Ecos.

10:17:53 15      Q.  Do you have any direct reports?

10:17:55 16      A.  No.

10:18:06 17      Q.  And for in-licensing, the same group of people

10:18:10 18  or is there a completely separate group?

10:18:12 19      A.  There's a completely separate group.

10:18:14 20      Q.  And they answer to Traci Libby?

10:18:17 21      A.  Yes.

10:18:44 22      Q.  Is there any sort of audit process for

10:18:50 23  licenses, compliance with licenses, that's any different

10:18:52 24  than the normal auditing process of the company, the

10:18:56 25  normal CPA auditing?

Page 47

10:19:00 1      A.  I don't understand.

10:19:02 2      Q.  Within a company with as many licenses as you

10:19:05 3  have, it is possible that you would have somebody or

10:19:13 4  some group that would from time to time check the

10:19:16 5  licenses for compliance, either on the outside or on the

10:19:21 6  inside?  So that was what my question was about, someone

10:19:26 7  like a bank.

10:19:29 8      A.  Could you restate your question.

10:19:31 9      Q.  Sure.  In a banking context, there's someone

10:19:36 10  internally responsible for daily, often daily, certainly

10:19:41 11  regular, auditing of the ongoing operations of the bank.

10:19:47 12      Is there a similar function or person here at

10:19:51 13  Life Technologies auditing license compliance?

10:19:57 14      A.  Excuse me.  We have a department called the

10:20:06 15  internal audit department.  I do not know if -- I'm

10:20:12 16  going to sneeze -- I don't know if they perform the same

10:20:14 17  function as you describe in a bank.  I'm not familiar

10:20:24 18  with any group who systematically audits internal

10:20:24 19  function on licenses.

10:20:35 20      My understanding of audit, just to clarify, is

10:20:38 21  this:  Whether they work for the same company or not,

10:20:41 22  they're external.  Obviously, many people check their

10:20:45 23  own work, but I would not call that an audit.

10:20:48 24      Q.  No, nor would I.  I was looking for that

10:20:52 25  independent review process.

Page 48

10:20:54 1      And, as far as you know, there's no such audit

10:20:57 2  process that goes on with regard to the licensings?

10:21:00 3      A.  Not to my knowledge.

10:21:08 4      MR. TROUPIS:  This is a good time to take a

10:21:10 5  break.

10:21:11 6      THE VIDEOGRAPHER:  Going off the record.  The

10:21:12 7  time is 10:21 a.m.

10:21:15 8      (Recess taken.)

10:51:35 9      THE VIDEOGRAPHER:  We're back on the record.

10:51:35 10  The time is 10:51 a.m.

10:51:42 11      MR. TROUPIS:  Q.  Dr. Moehle, just -- I had a

10:51:44 12  couple follow-up questions from before, before we move

10:51:49 13  on to a new topic.

10:51:51 14      At the end of the last session, I asked you

10:51:53 15  about the various audit procedures and you described

10:51:59 16  what you described.

10:52:01 17      Would your answers have been any different for

10:52:04 18  the process pre-merger?

10:52:10 19      A.  I'm thinking.  Not remembering every word that

10:52:22 20  I said, essentially they would have been a similar type

10:52:26 21  of process.

10:52:27 22      Q.  Thank you.

10:52:34 23      And I'm reminded among -- again, we've been

10:52:37 24  trying to identify people.  Who is in charge of the

10:52:41 25  applied markets division today?  If there is a person,

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

```
10:52:46  1    single person.
10:52:51  2         A.  Early -- my answer is a little bit different
10:52:53  3    than your question, because I'm not sure -- the answer
10:52:55  4    is I'm not sure, because early this year, we changed our
10:52:59  5    divisional structure considerably and so I don't have
10:53:02  6    the same appreciation for it.
10:53:05  7         Q.  Okay.  How did it change?  You had described
10:53:13  8    the applied markets division as having environmental
10:53:20  9    market, HID market, things like that.  How is it
10:53:24 10    different?  How did it change?
10:53:27 11         A.  I know less how it changed in that division,
10:53:31 12    because I was not in there, but the division structure
10:53:34 13    that we had immediately after the merger changed.
10:53:39 14         For instance, a year ago I was in the MBS
10:53:43 15    division, and I don't believe that there's currently an
10:53:46 16    MBS division.  I think they call them platforms.  My
10:53:51 17    function also moved to corporate.  So my involvement
10:53:54 18    with the business was different, because I was in the
10:53:58 19    corporate function now.
10:54:01 20         Q.  And I'll come back to that, because I thought
10:54:04 21    I understood the transition, but maybe I didn't.  I want
10:54:07 22    to come back to that.  Let me stay with the applied
10:54:10 23    markets.
10:54:10 24         Who would have responsibility for STR products
10:54:14 25    today?  What division or what group?  And I mean the
```

```
10:54:22  1    ones that you sell, the company sells.
10:54:26  2         A.  I would say, I'm not a hundred percent
10:54:29  3    certain, they may still call themselves applied markets.
10:54:33  4         Q.  And you mentioned that the structure changed
10:54:35  5    from a year ago to today.  How would that change
10:54:40  6    relative to products and how they're grouped?
10:54:46  7         A.  There were multiple changes to how products
10:54:50  8    were grouped.  And, again, with regard to the applied
10:54:52  9    markets, I don't know as well how -- whether there
10:54:55 10    was -- there could have been no change, for my
10:54:59 11    knowledge, but I don't know.
10:55:01 12         Q.  Then -- and with regard to your position from
10:55:04 13    2008 to now -- and again, if I'm treading the same
10:55:08 14    ground, I apologize -- it is a difficult corporate
10:55:13 15    structure to understand.  You were with MBS, that
10:55:17 16    division, at the time -- immediately following the
10:55:20 17    merger; is that right?
10:55:20 18         A.  Correct.
10:55:21 19         Q.  And then at some point, you -- the company
10:55:24 20    reorganized and you became a part of the corporate
10:55:28 21    group; is that right?
10:55:30 22         A.  Correct.
10:55:33 23         Q.  And how are the corporate group and the MBS
10:55:40 24    different?  What's the difference between them?
10:55:43 25         A.  The corporate group is -- started to say is a
```

```
10:55:48  1    corporate -- is sort of a function that serves multiple
10:55:53  2    businesses.  And the MBS group was a division of the
10:55:56  3    company that was like a business, it was almost a mini
10:56:00  4    company.
10:56:02  5         Q.  Oh, okay.  So it was a particular group of
10:56:06  6    products or services, MBS was?
10:56:10  7         A.  MBS was, Molecular Biology Systems.
10:56:21  8         Q.  So what would fall within the Molecular
10:56:25  9    Biology Systems?
10:56:27 10         A.  Largely PCR.
10:56:28 11         Q.  Oh, okay.
10:56:33 12         A.  A few other things.  Some of the legacy
10:56:36 13    Invitrogen catalog business would have been in Molecular
10:56:41 14    Biology Systems.
10:56:47 15         Q.  So now the function -- how would you describe
10:56:51 16    your job now?
10:56:55 17         A.  My job now is I'm in charge of strategic
10:57:00 18    settlements for the company.
10:57:03 19         Q.  What do you mean by "strategic settlements"?
10:57:05 20         A.  That's a phrase within the company, but I am
10:57:08 21    engaged in settling problems with other companies:
10:57:13 22    litigation, threatened litigation, arbitration, the
10:57:19 23    problems have not worked themselves out.
10:57:21 24         Q.  It wouldn't -- it's not product-specific.
10:57:24 25    It's when these problems arise somewhere in the company,
```

```
10:57:27  1    you're called in to see if you can reach a resolution
10:57:32  2    somehow?
10:57:33  3         A.  Yes.
10:57:37  4         Q.  But you retain the title, director of
10:57:43  5    licensing?  What's your title, your official title?
10:57:49  6         Let me look at your card, I apologize.  That's
10:57:53  7    terrible, and I do apologize.
10:57:54  8         Vice president of business development and
10:57:58  9    licensing now.  That is the -- that's your official
10:58:02 10    title?
10:58:04 11         A.  Everything is complicated.  That's not my
10:58:08 12    official title.  Within the company, we have internal
10:58:12 13    titles and some of those don't make sense in an external
10:58:17 14    face.  So on an external face, I'm VP of business
10:58:23 15    development and licensing.
10:58:24 16         Q.  I would agree with that last statement, it's
10:58:27 17    difficult sometimes to get through it.  So I do
10:58:30 18    apologize.  If I asked the question multiple times, it
10:58:32 19    is because I don't understand it.
10:58:40 20         That would explain more why you would report,
10:58:43 21    then, to Paul Grossman as well as to Nick Ecos, that you
10:58:48 22    have multiple hats, is that a fair statement, among
10:58:52 23    these groups?
10:58:55 24         A.  I'm parsing.  I wouldn't say necessarily
10:59:00 25    multiple hats, but my function is somewhat more
```

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

### Page 53

10:59:03  1    applicable to Nick and/or Paul, depending on the
10:59:07  2    particular project.
10:59:09  3        Q.  Much better said, much better said.
10:59:42  4        And when did you take on this role of
10:59:44  5    overseeing strategic settlements?
10:59:45  6        A.  About a year ago.
10:59:46  7        Q.  And prior to that time, describe your role
10:59:50  8    post-merger up to that time.
10:59:52  9        A.  I was the -- I was in charge of out-licensing
10:59:57 10   and OEM, as well as some other business development
11:00:01 11   activities for the MBS division.
11:00:17 12        Q.  And you are the right person.  If you'd look
11:00:18 13   and see to the left there, Exhibit 2, which I have
11:00:22 14   marked for identification, if you would look at that.
11:00:26 15        (Whereupon, Exhibit 2 was marked for
11:00:26 16        identification.)
11:00:27 17        MR. TROUPIS:  Q.  I'll explain what that is.
11:00:27 18   That's an opinion and order from --
11:00:29 19        MS. JOHNSON:  Counsel, do you have a copy of
11:00:31 20   that?
11:00:32 21        MR. TROUPIS:  Oh, didn't I give --
11:00:33 22        MS. JOHNSON:  Thank you.
11:00:35 23        MR. TROUPIS:  Q.  It's an opinion and order
11:00:37 24   from the Western District of Wisconsin, dated
11:00:40 25   November 29, 2011, from Judge Barbara Crabb.

### Page 54

11:00:45  1        Have you seen this document before?
11:00:50  2        A.  I've seen it as an email attachment, but I've
11:00:53  3    not seen it as a document.
11:00:55  4        Q.  Okay.  And in this order there was a grant of
11:01:08  5    infringement on page 31 and 32, a summary judgment to
11:01:15  6    Promega.  Has that, to your knowledge, been communicated
11:01:20  7    to any of the business units of the company?
11:01:24  8        MS. JOHNSON:  And I would just caution you not
11:01:26  9    to divulge any exchanges that you may have had with
11:01:30 10   counsel, either internal or external.
11:01:34 11        THE WITNESS:  Pretty much the extent of any
11:01:35 12   knowledge of this document is through discussions with
11:01:37 13   my attorneys.
11:01:38 14        MR. TROUPIS:  Q.  Do you know if the matter of
11:01:43 15   infringement on -- that is described on page 32 has been
11:01:48 16   communicated to any of the business units or any of the
11:01:56 17   units of the company?
11:01:57 18        A.  I have no direct knowledge.
11:01:59 19        Q.  Do you have indirect knowledge?
11:02:00 20        A.  Any knowledge I have would be from discussions
11:02:02 21   with my attorneys.
11:02:07 22        Q.  Has any group been directed, to your
11:02:11 23   knowledge, to cease the sale of any products subsequent
11:02:16 24   to this order?
11:02:20 25        A.  I have no direct knowledge.

### Page 55

11:02:22  1        Q.  Do you have any indirect knowledge?
11:02:25  2        A.  Any knowledge I have is through discussions
11:02:27  3    with my attorneys.
11:02:30  4        Q.  Is there a process within Life Technologies
11:02:32  5    today to communicate rulings that may affect the sale
11:02:38  6    or -- of a product of this company?
11:02:43  7        MS. JOHNSON:  Court rulings or?
11:02:45  8        MR. TROUPIS:  Correct.
11:02:45  9        THE WITNESS:  Could you restate your question.
11:02:47 10        MR. TROUPIS:  Q.  Is there a process by which
11:02:49 11   court rulings that may affect the sale of a product are
11:02:54 12   communicated within Life Technologies?
11:02:56 13        A.  I'm not aware of a formal process.
11:03:04 14        Q.  To your knowledge, has anyone been directed
11:03:07 15   not to sell a product to a customer as a consequence of
11:03:13 16   the November 29 ruling of Judge Crabb noted on
11:03:16 17   Exhibit 2?
11:03:16 18        A.  I have no direct knowledge.
11:03:28 19        Q.  Do you have -- is that to say that it has
11:03:31 20   happened or has not happened, or you just don't know if
11:03:35 21   anything has happened?
11:03:39 22        A.  I have no knowledge of anything that has
11:03:42 23   happened.  I don't know.
11:03:49 24        Q.  Has there been any discussion about
11:03:51 25   transitioning customers to Promega subsequent to the

### Page 56

11:03:54  1    November 29 decision?
11:03:56  2        A.  I have no knowledge.
11:04:37  3        (Whereupon, Exhibit 3 was marked for
11:04:37  4        identification.)
11:04:55  5        MR. TROUPIS:  Q.  Before we go to Exhibit 3,
11:04:56  6    who in the company would have knowledge about whether or
11:05:00  7    not the -- Judge Crabb's decision of November 29 has
11:05:04  8    been communicated to any of the business units?
11:05:12  9        A.  Other than my attorneys, I don't know who
11:05:16 10   would know.
11:05:22 11        Q.  And you've seen no general communication to
11:05:25 12   the company about that decision, have you, other than
11:05:31 13   communications that may have come from counsel?
11:05:35 14        A.  Yes, correct.  I've seen no general broadcast
11:05:38 15   email that I'm aware of to this effect.
11:05:41 16        Q.  I've shown you what has been marked Exhibit 3
11:05:46 17   for identification.  This is a press release.  We
11:05:50 18   happened to get it off the Genome website.  It was
11:05:54 19   actually a press statement.
11:05:56 20        In part, this is a statement, and you may take
11:05:59 21   a moment and review it.  In fact, I would like you to
11:06:02 22   take a moment and review it.  I'm going to ask you a few
11:06:05 23   questions about the context of this and what is refers
11:06:10 24   to.
11:07:15 25        Dr. Moehle, have you had a chance to review

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 57

| | |
|---|---|
| 11:07:17 1 | the exhibit? |
| 11:07:17 2 | A. Yes. |
| 11:07:18 3 | Q. And the -- in this Exhibit 3, it reflects on |
| 11:07:25 4 | comments made by the Life Tech chairman and CEO, Greg |
| 11:07:29 5 | Lucere, said that the company had assembled a team of |
| 11:07:31 6 | the best licensing people from its Applied Biosystems |
| 11:07:37 7 | and Invitrogen businesses. And then it goes on to say |
| 11:07:38 8 | that the effort has been able to slow a dropoff of |
| 11:07:42 9 | royalty revenues. |
| 11:07:44 10 | Do you recall the context of Mr. Lucere's |
| 11:07:48 11 | comments in October of 2009 about the topic of this |
| 11:07:51 12 | article? |
| 11:07:56 13 | A. I'm not entirely clear of your question. |
| 11:08:00 14 | Q. This reflects that there was a team of |
| 11:08:04 15 | licensing people gathered together to, quote, slow a |
| 11:08:10 16 | dropoff of royalty revenue. |
| 11:08:13 17 | You were a part of that team? |
| 11:08:15 18 | A. As I understand that announcement, I was a |
| 11:08:19 19 | part of that team. |
| 11:08:20 20 | Q. When was that team assembled? |
| 11:08:27 21 | A. To my understanding, at the point of the |
| 11:08:31 22 | merger. But during the first year, there was an |
| 11:08:35 23 | evolution of, you know, the group's coming together, as |
| 11:08:39 24 | it were, people from different companies, people from |
| 11:08:42 25 | different parts of the company. And so there was an |

Page 58

| | |
|---|---|
| 11:08:45 1 | evolution of relationship. And so the six-month point |
| 11:08:49 2 | might have been a point that Mr. Lucere is referring to |
| 11:08:53 3 | as the start of a new group. |
| 11:08:55 4 | Q. Who was in this group that Mr. Lucere is |
| 11:08:58 5 | referring to? |
| 11:08:59 6 | A. Many of the same people that I mentioned |
| 11:09:01 7 | earlier in my answer to you this morning, people who do |
| 11:09:07 8 | out-licensing work. |
| 11:09:09 9 | Q. Do you mean the long list of 10 or -- |
| 11:09:13 10 | A. Longer than that. |
| 11:09:14 11 | Q. It was longer than 10, but you listed quite a |
| 11:09:17 12 | few. |
| 11:09:18 13 | A. Correct. |
| 11:09:19 14 | Q. Who headed this group? |
| 11:09:27 15 | A. It's -- sorry for a complicated answer. |
| 11:09:31 16 | There was one person named, Vicki Singer, as |
| 11:09:35 17 | the head of the group. But it was a little bit more of |
| 11:09:38 18 | a confederation. It was not a line reporting |
| 11:09:41 19 | relationship. The individual groups were in the |
| 11:09:46 20 | business units, and Dr. Singer was in the corporate |
| 11:09:51 21 | function. |
| 11:09:55 22 | Q. And did this group meet regularly as a group? |
| 11:10:00 23 | A. The senior members did, yes. |
| 11:10:03 24 | Q. Were you one of those senior members? |
| 11:10:05 25 | A. Yes. |

Page 59

| | |
|---|---|
| 11:10:05 1 | Q. Who were some of the other senior members? |
| 11:10:10 2 | A. Of the people mentioned earlier, Rolando |
| 11:10:13 3 | Brawer, Susan Cole, Paula Stonemetz, Todd Krueger. |
| 11:10:20 4 | Traci Libby would participate, although she wasn't |
| 11:10:27 5 | formally with that group. And there's probably one or |
| 11:10:33 6 | two others that maybe I'm overlooking. |
| 11:10:35 7 | Q. And I understand that, and I am trying to get |
| 11:10:38 8 | context, to begin with. |
| 11:10:40 9 | When this group met, did they have a formal |
| 11:10:44 10 | objective, stated objective? |
| 11:10:48 11 | A. Increase revenue, maintain and increase |
| 11:10:51 12 | revenue. |
| 11:10:52 13 | Q. What was the issue? Why was that an issue at |
| 11:10:56 14 | the time of the merger? |
| 11:11:01 15 | A. Revenue? |
| 11:11:02 16 | Q. Yes. Wasn't it growing enough? |
| 11:11:05 17 | A. I guess the answer is it's never growing |
| 11:11:08 18 | enough. |
| 11:11:14 19 | Q. Had there been a dropoff or expected dropoff |
| 11:11:18 20 | in expected licensing revenue? |
| 11:11:20 21 | A. Yes. |
| 11:11:21 22 | Q. And what was the cause of that? |
| 11:11:25 23 | A. Patent expiries. |
| 11:11:28 24 | Q. Which patents? Were there particular patents |
| 11:11:30 25 | that was happening to? |

Page 60

| | |
|---|---|
| 11:11:33 1 | A. Multiple. |
| 11:11:34 2 | Q. Was there one group of patents? |
| 11:11:38 3 | A. PCR was -- PCR-related patents were of |
| 11:11:41 4 | particular interest. There was a number of them coming |
| 11:11:45 5 | into expiry. |
| 11:12:01 6 | Q. Did that group continue its operations for a |
| 11:12:03 7 | while? For how long did it continue, is easier to say. |
| 11:12:12 8 | A. Is your question -- let's go down this path -- |
| 11:12:16 9 | MS. JOHNSON: Oh, yeah, I think we're probably |
| 11:12:18 10 | getting into an area -- I'm not sure how far you're |
| 11:12:20 11 | going to go down the path, but we may be getting into an |
| 11:12:23 12 | area where we need to excuse. |
| 11:12:25 13 | MR. TROUPIS: Oh, I don't mean to, so -- |
| 11:12:32 14 | THE WITNESS: My apologies. |
| 11:12:33 15 | MR. TROUPIS: No, I said that from the outset. |
| 11:12:41 16 | MS. JOHNSON: Thank you. |
| 11:12:41 17 | (Begin attorneys' eyes only portion.) |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

**Page 61**

| | |
|---|---|
| 11:12:59 | 1  MR. TROUPIS: What was the question? |
| 11:13:00 | 2  (Record read by the reporter.) |
| 11:13:01 | 3  THE WITNESS: Yes, it continued its |
| 11:13:04 | 4  operations. |
| 11:13:04 | 5  MR. TROUPIS: Q. For how long? |
| 11:13:05 | 6  A. In the form that it was until about a year |
| 11:13:09 | 7  ago, when we reorganized the company, and then under |
| 11:13:15 | 8  similar throughout the course of this year as well. |
| 11:13:19 | 9  Q. Oh, okay. So you said it was reorganized. Is |
| 11:13:24 | 10  it the same group of people, or is there a different |
| 11:13:26 | 11  group of people now? |
| 11:13:27 | 12  A. It's essentially the same group of people who |
| 11:13:30 | 13  report into Nick Ecos now. |
| 11:13:33 | 14  Q. So Nick now heads that license review process? |
| 11:13:38 | 15  A. Yes. |
| 11:14:08 | 16  Q. And the reason you saw me earlier hesitate is |
| 11:14:12 | 17  I don't want to intrude on the privilege question, but |
| 11:14:15 | 18  did this group result in filing of any litigation by the |
| 11:14:22 | 19  company, by Life Technologies, since its origination? |
| 11:14:29 | 20  Did it recommend the filing of litigation, and was the |
| 11:14:33 | 21  litigation subsequently filed? |
| 11:14:35 | 22  MS. JOHNSON: And I would just caution you not |
| 11:14:37 | 23  to divulge contents of any communications between this |
| 11:14:41 | 24  group and counsel. |
| 11:14:47 | 25  THE WITNESS: I'm having a little difficulty |

**Page 62**

| | |
|---|---|
| 11:14:50 | 1  parsing your question. If I understand your question |
| 11:15:00 | 2  correctly, this group does not generate recommendations |
| 11:15:04 | 3  to initiate legal filings. |
| 11:15:06 | 4  MR. TROUPIS: Q. Oh, okay. |
| 11:15:07 | 5  A. If I understand your question. |
| 11:15:08 | 6  Q. And, yeah, that's a very fair answer. |
| 11:15:12 | 7  How would that decision go forward? I'm not |
| 11:15:15 | 8  asking you -- but I'm asking you the process by which a |
| 11:15:19 | 9  decision is made to file litigation, how does that |
| 11:15:23 | 10  happen in the company? |
| 11:15:24 | 11  MS. JOHNSON: Just in general, any sort of |
| 11:15:27 | 12  litigation? |
| 11:15:28 | 13  MR. TROUPIS: No, in regards to licensings. |
| 11:15:30 | 14  THE WITNESS: It would a decision made |
| 11:15:32 | 15  ultimately by legal after consultation between |
| 11:15:36 | 16  licensing, perhaps, legal, and perhaps business unit |
| 11:15:40 | 17  stakeholders, if you will. |
| 11:15:42 | 18  MR. TROUPIS: Q. Oh, okay. |
| 11:15:43 | 19  Who is in charge of that within the legal |
| 11:15:46 | 20  department? Is there a single person in charge of |
| 11:15:48 | 21  litigation? |
| 11:15:52 | 22  MS. JOHNSON: Objection. Vague and ambiguous. |
| 11:15:53 | 23  The concern is just any specific type of litigation |
| 11:15:55 | 24  generally? |
| 11:15:56 | 25  MR. TROUPIS: Again, out-licensing type or |

**Page 63**

| | |
|---|---|
| 11:15:59 | 1  in-licensing litigation. |
| 11:16:08 | 2  THE WITNESS: I would say Allen Hammond is the |
| 11:16:11 | 3  person I would name as being maybe the focal point where |
| 11:16:21 | 4  this function integrates, decisions on making filings. |
| 11:16:29 | 5  That's my estimation. |
| 11:16:31 | 6  MR. TROUPIS: Q. And I'm only asking for |
| 11:16:33 | 7  that. |
| 11:16:43 | 8  At the time of the -- was there any -- strike |
| 11:16:48 | 9  that. |
| 11:16:49 | 10  Was there anything similar to the Exhibit 3 |
| 11:16:54 | 11  process in place prior to the merger within |
| 11:17:02 | 12  Applied Biosystems? |
| 11:17:09 | 13  A. In what way similar? |
| 11:17:11 | 14  Q. Again, a very fair question. |
| 11:17:13 | 15  There was a group formed here with the express |
| 11:17:17 | 16  purpose of reviewing, as I understand it, of reviewing |
| 11:17:20 | 17  licenses in order to slow the dropoff of revenues. |
| 11:17:25 | 18  And was there a similar group with that |
| 11:17:29 | 19  function prior to the merger? |
| 11:17:34 | 20  A. I'm having a little trouble with your |
| 11:17:39 | 21  characterization of this group. |
| 11:17:41 | 22  Q. You may characterize this group and then |
| 11:17:43 | 23  answer that it's the same. I'm just trying to... |
| 11:17:47 | 24  A. This group was charged with exploiting our |
| 11:17:53 | 25  intellectual property throughout licensing, perhaps |

**Page 64**

| | |
|---|---|
| 11:17:56 | 1  audits, they were charged with raising revenue. |
| 11:17:59 | 2  The characterization I had a little concern |
| 11:18:01 | 3  with was, they didn't do it by reviewing existing |
| 11:18:04 | 4  licenses. The goal was to generate new licenses, the |
| 11:18:09 | 5  biggest goal, if you will. And then going to |
| 11:18:12 | 6  pre-merger, the group that I headed would be nominally |
| 11:18:17 | 7  similar. I headed a group of people whose |
| 11:18:20 | 8  responsibility was to write out-licenses of the |
| 11:18:24 | 9  company's IP. And while not as formal as this one, it |
| 11:18:27 | 10  was an important part of AB's business to generate |
| 11:18:31 | 11  revenues from out-licenses. |
| 11:18:34 | 12  Q. In doing that, how did you determine that a |
| 11:18:37 | 13  license might be needed? Were -- information came from |
| 11:18:41 | 14  a variety of sources, or did people actually formally go |
| 11:18:45 | 15  out and look for people who might need licenses? |
| 11:18:48 | 16  A. At what time? |
| 11:18:50 | 17  Q. Pre-merger, and then the same question |
| 11:18:53 | 18  post-merger. |
| 11:18:54 | 19  A. Pre-merger, during the time that I managed the |
| 11:18:58 | 20  licensing group, the bulk of our efforts, the bandwidth |
| 11:19:03 | 21  that we had, were employed granting licenses to people |
| 11:19:08 | 22  who came to us and then occasionally in settlement |
| 11:19:11 | 23  litigation such as the Promega, where the two parties |
| 11:19:14 | 24  needed to do licenses as part of a different reason, a |
| 11:19:19 | 25  disagreement, if you will. Much less focus on going out |

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

|  |  |
|---|---|
| **Page 65** | **Page 67** |

**Page 65**

11:19:26 1 after people, because I did not have -- I was fully
11:19:28 2 engaged with the people who came to me.
11:19:31 3 Q. And then post-merger how was it different?
11:19:35 4 A. It was different in a lot of ways. One way in
11:19:38 5 which it was different was the integration of the two
11:19:41 6 corporate cultures. There was a very significant
11:19:44 7 contribution of the Invitrogen culture, if you will,
11:19:47 8 which I was not familiar with prior to the merger.
11:19:52 9 But out-licensing was treated much more like a
11:19:56 10 business of its own, with little more regular monitoring
11:20:03 11 of out-licensing revenue as an entity itself.
11:20:06 12 Pre-merger, the out-licensing revenues were more a
11:20:13 13 function of individual businesses.
11:20:30 14 Q. Well, PCR -- after the PCR process is a
11:20:38 15 full-time job. I understand that.
11:20:55 16 When there's a claim of infringement, somebody
11:20:58 17 has made a claim that a product, process of
11:21:03 18 Life Technologies has infringed a patent, does that come
11:21:07 19 to your department or does it go directly to legal or
11:21:11 20 something else?
11:21:14 21 A. Just to clarify, if a third party makes an
11:21:17 22 acquisition?
11:21:19 23 Q. Yes. Yes.
11:21:20 24 A. It comes wherever the third party directs it.
11:21:23 25 Q. There's no process by which it ends up

**Page 66**

11:21:27 1 automatically in your group, either pre- or post-merger?
11:21:34 2 A. There is no process where it automatically
11:21:37 3 comes in my group, pre- or post-merger.
11:21:42 4 Q. Now, let me make it to the absolute present.
11:21:45 5 Would that still be the case, given the role that you
11:21:48 6 described a minute ago about settlement and --
11:21:56 7 settlement issues, problems, your description of your
11:21:59 8 own role?
11:22:04 9 A. Restate your question.
11:22:05 10 Q. I apologize.
11:22:06 11 You described at the beginning -- a little bit
11:22:09 12 ago, you described your role in a certain way. And so
11:22:15 13 in that new role, do claims of infringement lodged
11:22:23 14 against Life Technologies automatically come to you?
11:22:26 15 A. No, they don't automatically come to me.
11:22:29 16 Q. Who makes that decision to assign the matter
11:22:33 17 to you?
11:22:35 18 A. I would say there's no formal process.
11:23:16 19 (Whereupon, Exhibit 4 was marked for
11:23:16 20 identification.)
11:23:16 21 MR. TROUPIS: I've marked a document Exhibit 4
11:23:20 22 for identification. It says "Out-licensing rollup
11:23:24 23 Patent Expiration," and then it has a title. And it
11:23:29 24 bears IVGN160921614.
11:23:33 25 Q. I'll represent to you that this was provided

**Page 67**

11:23:36 1 to us --
11:23:38 2 A. Sorry, IVGN?
11:23:40 3 Q. 001609 through --
11:23:45 4 A. Oh, now I understand you. I'm sorry.
11:23:47 5 Q. Just so the record reflects --
11:23:49 6 A. I thought you were reading more numbers off
11:23:51 7 the end that I couldn't see.
11:23:55 8 Q. It's just the range of numbers. This was
11:23:57 9 provided to us as part of the ongoing arbitration
11:24:00 10 process.
11:24:01 11 And it appears to be a document related to the
11:24:06 12 discussion we're just now having about Mr. Lucere's
11:24:12 13 comments concerning patent expirations, your group that
11:24:20 14 you created. You can take a moment and familiarize
11:24:23 15 yourself with this, and I'll just ask some follow-up
11:24:26 16 question.
11:24:27 17 A. All of the pages?
11:24:27 18 Q. Yes, if you would, if you would.
11:26:23 19 A. I'm going to apologize in advance. It looks
11:26:26 20 like we'll be talking about this for a couple of
11:26:30 21 minutes.
11:26:30 22 May I take a quick break and go to the
11:26:33 23 bathroom?
11:26:35 24 Q. Absolutely.
11:26:35 25 THE VIDEOGRAPHER: This marks the end of Video

**Page 68**

11:26:43 1 1 in the deposition of Charles M. Moehle. Going off the
11:26:48 2 record. The time is 11:26 a.m.
11:33:36 3 (Recess taken.)
11:34:35 4 THE VIDEOGRAPHER: We're back on the record.
11:34:36 5 Here marks the beginning of Video 2 in the deposition of
11:34:41 6 Charles M. Moehle. The time is 11:34 a.m.
11:34:47 7 MR. TROUPIS: Q. Dr. Moehle, before the break
11:34:49 8 we marked Exhibit 4. And let me ask you, do you
11:34:54 9 recognize this?
11:34:57 10 A. Yes.
11:34:57 11 Q. What is it?
11:35:00 12 A. It is a report from the out-licensing group.
11:35:06 13 I don't recall the precise date, although I could infer
11:35:09 14 it from here, but it is a report of the activities of
11:35:14 15 the out-licensing department.
11:35:22 16 Oh, I'm sorry. It was not an out-licensing
11:35:24 17 department.
11:35:25 18 Q. Yeah. It was an out-licensing group, an
11:35:27 19 out-licensing group.
11:35:28 20 When it says -- I'm going to ask you some of
11:35:31 21 these abbreviations, which may not automatically be
11:35:35 22 obvious to me. On the first page, page 1, 1609, it
11:35:41 23 shows 2009 MBS SR1 forecast. Can you tell me what that
11:35:46 24 means.
11:35:47 25 A. Sure. MBS is the molecular biology division,

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

## Page 69

| | |
|---|---|
| 11:35:52 | 1 |
| 11:35:55 | 2 |
| 11:35:59 | 3 |
| 11:36:03 | 4 |
| 11:36:09 | 5 |
| 11:36:12 | 6 |
| 11:36:15 | 7 |
| 11:36:17 | 8 |
| 11:36:22 | 9 |
| 11:36:23 | 10 |
| 11:36:26 | 11 |
| 11:36:31 | 12 |
| 11:36:36 | 13 |
| 11:36:36 | 14 |
| 11:36:37 | 15 |
| 11:36:39 | 16 |
| 11:36:43 | 17 |
| 11:36:46 | 18 |
| 11:36:50 | 19 |
| 11:36:52 | 20 |
| 11:36:52 | 21 |
| 11:36:54 | 22 |
| 11:36:59 | 23 |
| 11:37:03 | 24 |
| 11:37:04 | 25 |

Molecular Biology Systems division where I worked. And SR1 is part of a strategic review process that the company goes through every year. There's SR1 and SR2, where there's sort of a first cut in SR1 of what the future looks like and a more refined planning process in SR2 for the upcoming year.

Q. So there would -- and you mentioned it was for 2009. So there would be an SR1 and SR2 forecast for each year?

A. Yes, it was a two-part process.

Q. But when I see SR1 or SR2, you have to know the year in which it applies to know the year it applies to?

A. Yes.

Q. I'm not trying to be obtuse. You mentioned that SR1 and SR2 were processes each year.

A. Yes, processes each year.

Q. And we see on the left-hand side there, MBS, that's the division you just mentioned; is that right?

A. Yes.

Q. What is UDG?

A. UDG is uracil-DNA glycosalase.

Q. I presume that's a type of some product or patent group?

A. It specifically refers to a protein or a gene

## Page 70

| | |
|---|---|
| 11:37:07 | 1 |
| 11:37:13 | 2 |
| 11:37:17 | 3 |
| 11:37:19 | 4 |
| 11:37:24 | 5 |
| 11:37:27 | 6 |
| 11:37:32 | 7 |
| 11:37:34 | 8 |
| 11:37:39 | 9 |
| 11:37:41 | 10 |
| 11:37:44 | 11 |
| 11:37:47 | 12 |
| 11:37:47 | 13 |
| 11:37:50 | 14 |
| 11:37:51 | 15 |
| 11:37:57 | 16 |
| 11:38:01 | 17 |
| 11:38:03 | 18 |
| 11:38:07 | 19 |
| 11:38:27 | 20 |
| 11:38:30 | 21 |
| 11:38:34 | 22 |
| 11:38:37 | 23 |
| 11:38:38 | 24 |
| 11:38:42 | 25 |

from bacteria. And there was -- there is IP owned by Life Technologies on the use of that protein in the PCR process.

Q. And what's the CS stand for there?

A. Cell systems. At the time of this, that was one of the other divisions of the company.

Q. That is kind of why you can date this, I gather, that this division existed at that time?

A. I suppose so.

Q. I don't mean to put words in your mouth.

A. I'm not using that as part of the reason how I date this.

Q. What do you think is the likely date of this?

A. This document?

Q. Yes. Or time period, would be a better way to put it.

A. I believe -- just give me a moment to look just to refresh my memory, because a little bit of a blur.

Okay. My memory doesn't tell me exactly, but these were all pages that were together originally. As they were produced, they were produced together, correct?

Q. That's correct.

A. So this appears to me and is consistent with

## Page 71

| | |
|---|---|
| 11:38:47 | 1 |
| 11:38:51 | 2 |
| 11:38:57 | 3 |
| 11:39:01 | 4 |
| 11:39:06 | 5 |
| 11:39:11 | 6 |
| 11:39:15 | 7 |
| 11:39:17 | 8 |
| 11:39:18 | 9 |
| 11:39:22 | 10 |
| 11:39:26 | 11 |
| 11:39:35 | 12 |
| 11:39:37 | 13 |
| 11:39:39 | 14 |
| 11:39:43 | 15 |
| 11:39:48 | 16 |
| 11:39:53 | 17 |
| 11:39:55 | 18 |
| 11:39:55 | 19 |
| 11:39:58 | 20 |
| 11:40:02 | 21 |
| 11:40:11 | 22 |
| 11:40:13 | 23 |
| 11:40:17 | 24 |
| 11:40:23 | 25 |

my recollection that this was part of the planning towards the end of 2010 looking forward to 2011. And the reason why I say that is as you get to slide 5, five within the internal numbering, it's looking in a detailed way about what 2011 would.

Q. Okay.

A. We wouldn't have done that two years in advance.

Q. So when it says on the first page, "2009 MBS SR1 Forecast," that's reflecting back on the original forecast from 2009 in that SR1 process? Am I correct in interpreting it that way?

A. Would you ask your question again.

Q. Sure. When I looked at page 1609, and I'm referring to the Bates number, it shows "2009 MBS SR1 Forecast" and then underneath it, it has different numbers, a graph.

A. Uh-huh.

Q. And I'm just saying, based on what you just said, that that appears to be looking back as to a prediction that was made in 2009.

A. I believe that is accurate, and I'm slightly hesitant because there's a little ambiguity in the way that it's written. Typically, the way we would describe it, sometimes a 2009 SR1 forecast would have occurred in

## Page 72

| | |
|---|---|
| 11:40:30 | 1 |
| 11:40:37 | 2 |
| 11:40:40 | 3 |
| 11:40:42 | 4 |
| 11:40:44 | 5 |
| 11:40:53 | 6 |
| 11:40:55 | 7 |
| 11:40:57 | 8 |
| 11:41:00 | 9 |
| 11:41:06 | 10 |
| 11:41:11 | 11 |
| 11:41:29 | 12 |
| 11:41:33 | 13 |
| 11:41:40 | 14 |
| 11:41:48 | 15 |
| 11:41:50 | 16 |
| 11:41:52 | 17 |
| 11:41:52 | 18 |
| 11:41:54 | 19 |
| 11:41:59 | 20 |
| 11:42:05 | 21 |
| 11:42:10 | 22 |
| 11:42:11 | 23 |
| 11:42:13 | 24 |
| 11:42:15 | 25 |

2008, because it would be -- and there was no 2009 SR1 process from my side, because the merger --

Q. Didn't exist, yeah.

A. So I believe this was just from a graph from the 2009 SR1 process for 2010, even though it's a little bit ambiguous the way that it's named.

Q. That makes sense.

And when it shows to the left there, I assume that's approximately 48M or 48 million and approximately 17M or million, is that the anticipated loss of revenue from those two sources? Is that how to interpret that?

A. I'm not -- in refreshing my memory and doing the math, but 50, 60, I believe not, only from the math, that 48 plus 17 is close to 72.

Q. No, that would 65.

A. Right, I said "close." There were other parts to the --

Q. Oh, I see what you're looking at. I'm actually looking at the title, "Patent Expiration Will cause 65M Profit Loss by 2015." So then I'm interpreting the 48 and the 17 as the cumulative effect by 2015.

A. I think that's actually a fair characterization. I was not looking at the title. I was looking at the graph.

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

### Page 73

| | |
|---|---|
| 11:42:17 | 1 |
| 11:42:19 | 2 |
| 11:42:21 | 3 |
| 11:42:23 | 4 |
| 11:42:28 | 5 |
| 11:42:30 | 6 |
| 11:42:36 | 7 |
| 11:42:39 | 8 |
| 11:42:48 | 9 |
| 11:42:55 | 10 |
| 11:42:57 | 11 |
| 11:43:02 | 12 |
| 11:43:06 | 13 |
| 11:43:09 | 14 |
| 11:43:14 | 15 |
| 11:43:18 | 16 |
| 11:43:21 | 17 |
| 11:43:27 | 18 |
| 11:43:33 | 19 |
| 11:43:36 | 20 |
| 11:43:39 | 21 |
| 11:43:56 | 22 |
| 11:44:00 | 23 |
| 11:44:07 | 24 |
| 11:44:10 | 25 |

Q. The graph that I had pointed you to before. So that's what I'm looking at.

A. Yes. And the graph does not go to 2015. That's why I was doing the math off the graph.

Q. That's because you're a scientist and I'm a lawyer.

Let's try to interpret that graph. What do those numbers do you think reflect, 72, 68, 46, and 25? If you know, if you can reasonably speculate.

A. I have a reasonable belief that I know what they are. And just to clarify a prior answer, 48 plus 17 wouldn't make sense for another reason. It's my recollection that this is probably a graph of the MBS royalty revenue forecast, not the entire company but the MBS division, in part because there was a little more structure in that division and in 2009 we were forecasting 72 million in revenue for licensing and O -- I think it was licensing and OEM, but the OEM component was relatively small, and then over the next couple of years, we were expecting patent expiries to result in a lowering of the royalty revenue.

Q. It looks like it's pretty close to 48 million, the decrease from 72 to 25.7. So what you've just said makes perfect sense, that that's the MBS division that's being shown in the graph.

### Page 74

| | |
|---|---|
| 11:44:11 | 1 |
| 11:44:14 | 2 |
| 11:44:21 | 3 |
| 11:44:26 | 4 |
| 11:44:31 | 5 |
| 11:44:36 | 6 |
| 11:44:39 | 7 |
| 11:44:40 | 8 |
| 11:44:44 | 9 |
| 11:44:49 | 10 |
| 11:44:53 | 11 |
| 11:44:54 | 12 |
| 11:45:05 | 13 |
| 11:45:10 | 14 |
| 11:45:21 | 15 |
| 11:45:24 | 16 |
| 11:45:28 | 17 |
| 11:45:33 | 18 |
| 11:45:37 | 19 |
| 11:45:40 | 20 |
| 11:45:45 | 21 |
| 11:45:49 | 22 |
| 11:45:52 | 23 |
| 11:45:56 | 24 |
| 11:45:57 | 25 |

A. Uh-huh, the math would be consistent.

Q. Let's go to the next page, which is 1610. What does it mean "Formed GOLC"? What is GOLC?

A. That was the -- the -- the out-licensing group, the acronym stands for "Global Out-Licensing Committee." It wasn't a department, it was more of a committee.

Q. And when it says "Global," this would be revenues from around the world, then? You weren't restricted simply to U.S. patents?

A. Correct. Around the company, around the world.

Q. On the right side, it says "New Cell Line Licensing Program." What is that, if you remember?

A. I partially remember, and if my recollection serves me, it would have been part of the CS group on the prior page.

Q. And when it says underneath that, "New CE Licensing," what does the CE refer to?

A. CE is capillary electrophoresis in our usage.

Q. Again, for clarification, it says "New CRO Projects." What is CRO?

A. CRO is an acronym for contract research organization.

Q. Oh, okay. So thus Covance and Charles River,

### Page 75

| | |
|---|---|
| 11:46:03 | 1 |
| 11:46:10 | 2 |
| 11:46:14 | 3 |
| 11:46:16 | 4 |
| 11:46:17 | 5 |
| 11:46:19 | 6 |
| 11:46:22 | 7 |
| 11:46:28 | 8 |
| 11:46:31 | 9 |
| 11:46:36 | 10 |
| 11:46:39 | 11 |
| 11:46:40 | 12 |
| 11:46:43 | 13 |
| 11:46:47 | 14 |
| 11:46:51 | 15 |
| 11:46:56 | 16 |
| 11:46:58 | 17 |
| 11:47:00 | 18 |
| 11:47:05 | 19 |
| 11:47:05 | 20 |
| 11:47:08 | 21 |
| 11:47:08 | 22 |
| 11:47:11 | 23 |
| 11:47:12 | 24 |
| 11:47:15 | 25 |

those would be those type of organizations.

And it notes that "Promega STR sublicensing legal actions underway," and that's consistent again with the date that you provided a little bit ago, by 2010.

Underneath that it says "made or exceeded AOP." What's AOP?

A. Give me a moment, because it's -- oh, yes, annual operating plan. It's an acronym that I use so much that I sometimes forget what it means. It's annual operating plan.

Q. What is the annual operating plan?

A. It's the -- the revenue goals that are set at the beginning of the year or at the end of the prior year. So it's a plan. It's an annual plan for the operation.

Q. And was that for the whole company, or is it done in a different way for divisions or groups?

A. Yes.

Q. Yes, it is done different for divisions and groups?

A. For the whole of the company and divisions and groups.

Q. So when it references AOP here, that would be for the GOLC group? "Here" meaning page 1610.

### Page 76

| | |
|---|---|
| 11:47:22 | 1 |
| 11:47:23 | 2 |
| 11:47:31 | 3 |
| 11:47:38 | 4 |
| 11:47:45 | 5 |
| 11:47:48 | 6 |
| 11:47:51 | 7 |
| 11:48:11 | 8 |
| 11:48:18 | 9 |
| 11:48:23 | 10 |
| 11:48:27 | 11 |
| 11:48:35 | 12 |
| 11:48:36 | 13 |
| 11:48:39 | 14 |
| 11:48:41 | 15 |
| 11:48:46 | 16 |
| 11:48:47 | 17 |
| 11:48:50 | 18 |
| 11:48:53 | 19 |
| 11:49:01 | 20 |
| 11:49:08 | 21 |
| 11:49:12 | 22 |
| 11:49:16 | 23 |
| 11:49:21 | 24 |
| 11:49:31 | 25 |

A. Yes. It's my recollection that it was referring to the GOLC AOP.

Q. Distinguish that from the SR1 and SR2.

A. SR1 and SR2 are planning, and AOP is the plan.

Q. So very much like the budget in advance?

A. Yes.

Q. Then on the next page, page 1611, something I don't understand. It has 2010 fees and royalties and then it has 2010 OEM sales. And I believe you've distinguished between those. Can you distinguish those again. They would seem both like royalties to me.

A. Well, what's your question?

Q. Can you distinguish between OEM and royalties for us?

A. Sure. Maybe not a 100 percent, but --

Q. As you --

A. -- as I see this document, without checking the records, the royalties would be the running royalties on licenses, and the OEM sales is the amount attributed to the sales of actual product by this group.

So it's -- you know, it's the transfer price. And I believe if there were royalties associated with the OEM sales, those would be royalties again. But my recollection is not a hundred percent clear on that.

Q. Again, forgive me if you said this before, the

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 77

| | |
|---|---|
| 11:49:35 | 1 |

11:49:35 1  OEM royalty grouping was -- came from Applied
11:49:41 2  Biosystems; is that right?  You used the same sort of
11:49:46 3  grouping pre-merger?
11:49:50 4      A.  Grouping?
11:49:51 5      Q.  You talked about them together.  When we went
11:49:56 6  to the front, for example, 1609, when we refer to the
11:50:01 7  totals, this is a combination of OEM and royalties?
11:50:09 8      A.  Everything in this document refers to
11:50:12 9  post-merger.
11:50:13 10      Q.  Okay.  And I was asking in pre-merger, were
11:50:17 11  these same terms used at Applied Biosystems?
11:50:21 12      A.  We would refer to some OEM sales, I'm pretty
11:50:29 13  sure.
11:50:29 14      Q.  Okay.  I was just trying to distinguish again,
11:50:32 15  because we have these two separate accounting systems
11:50:35 16  which are being merged together here, that this was
11:50:39 17  something that either came from Applied Biosystems or
11:50:43 18  from Invitrogen or is something of both.
11:50:50 19      A.  Probably something of both is most accurate.
11:51:02 20      Q.  Let's just take the first item to help me
11:51:05 21  understand.  And so it says -- I'm talking about 1611.
11:51:09 22  It says "PCR Systems" and it has the royalty amounts for
11:51:15 23  2010, and there's a decreased royalty amount in the next
11:51:19 24  column.  Would those -- what are those?  Are those the
11:51:26 25  predicted royalty decrease for PCR systems from 2010 to

Page 78

11:51:31 1  2011?
11:51:36 2      A.  Ask your question one more time.
11:51:38 3      Q.  Does the 85 and then the 68, is that the
11:51:45 4  predicted falloff in PCR systems royalties from 2010 to
11:51:51 5  2011?
11:51:55 6      A.  As I understand your question, no.
11:51:57 7      Q.  Okay.  What is it?
11:52:00 8      A.  It's in both cases a prediction of the total
11:52:03 9  annual royalties for that year.
11:52:05 10      Q.  Okay.  And if we took the difference between
11:52:08 11  the 2010 and 2011, that would be the decrease?
11:52:10 12      A.  Correct, correct.
11:52:12 13      Q.  And then in the 2010 OEM sales and 2011 OEM
11:52:18 14  sales, it would again be the predicted, your term, total
11:52:22 15  sales and the difference would be the decrease in --
11:52:27 16      A.  Correct.
11:52:32 17      Q.  It appears, when it says the 2010 totals and
11:52:34 18  the 2011 totals column, that that's -- that each is the
11:52:39 19  sum of the royalty and OEM for 2010 and then the sum of
11:52:44 20  the royalties and OEM for 2011?
11:52:47 21      A.  For that line.
11:52:49 22      Q.  Yes.  That's how I'm interpreting it.
11:52:54 23      A.  Yes.
11:52:54 24      Q.  And then YOY, looks like year-on-year
11:52:58 25  difference for dollars, and it shows 17.6, presumably

Page 79

11:53:06 1  million, and year-on-year percent in the last column,
11:53:11 2  negative 19 percent.
11:53:13 3      Does the 17.6, that's the -- appears to be
11:53:19 4  simply the decrease in revenue for PCR systems from 2010
11:53:24 5  to 2011, predicted?
11:53:26 6      A.  It is the change year-over-year.
11:53:28 7      Q.  And then the last column, the 19 percent is
11:53:31 8  the change expressed in a percentage?
11:53:34 9      A.  Correct.
11:53:43 10      Q.  Where would STRs, if they're here anywhere,
11:53:47 11  the STR fall, would they fall here?
11:53:56 12      A.  Could I have one minute to talk to my
11:53:58 13  attorney?
11:53:59 14      Q.  Absolutely.
11:54:01 15      THE VIDEOGRAPHER:  Going off the record.  The
11:54:02 16  time is 11:53 a.m.
11:54:05 17      (Recess taken.)
11:54:05 18      THE VIDEOGRAPHER:  We're back on the record.
12:03:04 19  The time is 12:03 p.m.
12:03:10 20      MR. TROUPIS:  Can you repeat the last
12:03:12 21  question.
12:03:13 22      (Record read by the reporter.)
12:03:35 23      THE WITNESS:  Could you explain what you mean
12:03:36 24  by an STR?
12:03:40 25      MR. TROUPIS:  Q.  There was licensing revenue

Page 80

12:03:42 1  being generated under the 1996 agreement between Promega
12:03:46 2  and Research Genetics that came with the Invitrogen,
12:03:52 3  Invitrogen merged, and that's the in-licensing, in --
12:03:59 4  the money coming in from a license, and those were on
12:04:04 5  what I refer to STR technology.
12:04:11 6      A.  So if I can restate to make sure I understand.
12:04:16 7      Q.  Absolutely.
12:04:17 8      A.  You're asking -- you said in-license.  So I
12:04:19 9  just want to -- whereas Invitrogen, if you will, had
12:04:24 10  out-licensed to Promega and received royalties from
12:04:28 11  Promega, where would those royalties go?  Is that the
12:04:31 12  question that you asked me?
12:04:32 13      Q.  Yes, that's right, that's right.  And your
12:04:34 14  correction is right.  You call it -- it was an
12:04:38 15  out-license?
12:04:40 16      A.  That would fall under Molecular Biology
12:04:42 17  Reagents in the third line, third row of this.
12:04:52 18      Q.  And I do apologize for confusing at times on
12:04:59 19  in-license and out-license, because from one person's
12:05:02 20  perspective it's an in-license and from another
12:05:04 21  company's perspective it's an out-license and vice
12:05:07 22  versa.
12:05:07 23      In the situation where Applied Biosystems is
12:05:20 24  paying an amount for the STR licenses, would that be
12:05:25 25  included in any of these statistics that we're looking

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 81

```
12:05:28   1   at on 1611 or in this document?
12:05:37   2        A.  It -- likely it would not.
12:05:47   3        Q.  Is there no netting of the in-license and
12:05:52   4   out-license for the technology as far as this time
12:05:54   5   period?  This time period being the time period of the
12:05:57   6   document that we're looking at, Exhibit 4.
12:06:02   7        A.  You would have to explain what you mean by
12:06:05   8   "netting."
12:06:12   9        Q.  I'm presuming that Applied Biosystems and
12:06:16  10   Invitrogen understood that one of the entities was
12:06:19  11   repaying an amount to Promega and Promega was paying
12:06:24  12   back a portion to Life Technologies, one of its
12:06:33  13   divisions.  So there was a net effect of a payment and a
12:06:39  14   receipt within the Life Technologies family.  Is there
12:06:43  15   an accounting for that anywhere in this document?
12:06:51  16        A.  Most likely not.
12:06:55  17        Q.  Why do you say "most likely."  Is there some
12:06:59  18   reason you're hesitating?
12:07:02  19        A.  Hypothetically it could -- there could be a
12:07:05  20   small representation on this document if anyone had an
12:07:09  21   OEM business in products that were covered by that
12:07:17  22   license.  I'm not aware of that.
12:07:22  23        Q.  That's fair, very fair.
12:07:25  24        Let me make it a bigger question, then.
12:07:27  25        In the GOLC group, which is what Exhibit 4 is
```

Page 82

```
12:07:33   1   focused on, was there any attempt to net in-licenses and
12:07:43   2   out-licenses when they were in the same area or the same
12:07:48   3   patent family?
12:07:54   4        A.  As I understand your question, no.
12:07:57   5        Q.  So this was strictly -- pardon me, what
12:07:59   6   money -- this being Exhibit 4 -- was strictly when money
12:08:05   7   was coming to Life Technologies from licensees outside
12:08:11   8   the company, that that's what this was focused on, this
12:08:17   9   being Exhibit 4?
12:08:18  10        A.  Mostly.
12:08:19  11        Q.  Except for the OEM?
12:08:21  12        A.  Correct.
12:08:35  13        Q.  At the bottom it shows -- at 1611, it shows
12:08:45  14   Life Total, Target, and Gap.  Can you explain what each
12:08:48  15   one of those categories are.
12:08:55  16        A.  So the life total is the sum of the column
12:09:00  17   above it, keeping in mind there are subtotals in
12:09:03  18   between, not to count twice.
12:09:16  19        Q.  And we did talk about that a minute ago,
12:09:20  20   above.
12:09:21  21        A.  Okay.
12:09:13  22        And then this document was part of the
12:09:16  23   planning process.  And so a target was being discussed
12:09:22  24   for the 2011, the coming year.  So in this case for fees
12:09:27  25   and royalties, $116 million; for OEM, $100 million; and
```

Page 83

```
12:09:35   1   the difference between the projected and the target was
12:09:38   2   the gap.
12:10:03   3        Q.  So in our -- the term you used earlier in
12:10:07   4   terms of revenue enhancement, it's the how much can
12:10:14   5   decrease that 9.2 expected gap that would be the
12:10:18   6   objective of the committee, either decrease it or even
12:10:27   7   go into the positive?
12:10:30   8        A.  Okay.  Your question doesn't --
12:10:35   9        Q.  Okay.  I do apologize if it doesn't.
12:10:39  10        The gap in this case is, as you said, the
12:10:44  11   difference between the target and the total.
12:10:51  12        Where is the target derived?
12:10:57  13        A.  To be honest, I don't know how the target was
12:10:59  14   derived.
12:11:01  15        Q.  It's a hoped-for number of some type?
12:11:04  16        A.  It's a target.
12:11:08  17        Q.  And I get some help in the -- underneath here
12:11:14  18   as to the purpose where it says "Improved significantly
12:11:18  19   from SR1 194M forecast and pre SR2 101 F & R rollup, gap
12:11:27  20   remains."
12:11:31  21        Can you interpret that?  I think I understand
12:11:34  22   it, but can you interpret what this means?
12:11:39  23        A.  And the "this" being?
12:11:40  24        Q.  "This" being the improved through projection.
12:11:45  25        A.  So "Improved significantly from SR1,
```

Page 84

```
12:11:48   1   194 million forecast," this is presumably, and I believe
12:11:53   2   I recall, it's part of the SR2 process, the later stage
12:11:57   3   of the planning process.
12:11:59   4        And in the earlier stage, there had been a
12:12:03   5   more pessimistic projection for the coming year of 194
12:12:09   6   versus 206 in -- 206.8 in the current document.
12:12:18   7        And it's also improved significantly from the
12:12:21   8   pre SR2.  And to be honest, I don't recall off the top
12:12:25   9   of my head what the 101 million F & R -- oh, fees and
12:12:30  10   royalties rollup.  So a more limited set that is
12:12:34  11   currently listed as 107.2, 2011, fees and royalties.
12:12:41  12        I don't have the recollection, but my
12:12:44  13   interpretation was that prior to the formal SR2 process,
12:12:49  14   there was an informal estimate of 101 million fees and
12:12:54  15   royalties rollup.
12:12:56  16        Q.  That makes sense.
12:12:57  17        A.  So on the second line, there's a gap
12:12:59  18   remaining, referring to the gap that's shown.  And then
12:13:04  19   it calls out the MBS, which is the top set of lines.
12:13:18  20        I have a feeling I know what that means, but I
12:13:34  21   have to say, since I'm not certain, I rather not
12:13:39  22   speculate.  I don't see an immediate math from this.
12:13:42  23   Because I could be wrong, I'd rather not speculate.
12:13:45  24        Q.  And now it gets to that, where I had mentioned
12:13:48  25   earlier, when we talk about improvements, these are --
```

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 85

| | |
|---|---|
| 12:14:04 | 1 | we were talking about an improvement above an expected |
| 12:14:10 | 2 | dropoff so that when it says "SR1 194M," you compared |
| 12:14:19 | 3 | that to the 206.8 shown above, which is the -- and it's |
| 12:14:28 | 4 | an improvement because you, in fact, received more, that |
| 12:14:33 | 5 | is, Life Technologies received more revenue than |
| 12:14:38 | 6 | originally predicted. |
| 12:14:41 | 7 |     A. Could you ask that as a question. |
| 12:14:42 | 8 |     Q. Sure. It appears to me that the document |
| 12:14:45 | 9 | considers an improvement to be an increase in the |
| 12:14:49 | 10 | revenue received over what was originally projected as |
| 12:14:56 | 11 | the revenue to be received? |
| 12:14:59 | 12 |     A. As I understand your question, the answer is |
| 12:15:01 | 13 | no. |
| 12:15:03 | 14 |     Q. Then what it is? |
| 12:15:06 | 15 |     A. I was confused by your question. |
| 12:15:09 | 16 |     Q. You compared the 194 to the 206 in your |
| 12:15:13 | 17 | response. |
| 12:15:16 | 18 |     A. Correct. |
| 12:15:16 | 19 |     Q. Why is the 206 better than the 194? |
| 12:15:20 | 20 |     A. It is a larger number. |
| 12:15:22 | 21 |     Q. And it's a larger revenue number for |
| 12:15:24 | 22 | Life Technologies; is that right? |
| 12:15:26 | 23 |     A. Correct. |
| 12:15:27 | 24 |     Q. And because more revenue has been received |
| 12:15:30 | 25 | than was projected to be received, that is an |

Page 86

| | |
|---|---|
| 12:15:35 | 1 | improvement as a result of the committee's work? |
| 12:15:47 | 2 |     A. There is a supposition in your question that's |
| 12:15:50 | 3 | incorrect. |
| 12:15:53 | 4 |     Q. And what is that? |
| 12:15:55 | 5 |     A. That the future had already happened. This |
| 12:15:58 | 6 | doesn't refer to any revenue received. |
| 12:16:01 | 7 |     Q. The projection has improved, not the actual |
| 12:16:04 | 8 | revenue at this point. |
| 12:16:05 | 9 |     A. Correct, correct. |
| 12:16:17 | 10 |     Q. And the projection presumably has improved |
| 12:16:20 | 11 | because there was some expectation by group that, in |
| 12:16:26 | 12 | fact, there would be improvement. Is that a fair |
| 12:16:30 | 13 | statement? |
| 12:16:30 | 14 |     A. It's not a logical statement. The way it's |
| 12:16:34 | 15 | constructed, I don't know how to answer it. |
| 12:16:37 | 16 |     Q. Why was there a different number at this point |
| 12:16:39 | 17 | in the year than earlier in the year? |
| 12:16:42 | 18 |     A. The number would have been different for a |
| 12:16:44 | 19 | number of -- a number of reasons. It was later in the |
| 12:16:48 | 20 | year, there's additional information available. It's |
| 12:16:52 | 21 | the second cycle, there's a lot closer scrutiny. And in |
| 12:16:57 | 22 | between, there would have been a lot of flogging by |
| 12:17:01 | 23 | senior people to make the number larger. |
| 12:17:04 | 24 |     At the moment, I can't tell you which was most |
| 12:17:09 | 25 | influential. |

Page 87

| | |
|---|---|
| 12:17:10 | 1 |     Q. That's fair. |
| 12:17:10 | 2 |     Do you know if these projections in the past |
| 12:17:13 | 3 | had been accurate at all, SR1 and SR2 forecasts for OEM |
| 12:17:21 | 4 | royalty and revenue, had they been, relatively speaking, |
| 12:17:24 | 5 | accurate? |
| 12:17:24 | 6 |     A. The only way to know if they're accurate is |
| 12:17:27 | 7 | after they come to fruition. |
| 12:17:30 | 8 |     Q. Well, they've done this each year, and I'm |
| 12:17:33 | 9 | asking whether or not the committee had, relatively |
| 12:17:37 | 10 | speaking, accurately depicted the outcomes? |
| 12:17:40 | 11 |     A. You need to reflect on the timing of the |
| 12:17:42 | 12 | merger. |
| 12:17:50 | 13 |     Q. Why do you say that? |
| 12:17:52 | 14 |     A. The merger occurred at the end of 2008. 2009 |
| 12:18:00 | 15 | would not have been a product of any prediction I made, |
| 12:18:06 | 16 | for instance, having come from the other company. |
| 12:18:09 | 17 |     Q. These were the first sets of predictions, the |
| 12:18:12 | 18 | ones we're looking at here? |
| 12:18:15 | 19 |     A. I don't know that I can answer that, either. |
| 12:18:17 | 20 |     Q. Are these the first set of predictions at |
| 12:18:22 | 21 | Life Technologies on these topics? |
| 12:18:31 | 22 |     A. This was 2010. I would say no. |
| 12:18:32 | 23 |     Q. What would have preceded it? |
| 12:18:34 | 24 |     A. It depends to some extent on your definition. |
| 12:18:36 | 25 | But at Life Technologies, at the end of 2009, there |

Page 88

| | |
|---|---|
| 12:18:39 | 1 | would have been a similar process. |
| 12:18:44 | 2 |     Q. And do you recall when they went through that |
| 12:18:46 | 3 | process in 2009 that it had -- had it accurately |
| 12:18:50 | 4 | predicted the revenues? |
| 12:18:55 | 5 |     A. Accuracy is in the eye of the beholder. |
| 12:18:55 | 6 |     Q. I said "relatively," I think. |
| 12:18:59 | 7 |     A. They were not identical. I don't know when |
| 12:19:05 | 8 | you're outside the realm of accurate. |
| 12:19:09 | 9 |     Q. Would this number, the 206.8 on 1611, be |
| 12:19:16 | 10 | something on which management would reasonably rely? |
| 12:19:21 | 11 |     MS. JOHNSON: Objection. Lack of foundation. |
| 12:19:22 | 12 |     MR. TROUPIS: Q. Is it a number that you |
| 12:19:23 | 13 | would reasonably rely upon? |
| 12:19:26 | 14 |     A. 206.8? |
| 12:19:29 | 15 |     Q. Yes. |
| 12:19:29 | 16 |     A. I would not have the basis to reasonably rely |
| 12:19:32 | 17 | on that number. |
| 12:19:33 | 18 |     Q. So it is inaccurate? |
| 12:19:35 | 19 |     A. I did not say that. |
| 12:19:38 | 20 |     Q. Would anyone that you know reasonably rely |
| 12:19:41 | 21 | upon that number at Life Technologies in making |
| 12:19:42 | 22 | corporate decisions? |
| 12:19:46 | 23 |     A. 206.8? |
| 12:19:48 | 24 |     Q. Uh-huh. |
| 12:19:49 | 25 |     A. I don't think anyone did. |

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

| | | Page 89 |
|---|---|---|
| 12:19:51 | 1 | Q. So why did they write it down? |
| 12:19:55 | 2 | A. It was the process of making predictions. |
| 12:20:00 | 3 | Q. Why do you need -- |
| 12:20:01 | 4 | A. Forecasting. |
| 12:20:02 | 5 | Q. Why do you need predictions? You told me no |
| 12:20:05 | 6 | one relies on them, why would you do them? |
| 12:20:07 | 7 | A. I didn't tell you no one relies on them. |
| 12:20:10 | 8 | Q. Who relies on this document? |
| 12:20:11 | 9 | A. On this document? |
| 12:20:13 | 10 | Q. Yes. |
| 12:20:14 | 11 | A. Senior management relies on this document. |
| 12:20:18 | 12 | Q. So did you think they were justified in |
| 12:20:20 | 13 | relying upon it? |
| 12:20:21 | 14 | A. On the document? |
| 12:20:23 | 15 | Q. Yes. |
| 12:20:24 | 16 | A. Reasonably so. |
| 12:20:25 | 17 | Q. So you're not judging these to be inaccurate |
| 12:20:28 | 18 | numbers? |
| 12:20:30 | 19 | A. I'm not judging them to be inaccurate numbers. |
| 12:20:44 | 20 | Q. Do you know if after the -- this document was |
| 12:20:47 | 21 | done if -- this document being Exhibit 4, that these |
| 12:20:53 | 22 | projections were, in fact, met or is there a document |
| 12:20:56 | 23 | that looks back to see if they were accurate? |
| 12:21:00 | 24 | MS. JOHNSON: And, Counsel, you're referring |
| 12:21:01 | 25 | to the 2011 productions? |

| | | Page 90 |
|---|---|---|
| 12:21:05 | 1 | MR. TROUPIS: Actually, any of the items that |
| 12:21:08 | 2 | were otherwise predictable as opposed to statement of |
| 12:21:11 | 3 | existing fact. |
| 12:21:16 | 4 | THE WITNESS: In this case this would have |
| 12:21:17 | 5 | been towards the end of 2010, and so most of the 2010 |
| 12:21:21 | 6 | numbers should have been reflecting actuals with |
| 12:21:25 | 7 | relatively little predictions in them at that point. |
| 12:21:30 | 8 | Whatever this current fiscal year 2011 results are would |
| 12:21:35 | 9 | be the test of the accuracy of those numbers. |
| 12:21:40 | 10 | MR. TROUPIS: Q. Based on your knowledge of |
| 12:21:42 | 11 | 2011, will they be met? |
| 12:21:50 | 12 | A. Based on my knowledge, I believe that yes, |
| 12:21:52 | 13 | they will be met. |
| 12:22:08 | 14 | Q. Page 1612, the next page in the sequence, what |
| 12:22:28 | 15 | does it mean when it says under GS, "STR kits for small |
| 12:22:36 | 16 | HID companies," if you know? |
| 12:22:43 | 17 | A. GS is genetic systems, which actually leads to |
| 12:22:47 | 18 | a correction of something I said earlier. In this year |
| 12:22:50 | 19 | the division in which applied markets was in this year |
| 12:22:55 | 20 | was GS, genetic systems, not applied markets division. |
| 12:23:00 | 21 | Q. Thank you. |
| 12:23:01 | 22 | A. So these four titles are the four divisions in |
| 12:23:06 | 23 | 2009, 2010, MBS. |
| 12:23:10 | 24 | Q. Why don't you tell us what each one means |
| 12:23:14 | 25 | again so that I get it accurate. |

| | | Page 91 |
|---|---|---|
| 12:23:17 | 1 | A. MBS is Molecular Biology Systems. CS is cell |
| 12:23:31 | 2 | systems. GS is genetic systems. And I believe MD was |
| 12:23:39 | 3 | more aspirational in that regard, and I believe that it |
| 12:23:42 | 4 | stood for molecular diagnostics. These were -- so |
| 12:23:49 | 5 | you're -- |
| 12:23:50 | 6 | Q. Interpreting "STR kits for small HID |
| 12:23:53 | 7 | companies," what does that refer to? |
| 12:23:56 | 8 | A. This document refers to out-licensing and OEM |
| 12:24:00 | 9 | opportunities. And so in the same way, "STR kits for |
| 12:24:06 | 10 | small HID companies" would have referred to STR, short |
| 12:24:12 | 11 | tandem repeat, related kits. "For small HID," would |
| 12:24:17 | 12 | typically mean human identification companies. |
| 12:24:21 | 13 | Q. I notice that just below that, it says |
| 12:24:23 | 14 | "Savings on Caltech Sequencing Royalties and Roche HID |
| 12:24:27 | 15 | Royalties." What is it referring to when it says "Roche |
| 12:24:31 | 16 | HID Royalties," if you know? |
| 12:24:47 | 17 | A. I'm just -- |
| 12:24:48 | 18 | MS. JOHNSON: The concern, Counsel, is that we |
| 12:24:50 | 19 | could be getting into an area where there are |
| 12:24:53 | 20 | confidentiality obligations with third parties that he's |
| 12:24:56 | 21 | not allowed to disclose. I don't know if he can answer |
| 12:24:59 | 22 | the question without divulging that sort of information. |
| 12:25:01 | 23 | MR. TROUPIS: Why don't we hold it until after |
| 12:25:04 | 24 | lunch so you guys can talk about it. I obviously don't |
| 12:25:10 | 25 | know or I wouldn't have asked. |

| | | Page 92 |
|---|---|---|
| 12:25:16 | 1 | Q. It has this general item here, and it says |
| 12:25:19 | 2 | "Website Buildup, Marketing Tools, Enhanced Sales |
| 12:25:25 | 3 | Partnerships." |
| 12:25:25 | 4 | What did you interpret that to mean, "Website |
| 12:25:29 | 5 | Buildup" and then "Marketing Tools"? I didn't |
| 12:25:32 | 6 | understand the relationship to the document. |
| 12:25:40 | 7 | A. These -- the context in the slide is less |
| 12:25:46 | 8 | clear, but this line, "Website Build-out," was an |
| 12:25:51 | 9 | aspiration to have a more robust outward face, a website |
| 12:25:55 | 10 | for the GOLC that would stimulate out-licensing and OEM |
| 12:26:01 | 11 | revenues. |
| 12:26:01 | 12 | Q. Oh, okay. |
| 12:26:02 | 13 | A. "Marketing Tools" would not be so different, |
| 12:26:05 | 14 | just a different version of the same. |
| 12:26:08 | 15 | And "Enhanced Sales Partnership," I'm fairly |
| 12:26:13 | 16 | certain reflected an interest to work more closely with |
| 12:26:19 | 17 | the sales organization in terms of OEM opportunities. |
| 12:26:23 | 18 | There's an inherent conflict sometimes between direct |
| 12:26:27 | 19 | sales and OEM sales. |
| 12:26:29 | 20 | Q. Understood. |
| 12:26:30 | 21 | Did the website build-out happen? |
| 12:26:35 | 22 | A. Arguably, yeah, like any website, I mean the |
| 12:26:39 | 23 | website was enhanced. |
| 12:26:44 | 24 | Q. Spoken like a biotech guy as opposed to an IT |
| 12:26:50 | 25 | guy. I understand. |

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 93

12:26:53  1    Then page 1613, which is the next page in this
12:26:56  2  sequence, I assume that the categories we saw on 1611,
12:27:07  3  they appear to be the same categories here and that,
12:27:13  4  therefore, the definitions we talked about would be
12:27:15  5  equally applicable, to the best of your recollection?
12:27:20  6    A.  After a perusal, under the best of my
12:27:24  7  recollection, they would be referring to the same
12:27:26  8  categories.
12:27:35  9    Q.  Now, I'll ask you to interpret.  What does it
12:27:44 10  mean by "Potential Upside Savings and Totals," so if I'm
12:27:53 11  trying to understand this slide?
12:28:01 12    A.  Ask your question.
12:28:02 13    Q.  Can you explain what is meant by "Potential
12:28:05 14  Upside Savings and Totals" in the slide at 1613?
12:28:19 15    A.  I'm just recalling my thoughts, my memories.
12:28:23 16    Q.  The other ones, they do match up with the
12:28:26 17  prior slide.  That's the reason that I'm asking about
12:28:29 18  those three.
12:28:32 19    A.  This is, I guess, would be somewhat related to
12:28:34 20  the flogging that I was talking about earlier.  I mean,
12:28:37 21  there was a set of numbers put forth, 206.8 as the
12:28:43 22  rollup from the group.  There was a desire to see it be
12:28:47 23  more successful than that, hence the gap.
12:28:50 24    Q.  Hence the 216 shown down there at the bottom?
12:28:54 25    A.  The target.

Page 94

12:28:54  1    Q.  Yep.
12:28:55  2    A.  And so there was a second exercise to think
12:28:57  3  about what was, you know -- what was on the horizon and
12:29:04  4  could be reason -- maybe we were feeling cautious about
12:29:06  5  putting it into the initial forecast but that you can
12:29:11  6  connect and commit to, for various reasons, commit to in
12:29:16  7  the coming year, additional revenue.
12:29:23  8    Savings would be where there was an
12:29:26  9  opportunity to save money and, you know, not revenue per
12:29:31 10  se, but a cost savings through some effort.
12:29:34 11    And then total is the math from 2011 totals,
12:29:39 12  plus potential upside and plus savings, because it was
12:29:45 13  designed to be a, what is the contribution of this
12:29:49 14  group, what could the contribution of this group be in
12:29:52 15  the coming year.
12:30:07 16    Q.  So focusing, then, on where it says "Molecular
12:30:10 17  Reagents has Potential Upside, 0.5."  Do you recall what
12:30:17 18  that refers to -- I mean, first of all, potential
12:30:21 19  upside, what was the basis to believe there would a
12:30:25 20  potential upside?
12:30:29 21    A.  I was responsible for this group at this time,
12:30:32 22  and I was given a requirement to put a larger number,
12:30:36 23  and to a large extent, I distributed it, as I recall, to
12:30:44 24  some extent -- to some extent proportionally to what was
12:30:50 25  there and to the opportunities that I saw as being

Page 95

12:30:53  1  likely to close out in the coming year.  It was the
12:30:58  2  result of a complicated and not fully informed set of
12:31:03  3  decisions -- set of analysis.
12:31:05  4    Q.  Well said.
12:31:05  5    Is the .5, do you have any recollection of the
12:31:09  6  .5 other than the potential for proportionality?  Was
12:31:13  7  there any other thinking in that number, as you recall?
12:31:23  8    A.  You know, I can think of some things that it
12:31:25  9  might have been, but I don't recall the exact equation
12:31:29 10  that got me to .5.
12:31:31 11    Q.  What about down below?  I see in the CS
12:31:34 12  division, it has HID.  And, again, I'm not trying to
12:31:37 13  intrude upon a confidential issue here.  I assume HID
12:31:42 14  refers to human identification, and then it shows a
12:31:45 15  savings of 5, presumably 5 million.
12:31:49 16    What is that referring to, if you remember?
12:31:52 17  That's a fairly big number.
12:32:13 18    A.  I'm trying to recall.  That was GS, not CS
12:32:17 19  division you're reading.  The bottom goes up.
12:32:20 20    Q.  Thank you.
12:32:33 21    A.  I can think of more than one reason it might
12:32:36 22  have.  I don't recall what reason it was.
12:32:39 23    Q.  Can you tell us some of those reasons, then?
12:32:44 24    A.  One of those reasons is the same --
12:32:45 25    Q.  Is the subject of the problem.  Okay.

Page 96

12:32:50  1    A.  The other reason could have been Promega, the
12:32:53  2  dispute between the companies, but I don't know for
12:32:55  3  certain that that was the basis for that number.  There
12:32:59  4  were two reasons that I can think of.
12:33:05  5    Q.  Yeah, fine.
12:33:16  6    Then the 1614, the last page of this
12:33:20  7  document --
12:33:23  8    A.  I'm sorry, just to add to my last question.
12:33:25  9    There were two reasons that I could think of.
12:33:28 10  But again, just to clarify, I was not responsible for
12:33:30 11  this group.  There could have been other reasons that
12:33:32 12  I'm not thinking of.
12:33:34 13    Q.  Who would have been responsible for that
12:33:36 14  group?  The GS division, is that the right --
12:33:41 15    A.  That would have been a combination of
12:33:43 16  Dr. Singer I mentioned before and Mr. Krueger that I
12:33:47 17  mentioned before.  Todd Krueger and Vicki Singer.
12:33:58 18    Q.  The last page, 1614 down there, what does this
12:34:09 19  mean when it says "555K," which I assume is 555,000,
12:34:13 20  "investment will result from a 5.7 million in 2011
12:34:19 21  revenue."  What's that referring to?
12:34:19 22    A.  Just reviewing to make sure that my
12:34:28 23  recollection is correct.  I believe the math is correct,
12:34:34 24  that that's the sum of the numbers on the cost column.
12:34:38 25    Q.  Got it.

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 97

| | |
|---|---|
| 12:34:40 | 1  A.  And the sum of the numbers on the dollars |
| 12:34:43 | 2  column.  It's a request for additional resources. |
| 12:35:01 | 3  Q.  When it says in the 4.0 million GS, it says |
| 12:35:07 | 4  "Full-time OL Resources," what does that mean?  "OL," |
| 12:35:12 | 5  what does that mean? |
| 12:35:15 | 6  A.  I'm thinking.  In the context of this |
| 12:35:21 | 7  document, there's a chance I'm wrong, but I'm reasonably |
| 12:35:24 | 8  sure that it's OEM licensing.  So a person who it's been |
| 12:35:32 | 9  dedicated to either out-licensing OL or OEM or |
| 12:35:36 | 10 licensing. |
| 12:35:38 | 11 Q.  Yeah.  I see in the last column it says |
| 12:35:41 | 12 "Dependence on External factors."  That would make |
| 12:35:44 | 13 sense, that you could control the factors in allocating |
| 12:35:48 | 14 a resource.  When we say "low", is that sort of a fair |
| 12:35:52 | 15 definition of that? |
| 12:35:53 | 16 A.  Right.  If you're hiring someone, there's less |
| 12:35:57 | 17 dependence on external factors than say marketing. |
| 12:36:02 | 18 Q.  Right. |
| 12:36:29 | 19   And that's exhibit what? |
| 12:36:31 | 20   THE REPORTER:  Five. |
| 12:36:31 | 21   (Whereupon, Exhibit 5 was marked for |
| 12:36:31 | 22   identification.) |
| 12:36:41 | 23   MR. TROUPIS:  Then this will be Exhibit 6. |
| 12:36:43 | 24   (Whereupon, Exhibit 6 was marked for |
| 12:36:43 | 25   identification.) |

Page 98

| | |
|---|---|
| 12:37:16 | 1   MR. TROUPIS:  Q.  Dr. Moehle, I'll show you |
| 12:37:18 | 2  what has been marked Exhibit 5, which is a settlement |
| 12:37:22 | 3  agreement.  And then next to that is Exhibit 6, which is |
| 12:37:28 | 4  a cross-license.  You'll notice there's some printing |
| 12:37:31 | 5  across the top of that cross-license, Exhibit 6, that is |
| 12:37:35 | 6  actually a file stamp number from the Federal District |
| 12:37:38 | 7  Court for the Western District of Wisconsin, and that's |
| 12:37:41 | 8  why it has that number on it. |
| 12:37:44 | 9   Let's start with Exhibit 5.  Do you recognize |
| 12:37:46 | 10 Exhibit 5, without reviewing each and every page?  Each |
| 12:38:06 | 11 and every word, I should say. |
| 12:38:10 | 12 A.  Without reviewing every word, every page, this |
| 12:38:13 | 13 would appear to be a copy of the settlement agreement |
| 12:38:20 | 14 between Promega and Applera or ABI.  It is similar to |
| 12:38:30 | 15 the copy in my possession in that there's only a |
| 12:38:35 | 16 signature for one of the parties, and it is not |
| 12:38:39 | 17 officially the settlement agreement. |
| 12:38:45 | 18 Q.  And then the next item, Exhibit 6, |
| 12:38:51 | 19 cross-license, do you recognize that document? |
| 12:39:12 | 20 A.  In the same way, in a cursory examination, it |
| 12:39:14 | 21 looks like the cross-license that is fully executed |
| 12:39:18 | 22 between the parties. |
| 12:39:19 | 23 Q.  And I'll represent to you that Exhibit 5 and |
| 12:39:22 | 24 Exhibit 6 are, my understanding as well, settlement |
| 12:39:26 | 25 agreement and cross-license agreement.  They have been |

Page 99

| | |
|---|---|
| 12:39:30 | 1  used in exhibits in other matters -- other depositions |
| 12:39:33 | 2  in this case. |
| 12:39:42 | 3   You participated in the negotiation of those |
| 12:39:42 | 4  agreements; is that right?  Those being Exhibit 5 and |
| 12:39:46 | 5  Exhibit 6. |
| 12:39:47 | 6  A.  I did. |
| 12:39:54 | 7  Q.  Who else participated in the negotiation of |
| 12:39:57 | 8  those? |
| 12:39:58 | 9   MS. JOHNSON:  On the Applera side -- |
| 12:40:05 | 10   MR. TROUPIS:  On the Applera side, |
| 12:40:05 | 11 Applied Biosystems, yes. |
| 12:40:05 | 12   THE WITNESS:  You headed off my answer. |
| 12:40:10 | 13 Elan Foistvagn, who we mentioned before, was |
| 12:40:14 | 14 at the table.  In some cases Paul Grossman there.  I |
| 12:40:22 | 15 don't remember every day of the negotiation.  Probably |
| 12:40:23 | 16 there might have been a patent attorney present.  But |
| 12:40:26 | 17 Elan and I were the ones most often there, to the best |
| 12:40:30 | 18 of my recollection. |
| 12:40:33 | 19   MR. TROUPIS:  Q.  And who had designated you |
| 12:40:34 | 20 to be there?  Who had directed you to be there with |
| 12:40:38 | 21 them? |
| 12:40:39 | 22 A.  Mr. Grossman. |
| 12:40:40 | 23 Q.  So you were -- you were answering directly to |
| 12:40:43 | 24 Mr. Grossman during this time period about this |
| 12:40:46 | 25 negotiation -- on this negotiation? |

Page 100

| | |
|---|---|
| 12:40:48 | 1  A.  On this negotiation, definitely, yes. |
| 12:40:53 | 2  Q.  What interaction, if any, did you have with |
| 12:40:55 | 3  Cathy Bersic, the signatory on here? |
| 12:41:03 | 4  A.  More limited interaction, occasionally giving |
| 12:41:05 | 5  an update.  I did not give that many updates, though, |
| 12:41:09 | 6  directly to her.  A couple, I don't remember how many. |
| 12:41:17 | 7  Q.  Is it fair to say this was a lengthy |
| 12:41:19 | 8  negotiation? |
| 12:41:23 | 9  A.  Define "lengthy." |
| 12:41:24 | 10 Q.  More than a few months. |
| 12:41:27 | 11 A.  It was more than a few months. |
| 12:41:52 | 12 Q.  And, again, the reason I'm hesitating is I'm |
| 12:41:55 | 13 not trying to get into legal advice that occurred at the |
| 12:41:57 | 14 time, during this time period, although Elan was a |
| 12:42:02 | 15 lawyer; is that right? |
| 12:42:04 | 16 A.  And still is. |
| 12:42:10 | 17 Q.  The negotiations continued on a face-to-face |
| 12:42:12 | 18 basis as well as by email and other forms of |
| 12:42:14 | 19 communication between Promega and Applied Biosystems; is |
| 12:42:19 | 20 that right? |
| 12:42:21 | 21 A.  Sorry, I lost track of your question. |
| 12:42:23 | 22 Q.  During the time period that we just talked |
| 12:42:26 | 23 about when this negotiation was going on, there were |
| 12:42:29 | 24 face-to-face meetings as well as emails and other |
| 12:42:32 | 25 communications, such as letters and the like, as part of |

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 101

| | |
|---|---|
| 12:42:35 1 | the process of negotiation? |
| 12:42:36 2 | A. Correct. I don't recall any letters per se, |
| 12:42:38 3 | but emails, phone calls, face-to-face. |
| 12:42:57 4 | Q. When did you communicate the -- these |
| 12:43:02 5 | documents, if you communicated these documents, to your |
| 12:43:09 6 | merger partners, Invitrogen, if you know? |
| 12:43:15 7 | A. I have no knowledge. |
| 12:43:18 8 | Q. Was there a time that they requested copies of |
| 12:43:21 9 | these documents from you? |
| 12:43:23 10 | A. I have no knowledge. |
| 12:43:36 11 | Q. Was there any attempt to maintain these |
| 12:43:39 12 | documents as confidential from Invitrogen after the |
| 12:43:46 13 | merger had taken place, the former Invitrogen employees? |
| 12:43:53 14 | A. So after the merger was effective and we were |
| 12:43:56 15 | one company? |
| 12:43:57 16 | Q. Yes. |
| 12:44:02 17 | A. Was there any effort made to keep documents |
| 12:44:06 18 | confidential from other members of the company? |
| 12:44:08 19 | Q. Right. |
| 12:44:09 20 | A. I'm not aware of a barrier based on the, you |
| 12:44:12 21 | know, the historical company that the employees had came |
| 12:44:14 22 | from. There's always confidentiality that you don't |
| 12:44:18 23 | give a document like this to everyone. |
| 12:44:22 24 | Q. But there was no attempt to keep these matters |
| 12:44:27 25 | confidential from any of the former Invitrogen employees |

Page 102

| | |
|---|---|
| 12:44:30 1 | who might otherwise be involved in out-licensing, was |
| 12:44:37 2 | there, to your knowledge? |
| 12:44:38 3 | A. If there was -- I mean, I am not aware of any |
| 12:44:42 4 | effort. |
| 12:44:55 5 | Q. Was any permission ever requested of Promega |
| 12:45:09 6 | to share these documents with Invitrogen or Invitrogen |
| 12:45:13 7 | IP Holdings, to your knowledge? |
| 12:45:16 8 | A. I have no knowledge of this. |
| 12:45:24 9 | Q. It is fair to say, isn't it, that former |
| 12:45:27 10 | Invitrogen employees have had access to those documents |
| 12:45:33 11 | since the merger; is that right? |
| 12:45:36 12 | MS. JOHNSON: Objection. Lack of foundation. |
| 12:45:41 13 | THE WITNESS: What do you mean by "former"? |
| 12:45:43 14 | MR. TROUPIS: Q. Presumably some people came |
| 12:45:45 15 | over from Invitrogen to your company? |
| 12:45:48 16 | A. Current Life Technology employees? |
| 12:45:49 17 | Q. Yes. |
| 12:45:49 18 | A. Rephrasing that way, could you just state the |
| 12:45:52 19 | question again. |
| 12:45:53 20 | Q. Sure. Were -- these documents were shared |
| 12:45:56 21 | with former Invitrogen employees subsequent to the |
| 12:46:00 22 | merger; is that right? |
| 12:46:04 23 | A. Is that -- again I have trouble with the |
| 12:46:05 24 | "former," but to my knowledge, there are -- there are |
| 12:46:14 25 | appropriate Life Technology employees who used to work |

Page 103

| | |
|---|---|
| 12:46:16 1 | for Invitrogen prior to the merger who have seen these |
| 12:46:20 2 | documents. |
| 12:46:31 3 | Q. Traci Libby has been given access to these |
| 12:46:35 4 | documents, hasn't she? |
| 12:46:36 5 | A. It is my understanding that Traci Libby has |
| 12:46:39 6 | access to these documents. |
| 12:47:06 7 | Q. And no permission was, to your knowledge, ever |
| 12:47:09 8 | requested of Promega to share these documents with |
| 12:47:13 9 | former Invitrogen employees; is that right? |
| 12:47:18 10 | A. To my knowledge -- I have no knowledge of |
| 12:47:19 11 | whether any permission was asked to share these |
| 12:47:23 12 | documents with former or current employees. |
| 12:47:25 13 | Q. And that's fair. Let me phrase it slightly |
| 12:47:28 14 | different. |
| 12:47:29 15 | Each of these documents contains a |
| 12:47:31 16 | confidential provision; is that right? |
| 12:47:35 17 | A. I believe so. I would want to double-check, |
| 12:47:37 18 | but I'll take your stipulation if you're offering it. |
| 12:47:42 19 | Q. You do not have any knowledge of either |
| 12:47:46 20 | Applied Biosystems or Life Technology ever requesting |
| 12:47:49 21 | permission from Promega pursuant to the confidentiality |
| 12:47:53 22 | agreement to share these documents with anyone, do you? |
| 12:48:00 23 | A. I am not aware of any request for permission |
| 12:48:04 24 | to share these documents. |
| 12:48:05 25 | Does that answer your question? |

Page 104

| | |
|---|---|
| 12:48:08 1 | A. No, I think it does. |
| 12:48:14 2 | It is now 10 minutes to 1:00. We had a number |
| 12:48:18 3 | of breaks this morning, but let's take a break now for |
| 12:48:22 4 | lunch, and we can be back here at 1:45. I don't have a |
| 12:48:27 5 | clue where you eat around here. |
| 12:48:29 6 | THE VIDEOGRAPHER: Going off the record. The |
| 12:48:31 7 | time is 12:48 p.m. |
| 12:48:33 8 | (Noon recess taken.) |
| 14:01:58 9 | THE VIDEOGRAPHER: We're back on the record. |
| 14:02:05 10 | The time is 2:01 p.m. |
| 14:02:05 11 | MR. TROUPIS: Q. Dr. Moehle, I've shown you |
| 14:02:06 12 | what is marked Exhibit 6 for identification -- Exhibit 7 |
| 14:02:11 13 | for identification. |
| 14:02:12 14 | (Whereupon, Exhibit 7 was marked for |
| 14:02:12 15 | identification.) |
| 14:02:15 16 | MR. TROUPIS: Q. It is a license agreement of |
| 14:02:17 17 | the 19th of June, 1996, between Research Genetics and |
| 14:02:24 18 | Promega. The numbers across the top again indicate this |
| 14:02:28 19 | is actually filed with the Federal District Court for |
| 14:02:31 20 | the Western District of Wisconsin, and other witnesses |
| 14:02:34 21 | have testified already that this is the Research |
| 14:02:37 22 | Genetics agreement. |
| 14:02:39 23 | Have you seen this document before? |
| 14:02:44 24 | A. I believe that I have seen this document |
| 14:02:46 25 | before. |

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 105

| | | |
|---|---|---|
| 14:02:46 | 1 | Q. When was the first time that you did see it? |
| 14:02:55 | 2 | A. I don't recall the precise date, but it was |
| 14:02:57 | 3 | some point after the merger. I just don't recall |
| 14:03:00 | 4 | exactly when. |
| 14:03:10 | 5 | MR. TROUPIS: Let me show you -- let's mark -- |
| 14:03:19 | 6 | well, mark this as 8 and 9. |
| 14:03:24 | 7 | (Whereupon, Exhibits 8 & 9 were marked for |
| 14:03:24 | 8 | identification.) |
| 14:04:13 | 9 | MR. TROUPIS: Q. Look at Exhibit 8 and |
| 14:04:13 | 10 | Exhibit 9, which appear to be emails, one to you -- at |
| 14:04:18 | 11 | least headed from someone named Chen to you -- |
| 14:04:25 | 12 | A. Chow Lee. |
| 14:04:28 | 13 | Q. Chow Lee Chen to you, and then there is a -- |
| 14:04:37 | 14 | and then there's an email from Chow Lee Chen to Stewart |
| 14:04:43 | 15 | Hepburn, which reflects the transfer of a Promega |
| 14:04:46 | 16 | license. |
| 14:04:49 | 17 | So you can look at each of those and see if |
| 14:04:53 | 18 | you recall -- there's an email under that, and you can |
| 14:04:58 | 19 | see these are sequential. |
| 14:05:00 | 20 | A. There's two pages? |
| 14:05:01 | 21 | Q. I think so. |
| 14:05:02 | 22 | A. Paper is a little thick. I wasn't sure. |
| 14:05:13 | 23 | Q. In the second exhibit, 9, direct your |
| 14:05:15 | 24 | attention to the bottom email. The others follow. |
| 14:05:22 | 25 | A. Okay. |

Page 106

| | | |
|---|---|---|
| 14:05:59 | 1 | Q. So now back to the question that led me to |
| 14:06:02 | 2 | handing these to you, which was simply, when, if you |
| 14:06:07 | 3 | were called, was the first time you would have seen |
| 14:06:12 | 4 | Exhibit 7, which was the June 19, 1996, agreement? |
| 14:06:19 | 5 | A. To be honest, I don't recall these specific |
| 14:06:22 | 6 | emails. I don't deny them. I just don't recall them |
| 14:06:25 | 7 | clearly. |
| 14:06:26 | 8 | This makes sense. The timing would have been |
| 14:06:29 | 9 | after what we call day one, the effective date of the |
| 14:06:32 | 10 | merger, and the two sides were trying to get operating |
| 14:06:35 | 11 | as one side. So this would be consistent, but -- |
| 14:06:37 | 12 | Q. But the general time period in which you |
| 14:06:40 | 13 | probably would have seen this, December 4. I'm not |
| 14:06:43 | 14 | trying -- |
| 14:06:45 | 15 | A. Yeah. It certainly was not before that, but I |
| 14:06:48 | 16 | couldn't say if -- this looks reasonable. |
| 14:06:51 | 17 | MR. TROUPIS: Let me show you one other |
| 14:06:52 | 18 | document, which I also think is related to this, so that |
| 14:06:57 | 19 | we don't end up with an incomplete record on this |
| 14:07:01 | 20 | question. |
| 14:07:03 | 21 | Mark that as Exhibit 10. |
| 14:07:05 | 22 | (Whereupon, Exhibit 10 was marked for |
| 14:07:05 | 23 | identification.) |
| 14:07:32 | 24 | MR. TROUPIS: Q. So I've shown you what is |
| 14:07:33 | 25 | marked Exhibit 10, and you'll notice that the Bates |

Page 107

| | | |
|---|---|---|
| 14:07:36 | 1 | numbers that we've been talking about at the bottom, |
| 14:07:38 | 2 | Exhibit 8 is 770, Exhibit 10 is 771, and then Exhibit 9 |
| 14:07:49 | 3 | is Exhibit 779. |
| 14:07:58 | 4 | And the exhibit to you, the first of those, |
| 14:08:01 | 5 | Exhibit 8, refers to the Max Planck research genetic |
| 14:08:07 | 6 | license, and you'll notice that the document I've given |
| 14:08:11 | 7 | you, Exhibit 10, is between Research Genetics and -- and |
| 14:08:24 | 8 | there's an attached 1993 agreement. |
| 14:08:30 | 9 | So my question to you is, do you recall that |
| 14:08:33 | 10 | document? We have two licenses, a 1993 agreement, |
| 14:08:38 | 11 | Exhibit 10, and a 1996 agreement, which is Exhibit 7. |
| 14:08:55 | 12 | A. I'm sorry, what was your question again? |
| 14:08:57 | 13 | Q. Do you recall this document as distinct from |
| 14:09:01 | 14 | the other license, Exhibit 7? Exhibit 10 and Exhibit 7, |
| 14:09:16 | 15 | I'm asking you to compare. |
| 14:09:21 | 16 | A. I don't recall if I've seen Exhibit 10 or not. |
| 14:09:25 | 17 | I'm just not certain. I may have or I may not. I don't |
| 14:09:28 | 18 | place it. I'm a little confused, though, that at the |
| 14:09:33 | 19 | top, it says 1993, but it's signed with a date a few |
| 14:09:39 | 20 | weeks or a month before the other 1996 documents. |
| 14:09:43 | 21 | Q. In fact, this document, IVGN771, is a |
| 14:09:50 | 22 | September -- refers to a license agreement which is |
| 14:09:54 | 23 | attached of September 6, 1993, and is an amendment to |
| 14:09:58 | 24 | that document. |
| 14:10:00 | 25 | A. Okay. |

Page 108

| | | |
|---|---|---|
| 14:10:03 | 1 | Q. But as it came from IVGN, that's why I |
| 14:10:07 | 2 | provided it to you, and it appeared to have the same -- |
| 14:10:09 | 3 | it appeared to potentially be the document that's |
| 14:10:12 | 4 | attached to 770, Exhibit 8. |
| 14:10:18 | 5 | A. I may have seen this, but I don't recall it. |
| 14:10:21 | 6 | At the moment, it does not appear familiar. |
| 14:10:34 | 7 | Q. The second, Exhibit 9, I'd like you to focus |
| 14:10:38 | 8 | on, if you would, the first paragraph. It says, "Hi, |
| 14:10:43 | 9 | Stewart, I talked to Charlie Moehle this afternoon. |
| 14:10:47 | 10 | He's totally fine that we take care of this subject from |
| 14:10:53 | 11 | Invitrogen's side." |
| 14:10:55 | 12 | Can you explain to me what you -- what would |
| 14:10:58 | 13 | have been this subject? He's reflecting on a |
| 14:11:01 | 14 | conversation he had with you. |
| 14:11:04 | 15 | MS. JOHNSON: Objection. Lack of foundation. |
| 14:11:11 | 16 | THE WITNESS: I don't -- I mean, the subject |
| 14:11:15 | 17 | at this time on the calendar, I don't know exactly what |
| 14:11:19 | 18 | she was referring to. |
| 14:11:24 | 19 | MR. TROUPIS: Q. Do you know what role did |
| 14:11:25 | 20 | Stewart Hepburn play in reviewing the Promega agreements |
| 14:11:33 | 21 | that you had forwarded earlier that same day, according |
| 14:11:38 | 22 | to Exhibit 9? |
| 14:11:41 | 23 | A. I don't know precisely what role Stewart |
| 14:11:43 | 24 | played in evaluating these agreements. |
| 14:11:46 | 25 | Q. Do you know what role -- |

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 109

| | |
|---|---|
| 14:11:51 1 | A. Chow Lee. |
| 14:11:54 2 | Q. -- Chow Lee would have had? |
| 14:11:56 3 | A. Not exactly. She was in one of the licensing |
| 14:12:01 4 | groups, out-licensing groups, but other than that. |
| 14:12:04 5 | Q. Previously with Invitrogen? |
| 14:12:06 6 | A. Yes. I had business dealings with her at a |
| 14:12:12 7 | prior company. |
| 14:12:14 8 | Q. Did you subsequently have any conversations |
| 14:12:15 9 | with Stewart Hepburn regarding the Promega agreements in |
| 14:12:19 10 | the year 2008 or at or about that time period? |
| 14:12:31 11 | A. I don't recall specific timing and whether the |
| 14:12:34 12 | conversation was with Stewart. Any conversation I had |
| 14:12:38 13 | on this topic would have been with attorneys or in the |
| 14:12:42 14 | context of a legal discussion. |
| 14:12:52 15 | Q. With regard to Chow Lee, would that same |
| 14:12:55 16 | answer apply, that you had no -- do you recall any |
| 14:12:58 17 | discussions with Chow Lee about these Promega documents |
| 14:13:03 18 | after December 4, 2008, during that next year period? |
| 14:13:11 19 | A. Let's think, I'm just being careful. I don't |
| 14:13:15 20 | remember when it started, but there were some committee |
| 14:13:19 21 | meetings, if you will, under the direction of the |
| 14:13:22 22 | attorneys. I'm thinking whether I ever had any |
| 14:13:26 23 | conversations with her that was not under the direction |
| 14:13:29 24 | of an attorney. And I can't recall any. |
| 14:13:36 25 | Q. Was the committee that you're referring to the |

Page 110

| | |
|---|---|
| 14:13:37 1 | GOLC committee? |
| 14:13:38 2 | A. No. |
| 14:13:40 3 | Q. What committee? |
| 14:13:41 4 | A. Just a group, a couple of attorneys evaluating |
| 14:13:44 5 | the situation. Committee just in the sense of more than |
| 14:13:47 6 | two people at a table. |
| 14:14:01 7 | Q. Let's look, then, at Exhibit 7, marked for |
| 14:14:04 8 | identification the license agreement, June 19, 1996. |
| 14:14:10 9 | And I'd like to focus on section 1.11. |
| 14:14:16 10 | In your own words, what is your understanding |
| 14:14:43 11 | of the net sales of license product definition in 1.11 |
| 14:14:49 12 | of Exhibit 7? |
| 14:14:54 13 | MS. JOHNSON: Object to the extent that it |
| 14:14:55 14 | lacks foundation. |
| 14:14:56 15 | And also caution you not to divulge the |
| 14:15:13 17 | content of any conversations you may have had with |
| 14:15:17 18 | counsel regarding that paragraph. To the extent -- and |
| 14:15:19 19 | understanding independent of any such conversations, you |
| 14:15:29 20 | can answer. |
| 14:15:34 21 | THE WITNESS: As I read this paragraph, I |
| 14:15:36 22 | don't know that I could give an answer that was |
| 14:15:49 23 | independent of discussions with my counsel. |
| 14:15:52 24 | MR. TROUPIS: Q. Let's go back, then, to |
| 14:16:11 25 | Exhibit 6. I think you have it there to your right. |
| | What is -- and I'm focused on section 1.9 of |

Page 111

| | |
|---|---|
| 14:16:15 1 | Exhibit 6. Ask you to state in your own words what your |
| 14:16:24 2 | understanding of this net sales provision is. |
| 14:16:27 3 | And I point out to counsel that he has been -- |
| 14:16:30 4 | you were designated under Rule 26 as a witness with |
| 14:16:35 5 | regard to the execution and terms of the 2006 |
| 14:16:38 6 | cross-license, so I ask that question. |
| 14:16:42 7 | MS. JOHNSON: And you're asking him to answer |
| 14:16:44 8 | with respect to the entirety of paragraph 1.9? |
| 14:16:47 9 | MR. TROUPIS: Yes. |
| 14:16:47 10 | Q. And take whatever length of time you like to |
| 14:16:50 11 | explain that provision. |
| 14:16:52 12 | A. Okay. Let me take a minute and just read it. |
| 14:16:57 13 | Q. Certainly. |
| 14:17:35 14 | A. So if you're ready. |
| 14:17:36 15 | Q. Please, please. |
| 14:17:38 16 | A. Starting at a high level, this is a definition |
| 14:17:41 17 | of net sales, which is the basis upon which a royalty |
| 14:17:45 18 | would be calculated in the license. |
| 14:17:49 19 | There is three main parts, again at a high |
| 14:17:53 20 | level. First part, part A, this relates to what we |
| 14:17:58 21 | might call ordinary sales, plain sales. |
| 14:18:02 22 | Category B is a category of special sales, |
| 14:18:06 23 | where there's reason to doubt that -- or to question |
| 14:18:10 24 | that the price reflects the value of the item. |
| 14:18:14 25 | And then the third section, which is not |

Page 112

| | |
|---|---|
| 14:18:17 1 | lettered, is what to do if the value of the royalty item |
| 14:18:21 2 | is confused by being part of a larger assembly, if you |
| 14:18:25 3 | will, and how do you back out the value that should be |
| 14:18:30 4 | royalty bearing. |
| 14:18:32 5 | Would you like me to go into more detail or is |
| 14:18:35 6 | that -- |
| 14:18:37 7 | Q. That's good enough for the moment. Let me ask |
| 14:18:39 8 | you a couple of follow-up questions rather than |
| 14:18:42 9 | rereading it all. |
| 14:18:43 10 | One question is, is the -- does the net sales |
| 14:18:52 11 | from the perspective of the party reporting the royalty, |
| 14:19:00 12 | paying the royalty, does that net sales include foreign |
| 14:19:08 13 | sales, sales off-site of the United States? |
| 14:19:13 14 | A. In this license? |
| 14:19:15 15 | Q. Yes. |
| 14:19:46 16 | A. Now that I've read it, can you just restate |
| 14:19:50 17 | your question. |
| 14:19:51 18 | MR. TROUPIS: Why don't we reread it. |
| 14:20:11 19 | (Record read by the reporter.) |
| 14:20:14 20 | THE WITNESS: To some extent I would call that |
| 14:20:16 21 | an incomplete question, in the sense that this doesn't |
| 14:20:21 22 | read on the issue of whether it's in the U.S. or outside |
| 14:20:24 23 | the U.S. Without that limitation, as you're talking |
| 14:20:29 24 | only of net sales, you would have to assume worldwide |
| 14:20:33 25 | unless some other part of the agreement gave you a |

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 113

| | | |
|---|---|---|
| 14:20:36 | 1 | restriction otherwise. |
| 14:20:37 | 2 | MR. TROUPIS: Q. Are there other parts of the |
| 14:20:38 | 3 | agreement that do restrict it otherwise, to your |
| 14:20:39 | 4 | knowledge? |
| 14:20:41 | 5 | A. I would have to read through carefully. |
| 14:20:46 | 6 | Do you want me to look? |
| 14:20:47 | 7 | Q. Yes, yes, if it would help you answer this |
| 14:20:51 | 8 | question. |
| 14:20:53 | 9 | A. So in the cross-license agreement, |
| 14:20:58 | 10 | affiliates -- be easier with a computer to search for |
| 14:21:34 | 11 | terms. |
| 14:22:07 | 12 | So in the example of this, the cross-license, |
| 14:22:10 | 13 | there's a term often explicitly stated that I don't see, |
| 14:22:14 | 14 | which is "territory." Often you'll see territory is |
| 14:22:18 | 15 | U.S., worldwide, et cetera. However, the licensed |
| 14:22:23 | 16 | patents include all of the foreigns, as far as I can |
| 14:22:27 | 17 | tell. I'm not a patent attorney. |
| 14:22:28 | 18 | And so the opportunity to infringe is |
| 14:22:32 | 19 | theoretically worldwide, and the valid claims |
| 14:22:37 | 20 | definition, 117, does not limit to U.S. A valid claim |
| 14:22:45 | 21 | could be international under that definition, and so the |
| 14:22:51 | 22 | payment of royalties does not limit to the U.S. |
| 14:22:53 | 23 | So I would come to the conclusion that if the |
| 14:22:57 | 24 | patent coverage were appropriate, there would be |
| 14:23:01 | 25 | international payments. And so it would come back to an |

Page 114

| | | |
|---|---|---|
| 14:23:06 | 1 | analysis of the patent claims and the products. |
| 14:24:35 | 2 | Q. Okay, thank you. |
| 14:24:35 | 3 | What number are we up to? |
| 14:24:38 | 4 | THE REPORTER: This is 11. |
| 14:24:39 | 5 | (Whereupon, Exhibit 11 was marked for |
| 14:24:39 | 6 | identification.) |
| 14:24:49 | 7 | MR. TROUPIS: Q. I've shown you what is |
| 14:24:50 | 8 | marked as Exhibit 11 for identification, which is a |
| 14:24:52 | 9 | letter dated October 20, 2009. Again, you'll notice |
| 14:24:57 | 10 | that the heading contains the letters or -- from the |
| 14:25:01 | 11 | Western District of Wisconsin. We mentioned that |
| 14:25:03 | 12 | before. So this is an exhibit in those proceedings. |
| 14:25:08 | 13 | And it's a letter directed to Promega Corporation, |
| 14:25:12 | 14 | signed by Traci Libby. |
| 14:25:14 | 15 | And I'll ask you first, have you seen this |
| 14:25:18 | 16 | before? |
| 14:25:18 | 17 | A. I believe so. |
| 14:25:20 | 18 | Q. What is your understanding of what it is -- |
| 14:25:23 | 19 | what is the purpose of this letter? |
| 14:25:26 | 20 | MS. JOHNSON: And, again, I would caution you |
| 14:25:27 | 21 | not to divulge any communications that you may have had |
| 14:25:31 | 22 | with counsel. To the extent that you can answer the |
| 14:25:34 | 23 | question without disclosing such communications, you may |
| 14:25:43 | 24 | do so. |
| 14:25:44 | 25 | THE WITNESS: Give me a moment to read through |

Page 115

| | | |
|---|---|---|
| 14:25:46 | 1 | it again. |
| 14:25:53 | 2 | Could you reread the question one more time. |
| 14:26:37 | 3 | (Record read by the reporter.) |
| 14:26:56 | 4 | THE WITNESS: So in reading this letter, I |
| 14:26:56 | 5 | think the purpose of the letter would be largely |
| 14:26:59 | 6 | contained in the second to last paragraph. |
| 14:27:03 | 7 | "We firmly request Promega's prompt attention |
| 14:27:07 | 8 | into this matter, including payment of outstanding |
| 14:27:10 | 9 | amounts due, which are articulated above in the letter, |
| 14:27:13 | 10 | in correction of this issue going forward." |
| 14:27:20 | 11 | MR. TROUPIS: Q. Were you involved in the |
| 14:27:23 | 12 | preparation of this letter? |
| 14:27:24 | 13 | A. I believe so -- yes. Not I believe so. Yes. |
| 14:27:30 | 14 | Q. Did you, in fact, revise various drafts of |
| 14:27:34 | 15 | this letter as you were going through -- as it was being |
| 14:27:39 | 16 | prepared? |
| 14:27:40 | 17 | MS. JOHNSON: To the -- and I would caution |
| 14:27:41 | 18 | the witness again not to the divulge communications with |
| 14:27:45 | 19 | counsel to the extent that the question can be answered |
| 14:27:48 | 20 | without doing so. |
| 14:27:50 | 21 | THE WITNESS: I can't point to a specific |
| 14:27:51 | 22 | change, but I believe I participated in a review of this |
| 14:27:54 | 23 | and probably made suggestions. |
| 14:27:57 | 24 | MR. TROUPIS: Q. Was this before you took on |
| 14:28:03 | 25 | the position you now fill, described a little bit |

Page 116

| | | |
|---|---|---|
| 14:28:08 | 1 | earlier, as solving strategic settlements? |
| 14:28:14 | 2 | A. Yes. This is October 20, 2009. |
| 14:28:16 | 3 | Q. So at that time what was your position? |
| 14:28:22 | 4 | A. I was senior director of business development |
| 14:28:27 | 5 | at that time, working in the MBS division. |
| 14:28:34 | 6 | Q. In October of 2009, had the GOLC committee or |
| 14:28:40 | 7 | group been formed? |
| 14:28:42 | 8 | A. Yes. |
| 14:28:43 | 9 | Q. Was this the result, in part, of discussions |
| 14:28:47 | 10 | that took place in that committee? |
| 14:28:52 | 11 | MS. JOHNSON: By "this" -- |
| 14:28:53 | 12 | MR. TROUPIS: Q. By "this" I mean Exhibit 11. |
| 14:28:57 | 13 | A. It's kind of sometimes difficult to parse, but |
| 14:29:01 | 14 | I would say no. The proper answer here is no. |
| 14:29:04 | 15 | Q. Was it not discussed at that committee? "It" |
| 14:29:08 | 16 | being that a letter would be sent to Promega about an |
| 14:29:16 | 17 | underpayment. |
| 14:29:23 | 18 | A. You know, I have to say that I don't remember |
| 14:29:25 | 19 | each detail of each meeting. I would expect that in a |
| 14:29:29 | 20 | regular update meeting there would be a mention that the |
| 14:29:32 | 21 | letter was going out or something to that effect, |
| 14:29:35 | 22 | because it would have been one of the projects, members |
| 14:29:38 | 23 | of the committee, that had some attention. |
| 14:30:02 | 24 | (Whereupon, Exhibit 12 was marked for |
| 14:30:02 | 25 | identification.) |

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

**Page 117**

14:30:11  1      MR. TROUPIS:  Show you what has been marked as
14:30:14  2  Exhibit 12 for identification, and it appears to be an
14:30:18  3  email -- a sequence of emails.
14:30:20  4      Q.  You'll again notice there's a Bates number on
14:30:23  5  the lower right-hand side, this time IVGN1983 through
14:30:30  6  1986.
14:30:32  7      And if you'll turn, please, to the final page
14:30:36  8  of that, which is 1986, the salutation from Vicki Singer
14:30:46  9  is, "Dear GOLC members," and on page 1983 in that same
14:30:57 10  sequence is a discussion of Promega's underpayment.
14:31:07 11      Can you take a minute to review the entire
14:31:09 12  email, please.
14:31:10 13      A.  Sure.  Start from the back.
14:35:36 14      Q.  Have you had a chance to review it?
14:35:39 15      A.  Not all the way.
14:35:42 16      Q.  Okay.
14:37:34 17      A.  Okay.
14:37:42 18      Q.  Let me focus first on page 1986, which is the
14:37:47 19  last page, which the emails run -- this is actually
14:37:51 20  first in the sequence, and there's an email dated
14:37:55 21  August 19, 2009, that I mentioned earlier.
14:38:02 22      Now, I would like to focus on the second to
14:38:04 23  last -- third to last paragraph, because the way they
14:38:08 24  got it numbered there, that starts out "I am
14:38:11 25  anticipating."  And the sentence continues, "I am

**Page 118**

14:38:15  1  anticipating a presentation where we focus on the size
14:38:19  2  of the gap, recognizing that the conservative SR1 plans
14:38:24  3  fill much but not all of it, and then show that we've
14:38:28  4  identified a number of interesting opportunities that
14:38:31  5  could not only fill this gap but also enable the company
14:38:34  6  as a whole to grow rapidly but that there is a
14:38:38  7  significant risk involved."
14:38:40  8      What is your understanding of "fill this gap"?
14:38:47  9  What gap is being referred to there?  What did you
14:38:50 10  understand it to mean?
14:39:00 11      A.  It's slightly ambiguous.  It refers, though,
14:39:04 12  in a way, to the gap between either the royalty revenues
14:39:09 13  that we obtained last year and were likely to obtain in
14:39:12 14  the following year, or it may more specifically refer to
14:39:16 15  a gap between what management wanted and what we were
14:39:20 16  saying we could deliver.  Reading this, I'm not a
14:39:22 17  hundred percent sure which, but I think it was the
14:39:24 18  former.
14:39:26 19      Q.  Okay.  In either one of those, the gap is
14:39:34 20  the -- in either one of those, the purpose is to find a
14:39:43 21  way to reduce the losses of revenue from licenses.
14:39:53 22  We've been talking about that before.
14:39:57 23      A.  Perhaps more appropriately augment the revenue
14:40:00 24  from the licensing group.
14:40:02 25      Q.  Okay.  That's fair.

**Page 119**

14:40:04  1      And by "augment" we mean increase the revenue
14:40:07  2  from that?
14:40:07  3      A.  Yes, increase.
14:40:12  4      Q.  Up above on that same page, 1986, there is a
14:40:16  5  conclusion of a long email from you to Vicki Singer and
14:40:21  6  others that begins on page 1984 and ends on 1986, and
14:40:28  7  the last paragraph says, "I am curious/concerned about
14:40:32  8  the bullet regarding the" -- half a quote -- "new
14:40:39  9  diagnostic division."
14:40:41 10      What were you referring to there, "new
14:40:45 11  diagnostic division"?
14:40:50 12      A.  Similar to when we were talking about the
14:40:54 13  other presentation.  There was an aspiration to be more
14:40:57 14  into diagnostics, and building up there was a small
14:41:00 15  effort that was -- aspiration we built up into a larger
14:41:05 16  effort.
14:41:05 17      Q.  Did that ever happen?  Was there ever a new
14:41:09 18  diagnostic division?
14:41:11 19      A.  A hard question to answer, because we don't
14:41:14 20  have divisions now.  But there has been continued
14:41:17 21  interest in diagnostics in our company and increased
14:41:21 22  investment in diagnostics.
14:41:21 23      Q.  And where does that occur within the company?
14:41:23 24  Are the products directed to the diagnostic area in a
14:41:29 25  single area of the company, single division, referred to

**Page 120**

14:41:33  1  as droops and divisions and markets, so I apologize if
14:41:37  2  I'm not as clear.  But where would funds be placed to
14:41:43  3  develop diagnostics?
14:41:46  4      A.  It's a matter of definitions.  It's hard to
14:41:50  5  answer your question.
14:41:51  6      Q.  So is clinical diagnostics funded in multiple
14:41:58  7  areas of the company?
14:42:01  8      MS. JOHNSON:  Objection.  Lack of foundation
14:42:02  9  and vague and ambiguous.
14:42:05 10      It may be helpful if you specify what products
14:42:08 11  you're talking about.
14:42:12 12      MR. TROUPIS:  Q.  You know, does
14:42:14 13  Life Technologies market certain products to clinical
14:42:18 14  diagnostics?
14:42:20 15      A.  Does Life Technologies market certain products
14:42:23 16  to clinical diagnostic -- to clinical diagnostic
14:42:29 17  companies?
14:42:30 18      Q.  Clinical diagnostic companies.
14:42:37 19      A.  I'm just having trouble parsing out the right
14:42:39 20  way to answer your question, because we do a lot of
14:42:44 21  different kinds of business.  We have announced, for
14:42:49 22  instance, a collaboration with GSK, maybe a year ago
14:42:54 23  where we would work with them, I don't remember the
14:42:57 24  details of the announcement, but it's a diagnostics
14:43:00 25  collaboration.  We sell a thermal cycler to Abbott

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 121

| | |
|---|---|
| 14:43:04 | 1 Laboratories that we OEM to them for their diagnostics |
| 14:43:11 | 2 divisions. |
| 14:43:11 | 3   Q.  So various products are, fair to say, are sold |
| 14:43:16 | 4 by various parts of the company to clinical diagnostic |
| 14:43:23 | 5 companies? |
| 14:43:39 | 6   A.  If I could rephrase your question. |
| 14:43:43 | 7   Q.  Please do. |
| 14:43:45 | 8   A.  Clinical diagnostic companies often buy a |
| 14:43:46 | 9 variety of products from us that come from different |
| 14:43:50 | 10 parts of the company. |
| 14:43:51 | 11   Q.  There's no one division focused on clinical |
| 14:43:54 | 12 diagnostics.  Is that a fair statement? |
| 14:43:57 | 13   A.  I don't think so.  I apologize for being a |
| 14:44:04 | 14 stickler, but we don't have divisions.  So there's no |
| 14:44:09 | 15 divisions.  But I think what you're asking is a |
| 14:44:11 | 16 department, a group or something.  There is a part of |
| 14:44:13 | 17 the company that focuses exclusively on clinical uses, |
| 14:44:18 | 18 but that's not the entirety of my company's interest in |
| 14:44:23 | 19 that field. |
| 14:44:24 | 20   Q.  What department is that?  What department is |
| 14:44:31 | 21 that? |
| 14:44:33 | 22   A.  I don't know the title.  I mean -- |
| 14:44:38 | 23   Q.  How would you expect me to, then? |
| 14:44:41 | 24     Who heads that department? |
| 14:44:47 | 25   A.  It's probably Kim Caple, C-A-P-L-E.  If she's |

Page 122

| | |
|---|---|
| 14:44:54 | 1 not the head, she works for the head or, you know, I |
| 14:44:56 | 2 don't know the precise structure. |
| 14:45:00 | 3   Q.  What products do they sell in that department |
| 14:45:04 | 4 or market? |
| 14:45:05 | 5   A.  It's more about development at this stage, |
| 14:45:08 | 6 looking to develop clinical diagnostic tests, also with |
| 14:45:15 | 7 the instrumentation software, just the equipment needed |
| 14:45:18 | 8 to do clinical diagnostics. |
| 14:45:20 | 9   Q.  So do they have -- they don't formally sell |
| 14:45:24 | 10 products at this point from that -- assigned to that |
| 14:45:27 | 11 department? |
| 14:45:27 | 12   A.  I don't know what is assigned -- what sales |
| 14:45:30 | 13 are assigned to their group versus other groups.  Just |
| 14:45:38 | 14 to add -- we talked about the Abbott Laboratories.  We |
| 14:45:43 | 15 sell them a thermal cycler that they then sell in a |
| 14:45:47 | 16 diagnostic space.  I don't know if Kim Caple's group |
| 14:45:56 | 17 gets credit for those sales or a different group gets |
| 14:45:59 | 18 credit for those sales.  I'm not part of the marketing |
| 14:46:02 | 19 or sales organization. |
| 14:46:05 | 20   Q.  Yeah, where is Kim located? |
| 14:46:09 | 21   A.  In the Bay Area, this campus. |
| 14:46:20 | 22   Q.  Going back to your email, email from you to |
| 14:46:23 | 23 Vicki Singer that begins on 1984 and continues to 1986. |
| 14:46:34 | 24 There's a slide 11 on 1985, and it says, "As we've |
| 14:46:44 | 25 discussed before, this deal is very unlikely to impact |

Page 123

| | |
|---|---|
| 14:46:50 | 1 our HID business." |
| 14:46:50 | 2     What was "this" that you're referring to? |
| 14:47:10 | 3   A.  It would be resolution of the dispute with |
| 14:47:13 | 4 Promega. |
| 14:47:21 | 5   Q.  And so the peanut butter reference here is |
| 14:47:25 | 6 Promega, which I find entertaining in itself, but I'm |
| 14:47:29 | 7 just asking, is that the reference that you're referring |
| 14:47:30 | 8 to? |
| 14:47:31 | 9   A.  I believe so, yes. |
| 14:47:46 | 10   Q.  Then the following up to page 1984, so we're |
| 14:47:50 | 11 kind of going in reverse order, but the proper time |
| 14:47:53 | 12 sequence order, Todd Krueger writes back to you and |
| 14:48:01 | 13 talks about, "I would like to discuss your comments on |
| 14:48:05 | 14 slide 11, as it would undoubtedly irritate those in |
| 14:48:11 | 15 Genetic Systems, especially Peter, Lenny and Kip."  And |
| 14:48:17 | 16 then the last sentence, "If such a decision has been |
| 14:48:19 | 17 made, who made it and when?" |
| 14:48:22 | 18     And I isolate those two.  The first is, who |
| 14:48:26 | 19 are Peter, Lenny, and Kim? |
| 14:48:31 | 20   A.  Peter is Peter Christy, C-H-R-I-S-T-Y; Lenny |
| 14:48:41 | 21 is Lenny Kleven, K-L-E-V-E-N; and Kip Miller, |
| 14:48:49 | 22 M-I-L-L-E-R. |
| 14:48:52 | 23   Q.  Mr. Krueger is reflecting -- |
| 14:48:55 | 24   A.  Krueger. |
| 14:48:56 | 25   Q.  I apologize. |

Page 124

| | |
|---|---|
| 14:48:57 | 1     Krueger, I apologize. |
| 14:48:57 | 2     -- quote, "It will undoubtedly irritate those |
| 14:49:01 | 3 in Genetics Systems" and then names those people. |
| 14:49:01 | 4     Why did he believe it would irritate them, if |
| 14:49:04 | 5 you know? |
| 14:49:09 | 6   A.  At the time, my understanding was that they |
| 14:49:13 | 7 were assuming that any resolution would result in |
| 14:49:19 | 8 ongoing benefit to their sales organization. |
| 14:49:28 | 9   Q.  So why would they, then, be irritated?  Was |
| 14:49:32 | 10 there going to be -- did slide 11 suggest that it would |
| 14:49:36 | 11 go somewhere else? |
| 14:49:39 | 12   A.  Yes. |
| 14:49:39 | 13   Q.  That the statement is a revenue play for the |
| 14:49:43 | 14 MBS division? |
| 14:49:44 | 15   A.  Yes. |
| 14:49:44 | 16   Q.  So these were two different divisions within |
| 14:49:48 | 17 the company? |
| 14:49:49 | 18   A.  Yes. |
| 14:49:56 | 19   Q.  And then the next email in the sequence, the |
| 14:49:59 | 20 one above that beginning on 1983 through 1984, |
| 14:50:20 | 21 consistent with what you just said, paragraph beginning, |
| 14:50:23 | 22 "Let's talk about it tomorrow.  My position is that we |
| 14:50:26 | 23 need to do what generates the best value for the |
| 14:50:30 | 24 company, but please keep in mind that the license from |
| 14:50:34 | 25 Life to Promega is part of my product line, and I will |

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 125

| 14:50:38 | 1 | be a key stakeholder in how this plays out." |
| 14:50:40 | 2 | Is that a reference to the MBS division, that |
| 14:50:45 | 3 | the revenue would be attributed to them?  Is that what |
| 14:50:48 | 4 | you were referring to there? |
| 14:50:50 | 5 | A.  Close.  I was referring to the fact that the |
| 14:50:53 | 6 | revenue under the license is attributed to us.  So if |
| 14:50:56 | 7 | the revenue changed, if there was an increase in payment |
| 14:50:59 | 8 | to make up for past underpayment, my logic was it would |
| 14:51:03 | 9 | go to the same place as the primary royalty stream. |
| 14:51:11 | 10 | Q.  It also says the license from Life to Promega. |
| 14:51:15 | 11 | So at this point in time, the license was the 2006 |
| 14:51:24 | 12 | license or the 1996 license, which one were you |
| 14:51:29 | 13 | referring to? |
| 14:51:33 | 14 | A.  In this case it didn't matter, to be honest, |
| 14:51:36 | 15 | but it was more apropos to the 1994. |
| 14:51:39 | 16 | Q.  '-6. |
| 14:51:40 | 17 | A.  '-6 license, yes. |
| 14:51:43 | 18 | Q.  Okay. |
| 14:51:45 | 19 | A.  Any license from us to Promega would have been |
| 14:51:47 | 20 | in my royalty stream. |
| 14:51:51 | 21 | Q.  That's my understanding as well. |
| 14:51:56 | 22 | Now, I'm going to take a break because they're |
| 14:51:58 | 23 | going to switch tapes.  So we can take a break right now |
| 14:52:03 | 24 | for just a quick five-minute break while they do that, |
| 14:52:06 | 25 | if you like. |

Page 126

| 14:52:08 | 1 | MS. JOHNSON:  Sure. |
| 14:52:09 | 2 | THE VIDEOGRAPHER:  This marks the end of Video |
| 14:52:10 | 3 | 2 in the deposition of Charles M. Moehle.  Going off the |
| 14:52:13 | 4 | record.  The time is 2:22 p.m. |
| 14:52:16 | 5 | (Recess taken.) |
| 15:09:05 | 6 | THE VIDEOGRAPHER:  We're back on the record. |
| 15:09:06 | 7 | Here marks the beginning of Video 3 in the deposition of |
| 15:09:10 | 8 | Charles M. Moehle.  The time is 3:09 p.m. |
| 15:09:16 | 9 | MR. TROUPIS:  Q.  Dr. Moehle, we were working |
| 15:09:18 | 10 | on -- working through Exhibit 12, marked for |
| 15:09:23 | 11 | identification, and I just have a couple more questions |
| 15:09:27 | 12 | on it. |
| 15:09:28 | 13 | On page 1983 marked for identification, the |
| 15:09:33 | 14 | very first page, there is an email from you to Charles |
| 15:09:37 | 15 | Piazza and Peter Danski.  Who are Charles Piazza and |
| 15:09:40 | 16 | Peter Danski? |
| 15:09:42 | 17 | A.  Peter Danski was my boss in 2009 and 2010. |
| 15:09:47 | 18 | Q.  Is this one of the seven people? |
| 15:09:50 | 19 | A.  No, he wasn't one of them. |
| 15:09:52 | 20 | And then Chuck, Charles Piazza, Chuck Piazza |
| 15:09:54 | 21 | was one of my peers reporting to Peter Danski.  He was |
| 15:10:01 | 22 | the head of the business group that collected the |
| 15:10:04 | 23 | royalties from the original 1996.  So it was his |
| 15:10:08 | 24 | business that would be affected by an increase or |
| 15:10:11 | 25 | decrease in that royalty stream. |

Page 127

| 15:10:13 | 1 | Q.  So he was the person at Invitrogen before the |
| 15:10:17 | 2 | merger?  When you said "his group," would he have come |
| 15:10:22 | 3 | over from Invitrogen? |
| 15:10:27 | 4 | A.  Coincidently, yes, he did come over from |
| 15:10:30 | 5 | Invitrogen, but at the merger, I mean, it didn't |
| 15:10:33 | 6 | necessarily matter where you had resided. |
| 15:10:36 | 7 | Q.  I wasn't trying to imply that.  You had |
| 15:10:40 | 8 | mentioned it was where the payments had resided. |
| 15:10:43 | 9 | A.  So the business that he ran after the merger |
| 15:10:45 | 10 | was the business that received the royalties from that |
| 15:10:49 | 11 | license.  That's the -- |
| 15:10:52 | 12 | Q.  That's the -- I apologize. |
| 15:10:54 | 13 | Who are Phoebe White and Rolando Brawer? |
| 15:10:58 | 14 | A.  Rolando was one of my reports.  He was a |
| 15:11:02 | 15 | legacy Invitrogen employee.  He's still with the |
| 15:11:05 | 16 | company.  His group, his smaller group, was also the one |
| 15:11:10 | 17 | that had managed that license prior to the merger and |
| 15:11:13 | 18 | after the merger. |
| 15:11:16 | 19 | And Phoebe White was a legacy |
| 15:11:24 | 20 | Applied Biosystems Applera employee.  At that time I |
| 15:11:27 | 21 | believe she was Peter's chief of staff, kind of helped |
| 15:11:32 | 22 | him -- she was an executive with the company, but she |
| 15:11:36 | 23 | was his right hand.  I think that was her role at that |
| 15:11:40 | 24 | time.  She had changed roles a few times in the company. |
| 15:11:45 | 25 | Q.  The email immediately above that is an email |

Page 128

| 15:11:53 | 1 | to Charles Piazza from Rolando Brawer.  And it says |
| 15:11:58 | 2 | Chuck, so that's to Mr. Piazza? |
| 15:12:00 | 3 | A.  Yes. |
| 15:12:01 | 4 | Q.  He makes a reference, and if you know, it says |
| 15:12:04 | 5 | "This one" -- "This was one of the particular matters I |
| 15:12:08 | 6 | wanted to discuss with you, and Vicki's meddling in our |
| 15:12:12 | 7 | business." |
| 15:12:12 | 8 | Do you have any idea who Vicki is in that |
| 15:12:17 | 9 | reference? |
| 15:12:18 | 10 | A.  That's Vicki Singer, Dr. Singer. |
| 15:12:33 | 11 | (Whereupon, Exhibit 13 was marked for |
| 15:12:33 | 12 | identification.) |
| 15:12:38 | 13 | MR. TROUPIS:  Q.  See, after I made that |
| 15:12:40 | 14 | comment about not having enough exhibits, I just thought |
| 15:12:44 | 15 | I'd make a Pete Carroll and tell him I didn't have |
| 15:12:48 | 16 | enough exhibits. |
| 15:12:49 | 17 | This is Exhibit 13. |
| 15:12:55 | 18 | I've handed you what's been marked as |
| 15:12:57 | 19 | Exhibit 13, Doctor, and it shows -- it appears to be an |
| 15:13:01 | 20 | email from you to Peter Danski, dated September 8, 2009. |
| 15:13:11 | 21 | And it says, "Pete, I wanted to touch base with you on |
| 15:13:17 | 22 | three issues."  And the second issue there is STRs. |
| 15:13:21 | 23 | Do you recall this email? |
| 15:13:23 | 24 | A.  Not precisely, but more or less. |
| 15:13:28 | 25 | Q.  Okay.  This appears to be much of the same |

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 129

15:13:36  1   discussion, and I'm not putting words into your mouth,
15:13:38  2   but I didn't -- it says in that STR paragraph you say,
15:13:42  3   "he seems pretty clear the ResGen IBGN license to
15:13:49  4   Promega should be transferred to GS division."
15:13:50  5        What is that a reference to, the GS division?
15:13:55  6        A.   As we discussed earlier, genetic systems
15:13:59  7   division, which is where Peter Christy worked.
15:14:05  8        Q.   Was it ever transferred to the GS division?
15:14:09  9        A.   I'm pretty sure it was not, and now we don't
15:14:12  10  talk about divisions.
15:14:19  11       Q.   Is there a GS department?
15:14:26  12       A.   I don't know that you can make a one-to-one
15:14:28  13  mapping or not.
15:14:29  14       Q.   Who was -- and you may have answered this
15:14:32  15  earlier today.  Where was the ResGen license to Promega
15:14:40  16  trans -- where is it now housed within the company, what
15:14:46  17  department has responsibility for it?
15:14:49  18       MS. JOHNSON:   Object to the extent that it
15:14:50  19  lacks foundation.
15:15:02  20       THE WITNESS:   Regardless of how you refine the
15:15:04  21  question, I think I don't know the answer with
15:15:07  22  certainty.  Over the last year, I have a different role
15:15:10  23  and I don't pay as much attention.
15:15:13  24       MR. TROUPIS:   Q.  Okay.  Is that the same
15:15:19  25  answer with regard to the 2006 license, cross-license?

Page 130

15:15:28  1        A.   The cross-license, yeah.  I don't know
15:15:37  2   precisely who, but I think that's a moot point.  I don't
15:15:42  3   know if -- frankly, I don't know if there's any revenue
15:15:45  4   coming in under the cross-license, so I don't know the
15:15:48  5   answer.
15:15:48  6        Q.   That's fine.
15:15:49  7        The last sentence refers to "convince AJ."  Do
15:15:53  8   you know what that AJ is?
15:15:55  9        A.   Sorry, where?
15:15:57  10       Q.   The last sentence of this email, Exhibit 13.
15:16:03  11       MS. JOHNSON:   And I caution you not to divulge
15:16:06  12  communication -- I understand, I think you can answer
15:16:08  13  the question as he phrased it.
15:16:10  14       THE WITNESS:   Yeah, I think he's -- I won't
15:16:12  15  say.  AJ is a reference to the same paragraph.  It's
15:16:16  16  analytic jana.
15:16:22  17       MR. TROUPIS:   Q.  Oh, okay.
15:16:29  18       MS. JOHNSON:   You surprised us both.
15:16:32  19       THE WITNESS:   Yeah, I know.  I could tell.  I
15:16:33  20  could have played you along.
15:16:36  21       MR. TROUPIS:   Q.  I couldn't not ask the
15:16:39  22  question.
15:16:52  23       This is Exhibit 14.
15:16:55  24       (Whereupon, Exhibit 14 was marked for
15:16:55  25  identification.)

Page 131

15:17:01  1        MR. TROUPIS:   Q.  So I've handed you the
15:17:04  2   Exhibit 14 marked for identification, which is IVGN1621
15:17:12  3   to 1622.  Again, it's a sequence of emails.
15:17:25  4        You start at the back end.  It sequences
15:17:29  5   chronologically.
15:17:30  6        A.   Would you like me to read it?
15:17:33  7        Q.   Yes, please.
15:18:04  8        A.   Okay.
15:18:06  9        Q.   Starting with the first in the sequence, which
15:18:08  10  is on page 1622, there is a phrase that says, "On the
15:18:16  11  Promega sublicense, that would need to be eliminated
15:18:20  12  intercompany between legacy IVGN and AB against market.
15:18:24  13  Right now our estimate is about 200,000, 200K,
15:18:27  14  elimination for this quarter."
15:18:30  15       What is that -- can you explain that to us?
15:18:32  16  What does it mean by "the legacy" and what does it mean
15:18:40  17  by "elimination"?
15:18:41  18       A.   Yes, I can explain that.
15:18:43  19       Q.   Yes, please, explain that.
15:18:47  20       A.   Prior to the merger, Invitrogen again received
15:18:51  21  a revenue stream from Promega that was probably 300,
15:18:55  22  $400,000 a year, on that ballpark, may not be exactly
15:19:04  23  the right number.
15:19:05  24       When we started after the merger, at the
15:19:07  25  beginning of 2009, my group and any group had a revenue

Page 132

15:19:12  1   target, and the revenue target was built up from what
15:19:16  2   you had done the prior year.  So part of my revenue
15:19:20  3   target for 2009 was an amount roughly equal to what
15:19:25  4   Promega had paid to Invitrogen in 2008.
15:19:31  5        After the year started, as the accountants
15:19:35  6   went through the books here and there, they determined
15:19:38  7   that they needed to be conservative.  And if one company
15:19:43  8   paid the corporation and received money from the
15:19:45  9   corporation under the same transaction that it might be
15:19:49  10  construed as a round-trip for SEC purposes and that it
15:19:54  11  needed to be netted against each other and whatever the
15:19:57  12  impact would on the company's books.
15:19:59  13       So my department lost two -- looks like
15:20:02  14  $200,000 in revenue that we were still accountable for.
15:20:10  15       Q.   And that appears to be the topic all the way
15:20:13  16  through this?
15:20:14  17       A.   Yes.  That is that chain.
15:20:17  18       Q.   Now, I understand what Promega STR round-trip
15:20:21  19  means.  Thank you.
15:20:30  20       (Whereupon, Exhibit 15 was marked for
15:20:30  21  identification.)
15:20:42  22       MR. TROUPIS:   Q.  I've handed you what's been
15:20:44  23  marked Exhibit 15 for identification.  Again, it appears
15:20:47  24  to be an email from you to Rolando Brawer and Susan
15:20:51  25  Cole, dated November 3, 2009, and it's a sequential

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

### Page 133

15:20:57 1 email at the bottom. The first email is October 30,
15:21:02 2 2009.
15:21:03 3     Do you recall this -- you can look at it and
15:21:05 4 I'll ask, do you recall this?
15:21:15 5     A. Yeah, more or less I remember this.
15:21:22 6     Q. It appears -- we've been talking about the SR2
15:21:26 7 and the SR1 process and the GOLC process.
15:21:34 8     The second email here is from Rolando to you
15:21:38 9 and it says, "Are you going to allocate some of the
15:21:41 10 7.6 million to an eventual payment by Promega for sales
15:21:45 11 prior to the merger?"
15:21:48 12     And I noticed that it's titled "SR2
15:21:52 13 Presentation."
15:21:55 14     Can you explain what was being referred to
15:21:57 15 here in this particular sentence in the email?
15:22:00 16     A. Yes.
15:22:00 17     Q. Okay. Please do.
15:22:04 18     A. So again, the context was the SR2 process. We
15:22:08 19 had built a bottoms-up forecast of what we thought we
15:22:12 20 would do in the following year. And at the SR2
15:22:16 21 presentation, we were told everything is great, good
15:22:19 22 work, take 7.6 and add it to your number. So that was
15:22:23 23 the 7.6.
15:22:27 24     And so then it was left up to us to find a way
15:22:30 25 to earn more money. And Rolando was just asking me, you

### Page 134

15:22:35 1 know, where we were allocating the amount and he was
15:22:40 2 asking specifically would any of that come from
15:22:43 3 settlement perhaps with Promega under the Tautz,
15:22:50 4 T-A-U-T-Z, issue. And he's referring specifically to
15:22:56 5 sales prior to the merger, back royalties.
15:22:58 6     Q. Okay. Thank you for explaining that.
15:23:01 7     What is the -- did this then -- was this then
15:23:04 8 added into a document under the SR2 or a similar
15:23:12 9 document as an amount?
15:23:17 10     A. At this time when I got this challenge, if I
15:23:21 11 remember correctly, I called it aspirational, meaning
15:23:27 12 that I didn't have a direct line to it, but we had to
15:23:30 13 fill it. At some point in the year, as we did updates
15:23:33 14 on our revenues, I don't recall whether Promega Tautz,
15:23:37 15 as it's listed there, was ever listed as a specific
15:23:41 16 target for revenue or not. I don't recall.
15:23:46 17     Q. Okay. Thank you.
15:23:51 18     (Whereupon, Exhibit 16 was marked for
15:23:51 19 identification.)
15:24:31 20     MR. TROUPIS: Exhibit 15?
15:24:33 21     THE REPORTER: 16.
15:24:34 22     MR. TROUPIS: Q. I've shown you, Doctor,
15:24:36 23 what's been marked as Exhibit 16 for identification,
15:24:38 24 again a series of emails from page 850 to 852 on the
15:24:50 25 Bates numbers. This actually is a continuation of one

### Page 135

15:24:56 1 we saw a little bit earlier, but it's actually from
15:25:02 2 2008. My apologies, because it's out of sequence from
15:25:08 3 what we were discussing.
15:25:10 4     But my focus here, this appears to be during
15:25:13 5 that time period we did discuss earlier when the
15:25:16 6 agreements are being exchanged from you to --
15:25:24 7     A. Chow Lee.
15:25:25 8     Q. -- Chow Lee.
15:25:27 9     And it -- there's a -- second to the last of
15:25:34 10 the emails 12/5/2008, 522.
15:25:42 11     And it says "Hi, Charlie, do you know the name
15:25:44 12 of the person at ABI that is responsible for paying
15:25:48 13 royalty to Promega?" And then it's -- there's a
15:25:53 14 description provided by Chow Lee of the agreement.
15:26:03 15     And then you say, "Peter should own this" at
15:26:06 16 the top. Is that Peter Christy?
15:26:08 17     A. Yes, whom I copied on the email.
15:26:16 18     Q. Do you know if there was contact at this point
15:26:19 19 in time with Max Planck regarding the ability to pay an
15:26:26 20 amount directly to Max Planck?
15:26:29 21     A. I'm sorry, regarding?
15:26:31 22     Q. I'll quote the sentence. It says, "So
15:26:33 23 moving" -- and this is in the second email in the
15:26:36 24 sequence. "So moving forward after 2009,
15:26:38 25 Life Technologies can pay 2 percent to Max Planck

### Page 136

15:26:43 1 directly instead of 5.5 percent to Promega."
15:26:48 2     Do you recall that there were discussions with
15:26:50 3 Max Planck at or about this time concerning this mat --
15:26:54 4 the matter addressed in this email?
15:27:00 5     A. I do not recall. I know there had been
15:27:03 6 discussions with Max Planck, but I don't know when they
15:27:06 7 started.
15:27:08 8     Q. Do you know why Chow Lee had come to the
15:27:10 9 conclusion that -- why you could pay 2 percent to
15:27:16 10 Max Planck directly instead of 5 percent to Promega?
15:27:32 11     A. Not really. I mean, I could try to infer,
15:27:36 12 meaning that I'd be speculating.
15:27:39 13     Q. You don't know whether there was or wasn't a
15:27:42 14 meeting at this point in time, 2008?
15:27:45 15     A. Correct. I do not know if there was or wasn't
15:27:49 16 a meeting with Max Planck at that date.
15:27:54 17     Q. Has there been any separate agreement entered
15:27:56 18 into with Max Planck that they would accept 2 percent in
15:27:58 19 settlement of the obligations under that 1996 agreement?
15:28:05 20     MS. JOHNSON: And I would caution the witness
15:28:07 21 not to divulge any communications with counsel.
15:28:09 22     MR. TROUPIS: And I'm not asking that.
15:28:10 23     MS. JOHNSON: If you can answer without doing
15:28:12 24 so, then you may answer.
15:28:17 25     THE WITNESS: Even if there's confidentiality?

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 137

| | |
|---|---|
| 15:28:23 | 1 MS. JOHNSON: I think -- |
| 15:28:24 | 2 Counsel, perhaps it would make sense for us to |
| 15:28:26 | 3 return to this document later on, or we can confer about |
| 15:28:30 | 4 it now. I think the concern would be -- |
| 15:28:32 | 5 MR. TROUPIS: And I'm not trying to open up |
| 15:28:34 | 6 whole new avenues. |
| 15:28:35 | 7 Speaking of that, I had asked about the HID |
| 15:28:37 | 8 Roche question. What have you determined? |
| 15:28:40 | 9 MS. JOHNSON: We can come back to that |
| 15:28:42 | 10 whenever you like. The concern with that particular |
| 15:28:45 | 11 sentence, and just to be clear, we should probably refer |
| 15:28:50 | 12 on the record to the document that raises the question. |
| 15:28:53 | 13 Deposition Exhibit 4. |
| 15:29:07 | 14 MR. TROUPIS: Yes. |
| 15:29:07 | 15 MS. JOHNSON: And I believe that the reference |
| 15:29:08 | 16 was on page 4. |
| 15:29:11 | 17 MR. TROUPIS: That's correct. |
| 15:29:12 | 18 MS. JOHNSON: Control No. 1612 of that |
| 15:29:14 | 19 document. The concern is apparently at this time, there |
| 15:29:19 | 20 were ongoing discussions between Roche and |
| 15:29:22 | 21 Life Technologies regarding the resolution of various |
| 15:29:26 | 22 disputes. There were confidentiality agreements with |
| 15:29:28 | 23 Roche regarding those discussions. And so the concern |
| 15:29:31 | 24 is any disclosure of the content could potentially be in |
| 15:29:36 | 25 violation of those confidentiality agreements. It's a |

Page 138

| | |
|---|---|
| 15:29:40 | 1 confidentiality concern, I believe, more than a |
| 15:29:42 | 2 privilege concern. |
| 15:29:47 | 3 MR. TROUPIS: Let's think about that. We are |
| 15:29:50 | 4 under protective order, but by the same token, I don't |
| 15:29:54 | 5 particularly want people to have to get into problems |
| 15:29:57 | 6 they don't need to get into. |
| 15:29:59 | 7 MS. JOHNSON: And I understand the protective |
| 15:30:01 | 8 order. I simply have not seen the confidentiality |
| 15:30:05 | 9 agreement at issue. Typically disclosure would not be |
| 15:30:06 | 10 allowed absent consent or a court order. |
| 15:30:09 | 11 MR. TROUPIS: And why don't we -- and I'll -- |
| 15:30:11 | 12 let's leave that, then, we've left it on the record, |
| 15:30:14 | 13 that we may follow up with a written question with |
| 15:30:17 | 14 regard to that after you've made that determination. |
| 15:30:20 | 15 MS. JOHNSON: That might be a better way to |
| 15:30:22 | 16 handle it. |
| 15:30:23 | 17 MR. TROUPIS: So we don't need to force the |
| 15:30:27 | 18 question today. I don't want to do that, as much as I |
| 15:30:31 | 19 find litigating with Roche entertaining. Not half as |
| 15:30:49 | 20 entertaining as Applied Biosystems. |
| 15:31:07 | 21 (Whereupon, Exhibit 17 was marked for |
| 15:31:07 | 22 identification.) |
| 15:31:14 | 23 MR. TROUPIS: What number are we on? |
| 15:31:17 | 24 THE REPORTER: 17. |
| 15:31:32 | 25 MR. TROUPIS: Q. I've handed you Exhibit 17 |

Page 139

| | |
|---|---|
| 15:31:35 | 1 marked for identification, a May 4, 2010, demand for |
| 15:31:38 | 2 arbitration from Life Technologies from Promega |
| 15:31:46 | 3 Corporation signed by Traci Libby. |
| 15:31:47 | 4 And my question to you is, have you seen this |
| 15:31:49 | 5 before? |
| 15:31:50 | 6 A. I think so. |
| 15:31:58 | 7 Q. Did you participate in the drafting of this |
| 15:32:00 | 8 letter? |
| 15:32:02 | 9 A. I may have, but I don't recall for sure. My |
| 15:32:06 | 10 involvement in this case was not every step in every -- |
| 15:32:10 | 11 so I don't recall for sure. |
| 15:32:22 | 12 Q. Were you -- given your position at the time in |
| 15:32:24 | 13 the company in May 2010, was your approval required |
| 15:32:32 | 14 before this demand for arbitration can be sent by Traci |
| 15:32:35 | 15 Libby? |
| 15:32:50 | 16 A. That's a -- not formally. |
| 15:32:54 | 17 Q. But as part of your responsibilities with your |
| 15:33:05 | 18 position, you did participate in the decision-making to |
| 15:33:11 | 19 issue the demand for arbitration, didn't you? |
| 15:33:16 | 20 A. I believe so, yes. |
| 15:33:33 | 21 Q. Back to the 2006 agreement, which is -- is |
| 15:33:43 | 22 that Exhibit 5? Yes, Exhibit 5. |
| 15:34:14 | 23 Following the signing of Exhibit 5, the |
| 15:34:16 | 24 cross-license agreement, you and Dr. Dimond had a number |
| 15:34:23 | 25 of discussions; is that right? |

Page 140

| | |
|---|---|
| 15:34:27 | 1 A. Following the signing? |
| 15:34:30 | 2 Q. After the signing. |
| 15:34:34 | 3 A. Sitting here today, I don't recall. |
| 15:34:36 | 4 Q. Oh, by the way, now Dimond can come back. |
| 15:34:40 | 5 We're going to talk about the discussions you and he |
| 15:34:45 | 6 had. |
| 15:34:46 | 7 MS. JOHNSON: And, for the record, we'll |
| 15:34:49 | 8 designate the entire portion after Dr. Dimond and |
| 15:34:51 | 9 Mr. Ghoca left the room as attorneys' eyes only up to |
| 15:34:57 | 10 this point. |
| 15:35:01 | 11 MR. TROUPIS: That's fine. |
| 15:35:01 | 12 (End attorneys' eyes only portion.) |
| 15:37:08 | 13 (Discussion off the record.) |
| | 14 |
| | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| | 25 |

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

## Page 141

15:37:09  1    THE VIDEOGRAPHER: Back on the record. The
15:37:09  2  time is 3:37 p.m.
15:37:10  3    (Whereupon, Exhibit 18 was marked for
15:37:10  4  identification.)
15:37:12  5    MR. TROUPIS: Q. Doctor, I've shown you what
15:37:15  6  has been marked Exhibit 18 for identification. It is a
15:37:18  7  sequence of emails, beginning with a lengthy email from
15:37:22  8  Dr. Randall Dimond of January 7, 2007, and then a
15:37:27  9  responding email from you on January 8, 2007. I'll ask
15:37:30  10  you to review that. I wanted to ask you a few questions
15:37:35  11  about this email exchange that you and Dr. Dimond had.
15:38:42  12    A. Okay.
15:38:47  13    Q. Do you recall this email?
15:38:52  14    A. Not really. Not in any detail.
15:38:55  15    Q. Do you recall the matter being raised in the
15:38:58  16  email a lot about this time?
15:39:04  17    A. It's kind of -- I don't really remember.
15:39:10  18    Q. In the email from Dr. Dimond, he is talking
15:39:13  19  about the definition in the 2006 cross-license, and he's
15:39:24  20  talking -- and he makes references to the fact that
15:39:27  21  there apparently has arisen a dispute between the two
15:39:32  22  companies, Promega and Applied Biosystems, about whether
15:39:35  23  or not certain combination products should have factored
15:39:42  24  out some nonlicensed portions of those products.
15:39:49  25    And that was the substance of the email, the

## Page 142

15:39:54  1  email exchange.
15:39:55  2    Do you recall how this resolved?
15:39:56  3    A. No, I do not.
15:40:15  4    Q. Do you recall talking to Dr. Dimond about this
15:40:19  5  or anybody at Applied Biosystems about this matter?
15:40:22  6    A. Sitting here today, I don't recall this.
15:40:40  7    Q. There are two items in this email. The second
15:40:43  8  item has to do with the service contracts and AB
15:40:49  9  instrumentation.
15:40:51  10    Do you recall the provisions of the 2006
15:40:55  11  agreements that related to AB's instrumentation and the
15:40:59  12  warranties it provided to Promega so that its reagents
15:41:06  13  could continue to be used on that instrumentation?
15:41:10  14    A. I remember the 2006 agreement. I don't
15:41:12  15  strictly remember if it was a warranty ownership, but
15:41:14  16  you know what you're talking about.
15:41:16  17    Q. What was your understanding with regard to
15:41:19  18  ABI's obligations concerning it's instrumentation and
15:41:24  19  the use of Promega reagents?
15:41:30  20    A. It's a little bit of a vague question. If you
15:41:33  21  could maybe just clarify more -- I don't have the
15:41:37  22  agreement --
15:41:37  23    Q. Yes, you do. We can look at sections 5.1.
15:41:41  24  Actually, it's of the settlement agreement. And I made
15:41:45  25  reference to the wrong document, so I do apologize.

## Page 143

15:41:52  1  It's Exhibit 5.
15:42:15  2    Q. And your question again?
15:42:16  3    Q. What's your understanding about AB's
15:42:21  4  obligations to continue to have its -- to continue to
15:42:30  5  provide assurances that Promega's reagents will be
15:42:34  6  usable on ABG instrumentation?
15:42:44  7    A. My understanding is that there was an
15:42:46  8  agreement that an instrument -- without specifically --
15:42:51  9    Q. And that's why I was asking you in a general
15:42:53  10  way.
15:42:55  11    A. -- that an instrument -- one of ABI's
15:43:00  12  instruments would be kept on the market that was
15:43:03  13  compatible with Promega chemistries. This was a heavily
15:43:09  14  negotiated point, very important to Promega, as part of
15:43:11  15  the cross-license and settlement.
15:43:14  16    Q. And to your knowledge, has ABG continued to
15:43:19  17  abide by that provision?
15:43:25  18    A. I am not so directly -- I mean, my knowledge
15:43:28  19  is not very detailed of whether we did or not. I saw in
15:43:31  20  what you provided me that Dr. Dimond was raising a
15:43:35  21  concern that we were not apparently, in his mind, living
15:43:38  22  up to our obligations.
15:43:40  23    Q. I didn't mean it to imply some answer.
15:43:45  24    Is it your understanding that ABG continues to
15:43:48  25  believe that it has the obligation to provide the

## Page 144

15:43:53  1  assurances that you just described?
15:43:55  2    A. For the time period specified in the
15:43:57  3  agreement, it is my understanding that we have signed up
15:44:00  4  for that obligation.
15:44:05  5    Q. Do you recall any other conversations with
15:44:09  6  Dr. Dimond or anyone at Promega concerning that
15:44:16  7  obligation, that obligation being the instrument --
15:44:16  8    MS. JOHNSON: Excuse me. After execution of
15:44:17  9  the agreement or?
15:44:17  10    MR. TROUPIS: Subsequent to the agreement,
15:44:17  11  yes.
15:44:17  12    THE WITNESS: I've lost a little bit of
15:44:17  13  track -- with whom?
15:44:21  14    MR. TROUPIS: Q. With anyone at Promega, I
15:44:24  15  broadened it beyond Dr. Dimond.
15:44:26  16    A. No, I don't recall. I'm not saying I didn't.
15:44:28  17  I just don't recall at this point.
15:44:59  18    (Whereupon, Exhibit 19 was marked for
15:44:59  19  identification.)
15:45:18  20    MR. TROUPIS: Q. Doctor, I've shown you what
15:45:19  21  has been marked as Exhibit 19 for identification. It
15:45:22  22  begins with a letter of February 2, 2010. And then in
15:45:28  23  sequence, there's an April 29, 2010, letter. These are
15:45:34  24  letters to Promega from Life Technologies and then a
15:45:40  25  letter of October 28, 2010.

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 145

15:45:47   1   And I'll represent to you that these were
15:45:49   2   letters received by Promega, as I said, from
15:45:53   3   Life Technologies or, last instance, Applied Biosystems.
15:45:59   4     A.   Sorry. If I can ask one question.
15:46:01   5     Q.   Certainly.
15:46:01   6     A.   Why are there no Bates numbers on these?
15:46:05   7     Q.   Because I couldn't find the Bates-numbered
15:46:10   8   version of these. Not because they haven't been
15:46:12   9   provided. These are all documents that came from you,
15:46:13   10   not from us. But they were provided to us, and they are
15:46:13   11   contained in our records and have been filed in multiple
15:46:17   12   proceedings. But I do apologize. I simply couldn't
15:46:22   13   find them.
15:46:25   14     MS. JOHNSON: I'm sorry to interrupt.
15:46:26   15   Just to clarify, when you say they're
15:46:27   16   documents provided by you?
15:46:30   17     MR. TROUPIS: By "you" I mean
15:46:30   18   Life Technologies or Applied Biosystems. They sent them
15:46:35   19   to us, Promega.
15:46:38   20     MS. JOHNSON: Thank you.
15:46:38   21     MR. TROUPIS: Q. And let me explain my
15:46:40   22   understanding of what these are, and that will be
15:46:43   23   helpful for you to answer the questions, and that is
15:46:46   24   that there are payments made on the cross-licenses and
15:46:53   25   over time by Life Technologies or Applied Biosystems to

Page 146

15:46:58   1   Promega and for various products.
15:47:08   2     Those have been corrected from time to time by
15:47:13   3   Life Technologies or Applied Biosystems. And these are
15:47:19   4   some of those corrections referencing the -- referencing
15:47:25   5   the period in 2009 into 2010. This is when they were
15:47:34   6   talked about, but as the directions go to a series of
15:47:40   7   years, beginning in 2009, we're trying to determine what
15:47:47   8   was the basis of this -- these corrections, and that is
15:47:54   9   my question to you, were you involved in these
15:48:05   10   corrections --
15:48:06   11     A.   I believe not. I don't recall a discussion of
15:48:08   12   corrections to Promega. So I don't think I had any
15:48:13   13   involvement in this.
15:48:15   14     Q.   So you don't know what the basis of, then,
15:48:18   15   following -- my question is simply that you don't know
15:48:21   16   the basis of these corrections?
15:48:22   17     A.   No. Sitting here, I don't recall. If I heard
15:48:27   18   this, it went by me. I don't recall this at all.
15:48:40   19     Q.   Does Lorna Quitoriano, does she work with you
15:48:47   20   or work for you? Obviously, she's an employee.
15:48:50   21     A.   Lorna has never worked for me.
15:48:54   22     Q.   It says it's licensing management and contract
15:48:59   23   compliance, that's the second in the sequence, the
15:49:02   24   April 29, 2010, letter --
15:49:06   25     A.   I'm sorry, about how many pages?

Page 147

15:49:08   1     Q.   Third -- fourth page in. So she refers to
15:49:15   2   herself as licensing management and contracts
15:49:18   3   compliance.
15:49:19   4     A.   Right.
15:49:20   5     Q.   What is that?
15:49:22   6     A.   That's part of Traci Libby's group. They do
15:49:25   7   the accounting. They collect the royalties. They see
15:49:28   8   to it that the checks go out on time.
15:49:30   9     Q.   So this -- Lorna, that would be somebody
15:49:35   10   answering to -- within the structure of Traci Libby?
15:49:38   11     A.   Yes.
15:49:44   12     Q.   Do you know what their role is when it comes
15:49:47   13   to contracts compliance? How they carry out that role?
15:49:54   14     A.   Maybe could you be more specific.
15:49:56   15     Q.   Yeah, you know, I'm trying to -- as a
15:50:00   16   precursor, I'm trying to determine how they go about
15:50:03   17   their jobs. And so my question is, when it says
15:50:07   18   "contract compliance," do you know how they go about the
15:50:11   19   process of contract compliance?
15:50:17   20     A.   Not in a specific or detailed way.
15:50:20   21     Q.   Do you know in a general way? Let me put it
15:50:23   22   differently. What's your general understanding?
15:50:26   23     A.   My general understanding of Lorna's role is
15:50:29   24   along the lines of, like I said a few moments ago, of
15:50:33   25   checking that the checks come in, checking that the

Page 148

15:50:37   1   checks go out, writing the letters that accompany them.
15:50:42   2   It's -- my understanding is it's largely bookkeeping.
15:50:47   3     Q.   A bookkeeping or accounting process?
15:50:50   4     A.   Checking off the boxes, making sure that the
15:50:52   5   machine is running.
15:50:54   6     Q.   Not a --
15:50:55   7     A.   Raising your hand if something is wrong.
15:50:58   8     Q.   In contrast, not a substantive analysis of the
15:51:02   9   contracts themselves?
15:51:03   10     A.   I would not expect that of Lorna.
15:51:28   11     Q.   In that context of this exhibit, 19, who would
15:51:34   12   internally determine whether a product sales should no
15:51:38   13   longer be reported or royalty should not be paid on a
15:51:42   14   product?
15:51:44   15     MS. JOHNSON: At any particular point in time?
15:51:47   16     MR. TROUPIS: Same time period, 2010 -- 2009
15:51:50   17   and 2010, actually, is the time period involved.
15:51:59   18     THE WITNESS: Who would be responsible for
15:52:01   19   determining when a product is no longer royalty bearing?
15:52:04   20   Is that essentially what you're saying?
15:52:06   21     MR. TROUPIS: Q. Yes.
15:52:07   22     A.   That would depend a lot on product. It could
15:52:14   23   have come from someone in Traci's -- you know,
15:52:16   24   hypothetical, it could have come from someone in Traci's
15:52:21   25   group more senior than Lorna. It could have come from a

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 149

| | |
|---|---|
| 15:52:25 | 1 patent attorney. It could have come from a product |
| 15:52:28 | 2 manager asking questions. I'm not sure precisely what |
| 15:52:31 | 3 they're referring to. |
| 15:52:32 | 4 Q. In this instance, the products are listed |
| 15:52:35 | 5 there. They're the STR products subject to the 2006 |
| 15:52:46 | 6 agreement. Would there be a particular person in that |
| 15:52:51 | 7 instance that you would know would have that level of |
| 15:52:55 | 8 responsibility? |
| 15:52:56 | 9 A. I don't have enough information. I don't know |
| 15:52:59 | 10 what on here or what the statements were, what the |
| 15:53:02 | 11 reasons were. |
| 15:53:10 | 12 Q. Is there anyone other than Traci Libby who is |
| 15:53:12 | 13 responsible for determining the royalty obligations for |
| 15:53:19 | 14 the 2006 license agreement, the payments by ABI to |
| 15:53:27 | 15 Promega? |
| 15:53:28 | 16 A. I think ultimately it would be one of the |
| 15:53:30 | 17 patent attorneys, possibly a transaction attorney, but |
| 15:53:34 | 18 more likely a patent attorney. |
| 15:53:44 | 19 Q. What department now sells these, the products |
| 15:53:50 | 20 under the 2006 agreement, the ones that were listed in |
| 15:53:55 | 21 Exhibit 19, if you know? |
| 15:53:57 | 22 A. I don't really know their structure. We've |
| 15:54:00 | 23 talked about that a little earlier in the day. I have |
| 15:54:05 | 24 no new information. |
| 15:54:06 | 25 Q. And I'm not trying to retread old ground. |

Page 150

| | |
|---|---|
| 15:54:10 | 1 A. I have no direct involvement. That's why |
| 15:54:13 | 2 I'm -- |
| 15:54:46 | 3 (Whereupon, Exhibit 20 was marked for |
| 15:54:46 | 4 identification.) |
| 15:54:55 | 5 MS. JOHNSON: Jim, do you have a copy of that? |
| 15:54:57 | 6 MR. TROUPIS: No. I'm not going to give you a |
| 15:54:59 | 7 copy. Yes. |
| 15:55:00 | 8 THE WITNESS: So as you described before, the |
| 15:55:02 | 9 headers from the litigation. |
| 15:55:03 | 10 MR. TROUPIS: Q. Yes. And this is showing |
| 15:55:04 | 11 you Exhibit 20 marked for identification. The header |
| 15:55:07 | 12 indicates that it's filed with the Federal District |
| 15:55:10 | 13 Court, was filed with the Federal District Court in |
| 15:55:13 | 14 Madison. |
| 15:55:14 | 15 And I'll represent to you that this is -- it |
| 15:55:17 | 16 came from an internet site for -- it's the user's guide |
| 15:55:24 | 17 for the product involved here, AmpFLSTR Identifier |
| 15:55:29 | 18 Direct PCR Amplification kit. It shows a revision date |
| 15:55:31 | 19 of October 2011. |
| 15:55:44 | 20 And I provide this to you in your capacity as |
| 15:55:47 | 21 a witness for the 2006 license agreement. On the second |
| 15:55:52 | 22 page of this document, there is a limited use label |
| 15:55:59 | 23 license. |
| 15:56:00 | 24 Do you see that it notes that there, and then |
| 15:56:03 | 25 at the top it says "For research, forensic, or paternity |

Page 151

| | |
|---|---|
| 15:56:09 | 1 test only." |
| 15:56:10 | 2 And my question, I think the context of this |
| 15:56:14 | 3 document is who determines the proper wording of |
| 15:56:20 | 4 licenses of the type you're seeing here on products sold |
| 15:56:25 | 5 by Life Technologies or Applied Biosystems? |
| 15:56:32 | 6 A. What time period? |
| 15:56:34 | 7 Q. The present for now. |
| 15:56:38 | 8 A. I don't have certain knowledge, but I believe |
| 15:56:40 | 9 it would largely be Traci Libby's group in conjunction |
| 15:56:46 | 10 with the patent attorneys, perhaps with input from a |
| 15:56:54 | 11 business development person closer to the product sales. |
| 15:56:58 | 12 Q. Now, let's move it back in time. After the |
| 15:57:03 | 13 signing of the 2006 cross-license, were you involved in |
| 15:57:10 | 14 the determination of the proper marking of the products; |
| 15:57:14 | 15 that is, these also that would be provided with the |
| 15:57:19 | 16 product sold, the STR products? |
| 15:57:25 | 17 A. I had more managerial involvement than direct. |
| 15:57:31 | 18 Q. At that time who would have been responsible |
| 15:57:35 | 19 for the license language? |
| 15:57:42 | 20 A. It would have been the patent attorneys. I'm |
| 15:57:48 | 21 thinking about -- there was a change, and I'm trying to |
| 15:57:50 | 22 remember when the change occurred, 2006. I will just go |
| 15:58:06 | 23 ahead and give you both answers. |
| 15:58:08 | 24 Q. I was going to say why -- I'll get to the |
| 15:58:11 | 25 other one anyways. |

Page 152

| | |
|---|---|
| 15:58:14 | 1 A. I don't recall when the changeover occurred, |
| 15:58:16 | 2 but at the earlier time period, there was a staff of |
| 15:58:19 | 3 people that reported to me and they were led by Katie -- |
| 15:58:23 | 4 at the moment I'm forgetting Katie's last name. She's |
| 15:58:29 | 5 been separated from the company for a while. It will |
| 15:58:32 | 6 come back to me. And then she had some people under her |
| 15:58:36 | 7 that worked more closely with the patent attorneys and |
| 15:58:38 | 8 the transaction attorneys discussing the labels. |
| 15:58:43 | 9 After that, that group was moved -- was |
| 15:58:47 | 10 remained in legal, if you will, and like the rest of my |
| 15:58:51 | 11 group, moved to corporate development, and then I did |
| 15:58:54 | 12 not have the managerial oversight of that group. |
| 15:58:58 | 13 Q. So shortly after the 2006 agreement, late |
| 15:59:04 | 14 2006, 2007, you did have management responsibilities for |
| 15:59:08 | 15 some of the group that made these marketing decisions? |
| 15:59:11 | 16 A. I believe so. Again, with the caveat that I |
| 15:59:15 | 17 can't remember the precise day of when I no longer did. |
| 15:59:18 | 18 Q. But at some point, and now at least since |
| 15:59:21 | 19 before the merger, you have not had that responsibility? |
| 15:59:25 | 20 A. Correct. |
| 16:00:07 | 21 MR. TROUPIS: If we take a break, we'll come |
| 16:00:09 | 22 back and I think we'll be able to finish up. |
| 16:00:12 | 23 THE VIDEOGRAPHER: Going off the record. The |
| 16:00:13 | 24 time is 4:00 p.m. |
| 16:00:16 | 25 (Recess taken.) |

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

| | Page 153 |
|---|---|
| 16:32:17 1 | THE VIDEOGRAPHER: Back on the record. The |
| 16:32:18 2 | time is 4:32 p.m. |
| 16:32:27 3 | MR. TROUPIS: We're back on the record. |
| 16:32:27 4 | Exhibit 16, what is it? |
| 16:32:27 5 | MS. JOHNSON: I can't remember. |
| 16:32:27 6 | MR. TROUPIS: The question was the resolution |
| 16:32:29 7 | of whether or not we could discuss agreements that might |
| 16:32:33 8 | have existed between Max Planck and Life Technologies. |
| 16:32:38 9 | MS. JOHNSON: And I think there had been a |
| 16:32:38 10 | question pending that I did not allow him to answer. I |
| 16:32:42 11 | don't recall what it was. He can answer. I don't know |
| 16:32:43 12 | if you want to just restate it. |
| 16:32:43 13 | MR. TROUPIS: Is there any chance you could |
| 16:32:45 14 | actually find that question, Mr. Reporter? |
| 16:34:25 15 | (Record read by the reporter.) |
| 16:34:29 16 | THE WITNESS: So I'm reasonably sure we've not |
| 16:34:31 17 | entered into an agreement for a different royalty rate |
| 16:34:34 18 | with Max Planck. |
| 16:34:37 19 | MR. TROUPIS: Q. There's no agreement that -- |
| 16:34:38 20 | is there any agreement in the event of a resolution with |
| 16:34:43 21 | Promega of the ongoing disputes with Promega that you |
| 16:34:46 22 | would pay Max Planck a certain amount of money? |
| 16:34:50 23 | MS. JOHNSON: And I would caution you not to |
| 16:34:52 24 | divulge any privileged communications that you may have |
| 16:34:54 25 | had with counsel. If you can answer the question |

| | Page 154 |
|---|---|
| 16:34:56 1 | without doing that, then you may answer. |
| 16:34:59 2 | THE WITNESS: I'm not aware of any agreement, |
| 16:35:01 3 | any contingent agreement. |
| 16:35:04 4 | MR. TROUPIS: Q. Okay. That's fine. Thank |
| 16:35:05 5 | you. |
| 16:35:12 6 | One other document that I'd like -- let's have |
| 16:35:19 7 | this marked. |
| 16:35:29 8 | (Whereupon, Exhibit 21 was marked for |
| 16:35:29 9 | identification.) |
| 16:35:30 10 | THE WITNESS: In case I forget, when we bring |
| 16:35:32 11 | them back in, I wanted to correct one of my earlier |
| 16:35:35 12 | answers also. |
| 16:35:37 13 | MR. TROUPIS: This is Exhibit 21. |
| 16:35:45 14 | Q. Dr. Moehle, I've given you what is labeled as |
| 16:35:47 15 | a document IVGN706 to 718. At the upper left-hand of |
| 16:35:53 16 | the first page, it says "Opportunities Included in AOP." |
| 16:35:57 17 | I will tell you that my assumption is that |
| 16:36:00 18 | this is an Excel spreadsheet and therefore oftentimes |
| 16:36:03 19 | the way to read it is that you have to literally put |
| 16:36:08 20 | them side-by-side or -- when it prints out or simply |
| 16:36:12 21 | look at the number in the far left-hand column and that |
| 16:36:18 22 | will repeat for subsequent columns that couldn't fit on |
| 16:36:24 23 | a single page. |
| 16:36:34 24 | And I'll ask you if you recognize this |
| 16:36:36 25 | document. |

| | Page 155 |
|---|---|
| 16:36:39 1 | A. If you had printed out a different format, I |
| 16:36:43 2 | might, more likely than not -- |
| 16:36:46 3 | Q. I tried. |
| 16:36:50 4 | A. I recognize concepts in this document. I |
| 16:36:52 5 | can't say -- I can't speak to this individual document. |
| 16:37:00 6 | You know, the names, I know the names of the people |
| 16:37:02 7 | of -- at least some of the column A opportunities. |
| 16:37:09 8 | Perhaps if you had a more specific question. |
| 16:37:12 9 | Q. Sure. Well, earlier today you had referred to |
| 16:37:17 10 | the AOP designation as -- it was my recollection, as |
| 16:37:24 11 | part of the budgeting process, but what's your |
| 16:37:28 12 | understanding of AOP? |
| 16:37:29 13 | A. AOP, again, the acronym is annual operating |
| 16:37:33 14 | plan. It's the plan that you're held to for the year. |
| 16:37:36 15 | It's your goal. |
| 16:37:44 16 | Q. Yes, and that's what you had said earlier |
| 16:37:48 17 | today. And so when I -- this document, based on the |
| 16:37:51 18 | discussions we've been having during the day today, I |
| 16:37:55 19 | look at, for example, item 10 on page 706. And it says |
| 16:37:59 20 | "MBS Total," and that would appear to be in the -- your |
| 16:38:04 21 | group in which you were a member. And this is a total |
| 16:38:11 22 | of something. I don't know whether it's revenue or |
| 16:38:14 23 | license revenue or what it would be. |
| 16:38:18 24 | A. Nor do I. I mean, the categories, MPRPRT is |
| 16:38:28 25 | protein, GEN is genetics, UDG we've talked about before. |

| | Page 156 |
|---|---|
| 16:38:52 1 | This is -- you know, this is similar to, if not the |
| 16:38:56 2 | same, to a relatively complicated model that we would do |
| 16:39:00 3 | in 2009 and 2010. Partly it's because of the |
| 16:39:07 4 | format. |
| 16:39:10 5 | The overall point of this document was to |
| 16:39:13 6 | track where we are against revenues, what's come in, |
| 16:39:19 7 | what did we think was going to come in, and it was an |
| 16:39:23 8 | attempt to get some granularity to manage the business |
| 16:39:27 9 | of licensing an OEM for the MBS business division that |
| 16:39:32 10 | occurred -- that existed at that time. |
| 16:39:34 11 | Q. And your description there fits my assumption |
| 16:39:37 12 | when I looked at this a minute ago, based on today's |
| 16:39:42 13 | discussions. |
| 16:39:43 14 | So, for example, when I looked on, again |
| 16:39:45 15 | staying on page 706, I see "Revenue Type," and then it |
| 16:39:51 16 | says, "Running Royalties, Settlement, License Fee," |
| 16:39:59 17 | these would appear to be the kinds of resolution that |
| 16:40:04 18 | the GOLC group was looking to do in order to raise |
| 16:40:08 19 | revenue. |
| 16:40:11 20 | Am I assuming correctly? |
| 16:40:17 21 | A. Your question is complex. Could you refine |
| 16:40:21 22 | it? |
| 16:40:23 23 | Q. Well, when it says "Revenue Type" on page 706, |
| 16:40:26 24 | what does it mean? |
| 16:40:27 25 | A. That would be a category of revenue. Running |

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 157

16:40:31  1  royalties, as you anticipated, is on an existing license
16:40:34  2  or a quarterly payment, typically.
16:40:37  3       Settlement would be a resolution of the
16:40:39  4  dispute.
16:40:40  5       License fee, sometimes when you sign a license
16:40:43  6  at the beginning, you pay a fee.  Sometimes there's an
16:40:47  7  annual fee.
16:40:51  8       Q.  And then, for example, we see in the left-hand
16:40:55  9  column, "Licensee Name" and it indicates, for example,
16:41:01 10  audits.
16:41:03 11       Again, my assumption is based upon your
16:41:06 12  testimony earlier today that would have been
16:41:08 13  something that you would expect to audit, say, Agilent
16:41:14 14  in 58 and that you're predicting potentially a
16:41:19 15  settlement and the technology is RTTCSA, whatever that
16:41:25 16  is?
16:41:26 17       A.  Correct.
16:41:28 18       Q.  And in the last column, FCST is the category?
16:41:35 19       A.  I'm sorry, where again?
16:41:37 20       Q.  It says "Upside."
16:41:41 21       A.  Oh, column E, "FCST Forecast."
16:41:45 22       Q.  Forecast category, again consistent with what
16:41:49 23  we had been taking about earlier today.  And then if you
16:41:52 24  turn to the next page and again staying with, for
16:41:56 25  example, Agilent at 58, column F, I think it says "PLG."

Page 158

16:42:05  1  I wonder what that would --
16:42:07  2       A.  58, SDS.
16:42:09  3       Q.  It says "SDS" and above that column heading is
16:42:12  4  "PLG."
16:42:28  5       A.  I'm having trouble with the exact acronym.  I
16:42:32  6  think P is probably product and G is probably group.
16:42:35  7  But more to the point, CPC, SDS, DNZ, in the legacy ABI
16:42:43  8  business, those were business categories.  CPC is core
16:42:46  9  PCR.  So a certain type of PCR would fit in there.  SDS
16:42:52 10  was sequence detection systems.  So that tended to be
16:43:09 11  realtime PCR.  And DNZ was related to sequencing.  I
16:43:16 12  don't remember the precise acronym.
16:43:21 13       Q.  And then the next three -- four columns, the
16:43:25 14  quarters of the year, and then the total appears to be
16:43:29 15  the total of the prior four columns.  So you're
16:43:32 16  predicting certain cash flows during certain quarters;
16:43:37 17  is that correct?
16:43:39 18       A.  From the context, it doesn't actually say that
16:43:44 19  you're forecasting, but because I did not manage this
16:43:47 20  process this year and it's 2011, I would infer yes, it
16:43:50 21  was the forecast for this year that we put together last
16:43:53 22  year.
16:43:57 23       Q.  And then there's a comments column.  Changes,
16:44:00 24  if there's a change.  There's notes.  And then on the
16:44:09 25  next page, it has column N, and it says "Grouping"?

Page 159

16:44:13  1       A.  Yes.
16:44:13  2       Q.  What does it mean "Stand-alone PRT Upside,"
16:44:18  3  again "Upside"?
16:44:34  4       A.  Got to be a Mad Magazine fold here.
16:44:45  5       I'm having trouble placing stand-alone, but
16:44:48  6  PRT upside would -- PRT upside.  PRT was the group, and
16:45:04  7  upside was a tracking we would use for, you know, not in
16:45:08  8  the forecast, but possibly, so that's upside.
16:45:15  9       I don't -- looking at this, let me see if I --
16:45:42 10  I don't -- I don't recall a specific meaning to
16:45:45 11  stand-alone.  I'm sure at one time I knew it.
16:45:57 12       Q.  Okay.  That's helpful.
16:46:00 13       Then on the next page, page 709, next it
16:46:08 14  starts to use different language.  It says "New Enzyme
16:46:11 15  2/year 2014."
16:46:16 16       A.  Can you give me a row?
16:46:19 17       Q.  Column A, row 79.
16:46:21 18       A.  New enzyme, two per year until 2014, slash,
16:46:26 19  I'm sure --
16:46:29 20       Q.  Per.
16:46:30 21       A.  These -- well, ask the question.
16:46:32 22       Q.  What are they, what would this be referring
16:46:35 23  to, enzyme-kappa?
16:46:38 24       A.  These are likely, you know, some of them I
16:46:40 25  need to double-check.  I was going to say one thing, but

Page 160

16:46:50  1  I need to check.
16:46:51  2       Q.  Check, please.
16:46:52  3       A.  It says "Running Royalties."  Because in B it
16:46:59  4  says "Running Royalties," it says to me that these were
16:47:07  5  under -- my initial response was that it was the Roche
16:47:17  6  PCR enzyme -- enzyme for short, the sublicense of the
16:47:23  7  Roche PCR, but I'm not 100 percent certain of that.
16:47:31  8       Again, it's hard because of the way this is
16:47:35  9  pulled apart, but I think that would be the
16:47:37 10  nomenclature.
16:47:41 11       Q.  Were these new patents or -- that's why when
16:47:48 12  you say "new enzyme," I thought --
16:47:50 13       A.  No.  I think "new" refers to new licenses.
16:47:52 14  "Enzyme" referred to the category.  Sometimes for short,
16:47:57 15  the Roche PCR would be called an enzyme license versus
16:48:02 16  what shows up a little below it, kit license.
16:48:05 17       We had to -- different licensing programs.
16:48:09 18  And so this was part of the aspiration to have new
16:48:15 19  licensees, their upside that would generate additional
16:48:17 20  revenue, part of the annual work of the people in my
16:48:21 21  group, that were done in my group.
16:48:24 22       Q.  That makes sense.
16:48:26 23       A.  And they identified these players as someone
16:48:29 24  that might be interested or maybe they were considering
16:48:32 25  conversations already.

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

## Page 161

16:48:33   1   Q. And in column D where it says "PCR Chemistry"
16:48:35   2   here, that would -- that's what it means. It's
16:48:39   3   consistent with what you just said, which is it has to
16:48:41   4   do with the whole PCR portfolio.
16:48:44   5   A. Right.
16:48:47   6   Q. I see down below the next one it says "New
16:48:50   7   Passive Reference, four years," four per year. What's
16:48:54   8   passive -- passive REF?
16:48:58   9   A. Passive reference is some IP owned originally
16:49:02  10   by ABI or Applera, relevant to the Roche sublicenses,
16:49:08  11   but not in that license. And so we -- and in doing
16:49:15  12   realtime PCR, people will sometimes use a passive
16:49:19  13   reference and our IP covers the use of that passive
16:49:23  14   reference.
16:49:24  15   Is that --
16:49:24  16   Q. Yes, it does.
16:49:26  17   And then I see that same, in the next item --
16:49:29  18   when it says four year -- four years, is that the length
16:49:33  19   of the license?
16:49:34  20   A. I believe that to be four per year, that I
16:49:37  21   have all of these people on my list, I think I can get
16:49:41  22   to four of them this year and I can get to four of them
16:49:44  23   next year. I don't know which ones yet.
16:49:48  24   Q. And then I see in 112, it has new preamp and
16:49:53  25   then another new preamp below that?

## Page 162

16:49:55   1   A. Yeah.
16:49:56   2   Q. Preamplification technologies, I suppose?
16:50:01   3   A. Yes. It's sort of a sample prep in the PCR.
16:50:05   4   Q. Still within the PCR chemistries, I see?
16:50:09   5   A. Yeah. And, again, this is IP owned by
16:50:12   6   Life Technologies, not sublicense of Roche IP.
16:50:18   7   Q. How would you know that? Does this tell you
16:50:19   8   that, or is that just something that you would know?
16:50:22   9   A. I have that as knowledge. This is my work.
16:50:26  10   Q. That's why I asked if there was something
16:50:28  11   here.
16:50:31  12   And then it has "New" -- below that, "Other
16:50:34  13   New."
16:50:39  14   A. Yes.
16:50:40  15   Q. And there's a -- it has a number of items
16:50:44  16   here, "New DPCR"?
16:50:47  17   A. "DPCR" stands for digital PCR, four per year.
16:50:52  18   And one row is fees, one row is running royalties, to
16:50:55  19   sort of break out the difference, what is repeating and
16:50:58  20   what is not repeating.
16:50:58  21   Q. Keep them straight.
16:50:59  22   Then you got the Fluidigm Digital PCR.
16:51:04  23   New CSS, what's that?
16:51:09  24   A. At the moment, I'm not placing CSS.
16:51:16  25   Q. And then they got a DuPont Qualcomm. It says

## Page 163

16:51:21   1   "Settlement" in column B. That's number 123. So when I
16:51:28   2   see settlement, am I correct in assuming there is some
16:51:33   3   type of dispute and you're trying to settle it and
16:51:36   4   you're going to allocate a number to that settlement?
16:51:40   5   A. Yes, that is correct. CSS, just going back
16:51:44   6   for a moment, I don't remember exactly the acronym, but
16:51:47   7   as I recall, that's a jargon term possibly in the
16:51:54   8   sequencing business, just -- I can't -- for the moment,
16:51:59   9   I can't place it.
16:52:01  10   Q. After we leave here, we'll --
16:52:04  11   A. Yeah, right in the shower.
16:52:06  12   Q. And one of your favorite words at 125,
16:52:09  13   "Aspirational." That's the catchall, is that it? It's
16:52:13  14   not referring to a specific item, is it?
16:52:15  15   A. No. "Aspirational" meant -- was the shorthand
16:52:19  16   I asked my group to use where we had to do it, but we
16:52:25  17   didn't know what it would be yet.
16:52:26  18   Q. Got it.
16:52:27  19   And where it says "Assays" down below, these
16:52:29  20   look a little different because it's no longer in the
16:52:33  21   PCR chemistries but simply says "Assays" in column D.
16:52:33  22   What are these assays?
16:52:35  23   A. That actually is PCR chemistries, in one
16:52:42  24   sense. PCR chemistries refers to the enzyme, the
16:52:45  25   realtime method. Assays refers -- within ABI, not

## Page 164

16:52:50   1   within Life Technologies, assays has a very standard
16:52:56   2   technical meaning of primer probe sets for doing what's
16:53:00   3   called Taqman or 5' prime-nuclease method.
16:53:23   4   Q. And then in column C, again staying in that
16:53:27   5   assay group, has OLA PCR?
16:53:30   6   A. Uh-huh.
16:53:32   7   Q. What's that?
16:53:32   8   A. OLA is oligo-linked amplification. It's a
16:53:42   9   method of actually using antibodies instead of -- using
16:53:50  10   antibodies linked to primers to identify a protein with
16:53:54  11   the antibody and then amplify it with the PCR method.
16:53:59  12   I think that's how -- wait a minute, there's
16:54:02  13   OLA and PLA. And I'm sorry, it's getting to the end of
16:54:06  14   the day. I misspoke.
16:54:24  15   PLA is what I just described a moment ago.
16:54:26  16   OLA is a Oligo ligation assay, I believe is the acronym.
16:54:37  17   It's a method that we have licensed from Cornell
16:54:40  18   Research Foundation and then out-licensed again. It is
16:54:44  19   a form of amplification where two primers are put
16:54:48  20   together and that if they allele correctly, then they
16:54:52  21   will ligate and amplify. So it's almost like a version
16:54:57  22   of PCR.
16:54:58  23   Q. Yeah, exactly.
16:54:58  24   Then it says "PNA Clamp"?
16:55:01  25   A. PNA is peptide nucleic acid, which is a

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

**Page 165**

```
16:55:08   1   chemistry similar to DNA.  And so it's used in some
16:55:20   2   hybridization.  It's used as a primer for some PCR
16:55:24   3   reactions.  It's a substitute chemistry for DNA.
16:55:28   4       Q.  And then "Arrays for holijec," that's at 144.
16:55:32   5       A.  Yeah.  I believe that would have been, rather
16:55:37   6   than individual primer probe pairs and assay, it's an
16:55:40   7   array of them.
16:55:41   8       Q.  Okay.  And I see in 145 we have the ubiquitous
16:55:47   9   aspirational?
16:55:49  10       A.  Yes.  "Aspiration" is my term.
16:55:51  11       Q.  And the next page 710 appears to follow the
16:55:55  12   same formats we discussed earlier with regard to the
16:55:58  13   quarters.  We have DNZ and DNV.
16:56:03  14       A.  Those are both related to some DNA sequencing
16:56:08  15   technologies, as I recall.  Those acronyms I'm not as
16:56:11  16   familiar with.  I don't remember what fell into that
16:56:15  17   bucket right now.
16:56:16  18       Q.  And I see we have that net share with Cornell
16:56:19  19   down there at line 137, consistent with your
16:56:22  20   recollection before you looked at it.
16:56:24  21       A.  Yes.
16:56:25  22       Q.  Then if you turn to page 712, we have slightly
16:56:30  23   different entries.  What is -- it says "Program MBRPRT
16:56:43  24   and MBRGEN"?
16:56:48  25       A.  So when we had the divisional structure, MBS
```

**Page 166**

```
16:56:53   1   was the division, and the next layer below that, one of
16:56:58   2   the groups was MBR, molecular biology reagents.  I think
16:57:03   3   you saw that on some of the spreadsheets we were talking
16:57:07   4   about.
16:57:07   5       Q.  I think we saw that before, right?
16:57:09   6       A.  And MBR had two categories that I recall:
16:57:13   7   PRT, protein; GEN for genetics.
16:57:21   8       Q.  So then in the description, it lists, for
16:57:23   9   example, take the first one at line 5, "Dharmacon
16:57:27  10   SMARTpools"?
16:57:29  11       A.  Right.
16:57:30  12       Q.  What's that?
16:57:31  13       A.  Dharmacon is a -- I believe a subsidiary of
16:57:37  14   Thermal Fisher, if I'm not mistaken.  And so that's the
16:57:40  15   identity of the partner, if you will.
16:57:43  16       SMARTpools is a shorthand for one of the
16:57:46  17   technologies we have where we believed that Dharmacon
16:57:49  18   needed a license.  And we'd had some discussions with
16:57:53  19   them.  At that time, I believe we were in discussions
16:57:57  20   with them, but I think they subsequently broke off.
16:58:01  21       Q.  And then the next column it has "Owner, Moehle
16:58:05  22   Brawer, Jaru"?
16:58:07  23       A.  Jaru.
16:58:08  24       Q.  I assume that's you, and the Brawer we've
16:58:11  25   heard about today.
```

**Page 167**

```
16:58:12   1       A.  Right.  And Lou Jaru is -- reported to
16:58:18   2   Rolando.  So this was kind of just tracking for the
16:58:22   3   organization where we were dealing with this.  And so --
16:58:30   4   I'm sorry, Lou would have been doing the actual work.
16:58:33   5   He reported to Rolando, who reported to me.  So it was
16:58:36   6   just kind of a tracking.
16:58:37   7       Q.  So you all report -- oh, I'm sorry.  I did
16:58:38   8   that the second time today.
16:58:43   9       You're the person in charge and these people
16:58:46  10   report to you about the described program or project?
16:58:53  11       A.  Right.
16:58:59  12       Q.  So at this date, would you have some idea when
16:59:03  13   this date is?  It says printed at the bottom, 2/8/11.
16:59:06  14   2/8/11 at the bottom, lower left, it has "Update" in
16:59:13  15   number 1 on page 712.
16:59:16  16       A.  So I'm guessing that that would be about when
16:59:19  17   it was updated, but I don't recall this document.
16:59:23  18       Q.  Yeah.  I mean, it's a printed document.  So
16:59:25  19   sometimes more difficult.  But at about that time, would
16:59:29  20   this have been a structure, structure we just talked
16:59:32  21   about, where Jaru answers to Brawer, answers to you,
16:59:36  22   about the projects shown here on page 712?  Would that
16:59:39  23   have been the way it was organized?
16:59:41  24       A.  On that day, I'm not sure.  Up through the end
16:59:47  25   of 2010, yes, that was the structure.  As we came into
```

**Page 168**

```
16:59:53   1   2011, Nick Ecos -- we were -- with the day one of the
16:59:58   2   new year, we were put into a corporate group with a new
17:00:02   3   manager and we were evolving new processes and new
17:00:05   4   reporting.
17:00:06   5       Q.  And that's why I asked you that, is because
17:00:08   6   you described the fact that your position and
17:00:11   7   responsibilities changed at some point during 2011.
17:00:13   8       A.  Right.  So rather than make the changes and
17:00:15   9   then be ready to run on January 1, on January 1, we
17:00:18  10   started making the changes.  And I don't remember what
17:00:20  11   day.  Because this is the first week in February or the
17:00:25  12   8th of February.
17:00:27  13       Q.  So you would -- this was --
17:00:31  14       A.  It's a residual.  I mean, it's a -- it's a
17:00:38  15   legacy.
17:00:38  16       Q.  Yeah, a legacy from it.
17:00:40  17       Then I notice down below, we have -- similar
17:00:43  18   we keep following GA, what is that?
17:00:48  19       A.  Genetic analysis.
17:00:49  20       Q.  PCR instruments, PCR reagents, I assume those
17:00:52  21   are exactly what they say they are?
17:00:56  22       A.  Yes.
17:00:59  23       Q.  It says "A Roche Past Royalty Credit."  So is
17:01:03  24   that Roche -- is that Roche that originally had the PCR
17:01:09  25   patents you worked with originally?  Is that Roche?
```

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 169

17:01:20  1  Is that the Hoffmann-La Roche?
17:01:24  2      A.  It's part of that organization.
17:01:26  3      Q.  It wasn't a trick question.
17:01:28  4      A.  No, I was trying to think how to say it.
17:01:32  5      Q.  What's a past royalty credit?  Is that a -- if
17:01:38  6  you remember?
17:01:39  7      A.  No, I remember.
17:01:46  8      Q.  I'm not trying to intrude on anything --
17:01:49  9      MS. JOHNSON:  I suspect we may be running
17:01:51 10  into --
17:01:52 11      MR. TROUPIS:  The same question about Roche.
17:01:54 12      MS. JOHNSON:  Correct.
17:01:54 13      MR. TROUPIS:  Then let's move on, and we'll
17:01:57 14  come back to it if we can resolve it after this.
17:02:00 15      THE WITNESS:  It's just part of the same set
17:02:01 16  of discussions.
17:02:02 17      MR. TROUPIS:  Q.  I do notice that at line 32
17:02:03 18  we have Promega.  Do you know what that's referring to,
17:02:09 19  the PSSV?
17:02:12 20      A.  Yeah.  Passive reference, as we just talked
17:02:14 21  about a moment or two ago.  Passive reference.  Promega
17:02:19 22  expressed interest, I believe at that point, in taking a
17:02:22 23  license to our passive referenced IP.  It could have
17:02:27 24  been that they planned to contact Promega.  I don't
17:02:30 25  recall that the discussion occurred or it was planned or

Page 170

17:02:33  1  whatever.
17:02:45  2      Q.  Moehle, Cole, Tanaka, and Paducula, these are
17:02:51  3  people that work here; is that right?
17:02:53  4      A.  Yeah.  That's the spelling for Padma,
17:02:55  5  Paducula.  I couldn't remember how to say her name
17:03:00  6  earlier.
17:03:00  7      Q.  Again, within your group that would follow
17:03:02  8  from your first discussion of the --
17:03:04  9      A.  Yes.
17:03:05 10      Q.  -- lines of authority.
17:03:10 11      A.  Yes, correct.
17:03:21 12      Q.  On the next page, 713, we have slightly
17:03:26 13  different than what we've seen before.  It has a cost to
17:03:28 14  achieve in column G.  Then it has H, Q1 percent
17:03:32 15  probability.  What's that mean?
17:03:36 16      A.  What does "Q1 percent probability" mean?
17:03:39 17      Q.  Yes.
17:03:40 18      A.  That meant what was the likelihood we thought
17:03:43 19  that would be achieved in Q1, what's the short-term
17:03:47 20  forecast on that.
17:03:49 21      Q.  On the first quarter?
17:03:50 22      A.  Because this was in February, presumably, or
17:03:53 23  end of January.
17:03:55 24      Q.  Okay.  And?
17:03:56 25      A.  As you can see, there's a note.  "Agreement on

Page 171

17:03:58  1  financials 100 percent probability in Q1."  I'm sorry.
17:04:03  2  I was reading from row 5 as an example.
17:04:06  3      Q.  Yes.  And that's what I saw.  I can tell that
17:04:08  4  when it says 100 percent, it really just shows the full
17:04:13  5  amount.  10 percent is exactly that.  They just multiple
17:04:20  6  10 percent times the column.
17:04:22  7      A.  Right.
17:04:30  8      Q.  If we go over to say 715, can you tell me what
17:04:46  9  PCRGAOEM is?
17:04:49 10      A.  PCR genetic analysis OEM, an opportunity most
17:04:54 11  likely to be manufacturing primers and probes for the
17:05:00 12  customer.
17:05:05 13      Q.  A more traditional -- you're actually
17:05:08 14  producing it for them and they would relabel it or
17:05:13 15  however they would do it?
17:05:14 16      A.  Correct.
17:05:15 17      Q.  What does it mean when it says "PCR
17:05:17 18  Instruments"?  And I'm looking down at 69.  And then it
17:05:20 19  has in column B, MMD.  And then in that same column, it
17:05:25 20  says "Qiagen 7500 F-DX DIST."  Can you interpret that
17:05:30 21  for me?
17:05:38 22      A.  Part of it I can recognize pretty quickly.  I
17:05:41 23  was trying to remember what MMD is, see if there's a
17:05:48 24  header on B.
17:05:50 25      Oh, okay.  Yes.  So if you go to 712, the

Page 172

17:05:55  1  page 712.
17:05:58  2      Q.  Yes.
17:05:59  3      A.  And you look at the header for column B, row
17:06:03  4  two, it says "X-DIV."
17:06:05  5      Q.  Yes.
17:06:06  6      A.  So that would be a shorthand for
17:06:09  7  cross-divisional.  So we -- some deals we did were
17:06:13  8  completely internal, but if there was another division,
17:06:16  9  then we had to negotiate the right-of-way, determine who
17:06:19 10  gets the money and so forth.
17:06:21 11      And so CCDMMD, these are the other divisions
17:06:29 12  or groups or whatever.  They weren't necessarily
17:06:32 13  divisions, it was just who was the other stakeholder
17:06:35 14  that we had to work with.
17:06:37 15      Q.  Within your own organization?
17:06:38 16      A.  Within our own organization, yes.
17:06:42 17      Q.  What is 7500F-DX?
17:06:47 18      A.  7500F-DX stands for the -- sometimes called 75
17:06:52 19  fast DX.  7500 is a workhorse instrument that we sell
17:06:57 20  for realtime PCR for quite some time.  "Fast" refers to
17:07:02 21  a version of PCR where you can do it fast, literally
17:07:07 22  faster.  And "DX" means that this particular instrument
17:07:11 23  has a 510K clearance.  So within the guidelines of the
17:07:18 24  FDA, it's approved for diagnostics use.
17:07:22 25      Q.  DIST?  Did you say that's the DIST or the DX?

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

### Page 173

17:07:24 1 A. The DX.

17:07:25 2 Q. And the DIST?

17:07:27 3 A. Distributor.

17:07:27 4 What I'm guessing, and without full

17:07:29 5 recollection at the moment, was that Qiagen or Elotech

17:07:32 6 wanted to distribute these. As you know -- well, you

17:07:36 7 may or may not know -- Qiagen has a diagnostics

17:07:41 8 division. They sell tests.

17:07:45 9 This discussion, I don't know whether it bore

17:07:48 10 fruit, would have been whether we could provide these

17:07:51 11 instruments for them to sell with their tests and help

17:07:52 12 them get to the marketplace faster.

17:07:55 13 Q. And that makes sense, because if I go over to

17:07:58 14 page 716 and follow 69 across, I see an allocation, for

17:08:05 15 example, of 800,000 per year. So they would have the

17:08:07 16 equipment and then they would be paying you an equipment

17:08:11 17 charge? I'm just following.

17:08:14 18 A. Yeah, yeah. No, I'm trying to remember

17:08:16 19 exactly what N is. Just check the title. "What is

17:08:22 20 Needed to Achieve the Plan or Other Notes" on 713, is

17:08:27 21 the header for Qiagen.

17:08:32 22 And so here, that's likely an estimate of a --

17:08:40 23 so the percent probability is very low to zero. This is

17:08:45 24 a funnel of opportunities, and I believe that that

17:08:48 25 number would have been an estimate of the likely value

### Page 174

17:08:51 1 if the deal went through. Qiagen would buy that many

17:08:57 2 dollars' worth of instruments every year.

17:09:08 3 Q. So in a very real sense, this is a planning

17:09:11 4 document, as you said earlier, aspirational items, that

17:09:15 5 might or might not happen when you're trying to predict

17:09:18 6 their outcomes for the upcoming year?

17:09:20 7 A. It's a close management of how the year is

17:09:22 8 developing, what do we see close, medium, and far

17:09:25 9 likelihood, probabilities, and so that we could report

17:09:29 10 to our management how much to put into their forecasts

17:09:32 11 from our contribution.

17:09:35 12 Q. Is this all -- this all appears to be

17:09:39 13 licensing or OEM, this document we just looked at, 706

17:09:44 14 to 718. Was this just licensing and OEM?

17:09:53 15 A. Versus?

17:09:54 16 Q. Product sales.

17:09:55 17 A. Correct.

17:10:00 18 If I could clarify, on occasion a product sale

17:10:05 19 would show up in here if for some reason our group could

17:10:09 20 facilitate a contract. And we would try to say, look,

17:10:13 21 this isn't in our direct reporting, but we want some

17:10:19 22 recognition that we helped make this sale happen. So we

17:10:22 23 would send our people out to help make a sale sometimes.

17:10:26 24 That way we didn't fight over who got the money. We

17:10:26 25 didn't want to care about that. We wanted to show that

### Page 175

17:10:30 1 we were working all year long.

17:10:35 2 Q. Thank you. I appreciate that explanation.

17:10:54 3 They can come back. I'm not going to go into

17:10:57 4 any other document, and I just have a couple more

17:11:00 5 questions.

17:11:02 6 (Discussion off the record.)

17:11:44 7 THE WITNESS: I'd like to amend an answer that

17:11:46 8 I made before last break.

17:11:48 9 MR. TROUPIS: Q. Got it.

17:11:48 10 A. This is with regard to Exhibit 18.

17:12:13 11 Q. Okay.

17:12:14 12 A. During the break, I thought about this and I

17:12:17 13 realized I didn't recognize from the writing, but I do

17:12:21 14 remember one of the key issues in here and some of the

17:12:24 15 conversations I'd had with Mr. Dimond.

17:12:26 16 Shortly after the agreement was implemented,

17:12:29 17 Applied Biosystems took a position and paid less

17:12:34 18 royalties. And that was brought to the attention in

17:12:36 19 here. And on reflecting on this email, we reversed that

17:12:41 20 position and paid those royalties, the details of which

17:12:45 21 are largely attorney-client privilege, but I do remember

17:12:51 22 my personal response at let's just say embarrassment.

17:12:55 23 Q. And that's my understanding as well, is that

17:12:59 24 it was resolved and --

17:13:01 25 A. That's my recollection, very quickly resolved.

### Page 176

17:13:04 1 Q. Thank you very much.

17:13:12 2 The last time, actually the last time we got

17:13:15 3 together in January of 2010, down in Carlsbad,

17:13:18 4 Dr. Dimond asked you to inquire about whether sales were

17:13:26 5 being made into the clinical market and by this company

17:13:31 6 and how much were the STRs.

17:13:35 7 And my question is, did you make that inquiry

17:13:39 8 and did you reach any conclusion?

17:13:44 9 MS. JOHNSON: And I would caution you not to

17:13:46 10 divulge any attorney-client privileged information. I

17:13:49 11 don't know if you can answer that question without doing

17:13:51 12 so, but if you can.

17:13:55 13 And before you answer, I guess I would also

17:13:57 14 state for the record, I can't recall if there was a 408

17:14:04 15 agreement governing those discussions.

17:14:06 16 MR. TROUPIS: There was.

17:14:07 17 MS. JOHNSON: So to the extent there was, I

17:14:08 18 just want to make that point --

17:14:10 19 MR. TROUPIS: Yes --

17:14:13 20 THE WITNESS: We had a couple of discussions

17:14:15 21 around that area. I remember Dr. Dimond raising the

17:14:25 22 concern. Any analysis we did, or I did, at any rate,

17:14:25 23 would have been with my attorney. I would not have done

17:14:28 24 that as an independent investigation.

17:14:30 25 MR. TROUPIS: Q. So any of the conclusion you

# Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

## Page 177

```
17:14:32  1  reached, if you did, you would have shared it with your
17:14:35  2  attorney and you would consider it privileged?
17:14:39  3     A. I believe so. Anything I can think of at the
17:14:41  4  moment would have been with my attorney and therefore
17:14:44  5  privileged.
17:14:52  6     Q. We talked about the GOLC group, and I left off
17:14:58  7  one question, which was, was there an incentive program
17:15:05  8  for employees for the results of the GOLC committee
17:15:12  9  action activities?
17:15:17 10     A. Can you be more specific?
17:15:19 11     Q. Sure. In many settings, you would have some
17:15:24 12  kind of a bonus or other incentive payment for
17:15:27 13  increasing the revenues of the company, say if you're a
17:15:31 14  salesman or whatever. The GOLC was similar in a general
17:15:37 15  way to that. Thus my question was, you had forecasts,
17:15:41 16  you had predictions, you had outcomes, was there any
17:15:45 17  incentive payment for the members of the committee or
17:15:48 18  the group for results achieved?
17:15:52 19     A. To my regret -- no. Not in a sort of salesman
17:15:57 20  commission reward, based on individual, you know, tied
17:16:01 21  to specific individual effort.
17:16:03 22     Q. I thought you would know the answer to that
17:16:06 23  one.
17:16:09 24     Do you know whether you will be available to
17:16:11 25  testify at the trial on February 6th in Madison,
```

## Page 178

```
17:16:14  1  Wisconsin, on this matter that we're discussing today?
17:16:20  2     MS. JOHNSON: Well, I guess what do you mean
17:16:21  3  by "available"?
17:16:23  4     MR. TROUPIS: Q. Will you available to attend
17:16:25  5  the trial to testify?
17:16:26  6     A. I don't know the answer. I hadn't given it
17:16:29  7  thought, so I don't know.
17:16:39  8     Q. Have you come to any conclusion about
17:16:40  9  testimony you might give at that trial, if any?
17:16:46 10     MS. JOHNSON: And I would caution you not to
17:16:48 11  divulge any privileged communications with attorneys.
17:16:51 12     THE WITNESS: Yeah. The truth? I'm sorry. I
17:16:57 13  don't know how to answer your question.
17:16:59 14     MR. TROUPIS: Q. No, no. It's really a very
17:17:01 15  general question. We normally ask at this point,
17:17:05 16  frankly, in depositions at this stage of the
17:17:06 17  proceedings, which is, whether or not you know whether
17:17:08 18  you're going to testify and if you -- or if you know
17:17:11 19  what the substance of your testimony will be at trial.
17:17:14 20     A. I do not know if I will testify. And I guess
17:17:18 21  since I don't know, I can't know what the other would
17:17:21 22  be.
17:17:23 23     Q. That's fine.
17:17:25 24     That's all my questions. Thank you.
17:17:30 25     MS. JOHNSON: Dr. Moehle, I just have one
```

## Page 179

```
17:17:31  1  point of clarification, one question for you.
17:17:33  2     --oOo--
17:17:34  3     EXAMINATION BY MS. JOHNSON
17:17:35  4     MS. JOHNSON: Q. Did you have any
17:17:36  5  responsibility for obtaining any consents with respect
17:17:40  6  to the merger of Applera and Invitrogen Corporation?
17:17:47  7     THE WITNESS: Did you want to object?
17:17:51  8     MR. TROUPIS: I'm trying to -- could you
17:17:52  9  repeat the question? I'm sure it was carefully worded,
17:17:55 10  but I don't understand it.
17:18:12 11     (Record read by the reporter.)
17:18:15 12     THE WITNESS: No, I had no role in obtaining
17:18:18 13  any of the consents. I was not part of the tracking of
17:18:22 14  them or instigating any of them.
17:18:25 15     MR. TROUPIS: That's it. Thank you very much.
17:18:28 16  We'll get together every five years or so.
17:18:32 17     THE VIDEOGRAPHER: Here marks the end of Video
17:18:34 18  No. 3 in the deposition of Dr. Charles M. Moehle. The
17:18:37 19  original videos will be retained by Combs Reporting, 595
17:18:40 20  Market Street, Suite 620, San Francisco, California.
17:18:45 21  Time is 5:18 p.m.
08:44:11 22     --oOo--
08:44:16 23     (Whereupon, the deposition adjourned at
08:44:16 24  5:18 p.m.)
08:44:16 25     --oOo--
```

## Page 180

```
08:44:16  1     I declare under penalty of perjury that the
08:44:16  2  foregoing is true and correct. Subscribed at
08:44:16  3  _____, California, this ____ day
08:44:16  4  of _____, 2011.
08:44:16  5
08:44:16  6
08:44:16  7
08:44:16  8     CHARLES MOEHLE
          9
         10
         11
         12
         13
         14
         15
         16
         17
         18
         19
         20
         21
         22
         23
         24
         25
```

## Charles Moehle (Highly Confidential-Attorneys' Eyes Only)

Page 181

08:44:16  1        CERTIFICATE OF REPORTER
08:44:16  2      I, BRANDON D. COMBS, a Certified Shorthand
08:44:16  3  Reporter, hereby certify that the witness in the
08:44:16  4  foregoing deposition was by me duly sworn to tell the
08:44:16  5  truth, the whole truth, and nothing but the truth in the
08:44:16  6  within-entitled cause;
08:44:16  7      That said deposition was taken in shorthand by
08:44:16  8  me, a disinterested person, at the time and place
08:44:16  9  therein stated, and that the testimony of the said
08:44:16 10  witness was thereafter reduced to typewriting, by
08:44:16 11  computer, under my direction and supervision;
08:44:16 12      That before completion of the deposition,
08:44:16 13  review of the transcript was not requested.  If
08:44:16 14  requested, any changes made by the deponent (and
08:44:16 15  provided to the reporter) during the period allowed are
08:44:16 16  appended hereto.
08:44:16 17      I further certify that I am not of counsel or
08:44:16 18  attorney for either or any of the parties to the said
08:44:16 19  deposition, nor in any way interested in the event of
08:44:16 20  this cause, and that I am not related to any of the
08:44:16 21  parties thereto.
08:44:16 22      DATED: December 13, 2011.
08:44:16 23
08:44:16 24      BRANDON D. COMBS, CSR 12978
        25