UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

PROMEGA CORPORATION,

        Plaintiff,

and

MAX-PLANCK-GESELLSCHAFT zur
FORDERUNG der WISSENSCHAFTEN E.V.,

        Involuntary Plaintiff,

v.

LIFE TECHNOLOGIES CORPORATION,
INVITROGEN IP HOLDINGS, INC., and
APPLIED BIOSYSTEMS, LLC,

        Defendants.

Case No. 10-cv-281-bbc

**OPPOSITION TO PROMEGA'S MOTION *IN LIMINE* NO. 5: TO PRECLUDE
EVIDENCE OR ARGUMENT CONCERNING CERTAIN TERMS OF THE 2006
LICENCE AGREEMENT**

Defendants Life Technologies Corporation, Applied Biosystems, LLC, and Invitrogen IP Holdings, Inc., (collectively, "Life"), by and through counsel, respectfully submit this Memorandum in Support of their Opposition To Plaintiff Promega Corporation's ("Promega's") Motion *In Limine* No. 5: To Preclude Evidence Or Argument Concerning Certain Terms Of The 2006 Cross-License.

## I. ARGUMENT

Promega is seeking to preclude Life from "discussing those matters previously decided in summary judgment, in particular any matters attempting to re-define terms of the 2006 [Cross-License] and/or whether certain fields of use are or are not covered by the 2006 [Cross-License]." Promega's Mot. *In Limine* No. 5, Dkt. No. 381, at 3. As a threshold matter, Promega's desired remedy is unclear and vague, and the motion should be denied on that basis alone.

Further, while Life will not be re-litigating issues already determined by the Court's November 29, 2011 Opinion and Order, there are multiple issues related to the 2006 Cross-License that remain in the case. For example, Life's subjective understanding of the scope of the 2006 Cross-License is relevant to the Promega's claims of induced and willful infringement, which contain elements relating to knowledge and intent, and the reasonableness under the circumstances of Life's understanding. The scope of the licensed and unlicensed fields is relevant to the amount of damages that might be awarded, as is the number of products that Life sold into the unlicensed fields; Promega has raised new disputes regarding these issues that it did not raise with the Court on summary judgment. Life should not be precluded from responding and putting on defenses regarding these issues.

1

A.  **Life's Understanding Of The Scope Of The 2006 Cross-License Is Relevant To Promega's Claim Of Inducement And Willfulness.**

Promega is asserting claims that Life induced infringement and willfully infringed Promega's patents in this action. Life's belief that its actions were within the scope of the 2006 Cross-License is relevant to both of these allegations. *See, e.g., Global-Tech Appliances, Inc. et al. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011) ("[W]e now hold that induced infringement under § 271(b) requires knowledge that the induced acts constitute patent infringement."); *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007) (holding the test for willful infringement is whether "the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent," and if so, whether this objectively-defined risk "was either known or so obvious that it should have been known to the accused infringer.").

Thus, the jury will need to determine both whether Life's license defense – including whether Life's prior understanding of the permitted fields of use in the 2006 Cross-License – is "objectively reasonable," and what Life knew or should have known about the scope of the permitted fields of use. *See Wisconsin Alumni Research Found. v. Intel Corp.*, 656 F. Supp. 2d 898, 923-24 (W.D. Wis. 2009) (finding a defendant's licensing defense to be "objectively reasonable"). Terms of the 2006 Cross-License are relevant to both the objective reasonableness of Life's prior understanding of this agreement, and also to Life's actual subjective knowledge.

Promega should not be permitted to both assert claims of induced and willful infringement and to also preclude Life from presenting their defenses regarding Life's prior understanding of the 2006 Cross-License fields, and the reasonableness of that understanding.

B.  **Promega Itself Has Raised New Issues Regarding Fields Of Use That It Did Not Raise On Summary Judgment.**

After the Court's November 29, 2011 Opinion and Order, Promega raised several new issues regarding the meaning of the fields of use in the 2006 Cross-License. Promega did not

2

raise these in its summary judgment motion, and so the Court properly did not rule on them. Since no ruling has been made on these areas, there is no reason that Life should be precluded from responding to them. For example, Promega's expert stated in his Supplemental Report that



"█████████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████)'" Supp. Beyer Report, Dkt. No. 352, at ¶ 13. Promega should not be permitted to both raise the new argument that "████████████████████████████████████████████████████████████████

████████████████████████████████████████) while also precluding Life from responding to Promega's arguments.

C.   **The Court Has Not Ruled On The Specific Identity And Number Of Sales That Life Sold In Unlicensed Fields.**

On summary judgment this Court considered "whether several kinds of applications performed by the accused products sold by [Life] fall within the scope of the license agreement." Nov. 29, 2011 Op. and Order, Dkt. No. 345, at 23. The Court determined that certain Life products were within the scope of certain of the asserted claims and that certain fields were or were not within the scope of the 2006 Cross-License, ultimately stating that "I am granting plaintiff's motion for summary judgment with respect to direct infringement of the asserted apparatus claims in the '235, '598, '660 and '771 patents." *Id.* at 25. The Court did not, however, rule on any particular sales to any particular customers that were made outside the scope of the licensed fields or any particular customers who actually used STR kits outside the scope of the licensed fields. *Id.* at 25. That is, the Court did not identify the damages base, and this must be done at trial.

3

Determination of the damages base will involve a consideration of how many specific STR kits Life sold into unlicensed fields (as opposed to the licensed fields) as those fields were identified by the Court's November 29, 2011 Opinion and Order, and this remains an open issue for trial. The following sections outline some of the issues that remain open and relevant for trial.

### 1. Promega Has Relied On An Overly-Strict And Erroneous Interpretation Of What It Means To "Sell . . . In" An Unlicensed Field.

In attempting to "quantify the infringing *sales*," Promega's proposed damages expert assumed that Promega was entitled to damages for every sale of a product that was ultimately used by a customer outside of the licensed fields. Beyer Report, Dkt. No. 315, at ¶ 28 (emphasis added). But that assumption is unwarranted because it ignores the effect of the Cross-License, which, as interpreted by the Court, allows Life to "sell . . . in" certain fields but not to "sell . . . in" other fields. *See* Nov. 29, 2011 Op. and Order, Dtk. No. 345, at 23-24; 2006 Cross-License, Dkt. No. 252-61, at § 2. Dr. Beyer apparently interprets the phrase "sell . . . in" as used in the 2006 Cross-License as being solely a function of how an end-user uses a product, without regard to any conduct on the part of Life, or the absence of any obligation on Life to "police" customer end-uses, Life's knowledge of the ultimate kit use, or the product's design, marking, and operating instructions. *See* Beyer Report, Dkt. No. 315, at ¶ 28-30. But each of those factors is relevant to whether a product is sold into a given field.

Promega's position that whether or not a product is sold into a particular field is based solely on end-purchaser behavior (about which the seller may be unaware and may have no duty to police) is unsupported and contrary to law. In this case, the scope of the damages base requires analysis of the 2006 Cross-License, and should include only those kits that Life sold without authority and that were actually used outside the licensed fields.

4

### 2. Promega's Interpretation Of "Sell . . . In" Is Incorrect.

Cases that considered very similar wording to the license at issue here have held that the language meant something very different from Promega's determination that the scope of the damages base is determined by the behavior of the ultimate customer. In a particularly analogous case, *Curtiss-Wright Corp. v. Link Aviation, Inc.*, 182 F. Supp. 106, 123 (N.D.N.Y. 1959), a patentee granted "a non-exclusive license [to the patents at issue] to use and ***sell in*** all fields other than that of ground training; teaching and instruction of aircraft-operating personnel and for amusement purposes." *Id.* (emphasis added). The defendant was found to have "s[old] in" the field in question not solely because of ultimate customer use, but also because of three factors controlled by the defendant itself. Specifically, the Court found that: (1) the accused product "was ***designed for*** the training of aircraft-operating personnel," (2) "***[t]he literature***, referring to that device, plainly indicates that such was its purpose," and (3) "[t]he device itself and the ***operating instructions***, accompanying same, indicate that the [device] is excluded from the license above referred to." *Id.* at 124 (emphasis added).

None of these issues regarding which actual sales were "s[old] . . . in" an unlicensed field were decided in the Court's November 29, 2011 Opinion and Order. Indeed, as discussed above, to demonstrate entitlement to damages for a given "sale," Promega must show a logical link – via an act or acts of "selling" by Life – between products that have been found to be within the scope of the patent and a customer's ultimate use of the product in an unlicensed field.

The issues here are also analogous to that of divided infringement, where two independent actors must each take an action for liability to attach, and neither actor is strictly or automatically responsible for actions that the other performs. In situations "where the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed ***only if one party exercises control or direction over the entire process*** such that every

5

step is attributable to the controlling party, i.e., the mastermind." *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1329 (Fed. Cir. 2008) (quotations omitted) (emphasis added); *see also BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1381 (Fed. Cir. 2007) ("Direct infringement is a strict-liability offense, but it is limited to those who practice each and every element of the claimed invention."); *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 629 F.3d 1311, 1321 (Fed. Cir. 2010) ("What is critical here is whether the evidence shows that the relationship between Limelight[, the alleged infringer,] and its customers is such that the steps in question are performed by the customers as agents of Limelight or under a contractual obligation and are, thus, properly attributable to Limelight."), *vacated pending rehearing en banc*, 419 Fed. Appx. 989 (Fed. Cir. 2011); *see also McKesson Techs. Inc. v. Epic Sys. Corp.*, 2010-1291, 2011 U.S. App. LEXIS 7531, at *9-10 (Fed. Cir. Apr. 12, 2011), *vacated pending rehearing en banc*, 2011 U.S. App. LEXIS 10674 (Fed. Cir. May 26, 2011); *Int'l Rectifier v. Samsung Elecs. Co.*, 361 F.3d 1355, 1361 (Fed. Cir. 2004) (reversing district court's ruling that Samsung violated a permanent injunction prohibiting infringement in the United States on the grounds that Samsung did not control or participate in the extraterritorial activities of a third party such that the acts of the third party were not attributable to Samsung). By analogy, here, the parties to the 2006 Cross-License chose not to include any provisions requiring either cross-licensee to control its customers. Without such control, the behavior of the customers should not be automatically or strictly attributable to the cross-licensees.[1]

---

[1] For example, if Life was entitled under the contract to sell STR kits on its website without inquiring into the purchaser's intended use or otherwise "policing" the sale, then the scope of damages should not include the sale simply because the customer ultimately used the kit outside of the licensed fields. Similarly, absent breach of a contractual "policing" requirement, if Life sells a kit to a wholesaler or distributer believing that it will ultimately be used in forensics, but the ultimate end-user customer decides unilaterally to use it for cell line identification, then the scope of damages should not include the out-of-scope use.

In sum, once it is established that certain products are within the scope of the relevant patent claims and that there are both licensed and unlicensed fields into which the products have been sold, determining whether a particular "sale" should be included in the damages base (*i.e,* that the product was "sold into" an unlicensed field) has two parts: First, the actions by the licensee in making the sale must be outside the scope of what is authorized by the license. Second, the actions by the customer (*i.e.,* the use of the product) must be outside the scope of the licensed fields.

### 3. Patentees Who Want A License To Require Control Of Customer Use Know How To Contract For Such A Provision.

Sophisticated patentees – such as the current parties – are familiar with a variety of license provisions to require licensees to control customer use of licensed products. For example, the Supreme Court has recognized that one such provision requires affixing specific notices about limitations regarding permitted fields. *Gen. Talking Pictures Corp. v. W. Elec. Co.*, 304 U.S. 175, 180 (1938) ("In compliance with **a requirement of the license**, the Transformer Company affixed to amplifiers sold by it under the license a notice stating in substance that the apparatus was licensed only for radio amateur, experimental and broadcast reception under the patents in question.") (emphasis added). But the 2006 Cross-License in this case required no such notice. *See* 2006 Cross-License, Dkt. No. 252-61.

Similarly, in *Applera Corp. v. MJ Research Inc.*, 349 F. Supp. 2d 321 (D. Conn. 2004), Applera (Defendant Applied Biosystem's predecessor) proposed a provision requiring actual policing of customer use. In particular, Applera proposed license terms that would have permitted a licensee to sell "thermal cyclers" that were not licensed for a process called "PCR," but that would have required the potential licensee to actively police customers' ultimate use of the thermal cyclers, including "obtain[ing] from the customer, in advance of purchase and

7

annually until 2004, a written statement that the thermal cycler (a) will not be and, after purchase has not been, used for PCR." *Id.* at, 323-325. In contrast, the 2006 Cross-License at issue here contains no such policing requirements. *See* 2006 Cross-License, Dkt. No. 252-61.

Considering the level of sophistication of the parties here, the 2006 Cross-License certainly could have including any manner of "policing" or "customer use inquiry" obligations. That the parties omitted such an obligation – or more importantly that Promega did not insist on such an obligation – confirms that Life should not be held to that standard. *See, e.g., Texas Instruments, Inc., v. Tessera, Inc.*, 231 F.3d 1325, 1329-30 (Fed. Cir. 2000) (applying California law, which governs the 2006 Cross-License,[2] and recognizing that "sophisticated corporations with experience in patent licensing" – such as the parties here – are presumed to "have negotiated the clauses of the patent license agreement with knowledge of patent law").

Life should not be precluded from responding to Promega's overly-strict interpretation of "sell . . . in" as used in the 2006 Cross-License, and from addressing what may or may not have been required of Life in making its sales and of its customers in using the products and whether Promega has demonstrated a sufficient logical link – via actions by Life in selling the products – between the products at issue and actual use by customers in unlicensed fields. The Court did not rule on these issues in its November 29, 2011 Opinion and Order; Promega is either attempting to read "policing" requirements into the contract or apply a responsibility for customer behavior that is not supported by law. Life should be allowed to respond.

---

[2] The 2006 Cross-License selects California law as its governing law. 2006 Cross-License, Dkt. No. 252-61, § 7.5. In contract disputes, "[a]s a general rule," the law of this forum "recognizes validly executed choice of law provisions in the absence of any public policy reasons to disregard them." *Tarus IP, LLC, v. Daimlerchrysler Corp.*, 519 F. Supp. 2d 905, 923 (W.D. Wis. 2007) (citing *Bush v. National School Studios, Inc.*, 139 Wis. 2d 635, 642, 407 N.W.2d 883 (1987)).

## II. CONCLUSION

In light of the foregoing, Life respectfully request that the Court deny Plaintiff Promega Corporation's Plaintiff Promega Corporation's Motion *In Limine* No. 5: To Preclude Evidence Or Argument Concerning Certain Terms Of The 2006 License Agreement.

DATED: January 25, 2012.                    By: /s/ Kristine E. Johnson

        Francis M. Wikstrom (admitted *pro hac vice*)
        Kristine Edde Johnson (admitted *pro hac vice*)
        Michael R. McCarthy (admitted *pro hac vice*)
        Parsons Behle & Latimer
        201 South Main Street, Suite 1800
        Salt Lake City, UT 84111
        Ph: 801-532-1234
        F: 801-536-6111
        fwikstrom@parsonsbehle.com
        kjohnson@parsonsbehle.com
        mmccarthy@parsonsbehle.com

        Michael J. Modl
        Steven M. Streck
        Andrew J. Clarkowski
        Axley Brynelson, LLP
        2 E. Mifflin Street, Suite 200
        Madison, WI 53703
        Ph: 608-283-6705
        F: 608-257-5444
        mmodl@axley.com
        sstreck@axley.com
        aclarkowski@axley.com

        Amy Sun (admitted *pro hac vice*)
        Life Technologies Corporation
        5791 Van Allen Way
        Carlsbad, CA 92008
        Ph: (760) 603-7200
        F: (760) 476-6048
        amy.sun@lifetech.com

        Attorneys for Defendants