ATTACHMENT C

UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

* * * * * * * * * * * * * * * * * * * * * * * * * *

PROMEGA CORPORATION,

     Plaintiff,

  and

MAX-PLANCK-GESELLSCHAFT zur
FORDERUNG der WISSENSCHAFTEN E.V.,

     Involuntary Plaintiff,

  -vs-                     Case No. 10-CV-281-BBC


LIFE TECHNOLOGIES CORPORATION,  Madison, Wisconsin
INVITROGEN IP HOLDINGS INC.     February 6, 2012
and APPLIED BIOSYSTEMS, LLC,    3:00 p.m.

     Defendants.

* * * * * * * * * * * * * * * * * * * * * * * * * *

STENOGRAPHIC TRANSCRIPT OF FIRST DAY OF JURY TRIAL
AFTERNOON SESSION
HELD BEFORE DISTRICT JUDGE BARBARA B. CRABB, and a jury,


APPEARANCES:

For the Plaintiff:  Troupis Law Office, LLC
                BY:  ATTORNEYS JAMES TROUPIS,
                STEWART KARGE and PETER CARROLL
                8500 Greenway Blvd., Ste. 200
                Middleton, Wisconsin  53562

Also present:       William Linton, CEO of Promega
                Craig Christenson, General Counsel

Lynette Swenson    RMR, CRR, CBC
Federal Court Reporter
U.S. District Court   120 N. Henry St., Rm. 520
Madison, WI  53703   (608) 255-3821

1-P-2

```
 1  For the Defendants:   Parsons Behle & Latimer
                          BY:  ATTORNEYS FRANCIS WIKSTROM
 2                        and KRISTINE JOHNSON
                          201 South Main Street, Ste. 1800
 3                        Salt Lake City, Utah  84111

 4                        Axley Brynelson
                          BY:  ATTORNEYS MICHAEL MODL
 5                        2 East Mifflin Street, Ste. 200
                          Madison, Wisconsin  53703
 6

 7

 8

 9                        *  *  *  *  *

10        THE CLERK:  This Honorable Court is again in

11  session.  Please be seated and come to order.

12        THE COURT:  I'm ready to make some rulings, but

13  if you have anything you want to tell me before we get

14  started, I'll hear that.

15        MR. TROUPIS:  Yes, Your Honor.  We'd like to

16  address two of the matters now pending before the Court

17  if we might.  I'd like to address the matter of the

18  clarification of Dr. Beyer; and I know Dr. Carroll, who

19  is here as well, would like to address the question of

20  the forensics, the extent of the original summary

21  judgment ruling.

22        THE COURT:  Well, if it's brief because I've

23  read what -- all that you've written.

24        MR. TROUPIS:  I will be very brief with regard

25  to Dr. Beyer.  Because we received their response last
```

1 night, and I've been able to read it now, the parties

2 appear to agree that with regard to profitability,

3 process for returning profits, lost profits and like,

4 Dr. Beyer could still testify.

5      The problems arise because the total sales proof

6 appears -- it has nothing to do with the methodology

7 that the Court addressed, but within each of those

8 reports, there's a series of opinions on the total sales

9 that were involved worldwide.  The figure that is in the

10 supplemental report stated on page three at 700 million

11 dollars, the Court's reach of its decision is to all of

12 the kits, we'll introduce testimony simply to the fact

13 that all those kits do, in fact, infringe and that total

14 sales figure is then that number.  The problem with us

15 introducing that number based on the Court's ruling is

16 that it's unclear whether Dr. Beyer can testify to that.

17 We approached the other side to stipulate to that

18 number.

19      The alternative is some rather otherwise

20 unnecessary testimony, I think, from Guido Sandulli that

21 just simply goes through these spreadsheets to come up

22 with a total so that we can answer the first question

23 about the total number of infringing sales based upon

24 the Court's ruling.

25      The second problem occurs because we don't have any

1   idea, having twice asked the question in document

2   discovery for documents on the permitted fields, give us

3   the transaction level database of the permitted fields

4   and the amounts, and in both instances the defendants

5   indicated they don't have those documents; how they

6   intend to go forward proving it.  So we're left trying

7   to decide at the very least if they're going to put in

8   some generic evidence of somehow to prove that number

9   that Dr. Beyer would be able to testify, not to a

10  quantum, but at least as to what they introduce that

11  they have included sales to institutions which

12  Dr. Dimond will have testified as institutions would not

13  be using it for the permitted uses.  So that he wouldn't

14  be having a damage calculation, but he would indeed be

15  rebutting whatever proof they're apparently going to

16  present to show the permitted uses.  So that -- I want

17  to isolate that as to how we saw this going forward.

18          MR. WIKSTROM:  Your Honor, if I may address the

19  proposed stipulation.

20          THE COURT:  Mr. Wikstrom.

21          MR. WIKSTROM:  I believe it was yesterday they

22  asked us to consider stipulating to a number and I will

23  advise the Court that we are prepared to stipulate to a

24  number.  It will be -- and these will be --

25          THE COURT:  Of total sales.

1          MR. WIKSTROM:  Total worldwide sales of the
2    relevant kits.  We're trying to confirm the number.
3    It's going to be something in the neighborhood of 700
4    million, but the problem is we think that there are a
5    few kits that weren't on the list that the Court found
6    to be within the claims of the patents and so we should
7    have that by later today.
8          MR. TROUPIS:  Okay.  If we're capable of
9    getting that in that neighborhood, then there's not --
10   there will not likely be a problem to address that.
11         MS. JOHNSON:  Your Honor, if I may address the
12   remainder of Mr. Troupis's arguments very briefly.  It's
13   correct that with respect to profitability and process,
14   we believe that Mr. Wikstrom can testify to those issues
15   as long, of course, as he doesn't intrude on the Court's
16   ruling with respect to methodology.
17        As for the permitted fields, perhaps I'll have to
18   watch this play out, but I'm a bit at a loss as to what
19   Mr. Troupis is suggesting.  If Dr. Dimond is going to
20   provide some rebuttal testimony on permitted
21   institutions or licensed institutions, I'm not sure what
22   Dr. Beyer could add in that regard.
23         MR. TROUPIS:  Dr. Beyer does not -- Dr. Dimond
24   has no access to their customer lists, so he could not
25   isolate, he could not go through them to tell -- to

1  address those.  He can address the institutions as

2  institutions.  Dr. Beyer took that information and then

3  applied it to the institutional list that was provided

4  by defendants.  It was the protective order that was

5  causing the problem there.

6          THE COURT:  Okay.  All right.  So it might be

7  helpful if we started with how this case is going to go

8  forward and what I'm -- I really want to know what

9  dispute the jury is going to be called upon to decide.

10  The plaintiff is going to get up and say that these --

11  as stipulated -- first of all, "as found by the Court,

12  all of these products infringe the patents."  Then the

13  plaintiff is going to say "and our worldwide sales have

14  been stipulated to be this 700 million" or whatever it

15  turns out to be.  We figure that our lost profits on

16  sales of 700 million dollars would be "X" and our

17  reasonable royalty on those sales would be "Y," and

18  possibly would make an effort to show willfulness at

19  that stage?

20          MR. TROUPIS:  We would likely reverse it

21  slightly.  It was our intention to introduce Dr. -- we'd

22  begin our testimony with Mr. Linton, and then

23  Dr. Ballantyne doing a tutorial, and then Dr. Dimond

24  addressing many of the issues that Your Honor just

25  stated.  We would then introduce through -- and we would

1  introduce at that stage, also through Dr. Dimond, the

2  royalty process; the process and obligations of keeping

3  records; how records are kept; how they're done.  It

4  would introduce the license agreement and how that

5  license agreement came to be and what the understandings

6  of the parties were at that time.  We would then

7  introduce the willfulness evidence at that point through

8  both direct evidence of a number of witnesses as well as

9  -- that is live witnesses as well as the deposition

10  designations.  And during that process, they'll

11  demonstrate a variety of things with regard to the way

12  in which Life Technologies conducted its business, and

13  will address the enormous amount of activity, both

14  sales, support, creation of a special division, things

15  of that nature in direct contra-- in direct infringement

16  of these patents, intentionally, willfully, both through

17  its structures and through its actions.

18      In that same testimony, there will be testimony

19  about explicit customers and explicit sales that would

20  ultimately go to a potential damage calculation

21  generally, but it will come in at that point simply

22  because they're by designation.

23          THE COURT:  What do you mean by this last --

24  what exactly are you --

25          MR. TROUPIS:  Well, each of the witnesses is

1  going to be addressing specific sales of infringing uses

2  to specific institutions around the country and around

3  the world.  That's often the context in which Life

4  Technologies willfully infringed the patents, and that

5  will provide that background to the Court and the jury.

6          THE COURT:  So that's what it's relevant to;

7  willfulness?

8          MR. TROUPIS:  Relevant to willfulness, but it

9  has the effect as well of addressing in advance, and in

10 fact there's counter designations which we've included

11 from the defendants, the idea that some of these uses

12 may have been permitted.  So in a sense some of that

13 permitted and nonpermitted uses comes in there as well

14 simply because it can't be separated out from that.

15         THE COURT:  Okay.

16         MR. TROUPIS:  We would then introduce evidence

17 from the CFO of Promega with regard to exact

18 profitability and meeting the balance of the criteria in

19 order for the computations to be made.  It was at that

20 point that we had anticipated potentially using

21 Dr. Beyer as well in that profitability analysis.  So

22 that's the way we anticipated our case going in.

23         THE COURT:  And when you say your

24 understandings of the meeting of the license agreement,

25 what are you suggesting?

1          MR. TROUPIS:  Well, they're not about -- well,

2     it is the -- during the course of the negotiations, the

3     question of permitted and nonpermitted uses was

4     addressed by the parties, not so much to the question of

5     the definition of nonforensic use or forensic use which

6     the Court has already addressed, but in fact there were

7     offers made of these other areas which were declined

8     which goes to the heart of whether or not they

9     subsequently -- we expect that they're going to defend

10    this willfulness by suggesting well, we understood it to

11    mean something else or we thought we could do these

12    activities without violating the patents.  And so in

13    anticipation of that, we'll introduce evidence, direct

14    evidence, that in fact they did know; they were told;

15    they did turn these down; they did know what they were

16    doing; and then they subsequently created all of this

17    organizational structure shortly after those meetings in

18    fact, as the evidence will show, in which they just

19    pointblank went ahead and sold into all of these

20    infringing areas.  So that evidence helps us understand

21    that sequence of events.

22          THE COURT:  So that's relevant to willfulness

23    you're saying.

24          MR. TROUPIS:  Willfulness, yes.

25          THE COURT:  And Mr. Wikstrom, your plan when

1  plaintiff rests?

2        MR. WIKSTROM:  Your Honor, we will defend

3  against willfulness, of course.  And Your Honor, I want

4  to make it clear that by agreeing to stipulating to what

5  the total sales are, I don't mean to reargue any matter

6  that the Court has already decided, but I want to make

7  it clear for the record that by stipulating to that

8  number we're not agreeing to the approach that is set

9  forth in the special verdicts.

10       But given the way the Court has ruled, we will

11  stipulate to what the total sales should be without --

12  it would be our position that they're not -- the 700

13  million are not infringing sales because we have a

14  license to sell most of those.  We will then disprove

15  the willfulness through our witnesses who will testify

16  to the contrary what Mr. Troupis is saying.  And then

17  Your Honor, we're going to do the best we can to live

18  with the order of the Court to try to demonstrate the

19  sales that were contemplated under the license,

20  permitted under the license.  I understand you've placed

21  the burden on us to do that.

22       THE COURT:  Right.  So how long do you think

23  it's going to take now?

24       MR. TROUPIS:  We anticipate our case will be in

25  some time Thursday.  We'll finish some time Thursday, I

1 believe, based on, again, subject to the usual provisos,

2 but I think we'll be done by Thursday.

3       THE COURT:  We won't be able to hold trial on

4 Friday afternoon.  I have a meeting I have to go to, but

5 we could bring the jury in at 8:30 and work until 12:30.

6       MR. WIKSTROM:  Your Honor, I have a problem in

7 that regard.  We agreed that we would make, I believe,

8 five of our witnesses available live so that they

9 wouldn't have to -- their depositions wouldn't have to

10 be read.  I've been asking counsel now for days to tell

11 us when they think they might need those witnesses

12 because they have to be flown in.  They've told us about

13 two, but as to the remaining witnesses, this is all news

14 to us that they're now going to be finished on Thursday.

15 I need to know --

16       THE COURT:  Of course you do.

17       MR. WIKSTROM:  -- exactly who they want and

18 when they want us to try to have them there.  We'll do

19 our best to accommodate that schedule, but we haven't

20 been given the schedule.

21       MR. TROUPIS:  I apologize, Your Honor.  I

22 thought we had indicated the two we anticipated calling,

23 and at this point, I did not anticipate calling the

24 others in our direct case.  Is there some --

25       MR. WIKSTROM:  I think there's a

1    misunderstanding because in an email exchange that I had

2    with Mr. Karge --

3              MR. TROUPIS:  I apologize.

4              MR. WIKSTROM:  In an email I exchanged with

5    Mr. Karge yesterday, I was under the impression that

6    plaintiffs still wanted us to present the other

7    witnesses.  If they don't, that's fine.  I just need to

8    know one way or the other.

9              MR. TROUPIS:  No, we do not.  I apologize if

10   there was a misunderstanding.

11             THE COURT:  So let me understand, are the two

12   that Mr. Wikstrom knows about now, are those the only

13   two that he needs to produce this week?

14             MR. TROUPIS:  That's correct.

15             MR. WIKSTROM:  And just may I, Your Honor?

16             THE COURT:  Yes.

17             MR. WIKSTROM:  Mr. Sandulli and Mr. --

18             MR. TROUPIS:  Hall.

19             MR. WIKSTROM:  -- Hall?

20             MR. TROUPIS:  Those were the two.

21             MR. WIKSTROM:  Okay.  We're good then.

22             THE COURT:  Did you want to say anything about

23   Mr. Beyer then, Mr. Wikstrom?

24             MR. WIKSTROM:  Your Honor, Ms. Johnson is

25   addressing the merits on Dr. Beyer.

1           THE COURT:  Okay.

2           MS. JOHNSON:  Your Honor, our position is, as

3   we set forth in the filing last night, would remain the

4   same.  With respect to any intent by Dr. Beyer to offer

5   any testimony on quantum of infringing sales or method

6   for arriving at that, any of the bound methodology that

7   the Court has stricken, we would certainly object to

8   that.

9           THE COURT:  But I think now with the ruling

10  that the burden is on you to show what amount of those

11  sales was not infringing, that really does not become a

12  problem.

13          MS. JOHNSON:  I would agree.  Yes, Your Honor.

14          THE COURT:  All right.  So Mr. Beyer, Dr. Beyer

15  can talk about what he thinks a reasonable royalty would

16  be; he can talk about the total sales because that will

17  be a stipulated amount; and he can talk about what he

18  thinks lost profits should be.  But he cannot estimate

19  what falls outside the license and he doesn't need to.

20      One of the objections to Dr. Beyer's testimony

21  concerned issues with defendant's data.  I mean he

22  certainly can criticize the data that defendants put on,

23  but he can't go -- he can't say that data is absolutely

24  wrong.  Here is my data, which is better.

25          MR. TROUPIS:  Oh, I think that that's probably