**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF WISCONSIN**

---

PROMEGA CORPORATION,

                Plaintiff,

     and

MAX-PLANCK-GESELLSCHAFT zur
FORDERUNG der WISSENSCHAFTEN E.V.,

              Involuntary Plaintiff,

     v.

LIFE TECHNOLOGIES CORPORATION,
INVITROGEN IP HOLDINGS, INC., and
APPLIED BIOSYSTEMS, LLC,

              Defendants.

Case No. 10-cv-281-bbc

---

**DEFENDANTS' OBJECTIONS AND PROPOSED REVISIONS TO THE PROPOSED
POST-TRIAL JURY INSTRUCTIONS AND SPECIAL VERDICT FORMS**

---

1

# INTRODUCTION

Defendants Life Technologies Corp., Applied Biosystems LLC, and Invitrogen IP Holdings, Inc. (collectively "Life") submit these objections and proposed revisions to the Court's Proposed Post-Trial Instructions and in response to Promega's Objections and Proposed Revisions to the Court's Jury Instructions, filed on February 5, 2012.

Without waiving Life's previous arguments and objections contained in Life's Proposed Jury Instructions and Special Verdict form (Dkt. Nos. 392, 394) and Life's Objections to Promega's Proposed Jury Instructions and Special Verdict form (Dkt. No. 416), Life submits the following objections and proposed revisions.

For the Court's convenience, attached hereto as Exhibit A is a copy of the Court's February 3, 2012 Proposed Post-Trial Jury Instructions and Special Verdict Questions with mark-ups showing all of the changes proposed by Life herein.   The following sections discuss (i) Life's objections to the proposed instructions, including comments on Promega's February 5, 2012 objections to the Court's proposed instructions and on Promega's proposed additional instructions, (ii) a few additional instructions proposed by Life, (iii) comments and objections on Promega's proposed additional instructions, and (iv) Life's objections to the proposed Special Verdict Questions.

I.    **LIFE'S OBJECTIONS TO THE COURT'S PROPOSED POST-TRIAL JURY INSTRUCTIONS AND PROMEGA'S PROPOSED REVISIONS TO THOSE INSTRUCTIONS**

A.  **Life's General Objection to the Court's Proposed Post-Trial Jury Instructions**

Life respectfully objects to the Court's Proposed Post-Trial Jury Instructions on the grounds that in certain respects, discussed in detail below, and in light of the testimony adduced so far in this trial, some of those instructions would lead to jury confusion on the clear and convincing evidentiary standard, the license agreement, willfulness, and certain aspects of lost profits and reasonable royalties.  Life proposes clarifying amendments below that will assist the jury in reaching a fair verdict based upon the relevant evidence and law.

Life also respectfully objects to the Court's Proposed Post-Trial Jury Instructions to the extent that they fail to include Life's proposed language regarding Life's unauthorized sale and use by customers outside the scope of the 2006 cross license.  *See generally* Defendants' Proposed Final Set of Jury Instructions, Dkt. No. 392.  Life incorporates by reference its previous arguments on this issue as in its Memorandum in Support of Its Proposed Special Non-Stock Jury Instructions and Special Verdict Form (Dkt. No. 394 at 3-4) and its Objections to Promega's Proposed Jury Instructions and Proposed Special Verdict Form (Dkt. No. 416 at 2-4). Life believes that the proper damages analysis requires two steps:  did Life make an unauthorized sale of a kit, and if so, did the customer use it outside the scope of the 2006 cross license.

Life incorporates these objections into its objections below as noted.

**B.  Life's Specific Objections to the Court's Proposed Post-Trial Jury Instructions**

**Burden of Proof-Preponderance of the Evidence**

In addition to its General Objection above, Life objects to this instruction because it places the burden on Promega to prove willfulness (*i.e.,* original Question No. 6 on the Special Verdict Form, but renumbered below as Question No. 7) only by a preponderance of evidence, rather than by clear and convincing evidence.  Life proposes a clarification of this instruction, below.

Life also objects to this instruction because it places on Life the burden of proving the quantum (*e.g.,* in terms of dollars or units) of sales that were licensed, rather than placing the burden on Promega to prove the quantum of sales that were unlicensed.[1]  In particular, the instruction states that for Question No. 4[2] (renumbered herein as Question No. 2), "defendants have the burden to prove the answer by a preponderance of the evidence."  Life respectfully submits that such an approach is contrary to law.  The issue at this point in time is not the existence or scope of the license.  Rather, the issue is the quantum of sales that were outside the scope of the license.  Once the existence and scope of the license is proven by Life, the burden should be on Promega to show which sales fell outside that license, *i.e.,* the quantum of infringing sales.

It is settled law that "the patent owner bears that burden of providing by a preponderance of the evidence the quantum of damages."  *Transclean Corp. v Bridgewood Servs.*, 290 F.3d 1364, 1370 (Fed. Cir. 2002); *see also BIC Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1217

---

[1]  Life recognizes that the Court has ruled on some aspects of this issue, but wishes to preserve its arguments.   ,

[2] Question No. 4 reads:  "Of the sales in your answer to Question No. 1, what is the total dollar amount of defendants' kit sales that were permitted by the 2006 licensing agreement?"

4

(Fed. Cir. 1993) ("The finding of the amount of damages for patent infringement is a question of fact on which the patent owners bears the burden of proof."); *Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.*, 926 F.2d 1161, 1164 (Fed. Cir. 1991) ("[T]he amount of a prevailing party's damages [in a patent case] is a finding of act on which the plaintiff bears the burden of proof by a preponderance of the evidence.").

Life has found no cases in which court shifted the burden of proof on ***the quantum of damages*** to the alleged patent infringer just because a defense, affirmative or otherwise, was successful or not successful at the ***infringement liability*** phase. Neither is Life aware of any authority that would create a "presumption" that all of a licensee's sales are into unlicensed fields, or that a defendant relying on an express, written license is required to prove which of its sales over a five or six year period were within the license scope as opposed to the plaintiff, who alleges that the defendant exceeded the scope of its license, proving which sales exceed the license scope.

Promega is properly required to prove each act of making, using, or selling in the United States, or importing into the United States, that is "unauthorized" before such acts are considered to be "infringing" acts regarding which Promega may recover damages.  Life respectfully submits that the cases relied on by Promega do not support its position: Those cases deal with burdens of proof of infringement liability, not quantum of damages, and those cases also do not apply to the present factual circumstances.  For example, *Met-Coil Systems Corp. v. Korners Unlimited, Inc.* deals with burdens of proof of ***infringement*** in the context of an ***implied*** license, which is an intensely factual issue. 803 F.2d 684, 687 (Fed. Cir. 1986).  *Intel Corp. v. ITC*  also involved burden of proof of ***infringement*** and involved unique facts.  946 F.2d 821, 828 (Fed. Cir. 1991).  In that case, Atmel argued that its EPROMs did not infringe Intel's patent because

5

they were manufactured by Sanyo and that Sanyo had a license agreement with Intel that allowed Sanyo to act as a chip foundry for other companies (including Atmel).  The dispute was about the meaning and scope of the Intel-Sanyo license, not a license between Atmel and Intel.  So, when the Federal Circuit said that "[w]e agree that Atmel has not established its license defense to infringement," it was referring to Atmel's argument about the Intel-Sanyo license, not to an express written license between Intel and Atmel.  In any event, the relevant holdings of these cases did not involve the burden of proving the quantum of infringing sales.

Indeed, after a fact-finder determines what specific actions constitute patent infringement (regardless of what burdens are applied to reach those determinations) it is ***always*** the patentee's burden to show the ***amount*** of the specific actions that have occurred which fit the categories that were identified as infringing.  In *Avid Identification Systems. v. Global ID Systems,* 29 Fed. Appx. 598 (Fed. Cir. 2002), the Federal Circuit reversed and remanded the district court's damages decision because the district court improperly placed the burden on defendants: "[t]he burden of proof on the number of infringing Readers used or sold by GIDS in the United States was on the plaintiff, and it was inappropriate for the district court to shift that burden to the defendant, as it effectively did." 29 Fed. Appx. at 602. Similarly, in *Oiness v. Walgreen Co*., after a liability determination that a party's sales of a specific headrest willfully infringed a patent, the Federal Circuit remanded the case to either reduce the damages award or offer a new trial on damages where the patentee "purported to meet its burden of proof" regarding the extent of sales "with mere speculation and guess work." 88 F.3d 1025, 1030-31 (Fed. Cir. 1996). In the *Oiness* case, the Federal Circuit specifically noted that "[a]ny insufficiency in Walgreen's records ***cannot supplant Oiness's burden to prove lost profits by a preponderance of evidence***." *Id.* at 1031 (emphasis added).

6

Accordingly, this instruction should be revised regarding the burden of proof associated with the Questions as follows (new question numbers are incorporated based on Promega's withdrawal of its inducement claims and the associated deletion of the first two questions and Life's proposed addition of one question, as discussed below):

### Burden of Proof-Preponderance of the Evidence

When a party has the burden to prove any matter by a preponderance of the evidence, it means that you must be persuaded by the testimony and exhibits that the matter sought to be proved is more probably true than not true. On Question Nos. 1, 2, 3, 6 -1-6 in the special verdict, plaintiff has the burden to prove the answer by a preponderance of the evidence. In contrast, on Question No. 7, plaintiff has the burden of proving willfulness by clear and convincing evidence, which is a different standard. On Question No.4, defendants have the burden to prove the answer by a preponderance of the evidence. You should base your decision on all of the evidence, regardless which party presented it.

## Burden of Proof- Clear and Convincing

Life objects to this instruction because it is likely to confuse the jury into thinking that "satisfactory" evidence is enough to meet the standard or that the standard is anything less than "clear and convincing," both of which would be contrary to law.

On January 18, Life proposed its Instruction 2.3 which modified the Court's stock instruction to make clear to the jury that the "clear and convincing" burden of proof requires a higher probability that the particular proposition is true compared to the Court's preponderance instructions.  Life's instruction tracks the Seventh Circuit Instruction for willful infringement, premised on *In re Seagate Technology, LLC.,* 497 F.3d 1360, 1370-72 (Fed. Cir. 2007) (*en banc*).  The Federal Circuit set the standard for willfulness as "clear and convincing" evidence: "to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement

of a valid patent. . . . If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer."  497 F.3d at 1371.

The proposed instruction better articulates what "clear and convincing" means.  "Highly probable" is preferable to "satisfactory" as a reference to evidence; "satisfactory" could lead the jury to confuse the "clear and convincing" standard of proof applicable to certain issues in this case with the preponderance of the evidence standard.  For example, "satisfactory" could be interpreted as meaning merely "fulfilling all demands or requirements," which is as true for the preponderance of evidence standard as it is for the clear and convincing standard.  The word "satisfactory" adds nothing to improve the jury's understanding of the standard while simultaneously suggesting that the standard is lower than it actually is.  Indeed, if anything, the Jury must be satisfied that the evidence is clear and convincing, not that the evidence is "satisfactory."

Accordingly, Life requests that the Court use its Proposed Instruction 2.3 instead of the version the Court proposed.

### Burden of Proof – Clear and Convincing

In answering question 8̶ 7 on the issue of willful infringement in the special verdict form, you are instructed that the burden is on the plaintiff to convince you to a reasonable certainty  by evidence that is clear, satisfactory, and convincing that the answer should be yes. by "clear and convincing evidence." "Clear and convincing" evidence means evidence that convinces you that it is highly probable that the particular proposition is true.

**License Agreement**

In addition to its General Objection above, Life objects to the Court's proposed instruction on the grounds that it is an incomplete statement of the scope of rights granted to Life under the 2006 Cross License Agreement. Life is not re-litigating the Court's determination of the scope of the cross license. Instead, the issue is the interpretation of the cross license agreement under which Life was operating, and whether there were legitimate or credible reasons for believing that they were acting within the scope of the license (even if these reasons were later determined to be wrong) – *i.e.,* whether <u>Life's defenses were objectively unreasonable</u> <u>and</u> whether Life's actions were objectively reckless. To the extent the jury is asked to make a determination of willfulness, Life's understanding of the scope of the 2006 Cross License Agreement is an important factor in evaluating both the objective prong of willfulness (*e.g.,* whether the understanding of the contract scope under which Life was operating was objective unreasonable) and subjective prong (*e.g.,* assuming that there was an objectively high risk that the relevant sales were not authorized, whether Life knew that). For the jury to understand these issues and decide them fairly, the jury instruction should remain as true to the actual license grant as possible.

The Court's November 29, 2001 Opinion and Order states that "I am granting plaintiff's motion for summary judgment with respect to direct infringement of the asserted apparatus claims in the '235, '598, '660 and '771 patents." In doing so, the Court held that "chimerism in the context of bone marrow transplantation, cell line authentication, classifying molar specimens and determination of fetal sex" are not within the scope of the 2006 cross license." Order at 23, 24-25. On February 6, 2012, the Court further ruled that forensics "research, educational [sic], and training is not covered by the license unless it is done right there in the police department"

and the "genetics research that's done at universities that are not connected with any law enforcement agencies" is not included within the scope of the cross license. Finally, on February 10, 2012, the parties agreed that population databasing for use in legal proceedings was a permitted use of the accused STR kits under the 2006 cross license. Trial Tr. (Feb. 10, 2012), Vol. B at 63-65.

In light of the actual grant, the Court's November 29, 2011 Opinion and Order, the Court's February 6, 2012 ruling, and the parties' agreed upon understanding regarding population databasing for use in legal proceedings, Life respectfully submits that the following instruction is appropriate:

> ~~In 2006, plaintiff and defendants entered into a license agreement that gave defendants the right to make, use, sell, offer to sell or import the AmpFℓSTR® kits in particular fields. That agreement authorizes defendants to practice the patents at issue in this case for (1) use in, or preparation for, legal proceedings, or (2) analysis of biological specimens for the identification of individuals.~~

> The 2006 Cross License Agreement states that Promega granted Life a license under the Promega patents "to make, have made, import, export, use, offer to sell, sell, and have sold Licensed Products solely in the Genetic Identity Field." The cross license defines the Genetic Identity Field as "Forensics and Human Identity Applications and Paternity Applications."

> The phrase "Forensics and Human Identity Applications" is further defined as:

>> any analysis, based on the measurement of the length of polynucleotide sequence containing a tandem repeat, of human genetic material for (a) use in, or in preparation for, legal proceedings, or (b) analysis of biological specimens for identification of individuals. Forensics and Human Identity Applications do not include parentage determinations (except in cases of sexual assault investigation) or tissue typing.

>> Population databasing for use in legal proceedings is also within the meaning of "Forensics and Human Identity Applications."

> The phrase "Paternity Applications" is defined as: "any analysis, based on the measurement of the length of a polynucleotide sequence containing a tandem repeat, of human genetic material for parentage determination, except in cases of sexual assault investigations."

10

<u>In addition</u>, I have determined that some of the uses of the kits sold by defendants are not authorized under that license agreement because those uses are outside the particular fields set forth in the agreement. These uses are:

(1) Chimerism (which involves determining the relative amount present of two different types of DNA);

(2) Classifying molar specimens (which involves determining whether a mole is present and what type it is);

(3) Cell line authentication (which involves a determination of whether two cell lines are unique);

(4) Determination of fetal sex;

(5) Cancer analysis; and

(6) Genetic research.

In answering Question No. 4 2, you must determine the amount of defendants' kit sales that were authorized by the license agreement.


Life also objects to Promega's proposed modifications of the Court's instruction on this issue in the second paragraph of the instruction.  The Court's proposed language is both clear and accurate.  The Court did not hold that any other uses besides those enumerated were outside the scope of the 2006 license.

Promega also states in the penultimate sentence of its February 5 submission (Dkt No. 505) that the Court 'determined that certain sales did occur outside those fields of use, though [the Court did] not determine[] the amount." The Court made no such determination.  The Court's Summary Judgment Order specified which fields were outside the scope of the license. The Court made no statement that any sales did occur outside the licensed fields of use.  The burden properly remains on Promega to prove that sales occurred outside the licensed fields and how many such sales occurred.

**Lost Profits**

In addition to the General Objection above, Life objects to this instruction because it fails to provide sufficient information to the jury concerning all the factors that go into a lost profits analysis.

As a threshold matter, the instruction on lost profits does not limit the jury's determination to infringement of United States patents.  Instead, the Jury might be misled into believing that any lost profits award should or could be based on world-wide sales.  Below, Life proposes a brief separate instruction making clear that only infringement of United States patents is at issue in this case.  Here, Life proposes minor edits to the existing proposed lost profits instruction to make this point clear and to avoid juror confusion.

In addition, Life previously proposed a set of instructions that provided the jury with a framework for deciding whether Promega is entitled to lost profits.  Life's Proposed Instruction Nos. 5.5.1-5.5.7, Dkt. No. 392 at 35-42.  In terms of the substantive content regarding the elements of a lost profits analysis, those instructions are more precise and helpful to the jury. For all the reasons enumerated in its Memorandum in Support of its Proposed Jury Instructions (Dkt No. 394), Life continues to believe the substance of those instructions is more appropriate. However, if the Court declines to accept the substance of those instructions, Life proposes the following modifications to the Court's instructions.

First, in the portion of the Court's instruction regarding the two prongs the plaintiff must establish, prong two states that "Plaintiff does not need to prove this amount with precision."  By stating that Promega does not need to prove this amount, rather than phrasing the issue affirmatively in accord with the burden of proof (*e.g.,* "Promega must prove this amount with reasonable probability but not with absolute precision"), the jury may believe that Promega does

12

not have the burden on this issue or that Life must prove the amount.  That is contrary to law.

*BIC Leisure Prods. v. Windsurfing Int'l*, 1 F.3d 1214, 1217-1218 (Fed. Cir. 1993) ("To recover

lost profits as opposed to royalties, a patent owner must prove a causal relation between the

infringement and its loss of profits."); *Smithkline Diagnostics, Inc. v. Helena Laboratories Corp.*,

926 F.2d 1161, 1164-65 (Fed. Cir. 1991).  Accordingly, the second prong should include the

following language to comport with the law: "Plaintiff must prove this amount with reasonable

probability but not with absolute precision."

Second, the Court's language regarding demand omits that the demand must be linked to

the patented features of the product, not other features.  In *Ferguson Beauregard/Logic Controls*

*v. Mega Systems, LLC*, the Federal Circuit vacated the damages award because:

> the district court based its lost profits award on evidence of sales of a device
> embodying features in addition to those present in the infringed '376 patent,
> namely those features attributable to the [non-infringed] '991 patent.  The district
> court therefore failed to distinguish the allocation of profits that would have been
> made "but for" the infringement of the '376 patent with the profits that could fairly
> be allocated to customer demand related to the features embodying the '991
> patent.

350 F.3d 1327, 1345-46 (Fed. Cir. 2003).  Accordingly, the demand paragraph should include

the following language:  "The patented features must provide the basis for the demand, not other

features."

Third, the paragraph on non-infringing alternatives is incomplete.  It omits that an

acceptable non-infringing alternative need not be on the market as long as that product was

available. By using the word "product" and then not addressing alternatives in the sense of

alternative and non-infringing actions by Life or alternatives that were not actually "on the

market," the jury could be misled to believe that non-infringing alternatives must be ***actual***

products available for purchase.  That is not the law.  It is well-established that a non-infringing

alternative only needs to be available and need not be actually on the market.  *Grain Processing*

*Corp. v. American Maize-Prods. Co.*, 185 F.3d 1341, 1351 (Fed. Cir. 1999) ("[O]nly by comparing the patented invention to its next-best available alternative(s)—regardless of whether the alternative(s)were actually produced and sold during the infringement—can the court discern the market value of the patent owner's exclusive right, and therefore his expected profit or reward.").  Where material and know-how for the alleged substitute is readily available, an alternative may be considered available.  *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003); *Siemens Medical Solutions USA, Inc., v. Saint-Gobain Ceramics & Plastics, Inc.,* 637 F.3d 1269, 1288 (Fed. Cir. 2011).  Accordingly, Life requests that the Court add the language to the non-infringing alternatives paragraph regarding how an acceptable non-infringing substitute does not need to have been actually produced and sold during the damages period, and how an acceptable non-infringing substitute can be an alternative produce that was not on the market but that was nevertheless available during the damages period.

Life further objects to Promega's proposed revisions to this instruction.   First, Promega adds language to the first paragraph regarding which sales are "infringing sales for the purposes of Question 4 and Question 5."  Separate from Life's objections to the Special Verdict questions (see below), Promega's proposed language is confusing.  The paragraph frames the issue to be decided as which sales "were not permitted by the license agreement."  Life does suggest, however, that the Court replace "permitted" with "authorized" because the latter term has been consistently used throughout trial and the new term "permitted" would be confusing to the Jury.  Thus, the Court properly instructs the jury to consider only those sales from the Special Verdict Question that were not authorized by the 2006 license agreement.  Consequently, the Court's language in the first paragraph should not be modified.

Second, Promega's revision adds back into the Court's instruction on "Lost Profits" what the Court already rejected—namely, that Promega may present a case for lost profits based on the two-supplier market.  In its proposed damages jury instructions, Promega submitted Instruction No. 4, "Lost Profits—Two Supplier Market."  Dkt. No. 402 at 6.  Life objected to this instruction because Promega's damages expert, Dr. Beyer, had not offered any opinion that Promega could be entitled to lost profits based on a two-supplier market.  Dkt. No. 461 at 28.  Instead, Dr. Beyer's opinion applied all four Panduit factors to reach his opinion that Promega was entitled to lost profits.  Promega reintroduces the same language previously proposed in its Damages Instruction No. 4 into the Court's instruction on Lost Profits.

Accordingly, the Court should decline to insert the language proposed by Promega and should instruct the jury as follows:

**Lost profits[3]**

Question No. 5 6 asks what profits on its STR kits, if any, plaintiff lost in the United States as a result of defendants' infringing sales in the United States that were not permitted authorized by the license agreement. In answering this question, you may consider only those sales from Question No.5 3 that were not permitted by the 2006 license agreement.

.

To recover lost profits for infringing sales in the United States, plaintiff must show that:

1. There is a reasonable probability that plaintiff would have made additional sales of its own patented products but for defendants' infringing sales of the kits.

2. The amount of profit plaintiff would have made on those sales. Plaintiff does not need must to prove this amount with reasonable probability but not absolute precision.

---

[3] Life maintains that the substance of its Proposed Instructions 5.5.1-5.5.7 (Dkt. No. 392) regarding the elements of a lost profits analysis should be used in place of the Court's proposed instruction.  However, should the Court decline to reconsider its rejection of those instructions, Life proposes the following modifications.

Plaintiff may establish that it is reasonably probable that it would have made additional sales of its own patented products in the United States if defendants had not sold its infringing product by proving the following three things:

1.      There was a demand for defendants' infringing kits;

2.      There was no acceptable, non-infringing substitute for defendants' infringing kits;

3.      Plaintiff was capable of satisfying the demand.

Demand for the patented product can be proven by significant sales of plaintiff's patented product. Demand for the patented product can also be proven by significant sales of defendants' product containing the patented features.  The patented features must provide the basis for the demand, not other features. However, if you find that defendants generated new or different markets by sales or marketing efforts because of features other than those claimed by plaintiff, the sales of defendants' products cannot establish a demand for the patented product.

An "acceptable, non-infringing substitute" is a product that has the advantages of the patented invention that were important to the purchasers of defendants' kits. An acceptable non-infringing substitute does not need to have been actually produced and sold during the damages period.  For example,  an acceptable non-infringing substitute can be an alternative product that was not on the market but that was nevertheless available during the damages period. If purchasers of defendants' kits were motivated to purchase that product because of features that were available only from that product, then other products are not acceptable substitutes, even if they otherwise competed with plaintiff's and defendants' products.

Plaintiff is only entitled to lost profits for sales it could have actually made. You should consider whether Plaintiff has proven that it had the manufacturing capacity and the marketing capability to make the sales it says it lost. Plaintiff must prove that it was more probable than not that it could have made, or could have had someone else make for it, the additional products it says it could have sold but for the infringement. Plaintiff also must prove that it had the capability to market and sell the additional patented products.

## Reasonable Royalty

 Life objects to Promega's attempt to insert four additional factors into the reasonable royalty instruction.  *See* Dkt. No. 505 at 30.  First, Promega attempts to add a factor relating to

the nature and scope of the license, including whether it is limited in any way.  The Court's proposed instruction already asks the jury to consider "[t]he duration of the patents and the license, as well as the terms and scope of the license" in the fifth factor.  Promega's additional language repeats what the Court has already instructed the jury.  This repetition is likely to confuse the jury into thinking that the scope of the license factor is more important than any of the other factors.

Second, Promega inserts language regarding derivative or convoyed sales.  Promega has never alleged that it was entitled to damages from any alleged derivative or convoyed sales.  *See* Defendants' Objections to Promega's and Proposed Special Verdict Form  (Dkt. No. 461) at 34 ("In addition, Promega has never offered a damages opinion that it would be entitled to convoyed sales, as mentioned in factor 6.").  Thus, the existence of potential convoyed sales is irrelevant here and Promega has waived any right to seek such damages.

Third, Promega's last factor regarding the nature of the patented product was also proposed to the Court and rejected.  There is no reason to instruct the jury as to this additional factor.

Finally, the instruction on reasonable royalty does not limit the jury's determination to infringement of United States patents.  Instead, the Jury might be misled into believing that any reasonable royalty award should or could be based on world-wide sales.  Below, Life proposes a brief separate instruction making clear that only infringement of United States patents is at issue in this case.  Here, Life proposes minor edits to the existing proposed reasonable royalty instruction to make this point clear and to avoid juror confusion.

**Reasonable Royalty**

Question No.7 5 asks what amount of money is a reasonable royalty for plaintiff.

17

Plaintiff should be awarded a reasonable royalty for all infringing sales for which it has not been awarded lost profits damages.   Answer this question only if you find that plaintiff has not proven its claim for lost profits, or has proved its claim for lost profits for only a portion of the infringing sales.   Again, in determining a reasonable royalty, you may consider only those sales in the United States from Question No. ~~5~~ 2 that were not permitted by the 2006 license agreement.

A royalty is a payment made to the owner of a patent by someone else so that he can make, use, sell or import the patented invention.   A "reasonable royalty" is the amount plaintiff and defendants would have agreed upon as a royalty for practicing the patented inventions at the time defendants' infringement began.

In determining a reasonable royalty, you should assume that plaintiff would have been willing to allow defendants to make, use, sell and import the patented invention and that defendants would have been willing to pay plaintiff to do so.   You should take into account what plaintiff's and defendants' expectations would have been if they had negotiated a royalty and had acted reasonably in their negotiations.   You should assume that both plaintiff and defendants would have believed that plaintiff's patent was valid and infringed.   You should also assume that defendants would have been willing to pay, and plaintiff would have been willing to accept, the reasonable royalty they negotiated. Your role is to determine what plaintiff and defendants would have agreed upon if they had negotiated in this manner, not just what either plaintiff or defendants would have preferred.

In determining a reasonable royalty, you may consider the following factors, in addition to any others that are shown by the evidence:

- Royalties that others paid to plaintiff for the patented invention;
- Royalties that defendants paid to others for comparable patents;
- Whether plaintiff had a policy of licensing or not licensing the patents;
- Whether plaintiff and defendants are competitors;
- The duration of the patent and the license, as well as the terms and scope of the license;
- Whether use of the patented invention helps to make sales of other products or services;
- Whether the product made using the patent is commercially successful, as well as its profitability;
- The advantages of using the patented invention over products not covered by the patent;
- The extent of defendants' use of the patented invention and the value of that use to defendants;
- Any royalty amounts that are customary for similar or comparable patented inventions;
- Expert opinions regarding what would be a reasonable royalty.

**Willfulness**

Life objects to this instruction because it misstates the law and fails to give adequate instruction to the jury.

First, the Court's instruction omits that willfulness in this case must be limited to acts before the filing of the Complaint, on May 26, 2010. Because Promega did not pursue a preliminary injunction against Life, it cannot include post-complaint conduct to support willfulness. *See In re Seagate*, 497 F.3d 1360, 1374 (Fed. Cir. 2007) ("By contrast, when an accused infringer's post-filing conduct is reckless, a patentee can move for a preliminary injunction. . . . A patentee who does not attempt to stop an accused infringer's activities in this manner should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct.")

Second, the instruction omits that, for the first prong of the *Seagate* test, if Life's defenses raise a substantial question with regard to its defenses, then the inquiry is finished and there is no need to go on to the second prong. *Id.* at 1371. ("If this threshold objective standard is satisfied, the patentee must also demonstrate that this objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer."); *see Spine Solutions, Inc.v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1319 (Fed. Cir. 2010) (reversing denial of JMOL of no willfulness because defendant raised substantial question of invalidity); *Depuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1336 (Fed. Cir. 2009) (affirming grant of JMOL of no willful infringement on lack of evidence supporting first prong where defendant "presented a substantial question of noninfringing under the doctrine of equivalents."). Life's Proposed Instruction No. 3.5 includes this language.

Third, the instruction omits that the jury may consider Life's understanding of the scope of the 2006 cross-license and that its sales were within the scope of that license.  For example, the Court has previously granted summary judgment of no willful infringement because the licensee's license defense raised a substantial question regarding whether its sales were permitted under the license.  *See Wisconsin Alumni Res. Fdn. v. Intel Corp.*, 656 F. Supp. 2d 898, 923-34 (W.D. Wis. 2009).

In addition, Life objects to Promega's proposed revisions to the Court's instruction on willfulness.  The Court has already instructed the jury that it previously determined that Life infringed Promega's patents.  There is no additional reason to bring it up again.

Accordingly, Life respectfully asks the Court to instruct the jury as follows:

**Willfulness**

Not all infringement is willful.  To succeed on its contention that defendants infringed the patent willfully before this lawsuit was filed on May 26, 2010, plaintiff must prove two things by clear and convincing evidence:

1.      There was a high likelihood that defendants' actions constituted infringement of a valid patent. In making this determination, you may not consider defendants' actual state of mind. Instead, you should consider whether defendants' had objectively legitimate or credible reasons for believing that they were acting within the scope of the license even if these reasons were later determined to be wrong defenses to infringement or validity, even if those defenses ultimately were not successful.  Only if you conclude that defendants' defenses were objectively unreasonable, do you need to consider the second part of the test.

2.      Defendants knew of the high likelihood that it was infringing a valid patent, or this likelihood was so apparent that defendants should have known of it. In deciding whether defendants satisfied the state-of-mind part of the test, you should consider all circumstances bearing on this question.

## II.     LIFE'S ADDITIONAL INSTRUCTIONS

20

**Only Infringement of United States Patents Is At Issue**

In the event that the Court instruct the jury on damages, the following should be added to the instructions to make clear that only United States patents are at issue and that Promega bears the burden of proving infringing acts under those patents (*e.g.,* making, using selling in the United States or importing into the United States):

> Only kits made, used, or sold in the United States, or imported into in the United States are at issue in this case.  Worldwide sales are not at issue.  Instead, only kits that plaintiff proves were made, used, or sold in the United States, or imported into the United States, as opposed to worldwide, may be considered.

**Two Types of Damages—Lost Profits & Reasonable Royalty**

Life respectfully requests the Court to instruct the jury that there are two types of damages that Promega may be entitled to recover.  *See* Life's Proposed Instruction No. 5.3, Dkt. No. 392 at 33.  Currently, there is no instruction informing the jury that Promega is entitled to no less than a reasonable royalty for Life's unauthorized sales to customers who used the kits outside the scope of the 2006 cross license.  Absent this instruction, the jury will not have a clear understanding of how to approach the damages award.  The likelihood of this error is compounded by the Court's Special Verdict Questions, as discussed below.

Accordingly, the Court should provide the following instruction to the jury after instruction them on Damages Generally:

**TWO TYPES OF DAMAGES—LOST PROFITS & REASONABLE ROYALTY**

> There are two types of damages that Promega may be entitled to recover: lost profits, or a reasonable royalty.
>
> Lost profits consist of any actual reduction in business profits Promega [Plaintiff] suffered as a result of Life's unauthorized sales to customers who used the AmpFℓSTR® kits outside the scope of the 2006 cross license [Defendant's infringement]. A reasonable royalty is defined as the amount the patent owner and someone wanting to use the patented invention would agree upon as a fee for use

of the invention. I will describe shortly what Promega [Plaintiff] must prove to recover either type of damages.

Promega [Plaintiff] is entitled to recover no less than a reasonable royalty for each AmpFℓSTR® kit that was made, used, sold or imported in the United States without authority and that were used by a customer outside the scope of the 2006 cross license [infringing sale; fill in other infringing act], even if Promega [Plaintiff] cannot prove that it suffered lost profits in connection with that sale [; fill in other infringing act].

### III.   LIFE'S OBJECTIONS TO PROMEGA'S PROPOSED ADDITIONAL PROPOSED POST-TRIAL INSTRUCTIONS

**Promega's Proposed New Instruction "Precision in Calculating Damages Not Required; Doubts Resolved Against Infringer" (Page 30)**

Life objects to Promega's new instruction which includes language about resolving doubts against the infringer.  In fact, within the same instruction, Promega includes this language twice.  Promega previously proposed language relating to resolving doubts in the damages context against the infringer (*see* Promega's Proposed Damages Instruction Nos. 3 and 6, Dkt. No. 402).  The Court properly rejected inclusion of this language from the Post-Trial Jury Instructions.

First, such an instruction regarding resolving doubts against the infringer is only appropriate when the inadequacy of the evidence is the fault of the infringer.  *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572 (Fed. Cir. 1996).  In *Sensonics*, the accused infringer **failed to retain** production records during the litigation, and the defendant therefore only had manufacturing records relating to the last six months of production.  *Id.*  Because the defendant had destroyed records, the Federal Circuit held that "damages may be estimated on the best available evidence, taking cognizance of the reason for the inadequacy of proof and resolving doubt against the infringer."  *Id.*  Similarly, in *Beatrice Foods Co. v. New England Printing and Lithographing Co.*, 899 F.2d 1171 (Fed. Cir. 1990), the defendant **intentionally destroyed** the

22

only evidence related to its sales of infringing products three years after the litigation began. *Id.* at 1174. Consequently, because "the uncertainty in the damage calculation is the direct result of [the defendant's] procedures," the risk of uncertainty was appropriately borne by the defendant. *Id.* at 1176.

Here, there has been no indication that Life's records are incomplete, that Life destroyed any records, or that the 2006 cross license required Life to generate those kinds of records in the first place. Because the parties' 2006 cross license does not impose any duty on Life to "police" its sales and does not impose any duty on Life to inquire how customers intended to use the kits they purchased, Life's records comply with all requirements of the 2006 cross license Instead, Promega complains that it had to "scour over 500,000 discovery documents" (Dkt. No. 451 at 4) to identify customers to whom Life made unauthorized sales and who used Life's kits outside the scope of the license. There is a marked difference between information that never existed and information that a party chose to destroy. Any inadequacy in Promega's ability to prove its case lies with Promega.

Second, Promega now cites additional case law in support of its revised instruction incorporating resolving doubts against the infringer that it did not provide in support of its initial instructions. But these cases do not stand for Promega's proposition. In particular, *Computing Scale Co. v. Toledo Scale Co.* concerned a patent infringement case where the infringing article was a particular type of scale, a cylinder scale. 279 F. 648, 674 (7th Cir. 1921). The defendants sold two types of scales—the infringing cylinder scale and a non-infringing fan scale. *Id.* at 678. However, the defendant did not keep records related to the type of scale sold—either cylinder or fan—hence, the court resolved doubts regarding the amount of sales against the defendant. *Id.* at 673. Here, the records issue is different and more subtle than *Computing Scale*: Life does not

23

sell two types of kits, one unlicensed and one licensed.  Rather, the use of the kit by a third-party determines whether the sale of the kit is authorized or unauthorized.  With a few exceptions, Life does not have access to that information—only the customers know.  But Promega, despite its additional case law, has yet to identify a case in which a defendant was required to track authorized and unauthorized third party uses, especially in the face of a license that does not require such uses to be policed, tracked, recorded, or even inquired about.

Similarly, *Westinghouse Electric & Manufacturing Co. v. Wagner Electric & Manufacturing Co*. concerned apportioning damages from the sale of transformers.  225 U.S. 604, 616-17 (1912).  At issue was how to calculate damages where "the spaces added by the defendants were noninfringing and valuable improvements which had contributed to the making of the profits." *Id*. at 616.  Despite the plaintiff's exhaustive efforts to apportion the profits associated with the infringing portion from any profits due to the non-infringing features, including "resort[ing] to the books and the employes [sic] of the defendant" and expert testimony, the plaintiff was unable to apportion the profits. *Id*. at 621.  The Supreme Court held that in such cases when "the plaintiff has proved the existence of profits attributable to his invention and demonstrated that they are ***impossible*** of accurate or approximate apportionment" the burden should shift. *Id*. at 622 (emphasis added).  Promega has not demonstrated that the profits associated with unauthorized sales to customers who used Life's kits outside the scope of the 2006 cross license are "impossible of accurate or approximate apportionment."  Promega simply has not made any credible attempt to apportion the profits.  Any defects in its ability to prove damages result from a failure to pursue the necessary discovery.

*Story Parchment Co. v. Paterson Parchment Paper Co.* is no different (and is not a patent case).  282 U.S. 555, 563 (1931).  *Story Parchment* stands for the proposition that damages must

24

be "a matter of just and reasonable inference, although the result be only approximate." *Id.* Although the Supreme Court cited the Supreme Court of Michigan for the statement "the risk of uncertainty should be thrown upon the wrongdoer instead of upon the injured party," the Supreme Court did not resolve any doubts against the defendant. It affirmed jury's findings regarding damages because there was ample proof in the record to support damages with reasonable probability. *Id.* at 567-68.

Promega's remaining case law also does not support its proposed instruction.[4] Many of the cases to which Promega cites rely on *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, (Fed. Cir. 1983). *See, e.g., Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549 (Fed. Cir. 1984); *Kaufman Co. v. Lantech, Inc.*, 926 F.2d 1136 (Fed. Cir. 1991); *Minco Inc. v. Combustion Eng'g*, 95 F.3d 1109 (Fed. Cir. 1996). However, *Lam* is not apposite. In *Lam*, the defendant's sales numbers kept changing: "J-M advanced different numbers at different stages of this litigation—944 at the 1979 settlement hearing, and 843 and 819 at trial." 718 F.2d at 1065. Consequently, the Federal Circuit held that "[i]t was therefore within the district court's province to accept the more credible evidence after it heard testimony and reviewed documentary evidence from both sides." *Id.* To date, Promega has not raised similar issues here—there have been no accusations that Life's sales figures are inaccurate, only complaints that Life did not collect information that Promega desires to have now. Consequently, such an instruction is simply not appropriate.[5]

---

[4] Although *Minco Inc. v. Combustion Eng'g*, 95 F.3d 1109, 1118 (Fed. Cir. 1996) states that "the trial court may resolve doubts underlying the precise measurement of damages against the infringer," there is no evidence that the trial court did so. There is no mention that the lower court actually resolved doubts against the infringer in *DSU Medical Corp. v. JMS Co.*, 471 F.3d 1293, 1309 (Fed. Cir. 2006).

[5] At best, what these cases stand for is the proposition that the Court may resolve doubts against the defendant, not that they must.

Third, none of these cases relates to the issue actually at hand; all of them concern whether or not the defendant's poor record keeping, retention, or actual destruction of records precluded a precise calculation of damages. That is not the situation here. Promega has not accused Life of improper record keeping under the 2006 cross license or of improperly destroying records. Instead, Promega complains that Life did not include with its other sales records information about how each and every of its customers intended to use and actually used Life's products. But there is no such "policing" requirement in the 2006 cross license. Neither is there any requirement that Life inquire about its customers' uses. Life's records complied with all obligations imposed in the 2006 cross license. Promega's failure to seek the discovery on these issues should not be construed against Life.

Fourth, through this instruction, Promega seeks to apply a heightened standard of proof on Life. The only burden is the preponderance of the evidence. No more and no less. The Promega's proposed instruction creates a presumption that ***any sale*** for which Life cannot expressly prove to have been used to identify an individual must necessarily have been outside the scope of the 2006 cross license. Life should not be held to a standard of proof on damages that exceeds Promega's own damages burden.

Accordingly, the Court should decline to instruct the jury on this issue.


**Promega's Proposed Instruction on "Reckless--Defined" (Page 33)**

Life objects to the inclusion of this instruction. As previously stated, Promega's proposed instruction misstates the law. Promega makes no attempt to address Life's previous arguments against this instruction. In fact, Promega claims its instruction is supported by

*Farmer v. Brennan*, although Promega's instruction omits any language from that case, as explained below.

First, *In re Seagate* articulates the proper test for determining whether a defendant's actions are reckless—the two-part test in the Court's Proposed Post-Trial instructions. *See* 497 F.3d at 1370. There is no need for any additional instruction and Promega has not identified any model patent instructions that include such an instruction. *Seagate's* two part reflects the Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825, 836 (1994) which stated: "The civil law generally calls a person reckless who acts or (if the person has a duty to act) fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Seagate*, 497 F.3d at 1371. *Seagate* also pointed to *Safeco Insurance Company of America v. Burr,* 551 U.S. 47, 69 (2007), quoting "It is this high risk of harm, objectively assessed, that is the essence of recklessness at common law." *Seagate*, 497 F.3d at 1371. Promega's proposed instruction improperly suggests that recklessness is merely a "high likelihood" or "a risk of harm." That standard does not comport with the Supreme Court's precedent defining recklessness as an "unjustifiably high risk of harm" (*Farmer*, 511 U.S. at 836) or a "high risk of harm" (*Safeco*, 551 U.S. at 69). If the Court believes an instruction on recklessness is necessary, then it should apply the Supreme Court's definition of the term.

Promega's proposed definition of recklessness is additionally improper because it omits that where a defendant presents substantial evidence of noninfringement or invalidity there can be no recklessness. *See, e.g.*, *Spine Solutions, Inc. v. Medtronic Sofamor Danek USA, Inc.*, 620 F.3d 1305, 1319 (Fed. Cir. 2010) (reversing denial of JMOL of no willfulness because defendant raised substantial question of invalidity); *Depuy Spine, Inc. v. Medtronic Sofamor Danek USA,*

*Inc.*, 567 F.3d 1314, 1336-37 (affirming JMOL of no willfulness where defendant presented substantial question for noninfringement under doctrine of equivalents).

Second, Promega's proposed instruction also suggests that the "affirmative duty of due care" test is correct.  *See* page 48 ("Acts are reckless when they represent a departure from ordinary care…").  *In re Seagate*, 497 F.3d  at 1371 (*en banc*) expressly overruled this standard and stated that negligence is not sufficient to prove willfulness.  Accordingly, instructing the jury that "negligent wrongdoing" is evidence of recklessness would be clear error.

For at least these reasons, the Court should not use Promega's proposed "Reckless-Defined" instruction.


**Promega's Proposed Instruction on "Acts of Employees are Acts of a Corporation" (Page 33) & "Knowledge of a Corporation" (Page 34)**

Life renews its objection to these jury instructions. Life has stipulated that it will not argue that its employees were acting outside the scope of their employment.  Consequently, there is no reason to include either instruction.  Life will offer no evidence or argument that its sales reps were acting outside the scope of their employment.  Although Promega alludes to "the fragmented nature of the defendants' business" (Dkt. No. 505 at 3) it provides no explanation as to what it means by this phrase.  Neither does Promega explain how "the fragmented nature"— assuming Life's business had such a nature—requires instructing the jury as Promega desires.  Consequently, because Promega has failed to justify inclusion of these instructions and Life has agreed not to argue that its employees were acting outside the scope of their employment, the Court should not reconsider its previous determination not to include these instructions.

## IV.     LIFE'S OBJECTIONS TO THE COURT'S SPECIAL VERDICT FORM

First, Life agrees with Promega that the Court should remove Questions Nos. 1-2 because Promega is no longer pursuing indirect infringement against Life.

Second, in addition to the General Objection above, Life objects to Question No. 3 because it does not make clear that Promega bears the burden of proof of establishing the quantum of kits that were made, used, sold in the United States, or imported into the United States.  Life additionally objects to Promega's proposed modification of this question because, apart from the ambiguity regarding the burden, the Court's proposed instruction is sufficiently clear and precise.

Accordingly, Life proposes the following Special Verdict Question:

Question No. ~~3~~ 1: What is the total dollar amount of sales of <u>STR</u> kits <u>that were made, used, or sold in the United States, or imported into the United States,</u> ~~sales~~ by defendants that <u>the plaintiff has proven by a preponderance of the evidence</u>?  .

Answer No. ~~3~~1: $_____

<u>If the answer to this question is $0 (zero dollars), do not answer any of the following questions</u>.

Third, regarding Question No. 4, in addition to the General Objection above, Life requests that the Court change "permitted" to "authorized" as Life has consistently used this term throughout the trial and believes the jury will understand it better than "permitted."  In addition, as stated above in connection with the "Burden of Proof—Preponderance of the Evidence" instruction, it should be made clear to the jury at all times that Promega bears the burden to

prove damages, not Life.  Life also objects to Promega's modifications to this instruction

because Promega's modifications are likely to confuse the jury.

Accordingly, Life proposes the following modifications:

Question No. ~~4~~ 2: Of the sales in your answer to Question No. 1, what is the total
dollar amount of defendants' United States kit sales that were ~~permitted~~
authorized by the 2006 licensing agreement?

Answer No. ~~4~~ 2: $_____

Fourth, aside from its General Objection, Life does not object to Question No. 3

(formerly Question No. 5) as proposed by the Court. For convenience, Life repeats Question No.

3 below:

Question No. ~~5~~ 3: Subtract the dollar amount in Question No. 2 from the dollar
amount in Question No. 1.

Answer No. ~~5~~ 3:  $_____

Fifth, in addition to the General Objection above, Life objects to the order of the Court's

original Question Nos. 6 and 7.  As they currently stand, these Questions improperly suggest that

Promega is entitled to lost profits by starting with lost profits.  Although Question No. 6 asks the

jury to answer "What profits, if any" the jury is likely feel obligated to fill in the blank with an

amount.  Accordingly, Life proposes that before asking the amount of lost profits, if any, to

which Promega may be entitled, the Court include the following new Question (numbered

Question No. 4 in the new sequence):

30

Question No. 4: <u>Has Plaintiff proven by a preponderance of the evidence that it is entitled to lost profits on sales of its STR kits?</u>

<u>Answer No. 4:_____ (Yes/No)</u>

<u>If you answered "YES," to this Question, proceed to Question 5.  If you answered "NO" to this Question, please skip to Question 6.</u>

This approach ensures that the jury will consider, as instructed, whether Promega is entitled to lost profits according to its burden of proof rather than jumping immediately to determining an amount of lost profits.  Regarding original proposed Question No. 6 (now renumbered as Question No. 5), the language "if any" should be removed to account for new question No. 3, proposed above.  In light of the foregoing, Life requests that this question be phrased as follows:

Question No. ~~6~~ 5: What <u>is the total dollar amount of</u> profits <u>on sales of Promega's STR kits</u>~~, if any, did~~ <u>that</u> plaintiff ~~lose~~ <u>lost</u> as a result of defendants' sales in Question No. ~~5~~<u>3</u>?

Answer No. ~~6~~ 5: $_____

With the addition of Question No. 3, Life proposes the following modifications to Question No. 6 (formerly Question No. 7) to ensure the jury understands the contentions Promega has made:

Question No. ~~7~~ 6: ~~For those sales from~~ <u>If you answered</u> Question No. ~~5~~ <u>4 "NO",</u> what ~~amount of money is a~~ reasonable royalty <u>rate and total dollar amount has Promega proven by a preponderance of the evidence it is entitled to for the sales in Question 3</u>?

Answer No. ~~7~~<u>6</u>:  Reasonable Royalty Rate:_____%

Total dollar amount: $_____

Without these modifications, the Question may be misleading.  In particular, the Question should also reflect that Promega has not argued that it might be entitled to lost profits on certain sales and a reasonable royalty on others.

Regarding original Proposed Question No. 8 (now renumbered as Question No. 7) on the issue of willfulness, Life respectfully notes that the burden is on Promega to prove this claim by clear and convincing evidence.  Accordingly, Life requests that the burden be included in the Question so that the Jury is clear on the burden and not confused by the lower burden of proof that applies to the other Questions:

Question No. 7:  Has plaintiff proven by clear and convincing evidence that ~~Was~~ defendants' infringement was willful?

DATED:  February 13, 2012.        By: /s/ Kristine E. Johnson

Francis M. Wikstrom (admitted *pro hac vice*)
Kristine Edde Johnson (admitted *pro hac vice*)
Michael R. McCarthy (admitted *pro hac vice*)
Parsons Behle & Latimer
201 South Main Street, Suite 1800
Salt Lake City, UT 84111
Ph:  801-532-1234
F:  801-536-6111
fwikstrom@parsonsbehle.com
kjohnson@parsonsbehle.com
mmccarthy@parsonsbehle.com

Michael J. Modl
Steven M. Streck
Andrew J. Clarkowski
Axley Brynelson, LLP
2 E. Mifflin Street, Suite 200
Madison, WI 53703
Ph:  608-283-6705
F:  608-257-5444
mmodl@axley.com
sstreck@axley.com
aclarkowski@axley.com

Amy Sun (admitted *pro hac vice*)
Life Technologies Corporation
5791 Van Allen Way
Carlsbad, CA 92008
Ph:  (760) 603-7200
Amy.sun@lifetech.com

Attorneys for Defendants