# EXHIBIT A

## Promega Corporation v. Life Technologies Corporation

 **Bishop, Ellen (Vol. 01) - 11/29/2011 [Bishop, Ellen]**          1 CLIP  (RUNNING 00:31:04.222)

QC_020412

**BISHDES**                    **66 SEGMENTS  (RUNNING 00:31:04.222)**          

**1. PAGE 9:01 TO 10:01  (RUNNING 00:01:18.968)**

```
00009:01            THE VIDEOGRAPHER:  Here begins Video
      02   Number 1 of Volume I in the deposition of Ellen
      03   Bishop, in the matter of Promega Corporation versus
      04   Life Technologies Corporation, et al., in
      05   United States District Court, Western District of
      06   Wisconsin.  The case number is 10-cv-281-bbc.
      07            Today's date is November 29, 2011.  The
      08   time on the video monitor is 9:06 a.m.
      09            The video operator today is Joseph Mourgos
      10   representing Combs Reporting, 595 Market Street,
      11   Suite 620, San Francisco, California.
      12            This video deposition is taking place at
      13   101 Lincoln Centre Drive, Third Floor, Foster City,
      14   California, and was noticed by Medlen & Carroll LLP.
      15            Counsel, please voice identify yourselves
      16   and state whom you represent.
      17            MR. CARROLL:  Pete Carroll representing
      18   the plaintiff, Promega.
      19            MR. McCARTHY:  Michael McCarthy
      20   representing Defendant Life Technologies
      21   Corporation.
      22            THE VIDEOGRAPHER:  The court reporter
      23   today is Brandon Combs of Combs Reporting,
      24   Incorporated.
      25            Would the reporter please administer the
00010:01   oath.
```

**2. PAGE 11:11 TO 11:23  (RUNNING 00:00:24.760)**

```
      11       Q.   Now, if you could state your full name for
      12   the record.
      13       A.   Ellen Jane Bishop.
      14       Q.   And your residence?
      15       A.   The actual address or the city?
      16       Q.   Yeah.
      17       A.   3224 New London Lane, Modesto, California
      18   95355.
      19       Q.   And your employer?
      20       A.   Life Technologies.
      21       Q.   And what is your current position now?
      22       A.   My title is field sales and support
      23   specialist for human identification.
```

**3. PAGE 22:01 TO 22:07  (RUNNING 00:00:20.662)**

```
00022:01       Q.   And what were your duties?  Were you going
      02   to go out and work with the customer in the lab or
      03   answer phones?  What were your duties in 2005?
      04       A.   My primary duties were to answer and
      05   respond to customer emails and phone calls regarding
      06   technical questions for the human identification
      07   product line.
```

**4. PAGE 22:16 TO 22:20  (RUNNING 00:00:11.953)**

```
      16       Q.   Okay.  So from 2005 to today, has your
```

**PTX1350**                                    PTX1350_0001

## Promega Corporation v. Life Technologies Corporation

```
      17  title changed?
      18       A.   It has.  I now am senior field sales and
      19  support specialist, and I also am human identity
      20  technical support team lead.
```

**5. PAGE 23:02 TO 23:04 (RUNNING 00:00:05.842)**

```
      02       Q.   Now, in 2005, who did you report to as
      03  direct supervisor?
      04       A.   Michelle Shepherd.
```

**6. PAGE 30:15 TO 30:17 (RUNNING 00:00:12.463)**

```
      15       Q.   Okay.  All right.  Let me show you what
      16  the court reporter has marked as Exhibit 2.  It's a
      17  three-page document, Bates stamped LIFE-0495296.
```

**7. PAGE 30:20 TO 31:13 (RUNNING 00:00:47.255)**

```
      20            MR. CARROLL:  Q.  Okay.  Have you had a
      21  chance to look it over?
      22       A.   Yes.
      23       Q.   All right.  And appears to be an email
      24  chain?
      25       A.   Correct.
00031:01       Q.   And let's look at the second page, it
      02  appears to be an email that you authored.  Do you
      03  see that?
      04       A.   Yes.
      05       Q.   And it says there, sent by and then a
      06  colon, Ellen J. Bishop.  Do you see that?
      07       A.   Yes.
      08       Q.   And it's to Melissa Kotkin and Michael
      09  Hughes; correct?
      10       A.   Correct.
      11       Q.   And the re line or the subject line says
      12  non-HID, POP7; right?
      13       A.   POP7.
```

**8. PAGE 31:21 TO 31:23 (RUNNING 00:00:10.351)**

```
      21       Q.   And you're talking to Melissa and Mike in
      22  your email about a customer?
      23       A.   Correct.
```

**9. PAGE 32:03 TO 33:06 (RUNNING 00:01:09.914)**

```
      03       Q.   Any question that you authored it?
      04       A.   By looking at this, no.
      05       Q.   No question?
      06       A.   It doesn't appear to be doctored, so...
      07       Q.   The customer you indicate is running
      08  Identifiler on a 3100; that's one of these CE
      09  machines?
      10       A.   Correct.
      11       Q.   And the Identifiler is one of the ABI STR
      12  kits?
      13       A.   Correct.
      14       Q.   And they're running it with a polymer
      15  called POP4?
      16       A.   It says that she currently is or was, hard
      17  to read that, running 3100 POP4, yes.
      18       Q.   And they want to move to a different
      19  polymer, POP7?
      20       A.   Correct.
      21       Q.   Was this common?
      22       A.   Was this common?
      23       Q.   Did customers running ABI STR kits want to
      24  switch polymers?
```

PTX1350_0002

## Promega Corporation v. Life Technologies Corporation

```
        25      A.    For non-forensic labs, it is fairly
00033:01 common, yes.
        02      Q.    And why is that?
        03      A.    Because they're usually running multiple
        04 applications that require POP7, and to prevent them
        05 from having to switch polymer, they like to keep it
        06 convenient.
```

**10. PAGE 42:16 TO 43:01  (RUNNING 00:00:42.707)**

```
        16      Q.    Let me show you what's been marked
        17 Exhibit 4.  It's a single-page document, Bates
        18 stamped LIFE-0292914.
        19            (Whereupon, Exhibit 4 was marked for
        20            identification.)
        21      THE WITNESS:  Okay.
        22      MR. CARROLL:  Q.  Do you recognize this
        23 document?
        24      A.    Because it has my name on it, I do.
        25      Q.    So this was an email you authored?
00043:01      A.    It appears to be, yes.
```

**11. PAGE 43:15 TO 44:10  (RUNNING 00:00:53.381)**

```
        15      Q.    And you indicated that the ABI STR kit
        16 being run at Northwestern University was the
        17 Profiler Plus kit?
        18      A.    Correct.
        19      Q.    And that's on the 3730 machine?
        20      A.    Correct.
        21      Q.    And this is another case where the
        22 customer is asking about running an ABI STR kit on a
        23 machine that's not validated for that kit?
        24      A.    Correct.
        25      Q.    And so you went on and sent him the
00044:01 Profiler Plus users manual to help him out?
        02      A.    Yes.
        03      Q.    And then you also sent the 3130 user
        04 bulletin?
        05      A.    Correct.
        06      Q.    And the 3130 protocols?
        07      A.    Correct.
        08      Q.    And then you said you tried to -- you told
        09 him to try to use the 3130 protocols as a guideline?
        10      A.    Correct.
```

**12. PAGE 55:07 TO 55:10  (RUNNING 00:00:17.078)**

```
        07            MR. CARROLL:  Q.  Well, let's go back to
        08 one of the earlier exhibits.  Let's go back to
        09 Exhibit 2.  You testified you wrote this email;
        10 right?
```

**13. PAGE 55:13 TO 55:20  (RUNNING 00:00:17.990)**

```
        13            THE WITNESS:  Yes, I wrote this email.
        14            MR. CARROLL:  Q.  And the subject says
        15 non-HID; right?
        16      A.    Correct.
        17      Q.    So you knew this was a non-HID customer?
        18      A.    I knew it was -- by non-HID, as I
        19 clarified earlier, that it was a non-forensic
        20 customer, coming from not a crime lab.
```

**14. PAGE 55:21 TO 56:02  (RUNNING 00:00:15.750)**

```
        21      Q.    So in this case you knew that they were
        22 not doing forensic work.
        23      A.    Correct.
```

**CONFIDENTIAL**                                                                                    **page 3**

**Promega Corporation v. Life Technologies Corporation**

```
        24     Q.   And you --
        25     A.   Most likely.  I can't say that for sure.
00056:01       Q.   Why do you say that?
        02     A.   There are universities that do crime work.
```

**15. PAGE 63:04 TO 64:21 (RUNNING 00:02:20.750)**

```
        04          MR. CARROLL:  Q.  Ms. Bishop, the court
        05     reporter has marked as Exhibit 6, a multiple-page
        06     document, Bates stamped LIFE-0018378 to 8381.
        07          If you could take a second to look at it.
        08     A.   Okay.
        09     Q.   Have you seen this document before?
        10     A.   Not that I recall.  I'm sure I have.
        11     Q.   Did you have occasion to attend HID
        12     sales/service/support/product group conference
        13     calls?
        14     A.   Yes.
        15     Q.   During your time at ABI?
        16     A.   Yes.
        17     Q.   And now, Life Tech?
        18     A.   Yes.
        19     Q.   And how often would these calls be?
        20     A.   If I recall, they were once a month.
        21     Q.   And this would be something you all called
        22     in on?
        23     A.   Yes.
        24     Q.   If you can turn to the page Bates stamped
        25     18380, up at the top there's a header, non-HID HID
00064:01       calls increasing.  Do you see that?
        02     A.   Yes.
        03     Q.   Can you read that to yourself.
        04     A.   Okay.
        05     Q.   Now, this call appears to be from March of
        06     2008.  Do you recall whether non-HID troubleshooting
        07     calls were increasing at that time?
        08     A.   Not specifically, no.
        09     Q.   You'd been at the company since 2005,
        10     December I think you said?
        11     A.   Yes.
        12     Q.   And we saw from some of the documents
        13     marked non-HID that you had handled some of these
        14     calls?
        15     A.   Yes.
        16     Q.   And you continued to handle them, non-HID
        17     calls?
        18     A.   Yes.
        19     Q.   And when you say you can't recall whether
        20     they were increasing, you can't recall whether they
        21     were steady, increasing or unchanged?
```

**16. PAGE 64:23 TO 64:25 (RUNNING 00:00:04.583)**

```
        23          THE WITNESS:  According to this, it says
        24     that they were increasing.  I have no reason to
        25     believe that that's not true.
```

**17. PAGE 65:01 TO 65:03 (RUNNING 00:00:02.922)**

```
00065:01       MR. CARROLL:  Q.  But you didn't notice
        02 it?
        03     A.   Not that I recall.
```

**18. PAGE 65:04 TO 65:11 (RUNNING 00:00:21.062)**

```
        04     Q.   And then it goes on and it mentions bone
        05     marrow.  Do you know what that refers to?
        06     A.   It refers to the bone marrow in your
        07     bones.
```

CONFIDENTIAL                                                                **page 4**

## Promega Corporation v. Life Technologies Corporation

```
      08        Q.   I think we're talking, though, about in
      09  the context of non-HID customer calls, do you know
      10  what that is being referred to there, bone marrow?
      11        A.   Probably bone marrow testing.
```

**19.  PAGE 66:19 TO 67:09  (RUNNING 00:00:40.829)**

```
      19        Q.   Where somebody used ABI STR kits to
      20  monitor a bone marrow transplant, are you familiar
      21  with that technology?
      22        A.   No knowledge of it.
      23        Q.   No knowledge?
      24        A.   None.  Wouldn't even know how they would
      25  begin to do that.
   00067:01        Q.   Do you know what Chimerism means?
      02        A.   Limitedly.  Can I give the precise
      03  definition of it, no.
      04        Q.   What is your understanding of Chimerism?
      05        A.   An individual can potentially show two
      06  different DNA profiles.
      07        Q.   And that's because of the transplant?
      08        A.   I'm not sure.  I have limited knowledge of
      09  Chimerism.
```

**20.  PAGE 68:17 TO 68:21  (RUNNING 00:00:09.970)**

```
      17        Q.   That same paragraph on the third page of
      18  this exhibit says, we're exploring offering an
      19  online WebEx to direct these customers to for a
      20  nominal charge.  Do you see that?
      21        A.   Yes.
```

**21.  PAGE 68:22 TO 68:22  (RUNNING 00:00:01.167)**

```
      22        Q.   Was that ever developed?
```

**22.  PAGE 69:01 TO 69:02  (RUNNING 00:00:06.359)**

```
   00069:01  I'm not exactly sure what this is referring to, so I
      02  can't answer that question.
```

**23.  PAGE 69:03 TO 69:15  (RUNNING 00:00:32.872)**

```
      03             MR. CARROLL:  Q.  Is there something
      04  online you can direct a non-HID customer to today?
      05        A.   It's not specific to non-HID customers.
      06  We provide an online training opportunity, if that's
      07  what you're asking.
      08        Q.   But nothing specific for these customers?
      09        A.   No.
      10        Q.   And then the rest of that sentence says,
      11  this is really consuming HID tech support time and
      12  we believe it will continue.  Do you see that?
      13        A.   Yes.
      14        Q.   Was it your impression in 2008 that
      15  non-HID calls were consuming HID tech support time?
```

**24.  PAGE 69:18 TO 69:25  (RUNNING 00:00:28.965)**

```
      18             THE WITNESS:  There's never been a time
      19  limit around it.  They are -- non-forensic or
      20  non-HID customers tend to be time-consuming because
      21  they need more assistance with the process.
      22             MR. CARROLL:  Q.  And because of that were
      23  proposals made on how to make this less
      24  time-consuming for tech support?
      25        A.   Probably.
```

PTX1350_0005

## Promega Corporation v. Life Technologies Corporation

**25.  PAGE 75:19 TO 76:15  (RUNNING 00:00:56.939)**

```
         19         Q.   Going back to the third page of Exhibit 6,
         20    which is Bates stamped 18380, up above under the top
         21    header we talked about before the break, the last
         22    sentence of that paragraph says, once in place
         23    Jonathan will assist in advertising/posting to
         24    website, et cetera.  Do you see that?
         25         A.   Yes.
00076:01         Q.   Do you know what's being referred to
         02    there?
         03         A.   It sounds like based on the context of the
         04    entire paragraph that it's referring to the mobile
         05    online web to the extent that it's talking about a
         06    few sentences prior.
         07         Q.   And I looked on the first page for a
         08    Jonathan and I found Jonathan Tabak?
         09         A.   Tabak.
         10         Q.   Is that the Jonathan being referred to on
         11    the third page?
         12         A.   I would assume so.
         13         Q.   And do you know what his position was?
         14         A.   He was in the human identity marketing
         15    group.  I don't remember what his title is.
```

**26.  PAGE 82:16 TO 83:02  (RUNNING 00:01:02.826)**

```
         16         MR. CARROLL:  Q.  Ms. Shepherd (sic), the
         17    court reporter has marked as Exhibit 8, a three-page
         18    document, Bates stamped LIFE-0120080 and it goes to
         19    82.
         20         A.   Okay.
         21         Q.   And let's start at the bottom of the first
         22    page of Exhibit 8.  Do you recognize that to be an
         23    email that you authored?
         24         A.   Yes.
         25         Q.   And you sent it out to Lisa Ortuno and
00083:01    Michelle Shepherd?
         02         A.   Yes.
```

**27.  PAGE 83:07 TO 83:13  (RUNNING 00:00:17.634)**

```
         07         Q.   The next page of Exhibit 8 starts, Hi
         08    Ladies, as promised all of my open cases are in CT.
         09    What is CT?
         10         A.   That refers to Case Trace.
         11         Q.   And what's that?
         12         A.   It was the program prior to Siebel that we
         13    used for entering customer interactions.
```

**28.  PAGE 88:21 TO 90:03  (RUNNING 00:01:31.075)**

```
         21         Q.   Going down to the bottom of the second
         22    page of Exhibit 8, and counting up from the bottom
         23    to the second bullet point, CT232382.  Do you see
         24    that?
         25         A.   Uh-huh.
00089:01         Q.   There's a name Richard Chmelo, if I'm
         02    pronouncing that right?
         03         A.   Correct.
         04         Q.   And customer name Cygene, C-Y-G-E-N-E.  Do
         05    you see that?
         06         A.   Yes.
         07         Q.   And you indicated in your email, non-HID
         08    user seeing imbalance across loci.  Do you see that?
         09         A.   Yes.
         10         Q.   And do you recall this customer?
         11         A.   I do actually.
```

CONFIDENTIAL

**Promega Corporation v. Life Technologies Corporation**

```
12      Q.   And what do you recall?
13      A.   I recall having to go into his lab.  It
14 was a unique situation; I don't tend to work with
15 these non-forensic customers very often.  They're a
16 very small portion of my customer base, but this
17 particular customer actually lived -- I was living
18 in South Florida at the time.  If I recall his lab
19 was nearby.  It was convenient for me just to pop
20 in.
21           And this was a rare instance of going on
22 site to help the customer.
23      Q.   Okay.  And what did you do when you were
24 there?
25      A.   I helped apparently.  I don't remember the
00090:01 specifics without seeing this little blurb here, but
02 apparently, I helped him set up samples side-by-side
03 with the customer.
```

**29. PAGE 90:23 TO 91:25 (RUNNING 00:01:15.389)**

```
23      Q.   Ms. Shepherd, the court reporter has
24 marked as Exhibit 9, a three-page document, Bates
25 stamped LIFE-0214084 and it goes to 086.
00091:01           If you could take a look.
02           (Whereupon, Exhibit 9 was marked for
03           identification.)
04           THE WITNESS:  Sorry.  Just to clarify, are
05 you calling me Ms. Shepherd?
06           MR. CARROLL:  Q.  Did I call you
07 Ms. Shepherd?  I'm sorry.  Ms. Bishop.
08      A.   Okay.
09      Q.   Do you recognize this document?
10      A.   I recognize it because my name is on it,
11 but I don't remember it.
12      Q.   You don't recall the email?
13      A.   No.
14      Q.   On the from line at the top of the exhibit
15 is Ellen J. Bishop, that's you?
16      A.   Yes.
17      Q.   So you authored this?
18      A.   Apparently, yes.
19      Q.   And to Michelle Shepherd?
20      A.   Yes.
21      Q.   And this was in 2008?
22      A.   Okay.
23      Q.   The subject line says, re, non-HID HID
24 customer.  Do you see that?
25      A.   Yes.
```

**30. PAGE 93:08 TO 93:14 (RUNNING 00:00:18.247)**

```
08      Q.   And then your email, which in these email
09 strings, we have to go back to page 1, indicates you
10 briefly spoke to the customer?
11      A.   Yes.
12      Q.   And that would be the Mayo Clinic?
13      A.   That's what it seems to be referencing,
14 yes.
```

**31. PAGE 93:18 TO 94:13 (RUNNING 00:01:02.942)**

```
18      Q.   If you look at your email, it says that
19 you were looking for the below information from a
20 customer who was using a 36 centimeter with POP7 and
21 noticed that the following adjustments to the run
22 module improved her data.  Do you see that?
23      A.   Yes.
24      Q.   So are you communicating there that you
```

PTX1350_0007

## Promega Corporation v. Life Technologies Corporation

```
        25   were trying to help out on this information and you
00094:01   went to the data of another customer?
        02        A.   It appears that a customer provided me
        03   with an update on their troubleshooting with me, and
        04   that they had provided this information that the
        05   data looks good at the adjusted protocol.  And that
        06   was what I was putting forth as a suggestion to the
        07   new customer.
        08        Q.   Okay.  So is this kind of an example of
        09   what you testified to earlier this morning of where
        10   you would try to help out a customer based on
        11   perhaps results that another customer might have had
        12   with that particular protocol?
        13        A.   Correct.
```

**32.  PAGE 103:06 TO 103:09  (RUNNING 00:00:13.251)**

```
        06        Q.   Ms. Bishop, the court reporter has marked
        07   as Exhibit 12, a two-page document, Bates stamped
        08   LIFE-0123797 to 798.
        09             If you can take a look at that.
```

**33.  PAGE 103:12 TO 104:10  (RUNNING 00:00:53.498)**

```
        12             THE WITNESS:  Okay.
        13             MR. CARROLL:  Q.  Do you recognize the
        14   document?
        15        A.   I recognize it as having my name on it.
        16        Q.   And let's start with the lower email on
        17   the first page.
        18        A.   Okay.
        19        Q.   Where it says from Bishop, Ellen.  That's
        20   you?
        21        A.   Yes.
        22        Q.   And you authored that to Lisa Ortuno?
        23        A.   Yes.
        24        Q.   And the subject line says, re, bone
        25   marrow?
00104:01        A.   Yes.
        02        Q.   And you say, the customer sent in a very
        03   brief email to RN.  What's RN?
        04        A.   RightNow, that email system as I referred
        05   to earlier.
        06        Q.   Customer is from the Fred Hutchinson
        07   Cancer Research Center.  Do you see that?
        08        A.   Yes.
        09        Q.   And then you say, so probably diagnostic?
        10        A.   Yes.
```

**34.  PAGE 104:15 TO 104:16  (RUNNING 00:00:05.010)**

```
        15        Q.   Did you indicate so probably diagnostic
        16   because of the name?
```

**35.  PAGE 104:19 TO 104:23  (RUNNING 00:00:10.412)**

```
        19             THE WITNESS:  Because of the name of the
        20   research center?
        21             MR. CARROLL:  Q.  Right.
        22        A.   Potentially.  And as I look at this now,
        23   it could have been research versus diagnostic, so...
```

**36.  PAGE 105:05 TO 105:12  (RUNNING 00:00:15.305)**

```
        05        Q.   And you authored that to Lisa Ortuno and
        06   Cortney Boccardi?
        07        A.   Correct.
        08        Q.   And you say, Hey you two, Either of you
        09   have experience with or articles related to the use
```

**CONFIDENTIAL**                                                     **page 8**

## Promega Corporation v. Life Technologies Corporation

```
      10  of our AmpFLSTR kits on bone marrow DNA?  Do you see
      11  that?
      12       A.   Yes.
```

**37. PAGE 106:11 TO 106:18  (RUNNING 00:00:17.982)**

```
      11       Q.   Do you recall whether there was any
      12  follow-up?
      13       A.   I don't recall.  I have a lot of customer
      14  interactions so remembering specific instances is
      15  difficult.
      16       Q.   Okay.  Have you ever visited the
      17  Fred Hutchinson Cancer Research Center?
      18       A.   No.
```

**38. PAGE 107:01 TO 107:05  (RUNNING 00:00:14.086)**

```
   00107:01            MR. CARROLL:  Q.  Ms. Bishop, the court
      02  reporter has marked as Exhibit 13, a two-page
      03  document, Bates stamped LIFE-0130374 to 375.
      04            If you can take a look at that.
      05       A.   Okay.
```

**39. PAGE 108:09 TO 108:16  (RUNNING 00:00:14.187)**

```
      09       Q.   Right, do you recall this email?
      10       A.   No.
      11       Q.   Any question it came to you?
      12       A.   No.
      13       Q.   And she says, I have this one.  It's from
      14  Fred Hutchinson Cancer Institute, so it's probably a
      15  cell line authentication-type lab.  Do you see that?
      16       A.   Yeah.
```

**40. PAGE 137:06 TO 137:11  (RUNNING 00:00:25.737)**

```
      06            MR. CARROLL:  Q.  Ms. Bishop, the court
      07  reporter has marked as Exhibit 20, a two-page
      08  document Bates stamped LIFE-0163960 and it goes to
      09  961.
      10            If you could take a look at it.
      11       A.   Okay.
```

**41. PAGE 138:10 TO 138:15  (RUNNING 00:00:12.655)**

```
      10       Q.   And it says, Hi Shanin, thanks for
      11  checking on this.  I'm in the process of taking care
      12  of both of these.  They're both cell line
      13  authentication.  I would be happy to discuss these
      14  non-HID applications with you.  Do you see that?
      15       A.   I do.
```

**42. PAGE 138:20 TO 138:21  (RUNNING 00:00:02.655)**

```
      20       Q.   Any doubt you received it?
      21       A.   No.
```

**43. PAGE 152:18 TO 152:23  (RUNNING 00:00:26.540)**

```
      18            MR. CARROLL:  Q.  Ms. Bishop, the court
      19  reporter has marked as Exhibit 24, a two-page
      20  document, Bates stamped LIFE-0023674, and it goes to
      21  75.
      22            If you can have a look at that.
      23       A.   Okay.
```

**44. PAGE 153:17 TO 153:18  (RUNNING 00:00:02.259)**

```
      17       Q.   Any question it came to you?
      18       A.   No.
```

CONFIDENTIAL                                                                                    page 9

## Promega Corporation v. Life Technologies Corporation

**45. PAGE 155:08 TO 155:09 (RUNNING 00:00:05.121)**

```
08       Q.   Is she indicating to Lisa Ortuno that she
09   would like her to follow up with this customer?
```

**46. PAGE 155:12 TO 155:18 (RUNNING 00:00:19.198)**

```
12           THE WITNESS:  Yes.  It appears that way to
13   me.
14           MR. CARROLL:  Q.  And was that a common
15   occurrence during your time when Lisa Ortuno was
16   employed at the company?
17       A.   It was common for non-forensic inquiries
18   to get directed to Lisa Ortuno.
```

**47. PAGE 160:17 TO 161:09 (RUNNING 00:00:51.214)**

```
17           MR. CARROLL:  Q.  Ms. Bishop, the court
18   reporter has marked as Exhibit 26, a multi-page
19   document, Bates stamped LIFE-0249361, and it goes to
20   364.
21           If you can take a look at it.
22       A.   Okay.
23       Q.   I think your email starts on page 3, which
24   would end with the number 63.  It's in the middle of
25   the page.
00161:01     A.   Yes.
02       Q.   And on the from line is Ellen Bishop?
03       A.   Yep.
04       Q.   And you authored it?
05       A.   I did.
06       Q.   And you sent it to a number of the
07   technical support people including your supervisor,
08   Michelle Shepherd?
09       A.   I did.
```

**48. PAGE 162:08 TO 162:11 (RUNNING 00:00:08.807)**

```
08       Q.   And now responding back to you starting at
09   the bottom of the first page is Melissa Kotkin.  Do
10   you see that?
11       A.   Yes.
```

**49. PAGE 162:25 TO 163:10 (RUNNING 00:00:20.610)**

```
25       Q.   Any question you got it?
00163:01     A.   No.
02       Q.   Okay.  And the first header under
03   October 14 is Sarah Hughes at Serological Research
04   Institute.  Do you see that?
05       A.   Yes.
06       Q.   Are you familiar with that customer?
07       A.   No, not specifically.
08       Q.   Ever troubleshoot for Serological Research
09   Institute?
10       A.   I have.
```

**50. PAGE 163:21 TO 163:24 (RUNNING 00:00:08.260)**

```
21       Q.   And is the Serological Research Institute
22   a non-HID account?
23       A.   They would be considered a non-HID
24   account.
```

**51. PAGE 164:03 TO 165:01 (RUNNING 00:00:54.897)**

```
03       Q.   And now moving down to the last entry,
04   which actually is over on the page ending 63,
05   there's SUNY at Stony Brook Histocompatibility.  Do
06   you see that?
```

**CONFIDENTIAL**                                                                 **page 10**

## Promega Corporation v. Life Technologies Corporation

```
07      A.   I do.
08      Q.   And do you recall this client?
09      A.   No.
10      Q.   There's a person named Serafim,
11 S-E-R-A-F-I-M, and the last name is Maia, M-A-I-A.
12 Do you see that?
13      A.   I do.
14      Q.   Do you recall that person?
15      A.   Not that person, no.
16      Q.   Did you have any other interactions with
17 people at SUNY Stony Brook?
18      A.   It's possible.
19      Q.   You've troubleshooted there?
20      A.   It's possible.  Not there, not physically
21 on site, but it's possible that I've interacted
22 either via email or phone.
23      Q.   Do you know what they do with their
24 ABI STR kits?
25      A.   I do not.
00165:01      Q.   Okay.  But they're a non-HID lab?
```

**52. PAGE 165:03 TO 165:03  (RUNNING 00:00:00.655)**

```
03           THE WITNESS:  Yes.
```

**53. PAGE 176:17 TO 176:19  (RUNNING 00:00:03.421)**

```
17      Q.   Does that terminology HID box mean
18 anything to you?  It does?
19      A.   Yes.
```

**54. PAGE 176:22 TO 176:25  (RUNNING 00:00:11.787)**

```
22           MR. CARROLL:  Q.  And what does it mean?
23      A.   Typically, when we use that term, we're
24 referring to a 3500 instrument that's sold into a
25 laboratory not running human identity applications.
```

**55. PAGE 182:06 TO 182:24  (RUNNING 00:00:53.709)**

```
06           MR. CARROLL:  Q.  Ms. Bishop, the court
07 reporter has marked as Exhibit 35, a three-page
08 document, Bates stamped LIFE-0317901 to 904.  It's a
09 four-page document.
10           If you could just take a look at it.
11      A.   Okay.
12      Q.   And as an email exchange.  Let's start on
13 the third page.  And that's an email from you to a
14 Mr. Winokur, W-I-N-O-K-U-R.  Do you see that?
15      A.   I do.
16      Q.   And his email is at Partners.org?
17      A.   Okay.
18      Q.   And that's April of this year?
19      A.   Yep.
20      Q.   And the subject line is ProFiler Plus on a
21 3100?
22      A.   Okay.
23      Q.   Do you recall this email?
24      A.   More so than the previous emails.
```

**56. PAGE 183:17 TO 184:14  (RUNNING 00:01:04.116)**

```
17      Q.   What about GeneMapper?
18      A.   That's the analysis software, not the
19 software that runs the instrument.
20      Q.   Oh, okay.  Got it.
21           Is there a different data collection
22 software for a non-HID customer than an HID
23 customer?
```

PTX1350_0011

## Promega Corporation v. Life Technologies Corporation

```
    24      A.   There may be a different software for
    25 sequencing versus fragment analysis, but for
00184:01 fragment analysis, no.
    02      Q.   So for a non-HID user who is going to do
    03 ABI STR kits, there's not a different data
    04 collection --
    05      A.   No.
    06      Q.   -- software?
    07      Okay.  And this Mr. Winokur at Partners,
    08 do you know what institution he worked at?
    09      A.   Not without looking at the email.
    10      Q.   Okay.  You can look at the front page.
    11 That might help.
    12      A.   Okay.
    13      Q.   Massachusetts General Hospital?
    14      A.   That's what it says.
```

**57. PAGE 190:20 TO 190:24  (RUNNING 00:00:11.936)**

```
    20      MR. CARROLL:  Q.  Ms. Bishop, the court
    21 reporter has marked as Exhibit 37, a two-page
    22 document, Bates stamped LIFE-0006088 and it ends
    23 6089.
    24      If you can take a look at that.
```

**58. PAGE 190:25 TO 190:25  (RUNNING 00:00:01.143)**

```
    25      A.   Okay.
```

**59. PAGE 191:20 TO 191:23  (RUNNING 00:00:13.376)**

```
    20      Q.   Turning now to the first page, there's an
    21 email from Shanin at the bottom to you and Lisa
    22 Ortuno.  Do you see that?
    23      A.   I do.
```

**60. PAGE 192:08 TO 193:22  (RUNNING 00:01:18.648)**

```
    08      Q.   And then Lisa writes her back and says,
    09 what is the application.  Do you see that?
    10      A.   I do.
    11      Q.   And then she writes back and says, they're
    12 doing cell line authentication.  Do you see that?
    13      A.   Yes.
    14      Q.   Does that help you recall this email?
    15      A.   No.
    16      Q.   Any question that you got it?
    17      A.   No.
    18      Q.   And now the top email is from Lisa to
    19 Shanin but you're copied as well.  Do you see that?
    20      A.   I do.
    21      Q.   And Lisa says, there are a few service
    22 labs doing this.  I don't know that any are using ID
    23 Plus.  Identifiler, yes.  Universities and
    24 companies.  Your customer can try these.  Clearly we
    25 cannot make a recommendation for a specific one.
00193:01 And then she lists a number of entities.  Do you see
    02 that?
    03      A.   I do.
    04      Q.   Do you recall receiving this email?
    05      A.   Not specifically, no.  I'm not sure I even
    06 paid that much attention to it when I received it in
    07 the first place.
    08      Q.   Okay.  Let's talk about the four entities
    09 that she lists.
    10      A.   Okay.
    11      Q.   Genetica DNA Labs, familiar with them?
    12      A.   I've heard of them, yes.
    13      Q.   Have you done any troubleshooting?
```

PTX1350_0012

**Promega Corporation v. Life Technologies Corporation**

```
     14      A.    I have.
     15      Q.    And have you interacted with people in the
     16 lab?
     17      A.    Via phone or email.
     18      Q.    Not a visit?
     19      A.    Not a visit.
     20      Q.    And do you know whether they are using
     21 ABI STR kits?
     22      A.    To my knowledge they are, yes.
```

**61. PAGE 202:21 TO 203:10  (RUNNING 00:00:47.730)**

```
     21            MR. CARROLL:  Q.  Ms. Bishop, the court
     22 reporter has marked as Exhibit 40, a single-page
     23 document, Bates stamped LIFE-0027157.
     24            If you could take a look at it.
     25      A.    Okay.
00203:01      Q.    Have you seen this before?
     02      A.    No, not that I recall.
     03      Q.    And the email is from Lisa Ortuno?
     04      A.    It is.
     05      Q.    And are you on the to line?
     06      A.    I am.
     07      Q.    With a bunch of other people?
     08      A.    Yes.
     09      Q.    And this is April of this year?
     10      A.    It is.
```

**62. PAGE 203:18 TO 203:21  (RUNNING 00:00:10.841)**

```
     18      Q.    And Lisa reports to everyone that she's
     19 run STR kits and controls on the 3500 research box.
     20 Do you see that?
     21      A.    I do.
```

**63. PAGE 204:02 TO 204:07  (RUNNING 00:00:13.645)**

```
     02      Q.    And do you recall her running these tests?
     03      A.    Vaguely.  I knew she was doing it.
     04      Q.    And she says, this is to get a better feel
     05 for what the data looked like for our non-HID
     06 customers who want to try this.  Do you see that?
     07      A.    I do.
```

**64. PAGE 205:01 TO 205:07  (RUNNING 00:00:16.256)**

```
00205:01            MR. CARROLL:  Q.  Sure.  What happened
     02 when that 3500 came on the scene, did technical
     03 support get trained for that machine?
     04      A.    Of course, yes.
     05      Q.    And was Lisa's testing of the machine
     06 above and beyond the training that she got for the
     07 machine?
```

**65. PAGE 205:09 TO 205:09  (RUNNING 00:00:00.939)**

```
     09            THE WITNESS:  It was.
```

**66. PAGE 239:15 TO 240:05  (RUNNING 00:00:50.731)**

```
     15            MR. CARROLL:  Q.  Ms. Bishop, the court
     16 reporter has marked as Exhibit 56, a multi-page
     17 document, Bates stamped LIFE-0414250 and it goes to
     18 252.
     19            If you could have a look at that.
     20      A.    Okay.
     21      Q.    And this appears to be another email that
     22 you authored in 2006 to Melissa Kotkin; correct?
     23      A.    Yes.
     24      Q.    And the subject line is four non-HID
```

PTX1350_0013

**Promega Corporation v. Life Technologies Corporation**

```
    25  customers.  Do you see that?
00240:01      A.  It is.
    02      Q.  And you say, Hi Melissa, I just copied you
    03  to four different emails that came into RightNow,
    04  all from non-HID customers.  Do you see that?
    05      A.  I do.
```

TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:31:04.222)

PTX1350_0014

## Promega Corporation v. Life Technologies Corporation

 **Hale, Katherine (Vol. 01) - 12/15/2011**                                     1 CLIP (RUNNING 00:37:49.152)

QC020412



**HALEDES**                          **53 SEGMENTS (RUNNING 00:37:49.152)**

**1. PAGE 6:08 TO 6:13 (RUNNING 00:00:16.154)**

```
08        Q.    Dr. Hale, first thank you for being here today.
09   Could you please state your full name for the record.
10        A.    Full name is Dr. Katherine Anne Stemke Hale.
11        Q.    Thank you.  And could you also state your home
12   address for the record.
13        A.    5002 Stillbrook Drive, Houston, Texas 77035.
```

**2. PAGE 9:10 TO 9:22 (RUNNING 00:00:46.126)**

```
10        Q.    Okay.  I'm going to get some background
11   information to start.  I want to hear about what you did
12   for your education, so can you start with college and
13   tell me where you went to college and what degree you
14   got there?
15        A.    I went to Rice University here in Houston.  I
16   got a triple major in biochemistry, computer science,
17   and math science.  I did my Ph.D. at UT Austin, and then
18   I went to UT Southwestern to do a post doc.  After that
19   I was part of a -- help set up start-up company that was
20   based in Dallas.  I then moved to Houston with another
21   small company.  Then I came to M.D. Anderson.  So I've
22   been in Texas for a while.
```

**3. PAGE 12:07 TO 12:25 (RUNNING 00:00:47.788)**

```
07        Q.    And you're still employed by M.D. Anderson?
08        A.    Still employed by M.D. Anderson, yes.
09        Q.    When you came to M.D. Anderson, what was your
10   first title when you came here?
11        A.    Instructor.
12        Q.    Instructor.  And what were you an instructor
13   in?
14        A.    I was an instructor in the department of
15   systems biology.  It was called molecular therapeutics
16   at that point.
17        Q.    And what did you do for -- what did you do as
18   an instructor?
19        A.    I worked -- I still work in the Kleberg Center
20   for molecular markers, looking at primarily DNA
21   biomarkers that can help predict response to therapy and
22   appropriately direct people into the -- into the correct
23   therapy.
24        Q.    And you still work as an instructor?
25        A.    Yes.
```

**4. PAGE 13:06 TO 13:13 (RUNNING 00:00:22.337)**

```
06        Q.    Have the duties and what you do as an
07   instructor changed at all since you've been here?
08        A.    Yes.  I also now am the director for the
09   characterized cell line core, which is a CCSG funded
10   core facility, cancer center support grant.
11        Q.    Thank you.
12        A.    And that includes characterization of cell
13   lines.
```

**PTX1351**                                                     PTX1351_0001

## Promega Corporation v. Life Technologies Corporation

**5. PAGE 13:14 TO 13:15 (RUNNING 00:00:09.461)**

```
14      Q.   And when did you become the director there?
15      A.   2008, approximately.  I was codirector.
```

**6. PAGE 14:07 TO 14:13 (RUNNING 00:00:23.082)**

```
07       Q.   We may.  So could you tell me a little bit
08   about the work you do in your position as director.
09   Just sort of describe your work for me.
10       A.   So for the -- as director of the characterized
11   cell line core I direct two people who are paid for by
12   the core.  We do characterization of cell lines using
13   STR.
```

**7. PAGE 14:14 TO 15:06 (RUNNING 00:00:51.902)**

```
14       Q.   Could you describe the characterization of cell
15   lines?  Can you kind of tell me what that is.  I
16   apologize.  I'm not a scientist, unlike many people in
17   this room, so I have a lot of questions when it comes to
18   these things.
19       A.   So characterization of cell lines can be done
20   in a variety of different methods.  We look at the
21   mutational profile of a cell line to help researchers
22   figure out what the appropriate cell line is to use for
23   whatever process.
24            This is at the DNA level, also sometimes at
25   the RNA and the protein level so that the researchers
00015:01   choose the correct cell line for their research.
02            We also validate cell lines using STR to
03   make sure that the cell line that the people are using
04   is the one that they're expecting that they're using.
05   That's part of what I do for the characterized cell line
06   core.
```

**8. PAGE 16:21 TO 16:25 (RUNNING 00:00:09.390)**

```
21       Q.   And you said you're using a PCR technology?
22       A.   Yes.
23       Q.   And what do you mean by that?
24       A.   I'm using the Applied Biosystems identifiler
25   kit.
```

**9. PAGE 17:07 TO 17:20 (RUNNING 00:00:35.723)**

```
07       Q.   (BY MS. TROUPIS)  So you use identifiler as
08   your PCR technology?
09       A.   Correct.
10       Q.   And how long have you used identifiler?
11       A.   I believe we started using it 2008, 2009.
12   2009.
13       Q.   Okay.  And prior to that did you use any
14   product?
15       A.   No.  No.
16       Q.   What changed in 2008 or 2009 that made you
17   start using this?
18       A.   That is when we set up this characterized cell
19   line core, and that's when I needed to start validating
20   cell lines.
```

**10. PAGE 23:20 TO 23:23 (RUNNING 00:00:16.510)**

```
20       Q.   Do you know if anyone else at M.D. Anderson
21   uses STR kits?
22       A.   I do not know of anyone else at M.D. Anderson
23   who uses STR kits, otherwise they wouldn't come to me.
```

CONFIDENTIAL

PTX1351_0002

## Promega Corporation v. Life Technologies Corporation

**11. PAGE 23:24 TO 24:04 (RUNNING 00:00:11.475)**

```
        24      Q.   And you want to earn your money, right, since
        25   they're paying you.  Now, you stated that you use the
00024:01   STR kits to validate cell lines?
        02      A.   Yes.
        03      Q.   Do you use them for any other purposes?
        04      A.   No.
```

**12. PAGE 24:05 TO 24:08 (RUNNING 00:00:15.823)**

```
        05      Q.   Do you know if anyone else at M.D. Anderson
        06   uses STR kits for any purposes?
        07      A.   I don't know if anyone else uses STR kits,
        08   otherwise I would have asked them for help.
```

**13. PAGE 24:09 TO 24:25 (RUNNING 00:00:55.138)**

```
        09      Q.   So you stated you started using the STR kits in
        10   approximately 2008, 2009?
        11      A.   Yeah.  Yes.
        12      Q.   And at the time you're running -- you're
        13   validating the cell lines.  About how many kits do you
        14   use -- did you use the first year you were using them?
        15      A.   Probably just one.
        16      Q.   And how many validations of cell lines were you
        17   doing then?
        18      A.   Probably less than 500.  Maybe less than a
        19   hundred.
        20      Q.   And has that number changed since then?
        21      A.   Yes.
        22      Q.   Could you sort of give me an idea of how it
        23   changed over this three- to four-year period?
        24      A.   It probably doubled every year, but I'd have to
        25   look at my records to know exactly how many.
```

**14. PAGE 25:01 TO 25:04 (RUNNING 00:00:12.029)**

```
00025:01      Q.   So today how many kits are you using per year?
        02      A.   Probably two to three kits per year, if I had
        03   to guess.  But I could ask the person that I bought them
        04   from.
```

**15. PAGE 25:05 TO 25:10 (RUNNING 00:00:13.876)**

```
        05      Q.   I will take your word for the two to three
        06   right now.  And about how many tests are you doing per
        07   year?  About how many validations are you doing per
        08   year?
        09      A.   Probably closer to a thousand, if I had to
        10   guess.
```

**16. PAGE 25:11 TO 25:12 (RUNNING 00:00:02.749)**

```
        11      Q.   Do you do any forensic work in your lab?
        12      A.   No.
```

**17. PAGE 25:13 TO 26:11 (RUNNING 00:01:06.636)**

```
        13      Q.   Do you do any work for anyone outside of M.D.
        14   Anderson?
        15      A.   Yes.
        16      Q.   What kind of work do you do for people outside
        17   of M.D. Anderson?
        18      A.   I can accept samples from researchers outside
        19   of M.D. Anderson, and I do the same sort of analysis as
        20   I do for people in M.D. Anderson.
        21      Q.   So you would validate cell lines for people
        22   outside of M.D. Anderson?
        23      A.   Yes.
```

CONFIDENTIAL

**Promega Corporation v. Life Technologies Corporation**

```
      24        Q.    Is this something you do a lot?
      25        A.    No.
00026:01        Q.    About how many times this last year have you
      02  done this?
      03        A.    Maybe 50 samples outside of M.D. Anderson.
      04        Q.    And who would you typically do an outside
      05  sample for?
      06        A.    Generally researchers who used to be at M.D.
      07  Anderson and know of my core.
      08        Q.    Has anyone outside of M.D. Anderson ever asked
      09  you to do something with an STR kit that is not
      10  verifying a cell line?
      11        A.    No.
```

**18. PAGE 26:12 TO 30:03  (RUNNING 00:05:11.148)**

```
      12        Q.    Now, you stated before that when you started
      13  using the STR kits, the identifiler kits, something
      14  about you had trouble?
      15        A.    Yes.
      16        Q.    Am I correct in that?
      17        A.    Yes.
      18        Q.    Can you describe what sort of trouble you had
      19  when you were starting to use them?
      20        A.    I had variabilities.  Sometimes they would
      21  work.  Sometimes I would get signal.  Sometimes I would
      22  not.
      23        Q.    And you said you had to go outside M.D.
      24  Anderson to get help with that?
      25        A.    Yes.
00027:01        Q.    And where did you go to get help with that?
      02        A.    Applied Biosystems.  Life Technologies.  The
      03  makers of the kit.
      04        Q.    And what did you ask them to do?
      05        A.    I asked for help analysis of why they had --
      06  why I was having variability.
      07        Q.    And did they provide you with help?
      08        A.    Yes.
      09        Q.    Who did you initially talk to when you talked
      10  to someone at Applied Biosystems or Life Tech?
      11        A.    I believe I first contacted the sales rep, and
      12  then eventually I would just call the 1-800 number for
      13  Applied Biosystems.
      14        Q.    And who was the sales rep at the time?
      15        A.    Clark Eason, I believe.  He's still the sales
      16  rep.  I think I called Alan Silverman first.
      17        Q.    Was he a sales rep?
      18        A.    He was a sales rep, but he was not really
      19  associated with this product, so he referred me to other
      20  people within the company.
      21        Q.    And Clark Eason or Alan Silverman, whoever you
      22  first spoke with, what did they tell you to do?
      23        A.    They did not have any information on the
      24  product.  They referred me to the web site and to people
      25  within Applied Biosystems.
00028:01        Q.    You said they did not have any information on
      02  the product.  You mean, they didn't know how it worked,
      03  or what do you mean by they didn't have any information?
      04        A.    They did not know the product.  They didn't
      05  have information on how to use the product.  All they
      06  could really do is give me a price quote, not
      07  troubleshooting.
      08        Q.    And they sent you to the general number to get
      09  help, or how did they refer you back to someone who
      10  helped?
      11        A.    I don't remember exactly.  I do know that at
      12  one point I went on the web site and followed all the
```

## Promega Corporation v. Life Technologies Corporation

```
13  standard -- what kit -- what product do you have
14  problems with, and eventually I got a phone number.
15       Q.   And that was the 1-800 number?
16       A.   Yes.
17       Q.   Now, when you talked to the sales rep at first,
18  did you tell him specifically what your problem was?
19       A.   No, not really.
20       Q.   Now, you've called this 1-800 number.  When you
21  called the 1-800 number, did you get the help you
22  needed?
23       A.   Yes.
24       Q.   Can you describe what happened when you called
25  the 1-800 number for me?
00029:01      A.   I mentioned that I was having variability.  The
02   person worked with me and also with the DNA analysis
03   core that was running my samples to determine where the
04   problem could be.  We helped troubleshoot.
05            It was a mixture of partially of my
06   sequencing reactions being the wrong DNA concentrations
07   and partially the DNA analysis core were using the wrong
08   capillaries in their machine.
09       Q.   And do you remember who helped you figure this
10  problem out?
11       A.   I want to say the person's name was Lisa.  But
12  that's in the e-mails.
13       Q.   And we'll get to those in a little bit.  Don't
14  worry.  You said Lisa helped you out.  Did you tell
15  her -- when you told her your problem, what did you tell
16  her your problem was?
17       A.   That I was having variability.
18       Q.   And did she know what you needed -- scratch
19  that.
20            She knew you were using the identifiler,
21  correct?
22       A.   Correct.
23       Q.   Did she know for what purposes you were using
24  the identifiler?
25       A.   Yes.
00030:01      Q.   And so she knew you were doing cell line -- or
02  validation of the cells?
03       A.   Yes.
```

**19. PAGE 30:05 TO 30:11 (RUNNING 00:00:22.772)**

```
05       Q.   (BY MS. TROUPIS) How do you know she knew you
06   were doing that?
07       A.   Because I commented that this was one of the
08   first times when I dialed a 1-800 number and instantly
09   got a person as opposed to the phone tree.  And that's
10  when I found out that this kit was primarily used for
11  forensics, and that was required.
```

**20. PAGE 30:12 TO 30:19 (RUNNING 00:00:22.962)**

```
12       Q.   What do you mean it was required?
13       A.   If you have a problem with forensics, you
14  needed to instantly get a hold of someone to
15  troubleshoot.
16       Q.   Did you volunteer what you were doing with the
17  kit, or did you get asked what you were doing with the
18  kit?
19       A.   I volunteered.
```

**21. PAGE 30:20 TO 31:20 (RUNNING 00:01:39.557)**

```
20       Q.   Was this the only time you had any problem?
21       A.   No.  I had problems since.
22       Q.   What kind of problems have you had since?
```

**Promega Corporation v. Life Technologies Corporation**

```
    23        A.   It was not necessarily myself, because at that
    24   point I had a technician who helped run the process.
    25             We determined that it was a change in the
00031:01   capillaries to something that was done in the DNA
    02   analysis core.  They upgraded their capillaries, and
    03   suddenly things were working too well, so we needed to
    04   change our DNA concentration to be back in a good range
    05   for the machine.
    06        Q.   When you had this problem, how did you go about
    07   getting it solved?
    08        A.   Again, we called Applied Biosystems, explained
    09   that we were having a problem again with variability;
    10   and as I said, I was not the person directly talking,
    11   but I got everything from my technician, that she
    12   e-mailed and called -- I'm not sure if she e-mailed.  I
    13   know she called the person at Applied Biosystems.
    14        Q.   And who was the technician?
    15        A.   Her name is Vivian Gabisi, G-a-b-a-i-s-i, I
    16   believe.
    17        Q.   So she -- Vivian Gabisi explained the problem
    18   with the variability to the person she got on the
    19   phone --
    20        A.   Yes.
```

**22.  PAGE 31:22 TO 32:16  (RUNNING 00:01:26.699)**

```
    22        Q.   (BY MS. TROUPIS)  She explained the problem,
    23   and then what happened?
    24        A.   She explained the problem.  We worked with the
    25   DNA analysis core and Applied Biosystems to look at the
00032:01   data and determine what the problem was.
    02        Q.   You say they looked at the data, correct?
    03        A.   Yes.
    04        Q.   So did they know what you were using the data
    05   for?
    06        A.   I do not know if Vivian mentioned that -- I
    07   don't know.  Sorry.  I don't know.
    08        Q.   Would you expect her to have mentioned it?
    09        A.   I don't know.
    10        Q.   Would you have mentioned it?
    11        A.   I would have.
    12        Q.   And how did they solve the problem?
    13        A.   They worked with us.  They worked with the DNA
    14   analysis core to determine what, if any, settings needed
    15   to be changed on the machine or what, if any,
    16   modifications we needed to do for our PCR.
```

**23.  PAGE 33:07 TO 33:12  (RUNNING 00:00:14.898)**

```
    07        Q.   So before you stated that you're using
    08   approximately 2 to 3 kits per year now?
    09        A.   Probably, maybe more.
    10        Q.   Somewhere around 2 to 3.  We'll say that.  And
    11   they are all the identifiler kits?
    12        A.   Correct.
```

**24.  PAGE 38:22 TO 40:19  (RUNNING 00:02:19.984)**

```
    22        Q.   I have marked as Exhibit 2 a file received by
    23   Promega from M.D. Anderson.  I don't have a Bates number
    24   on it, but it was received by Promega from M.D. Anderson
    25   pursuant to a third party subpoena.
00039:01             Ms. Hale, you've been handed Exhibit 2,
    02   which is a document M.D. Anderson produced in this case.
    03   Can you take a minute to look at it and check out what
    04   it is.
    05        A.   I have looked at it.
    06        Q.   Do you recognize Exhibit 2?
```

PTX1351_0006

## Promega Corporation v. Life Technologies Corporation

```
07        A.    I recognize Exhibit 2.
08        Q.    Can you tell me what Exhibit 2 is.
09        A.    Exhibit 2 is the web site that we are planning
10   to put up.  It is not yet live yet.  This is the next
11   version of our web site.
12        Q.    And do you know who authored this?
13        A.    It was authored primarily by myself with input
14   from Vivian Gabisi and Carolyne Duff.
15        Q.    And who is Carolyne Duff?
16        A.    Carolyne Duff is someone who works for the CCSG
17   to help set up web sites, so her comments were primarily
18   technical with regards to the look and feel of the web
19   site.
20        Q.    And if you can take a look at the bottom of the
21   first page.
22        A.    Uh-huh.
23        Q.    And it states that, "We provide testing of STR
24   on cell lines using the Applied Biosystems ampFLSTR
25   identifier kit"?
00040:01        A.    Yes.
02        Q.    That's how you do all your testing on the cell
03    line?
04        A.    For STR testing, yes.
05        Q.    Thank you.  And this -- when it becomes part of
06    the web site, is that part of the external M.D. Anderson
07    web site or part of an internal M.D. Anderson web site?
08        A.    It will be both internal and external.
09        Q.    Will there be any difference between the
10    internal and external?
11    A.    No.
12    Q.    So this will be available to the public?
13    A.    Yes.
14    Q.    And you stated before that you do do some work
15    for people outside of M.D. Anderson, correct?
16    A.    Yes.
17    Q.    So someone could see this and come to you, if
18    they had potential work for you?
19        A.    Yes.
```

**25. PAGE 47:11 TO 48:02 (RUNNING 00:00:37.925)**

```
11        Q.    (BY MS. TROUPIS)  I've marked as Exhibit 5 a
12    file received from Promega -- or by Promega from M.D.
13    Anderson.  It hasn't got a Bates number on it, but it
14    was received pursuant to a third-party subpoena.
15              Dr. Hale, you've been handed what has been
16    marked as Exhibit No. 5.  Could you take a look at this
17    document?
18    A.    Yes.
19    Q.    And do you recognize this document?
20    A.    Yes.
21    Q.    And could you tell me what this document is?
22    A.    This is an e-mail from Lisa Ortuno, so now I
23    remember her last name.
24    Q.    Could we stop there for a second.
25              The Lisa that we were referring to earlier
00048:01    in this deposition is named Lisa -- that is Lisa Ortuno,
02    correct?
```

**26. PAGE 48:04 TO 48:04 (RUNNING 00:00:00.273)**

```
04        A.    Yes.
```

**27. PAGE 48:05 TO 48:24 (RUNNING 00:00:53.546)**

```
05        Q.    (BY MS. TROUPIS)  There is someone cc'd on this
06    named Phillip Czar.
07        A.    Yes.
```

CONFIDENTIAL

PTX1351_0007

**Promega Corporation v. Life Technologies Corporation**

```
08      Q.   Do you know who Phillip Czar is?
09      A.   Yes.
10      Q.   Who is Phillip Czar?
11      A.   Phillip Czar is the sales rep for Applied
12 Biosystems Life Technologies.
13      Q.   And how do you know Mr. Czar?
14      A.   I knew him when he was a rep for a different
15 company.  I have forgotten which company.  Sh.  Don't
16 tell him.  But he reintroduced himself saying that he
17 was the Life Technologies sales rep.
18      Q.   And can you tell me about this e-mail?
19      A.   This was an e-mail out of the blue saying,
20 hello, wanted to check in.
21      Q.   Is it something you commonly received from
22 Ms. Artuno?
23      A.   No.  This was the only time I believe I
24 received such an e-mail.
```

**28. PAGE 48:25 TO 49:07 (RUNNING 00:00:25.590)**

```
25         Q.   Now, Mr. Czar who is cc'd on this -- does he
00049:01 know what kind of work you were doing at M.D. Anderson?
02         A.   I don't -- I never talked to him about it in
03 particular.
04         Q.   Was there any reason why you did not talk to
05 him about it?
06         A.   Because I was busy and I never touch base with
07 him.  We had no reason to talk.
```

**29. PAGE 49:11 TO 50:18 (RUNNING 00:01:22.551)**

```
11      Q.   I've marked as Exhibit 6 a file received by
12 Promega from M.D. Anderson.  It doesn't have a Bates
13 number, but it was received by Promega from M.D.
14 Anderson pursuant to a third-party subpoena.
15           You've been handed Exhibit 6.  Could you
16 take a minute to look it over.
17      A.   Yes.
18      Q.   This appears to be an e-mail dated April 11,
19 2008 with the subject:  Fingerprinting kit.  Correct?
20      A.   Correct.
21      Q.   Do you recognize this document?
22      A.   Yes.
23      Q.   And what is this document?
24      A.   This is a document that I got from Clark with
25 regards to either -- I don't remember if it's a phone
00050:01 call or a -- when he just stopped by and visits asking
02 about using kits for STR identification.
03      Q.   And what do you mean STR identification?
04      A.   Identification of cell lines using STR.
05      Q.   And the Clark you were referring to was Clark
06 Eason, correct?
07      A.   Clark Eason.
08      Q.   And before you stated that Clark Eason is a
09 sales representative?
10      A.   Correct.
11      Q.   And this would be the same Clark Eason we
12 discussed earlier?
13      A.   The same Clark Eason.
14      Q.   The first line, it says, "The kit you've chosen
15 would be an appropriate solution for your requirements."
16 Correct?
17      A.   Yes.
18      Q.   And by your requirements, what does Clark mean?
```

**30. PAGE 50:21 TO 50:22 (RUNNING 00:00:02.124)**

```
21      Q.   (BY MS. TROUPIS)  Do you know what Mr. Clark
```

CONFIDENTIAL                                                                    page 8

**Promega Corporation v. Life Technologies Corporation**

```
        22   means by this?
```
**31. PAGE 50:24 TO 51:05  (RUNNING 00:00:17.901)**
```
        24      Q.   (BY MS. TROUPIS)  Go ahead and answer, if you
        25   can.
  00051:01      A.   Yes.  I would have called him and asked is the
        02   kit that I've chosen appropriate for cell line
        03   identification.
        04      Q.   And he told you via this e-mail that it was
        05   proper for your use?
```
**32. PAGE 51:07 TO 51:17  (RUNNING 00:00:42.006)**
```
        07      Q.   (BY MS. TROUPIS)  Go ahead and answer.
        08      A.   Yes.
        09      Q.   And did you order kits?
        10      A.   Yes.
        11      Q.   How many kits did you order?  Do you know?
        12      A.   Probably one initially, after receiving this
        13   e-mail, but many subsequent.
        14      Q.   So just -- I just want to go back over and make
        15   sure I understand correctly.  Mr. Eason knew your
        16   requirements for cell line verification, correct?
        17      A.   Yes.
```
**33. PAGE 51:19 TO 51:23  (RUNNING 00:00:12.304)**
```
        19      A.   Yes.
        20      Q.   (BY MS. TROUPIS)  And after knowing your
        21   requirements, he stated that the kit you've chosen will
        22   be an appropriate solution for your requirements,
        23   correct?
```
**34. PAGE 51:25 TO 52:03  (RUNNING 00:00:05.229)**
```
        25      A.   Yes.
  00052:01      Q.   (BY MS. TROUPIS)  And what kit had you chosen
        02   at that point?
        03      A.   The identifiler kit.
```
**35. PAGE 52:10 TO 53:05  (RUNNING 00:01:05.215)**
```
        10      Q.   I have marked as Exhibit 7 a file received by
        11   Promega from M.D. Anderson.  It hasn't got a Bates
        12   number on it, but it was received pursuant to a third
        13   party subpoena.
        14           Dr. Hale, I've given you what has been
        15   marked as Exhibit 7, which was produced by M.D. Anderson
        16   in this case.
        17           This is an e-mail -- or appears to be an
        18   e-mail with a subject line FW: Data from M.D. Anderson,
        19   and is dated February 22nd, 2010.
        20           Could you take a look at this e-mail for
        21   me, please.
        22      A.   Yes.
        23      Q.   Do you recognize this document?
        24      A.   I recognize this document.
        25      Q.   And could you tell me about this document?
  00053:01      A.   This is a document that Vivian Gabisi forwarded
        02   to me with regards to trouble that we were having with
        03   the STR identifiler kit and then data that was received
        04   from our core, so injection of those samples onto their
        05   machine.
```
**36. PAGE 54:25 TO 55:20  (RUNNING 00:00:39.255)**
```
        25      Q.   It's from HIDTechSupport.  And the e-mail
  00055:01   address is HID.TechSupport@lifetech.com.  Do you see
        02   that?
```

PTX1351_0009

## Promega Corporation v. Life Technologies Corporation

```
03        A.   Yes, I see that.
04        Q.   Is that one person, to your knowledge, or is
05  that someone else?
06        A.   I have no idea.
07        Q.   If you go to the end of that e-mail, I see that
08  it's signed Lisa Ortuno?
09        A.   Yes.
10        Q.   Would this e-mail have been from Lisa Ortuno?
11        A.   That would make sense.
12        Q.   In the CC line there are several people listed.
13  I see Phillip Czar.
14        A.   Uh-huh.
15        Q.   This would be the same Phillip Czar that we
16  talked about?
17        A.   Yes.
18        Q.   The next person is Gabriel Feltner.  Do you
19  know who Gabriel Feltner is?
20        A.   No.
```

**37. PAGE 56:07 TO 56:14  (RUNNING 00:00:11.536)**

```
07        Q.   (BY MS. TROUPIS)  Now, you had these problems
08  the second time.  These are the second set of problems
09  that you described before in the deposition.
10        A.   Yes.
11        Q.   And you've already stated that you believe this
12  e-mail is discussing those problems the second time,
13  correct?
14        A.   Yes.
```

**38. PAGE 56:17 TO 56:20  (RUNNING 00:00:08.920)**

```
17        Q.   (BY MS. TROUPIS)  When they were answering your
18  problems -- or they were discussing your problems in
19  this e-mail, do you believe they would have known what
20  you were using the identifiler kit for?
```

**39. PAGE 56:23 TO 57:01  (RUNNING 00:00:06.973)**

```
23        A.   I don't know.
24        Q.   (BY MS. TROUPIS)  Would you expect they knew
25  what problems -- or what you were using the identifiler
00057:01  kit for?
```

**40. PAGE 57:03 TO 57:03  (RUNNING 00:00:00.476)**

```
03        A.   I expect they would know.
```

**41. PAGE 57:03 TO 57:03  (RUNNING 00:00:00.483)**

```
03        A.   I expect they would know.
```

**42. PAGE 57:06 TO 58:14  (RUNNING 00:01:51.277)**

```
06        Q.   (BY MS. TROUPIS)  Okay.  I've marked as Exhibit
07  8 a file received by Promega from M.D. Anderson.  It
08  doesn't have a Bates number, but it was received
09  pursuant to a third-party subpoena.
10             Dr. Hale, you've been handed what has been
11  marked as Exhibit 8.  It appears to be an e-mail with
12  the subject line:  Data from M.D. Anderson, dated
13  February 23rd, 2010.
14             If you could take a look at this e-mail for
15  me.
16        A.   Yes.
17        Q.   Do you recognize this document?
18        A.   Yes.
19        Q.   Could you tell me what this document is?
20        A.   This is a follow-up from the previous e-mail
21  where it looks like problems were resolved.
```

**CONFIDENTIAL**

PTX1351_0010

## Promega Corporation v. Life Technologies Corporation

```
22    Q.   And by previous e-mail do you mean Exhibit 7?
23    A.   Yes.
24    Q.   And I see on the top that the e-mail is from
25  HIDTechSupport to you, correct?
00058:01    A.   Yes.
02    Q.   And although the "from" says HIDTechSupport,
03  the e-mail appears to be signed by Lisa M. Artuno,
04  correct?
05    A.   Yes.
06    Q.   And so you stated just now that the problem had
07  been solved, correct?
08    A.   Yes.
09    Q.   And this e-mail was Lisa telling you that the
10  problem had been -- or Ms. Artuno telling you that the
11  problem had been solved?
12    A.   It looks like there are still problems, but I
13  believe that they were on the right track, yes.  It
14  allowed us to solve the problem.
```

**43. PAGE 61:07 TO 62:05 (RUNNING 00:01:26.680)**

```
07    Q.   Okay.  I've marked as Exhibit 10 a file
08  received by Promega from M.D. Anderson.  It does not
09  have a Bates number, but it was received pursuant to a
10  third-party subpoena.
11         It appears to be an e-mail with the subject
12  line, "Re:  Follow-up to WebEx" dated February 6, 2009.
13         Dr. Hale, you've been handed what has been
14  marked Exhibit 10.  It appears to be an e-mail.  Could
15  you take a moment to look at this document.
16    A.   Uh-huh.  Okay.
17    Q.   Okay.  Do you recognize this document?
18    A.   I recognize this document.
19    Q.   Can you tell me what this document is?
20    A.   This was a document that was sent after the
21  WebEx training.
22    Q.   And why did you send this e-mail?
23    A.   I was interested in buying the GeneMapper
24  software myself because I was using software that was
25  given to me by the core facility, the DNA analysis core
00062:01  facility.
02    Q.   And why did you want this for yourself?
03    A.   I thought it might be good to have a copy that
04  didn't have some of the problems that our copy has.  We
05  can't delete data.
```

**44. PAGE 65:13 TO 67:21 (RUNNING 00:03:02.388)**

```
13    Q.   When you first put in the validation system you
14  used, did you get trained at all?
15    A.   I believe, yes.  I contacted Applied
16  Biosystems, and I had an informal walk-through of the
17  software without being charged for it.
18    Q.   And by informal walk-through, what do you mean?
19    A.   I mean that I contacted someone, Lisa, who then
20  helped me understand the GeneMapper program at -- just
21  at the get-it-up-and-running level without learning more
22  about some of the more advanced aspects of analysis of
23  samples.
24    Q.   And did she do this remotely or in person?
25    A.   Remotely.  So that might be the follow-up of
00066:01  WebEx.  It might be that she did a WebEx with just me
02  and then later on I paid for a second training.
03    Q.   And going back to when you were doing it the
04  first time, this walk-through you described, you said
05  you did it remotely, would that have been on the
06  computer or just over the phone, or how did you do it?
```

PTX1351_0011

## Promega Corporation v. Life Technologies Corporation

```
07      A.   It was on the computer.  I know this.
08      Q.   And how do you know this?
09      A.   Because that particular computer is not hooked
10  up to the Internet.  I had to go through special hoops
11  to log it onto our web and then take it off after the
12  training.
13      Q.   And could you sort of describe the training
14  that you did at this remote time?
15      A.   That was awhile ago, so we -- I'm sure we
16  looked at the data, data that was on the screen, and
17  then Lisa described what a pullup peak is, described
18  some of the information about the standards that are
19  used, went through some of the things you have to worry
20  about with when you do an actual run that you have to
21  worry that the standard curve looks good.  You have to
22  worry that your samples look good.
23      Q.   And would she have known what you were
24  ultimately going to be using the software for?
25      A.   When she talked to me, yes.
00067:01    Q.   So what did she know you were going to be using
02   the software for?
03      A.   Cell line identification.
04      Q.   So you did this initial informal walk-through
05   with Ms. Ortuno, and then you said you had Ms. Gabisi
06   also do training?
07      A.   Yes.
08      Q.   That would have been later after this?
09      A.   Yes.
10      Q.   How much later?
11      A.   Probably about a year later.  Six months to a
12  year.
13      Q.   And would it have been similar training to what
14  you received?
15      A.   I was not present, but I believe it was more
16  extensive because the first one was informal and the
17  second one we paid for.
18      Q.   And do you know who did the second training
19  with Ms. Gabisi?
20      A.   I believe it was Lisa, but I'm not entirely
21  certain.
```

**45.  PAGE 68:14 TO 69:03 (RUNNING 00:00:43.678)**

```
14      Q.   If you could go to the second page of Exhibit
15  10, near the top there appears to be an e-mail dated
16  February 6, 2009 --
17      A.   Uh-huh.
18      Q.   -- sent at 1:11 p.m.  Do you see that?
19      A.   Yes.
20      Q.   Could you look at that for a moment.  The
21  second paragraph of that states, "I have been going over
22  my notes and gathering the names of the other cell line
23  ID people I have been working with.  I am checking with
24  them to see if they would be interested in working with
25  you.  When I hear back, I'll let you know."
00069:01         Do you see that?
02      A.   Yes.
03      Q.   What is Ms. Artuno talking about there?
```

**46.  PAGE 69:06 TO 70:03 (RUNNING 00:01:15.025)**

```
06      A.   We, because we were looking at many STR
07   profiles, the cell lines, we're developing a program
08   that would do the matching of STR profiles against the
09   database.
10           And at one point I was considering
11  talking -- or I mentioned that we were doing this.  And
```

PTX1351_0012

## Promega Corporation v. Life Technologies Corporation

```
12   I was considering talking with Applied Biosystems to see
13   if they were interested in that matching algorithm.
14              But we determined that we really should
15   patent this STR algorithm.  I, therefore, didn't go any
16   further, and I never showed them any of the actual
17   algorithms.  And that's why I never responded to her
18   e-mails.
19      Q.   What do you mean responded to her e-mails?
20      A.   I never responded saying what people we were
21   interacting with.  I never said who is the algorithm.  I
22   never followed up any further.
23      Q.   And did Ms. Artuno ever send you any names of
24   people who were doing cell line identification?
25      A.   No, I don't think so.  I think that might have
00070:01   been one of the e-mails touching base again that the
02      e-mail out of the blue -- it might have had something to
03      do with this particular process.  Exhibit 5.
```

**47. PAGE 76:16 TO 77:18 (RUNNING 00:01:17.581)**

```
16              Dr. Hale, you have been handed what has
17   been marked as Exhibit 14.  It appears to be an e-mail
18   with the subject line:  "Re:  Data:  Meeting
19   rescheduled:  GM 4.0 Quick Analysis M.D. Anderson,"
20   dated January 27, 2010.
21              In the "from" line I have Lisa Ortuno and
22   to Katherine Stemke Hale, ccing Vivian Gabisi?
23              Could you take a look at this document.
24      A.   I read it.
25      Q.   Do you recognize this document?
00077:01      A.   I recognize this document.
02      Q.   And what is this document?
03      A.   This is a document from Lisa to me asking about
04      potentially setting up a seminar, presumably at M.D.
05      Anderson.
06      Q.   And what seminar would this be?
07      A.   We never set it up.
08      Q.   You never set it up.  What were you talking
09      about setting up a seminar on?
10      A.   We would be talking about a seminar on STR
11   analysis.
12      Q.   And that would be STR analysis using Life Tech
13   kits?
14      A.   One would presume so.
15      Q.   And why did you want to set up a seminar?
16      A.   She wanted to set up a seminar because I
17   mentioned that I have a lot of customers who were
18   looking at STR profiles for cell line identification.
```

**48. PAGE 77:19 TO 78:03 (RUNNING 00:00:44.100)**

```
19      Q.   Did you ever talk to anyone else at Life Tech
20   or Applied Biosystems about setting up this seminar?
21      A.   No.  But I should have done it.
22      Q.   Did you ever discuss this with Ms. Artuno
23   beyond this e-mail?
24      A.   No.  I don't recall discussing it past this
25   e-mail.
00078:01      Q.   Did you discuss anything similar with anyone
02      else from Life Tech ever?
03      A.   No, I don't think so.
```

**49. PAGE 85:08 TO 85:25 (RUNNING 00:00:52.664)**

```
08      Q.   And is there any reason why not?
09      A.   Yes.
10      Q.   Could you tell me what that reason is?
11      A.   The reason that we are here.  We hired someone.
```

CONFIDENTIAL                                                                page 13

**Promega Corporation v. Life Technologies Corporation**

```
12  He started work, and then we decided that we wanted to
13  put things on hold to determine if there were any
14  problems before we pursued any commercial STR matching
15  program.
16      Q.   And what do you mean by problems?
17      A.   Any legal problems associated with the reason
18  I'm here.
19      Q.   And what would that reason be?
20      A.   Promega and Applied -- Life Technologies'
21  potential conflict of interest on a patent or IPO.  So
22  we wanted to find out what was going on.
23      Q.   So you are aware that there are patent issues
24  between --
25      A.   One would presume that is the reason I am here.
```

**50. PAGE 95:21 TO 96:03 (RUNNING 00:00:20.515)**

```
21      Q.   Just a second here.  Now, so when you're
22  performing cell line validation, are you at all
23  interested in the source?
24      A.   We are interested in matching the cell line to
25  the sample.  So we don't care who the patient -- I don't
00096:01  care who the patient is.  And I'm not allowed to care.
02      Q.   So you don't care about the identity of the
03  person?
```

**51. PAGE 96:05 TO 96:05 (RUNNING 00:00:00.213)**

```
05      A.   No.
```

**52. PAGE 96:06 TO 96:07 (RUNNING 00:00:02.384)**

```
06      Q.   (BY MS. TROUPIS)  You're not trying to
07  determine the identity of the person?
```

**53. PAGE 96:09 TO 96:11 (RUNNING 00:00:06.121)**

```
09      A.   I'm not trying to identify the identity of the
10  person.  I'm attempting to identify the identity of the
11  cell line.
```

TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:37:49.152)

**CONFIDENTIAL**

PTX1351_0014

**Promega Corporation v. Life Technologies Corporation**

 **Kotkin, Melissa (Vol. 01) - 12/06/2011**                    1 CLIP  (RUNNING 00:35:51.080)

 QC020412

**KOTKDES**                    42 SEGMENTS  (RUNNING 00:35:51.080)          

**1. PAGE 6:01 TO 6:21  (RUNNING 00:00:48.237)**

```
00006:01          THE VIDEOGRAPHER:  This is the deposition of
      02     Melissa Kotkin being taken in the matter of Promega
      03     Corporation versus Life Technologies Corporation.
      04     The date is December 6, 2011.  The time is 8:24 a.m.
      05     Would counsel please introduce themselves.
      06          MR. KARGE:  Stewart Karge on behalf of Promega.
      07          MR. HOWERTON:  Thomas Howerton on behalf of
      08     Promega.
      09          MR. McCARTHY:  Michael McCarthy on behalf of
      10     Defendant Life Technologies Corporation.
      11          THE COURT:  And will the Court Reporter please
      12     swear in the witness.
      13                    MELISSA KOTKIN
      14     having been first duly sworn, testified as follows:
      15          THE WITNESS:  I do.
      16                 DIRECT EXAMINATION
      17     BY MR. KARGE:
      18          Q.   Good morning, Ms. Kotkin.  My name is
      19     Stewart Karge.  I represent Promega Corporation.
      20          Have you ever been deposed before?
      21          A.   Yes, I have.
```

**2. PAGE 7:24 TO 11:06  (RUNNING 00:04:44.560)**

```
      24          Q.   Let's begin with your educational background,
      25     please.  Can you give me a brief synopsis of your
00008:01     educational background?
      02          A.   Okay.  I went to the University of Central
      03     Florida.  I first earned a liberal studies degree and
      04     then earned a forensic science bachelor's degree with
      05     minoring in molecular biology and chemistry.
      06          I worked towards a master's degree, did not earn
      07     the master's degree, but I have credits toward the
      08     master's degree in forensics and the DNA program.
      09          Q.   Can you give me the dates upon which your
      10     various diplomas were received?
      11          A.   These are going to be approximate.  I believe
      12     '93 I earned my liberal studies degree, '96 or '97 would
      13     be the forensic science degree and then I was working
      14     towards the master's late 90's.  And again, approximate,
      15     I don't have the dates in front of me.
      16          Q.   Can you give me -- strike that.
      17          By whom are you currently employed?
      18          A.   I'm employed by Life Technologies.
      19          Q.   And what's your current title or position?
      20          A.   Senior Field Application Specialist.
      21          Q.   And how long have you held that title and
      22     position?
      23          A.   Approximately four years.  Prior to that I was
      24     just a Field Application Specialist, technically a
      25     similar role just with senior attached to it.
00009:01          Q.   And how long were you a Field Application
      02     Specialist?
      03          A.   Approximately two years, so for a total of six.
      04          Q.   And what position, if any, did you hold prior to
```

**PTX1352**                    PTX1352_0001

## Promega Corporation v. Life Technologies Corporation

```
05  that?
06       A.   At Life Technologies, no other position.
07       Q.   Okay.  Were you employed by some other company
08  prior to your being hired by Life Technologies?
09       A.   Yes, I worked for the Florida Department of Law
10  Enforcement.  First as a technician and then as a crime
11  lab analyst in DNA.
12       Q.   And how long did you work for the Florida
13  Department of Law Enforcement?
14       A.   Approximately four-and-a-half years.
15       Q.   Did you have a job prior to becoming employed by
16  the Florida Department of Law Enforcement?
17       A.   Yes.  I worked for the university.  I worked
18  when I first graduated with my liberal studies degree, I
19  worked in the field of chiropractic, so it was outside
20  the realm of my specialty now.
21       Q.   So the first job you had with forensic or
22  science was the job with the Florida Department of Law
23  Enforcement?
24       A.   While I was going through school, I interned at
25  Broward County Sheriff's Office.  It was interning for
00010:01  40 hours a week, but I was paid for 20.  But it was a
02  school requirement, so I guess I was employed by Broward
03  County Sheriff's Office.  And then while working at UCF,
04  I worked under Dr. Ballentine, who's also -- I was
05  working as a researcher.
06       Q.   What did you do for Dr. Ballentine?
07       A.   Well, it was when I was working towards my
08  master's, I worked in his lab.  But as far as my
09  employment, I was really a grad teaching assistant.  So I
10  was assisting with basic chemistry classes, so it wasn't
11  even with Dr. Ballentine, I worked for the chemistry
12  department.
13       Q.   Did you have any interaction with Dr. Ballentine
14  while you were a grad teaching assistant?
15       A.   Yes.
16       Q.   And what was that?
17       A.   It was when I was working on my project for my
18  master's.
19       Q.   And what was that project?
20       A.   I was working with phenotypic traits and DNA
21  samples.
22       Q.   And what about that caused you to have some
23  interaction with Dr. Ballentine?
24       A.   He was my mentor.
25       Q.   Other than working on that assignment or
00011:01  project, did you have any other contact with
02  Dr. Ballentine?
03       A.   He was my professor for a couple of classes.
04       Q.   Anything else?
05       A.   He was in charge of the master's program, so I
06  mean he was guidance, mentor, that was primarily.
```

**3. PAGE 11:25 TO 12:09  (RUNNING 00:00:27.625)**

```
25       Q.   I show you what the Court Reporter has marked as
00012:01  Kotkin Deposition Exhibit 1 and ask you if you have ever
02  seen this document before?
03       A.   I've seen this org chart, yes.
04       Q.   Okay.  Could you describe for me what this
05  document is?
06       A.   It's not the most recent organizational chart,
07  but it's an organizational chart of my group.  I report
08  to Michelle Shepherd and it just has her other reports on
09  it.
```

CONFIDENTIAL

PTX1352_0002

## Promega Corporation v. Life Technologies Corporation

**4. PAGE 12:20 TO 12:24  (RUNNING 00:00:13.010)**

```
20      Q.   You're identified as a Senior HID FAS team
21  lead/FAS; is that correct?
22      A.   Correct.
23      Q.   And can you tell me what that means, what those
24  initials mean?
```

**5. PAGE 13:01 TO 13:14  (RUNNING 00:00:44.272)**

```
00013:01     A.   The HID stands for Human Identification, FAS
02  stands for Field Application Specialist, team lead is my
03  special responsibility and being a mentor to my new --
04  not my new employees, but the new FASes to our team.
05      Q.   And this reflects your current position?
06      A.   Yes, it does.
07      Q.   And Michelle Shepherd is your current
08  supervisor?
09      A.   That is correct.
10      Q.   You said HID means Human Identification.  In the
11  context of your job, what does that mean?
12      A.   It means primarily I support forensic science
13  customers, so anyone who is crime lab, private lab,
14  working with forensic type of samples.
```

**6. PAGE 13:15 TO 13:15  (RUNNING 00:00:01.852)**

```
15          MR. KARGE:  Let's mark this as Exhibit 2.
```

**7. PAGE 13:17 TO 13:22  (RUNNING 00:00:19.059)**

```
17      Q.   Let me show you what's been marked as Kotkin
18  Deposition Exhibit 2 and ask you first if you have ever
19  seen this document before?
20      A.   I don't remember it, but --
21      Q.   If you note, there are certain initials that are
22  MDK.  Are those your initials?
```

**8. PAGE 13:25 TO 13:25  (RUNNING 00:00:01.374)**

```
25      A.   Those are my initials.
```

**9. PAGE 14:06 TO 14:10  (RUNNING 00:00:13.453)**

```
06      Q.   Under Qualify -- I'm sorry, Quantifiler/SDS
07  there are your initials; correct?
08      A.   Yes.
09      Q.   Do you have an understanding as to what
10  Quantifiler/SDS means?
```

**10. PAGE 14:12 TO 15:05  (RUNNING 00:00:59.316)**

```
12      A.   Yes, I do.
13      Q.   What is that?
14      A.   That's our realtime, so how we quantitate or
15  determine how much DNA we have, it's the instrument and
16  the chemistries that can run with that instrument.
17      Q.   And is that something that you are currently
18  involved in?
19      A.   I'm involved with everything on this page in one
20  way or another.  I wouldn't necessarily say that is my
21  main, you know, responsibility.  I don't believe we have
22  a recent list of, you know, contacts.
23      Q.   Okay.  Down towards the middle of the page
24  there's a line that says non-HID.  Do you see that?
25      A.   Yes, I do.
00015:01     Q.   And under the FAS and FSS column are your
02  initials again.  Do you see that?
03      A.   Yes.
04      Q.   Do you have an understanding as to what non-HID
```

## Promega Corporation v. Life Technologies Corporation

```
    05   is?
```

**11. PAGE 15:07 TO 17:10  (RUNNING 00:03:05.559)**

```
    07       A.   Yes, I do.
    08       Q.   What is your understanding of what that term
    09   means?
    10       A.   Non-HID to me is anything that is not a forensic
    11   lab.  So when we work in a forensic lab, forensic labs
    12   must have validated procedures.  So as a company we have
    13   validated procedures, but labs usually follow those
    14   recommendations.  And if a lab chooses not to, and
    15   typically it's not a forensic lab, we categorize that as
    16   a non-HID lab.
    17           So when I say they are not following our
    18   recommendations, it could be that they are running the
    19   instrument with a different capillary length or they are
    20   running -- they are analyzing the data, whether it's
    21   generated with Applied Biosystems data or Promega data,
    22   but they are analyzing it on GeneMapper 4.0 or a
    23   different version, a different software, other than the
    24   forensic software that we have.  So we kind of group
    25   anything that's different from the forensic into non-HID
00016:01   category.
    02       Q.   And what responsibilities, if any, do you have
    03   with the non-HID customers of Life Tech?
    04       A.   As of today or in the past or --
    05       Q.   Well, start with as of today.
    06       A.   As of today, if a customer sends me an email or
    07   contacts the company and inquires about working with
    08   samples generated from an STR kit, again whether it's
    09   Promega or Applied Biosystems, I'll assist them.
    10           I currently have the GeneMapper 4.1 software and
    11   that's not everything that my co-workers or my peers can
    12   say.  So when it comes to actually looking at the data in
    13   that software, that's where I can benefit -- I can help
    14   the customer.
    15       Q.   When you say that not all of your co-workers
    16   have the same software, are you the person to whom they
    17   would direct non-HID questions?
    18       A.   If it pertained to the software in general.  If
    19   it's just to analyze the data, we can usually do that in
    20   GeneMapper ID-X.  But if it's something specific about
    21   GeneMapper 4.0, yes, or 4.1, whatever version, yes, my
    22   peers would send me that question to try to see if I can
    23   figure that out.
    24       Q.   And how long have you had those
    25   responsibilities?
00017:01       A.   I believe I have been assisting with non-HID
    02   customers several years.  Probably four, five years,
    03   again approximate.
    04       Q.   Were you assisting non-HID customers prior to
    05   the time you received the title of Senior Field
    06   Application Specialist?
    07       A.   Yes, I was.
    08       Q.   Okay.  So you were doing that as a Field
    09   Application Specialist, as well?
    10       A.   Yes.
```

**12. PAGE 45:17 TO 45:19  (RUNNING 00:00:07.676)**

```
    17       Q.   Do you know if forensic clients do not work with
    18   MiniFiler?
    19       A.   Forensic clients do work with MiniFiler.
```

**13. PAGE 45:23 TO 47:07  (RUNNING 00:02:28.305)**

```
    23       Q.   And this was a series of emails, the front page
```

PTX1352_0004

## Promega Corporation v. Life Technologies Corporation

```
    24  of which is August 15, 2006 from you to Cynthia Waldron;
    25  correct?
00046:01     A.   Correct.
    02       Q.   Would you please read the second paragraph
    03  beginning as far as my -- out loud, please.
    04       A.   As far as my HID territory, I cover, and then I
    05  have the initials MA, VA, WV, NC, SC, FL, TN.  However it
    06  is the goal to get me to understand GeneMapper, initialed
    07  again as GM, so that I can help all the non-HID customers
    08  using the STR kits.  Also, if they are running the kits
    09  using POP7 or running it other than the way it is
    10  validated for HID.  This way there is one contact person.
    11       Q.   Is that a correct statement at the time of your
    12  responsibilities with respect to non-HID customers?
    13       A.   Yes.  So non-HID customers being non-forensic
    14  customers and then enveloping that into the role of if a
    15  customer is using an STR chemistry, regardless if it was
    16  AB or Promega, then -- but they weren't following the
    17  validated procedures, then it became a non-HID customer.
    18       Q.   Okay.  And if you are using the STR kits for
    19  forensics, are there requirements that you are obligated
    20  to use the validated protocol?
    21       A.   Yes.  As a company we have recommendations as to
    22  how these chemistries are validated and then if a
    23  forensic lab chooses to deviate from that, so be it, but
    24  forensic labs have strict rules and typically they will
    25  follow most guidelines.  I'm not going to speak for all
00047:01  forensic labs that they follow everything that we
    02  recommend.
    03       Q.   And you've had contact with non-forensic
    04  customers, as well, with respect to the STR kit
    05  questions; correct?
    06       A.   Correct.  If a lab is not a forensic lab working
    07  with STR chemistry, yes, I'll answer those questions.
```

**14.  PAGE 49:04 TO 49:23  (RUNNING 00:01:12.559)**

```
    04       Q.   Turning to the second page of the exhibit, the
    05  one Bates stamped 3433.  The last paragraph of that makes
    06  reference to a customer at Duke and one at Philly.
    07            Do you see that?
    08       A.   On the last page of 3433?
    09       Q.   On the last paragraph.
    10       A.   Last paragraph.  Yes, I do see it now.
    11       Q.   That is in the context of an email from
    12  Cynthia Waldron to you on August 14th, 2006; correct?
    13       A.   August 14, 2006, yes.
    14       Q.   And then the first page of Exhibit 10, then
    15  you're responding in that third paragraph where you say:
    16  As far as Duke, I actually have a webex with some
    17  customers on Friday.  Did you have a webex with someone
    18  at Duke in or about the time of August 2006?
    19       A.   I do not remember that.
    20       Q.   When you say you don't remember, is it that you
    21  don't believe that it happened or it's possible that it
    22  happened and you presently have no recollection of the
    23  fact?
```

**15.  PAGE 49:25 TO 50:01  (RUNNING 00:00:04.782)**

```
    25       A.   It's possible it happened.  I just do not
00050:01  remember whether or not it actually did.
```

**16.  PAGE 69:06 TO 70:16  (RUNNING 00:02:07.032)**

```
    06       Q.   I show you what's been marked as Kotkin
    07  Exhibit 18.  Please take a moment and let me know if
    08  you've seen this before.
```

PTX1352_0005

## Promega Corporation v. Life Technologies Corporation

```
        09      A.   I do not recognize this document.
        10      Q.   This purports to be an email from Ellen Bishop
        11  to you and Mark Padalino, P-A-D-A-L-I-N-O on
        12  September 28th, 2006.  Subject:  Non-HID customer
        13  inquiry.  Do you have any reason to believe you did not
        14  receive this email in the normal course of your job
        15  duties at Life Tech?
        16      A.   I have no reason to believe I did not receive
        17  this.
        18      Q.   The customer being referred to is Duggan Lab, do
        19  you see that, D-U-G-G-A-N?
        20      A.   I see that.
        21      Q.   Do you know who Duggan Lab is?
        22      A.   No, I do not.
        23      Q.   Do you know where they're located?
        24      A.   According to the email, Phoenix, Arizona.
        25      Q.   Did you have any contact with Duggan Lab?
00070:01      A.   I do not recall.
        02      Q.   Do you see right above the customer contact
        03  info, it says:  Melissa, would you please contact this
        04  customer to provide technical info regarding 3730 and
        05  GM 3.5.  Do you see that?
        06      A.   I do.
        07      Q.   Do you recall contacting anyone at Duggan Lab
        08  and providing the information requested?
        09      A.   I do not recall.
        10      Q.   In the normal course of your job duties, would
        11  you have done that?
        12      A.   I would assume I would have.
        13      Q.   The kit that is being identified that the
        14  customer wishes to buy is a Profiler Plus ID Identifiler
        15  kit; correct?
        16      A.   Two kits.
```

**17. PAGE 70:18 TO 70:24  (RUNNING 00:00:17.633)**

```
        18      Q.   Two kits.  Okay.  That represents two kits?
        19      A.   Profiler Plus ID is one, Identifiler is another
        20  kit.
        21      Q.   What's the reference to 3100?
        22      A.   That is a capillary electrophoresis.
        23      Q.   Is D.C. 1.1 an additional designation of that
        24  type of instrument?
```

**18. PAGE 71:01 TO 71:11  (RUNNING 00:00:35.392)**

```
00071:01      A.   That was the data collection software version.
        02      Q.   The question goes on to say they want
        03  information about using the Profiler Plus ID and
        04  Identifiler on a 3730 with GM 3.5.  Do you see that?
        05      A.   Yes, I do.
        06      Q.   That represents -- 3730 is another instrument;
        07  correct?
        08      A.   Correct.
        09      Q.   And the GM 3.5 is GeneMapper version 3.5?
        10      A.   Correct.
        11      Q.   Is that also a non-HID protocol?
```

**19. PAGE 71:11 TO 71:11  (RUNNING 00:00:00.908)**

```
        11      Q.   Is that also a non-HID protocol?
```

**20. PAGE 71:13 TO 71:14  (RUNNING 00:00:05.605)**

```
        13      A.   Yes, GeneMapper 3.5 would automatically make it
        14  a non-HID.
```

PTX1352_0006

## Promega Corporation v. Life Technologies Corporation

**21. PAGE 80:20 TO 81:22  (RUNNING 00:01:29.484)**

```
        20      Q.   I show you what's been marked as Kotkin
        21  Deposition Exhibit 22 and ask you to look at it and tell
        22  me if you recall seeing this document before.
        23      A.   I do not remember the document.
        24      Q.   It purports to be an email from Michelle
        25  Shepherd to you dated 11/29/06.  Subject:  Chimerism
 00081:01  customer needs GM 4.0 assistance - Mass General Hospital.
        02          Do you see that?
        03      A.   I do see that.
        04      Q.   Do you have any reason to believe you did not
        05  receive this email in the normal course of your job
        06  responsibilities on or about 11/29/06?
        07      A.   No.
        08      Q.   Do you have an understanding of what the word
        09  Chimerism means?
        10      A.   I recognize the word, but to give a definition,
        11  no, I would be unable to do so.
        12      Q.   How do you recognize the word?
        13      A.   I know I saw it back in my studies.
        14      Q.   You indicated earlier that anyone using
        15  GeneMapper 4.0 would be a non-HID customer; right?
        16      A.   Correct.
        17      Q.   And that's what this email said, this particular
        18  customer at Mass General Hospital was using?
        19      A.   Yes, in the subject line it says GeneMapper 4.0
        20  assistance.
        21      Q.   And they were using Profiler Plus as the STR
        22  product?
```

**22. PAGE 81:24 TO 81:25  (RUNNING 00:00:03.845)**

```
        24      A.   According to this email, it references Profiler
        25  Plus panels and bins.
```

**23. PAGE 113:18 TO 115:06  (RUNNING 00:02:21.495)**

```
        18      Q.   I show you what's been marked as Kotkin
        19  Deposition Exhibit 38.  Would you take a look at that and
        20  let me know if you have seen this document before?
        21      A.   No, I do not remember it offhand.
        22      Q.   This is an email string from April Orbison at
        23  the top to you dated 12/20/07.  Do you see that?
        24      A.   Yes, I do.
        25      Q.   Do you have any reason to believe you didn't
 00114:01  receive this email string in the normal course of your
        02  job responsibilities?
        03      A.   No.
        04      Q.   Who's April Orbison?
        05      A.   She is also a field application specialist.
        06      Q.   Did you know her or do you know her?
        07      A.   I do know her.
        08      Q.   And in her email to you, she's asking you to
        09  look at the email that's attached and letting her know
        10  what you think.  Do you see that?
        11      A.   Yes.
        12      Q.   Do you recall doing that?
        13      A.   I don't remember.
        14      Q.   Would you have done that in writing or would you
        15  have done that verbally?
        16      A.   I don't know in particular.  In general emails
        17  were easier for me due to my travel schedule.  Again,
        18  with business hours, emails are typically easier, but in
        19  this actual case, I'm sorry to say I don't remember.
        20  Going back to 2007 with many of these unfortunately it's
        21  difficult for me to remember exactly what I did and
        22  didn't do.
```

CONFIDENTIAL                                                                 page 7

## Promega Corporation v. Life Technologies Corporation

```
23      Q.   Would you turn to the second page of the
24   exhibit, please.  And this is the email that they are
25   asking you to look at.  The second paragraph says:  I
00115:01   have a customer who is considering POP7 on the 3130 with
02   Identifiler for bone marrow engraftment.
03          Do you see that?
04      A.   Yes, I do.
05      Q.   Bone marrow engraftment is not a forensic
06   application; is it?
```

**24.  PAGE 115:08 TO 115:16  (RUNNING 00:00:32.951)**

```
08      A.   No.
09      Q.   And in the third paragraph it says originally
10   this site was planning to use Promega kits for bone
11   marrow engraftment, but I think they will consider
12   AmpFLSTR kits.  Do you see that?
13      A.   I do.
14      Q.   Did you get involved in situations where sales
15   force for Applied Biosystems was trying to sell Applied
16   Biosystems kits instead of Promega kits to customers?
```

**25.  PAGE 115:18 TO 115:23  (RUNNING 00:00:12.136)**

```
18      A.   I normally did not get involved with the sales.
19   Typically my role would come in afterwards or supporting
20   any questions that the customer may have.
21      Q.   Okay.
22      A.   Regardless of the application in which they're
23   using it.
```

**26.  PAGE 116:03 TO 116:09  (RUNNING 00:00:15.684)**

```
03      Q.   You indicated that you normally weren't involved
04   in sales, but would answer technical questions or support
05   if requested?
06      A.   Uh-huh.
07      Q.   My question is:  The email, which is the first
08   page of this exhibit, is such an example of that; is it
09   not?
```

**27.  PAGE 116:11 TO 116:17  (RUNNING 00:00:23.769)**

```
11      A.   Yes, she's asking my opinion.
12      Q.   And you don't recall whether you provided an
13   opinion or not?
14      A.   No, I do not.
15      Q.   At the time of December '07, were you aware of
16   any customers using Applied Biosystem products for bone
17   marrow engraftment?
```

**28.  PAGE 116:19 TO 116:23  (RUNNING 00:00:13.909)**

```
19      A.   I would not know what application they were
20   using it in.  They may be using our kits, but I wouldn't
21   necessarily know for what purpose.
22      Q.   Well, you might not necessarily know, but here
23   you are being told; right?
```

**29.  PAGE 116:25 TO 116:25  (RUNNING 00:00:00.901)**

```
25      A.   Yes.
```

**30.  PAGE 119:25 TO 121:23  (RUNNING 00:03:04.465)**

```
25      Q.   I show you what's been marked as Kotkin
00120:01   Deposition Exhibit 40.  Take a minute to look at it and
02   let me know if you've seen this before.
03      A.   I recognize it to be minutes from a conference
04   call.  As to the exact document, I don't remember it.  I
```

PTX1352_0008

## Promega Corporation v. Life Technologies Corporation

```
05   don't remember the phone call.
06        Q.   It's minutes for -- described as the All HID
07   Sales/Service/Support/Product Group; correct?
08        A.   Correct.
09        Q.   And the date was Monday, March 17th, 2008;
10   right?
11        A.   Correct.
12        Q.   And it shows that you attended the call; right?
13        A.   Correct.
14        Q.   And the third item from the bottom of the first
15   page has the name Melissa.  Do you see that?
16        A.   I do.
17        Q.   Is that you?
18        A.   That is.
19        Q.   And it says:  Scheduled to GM ID webexes for
20   non-HID HID customers initial exposure to S/W.
21             Do you see that?
22        A.   I do.
23        Q.   Does the S/W refer to software?
24        A.   It does.
25        Q.   And did you schedule two -- strike that.
00121:01           What does GM ID mean?
02        A.   GeneMapper ID is our specific analysis software.
03   So the similar program of GeneMapper, GeneMapper ID is
04   specific for forensic customers working in crime labs and
05   databasing labs.
06        Q.   So what -- for whom were you scheduling webexes?
07        A.   I don't know.  I don't know if there's supposed
08   to be a comma in there so it's a non-HID HID customer.
09   From looking at this, it looks like I was showing a
10   customer GeneMapper ID software, so I don't know what
11   application, what STRs we went over.  I was just showing
12   them the software.
13        Q.   So you don't know what non-HID HID customers
14   refers to?
15        A.   No, I do not.  I do not remember.
16        Q.   Did you do these two webexes around the time
17   that these minutes were taken in March of 2008?
18        A.   I don't remember personally doing them, but if
19   it's in the document, then most likely I did.  But I
20   can't say when or whom -- with whom I did it with.
21        Q.   So you don't remember the names of the customers
22   that you showed the software to?
23        A.   No, I do not.
```

**31. PAGE 156:22 TO 157:15  (RUNNING 00:01:24.241)**

```
22        Q.   Let me show you what the Court Reporter has
23   marked as Kotkin Exhibit 52.  Please take a moment to
24   look at it and let me know if you recall seeing this
25   document before.
00157:01        A.   I vaguely remember this document.  I remember
02   Lisa running studies.
03        Q.   Okay.  And this is an email from Lisa Calandro
04   -- I'm sorry, from Lisa Ortuno to you and the others
05   listed here dated April 21, 2010; correct?
06        A.   Correct.
07        Q.   And the subject of the email is 3500 research
08   instrument data and then it lists 50 CM POP7 for ID, ID
09   Plus 28 and 29, MiniFiler and Yfiler and AL for NGM.
10             Do you see that?
11        A.   I do.
12        Q.   Just so it's clear what all this means, could
13   you tell me what each of those -- what your understanding
14   of what each of those references mean starting with 50cm
15   POP7 for ID.
```

## Promega Corporation v. Life Technologies Corporation

**32. PAGE 157:17 TO 158:07 (RUNNING 00:00:51.091)**

```
      17      A.   My understanding of reading that subject line is
      18  that with the 3500 instrument, which is another capillary
      19  electrophoresis instrument, that she looked at a
      20  50-centimeter array using POP7 for Identifiler,
      21  Identifiler Plus at 28 cycles and also 29 cycles,
      22  MiniFiler and Yfiler.  I do not know exactly what she
      23  means in the parentheses.
      24      Q.   NGM is another STR kit; correct?
      25      A.   Correct.  But I'm unsure what she means by the
00158:01  AL for NGM.  I could guess, but I'm not exactly sure what
      02  she meant by that.
      03      Q.   Okay.  You said you were aware of Lisa Ortuno
      04  running studies; correct?
      05      A.   Yes, correct.
      06      Q.   And you meant at this time period; right?
      07      A.   I would assume so, yes.
```

**33. PAGE 158:03 TO 159:01 (RUNNING 00:01:25.188)**

```
      03      Q.   Okay.  You said you were aware of Lisa Ortuno
      04  running studies; correct?
      05      A.   Yes, correct.
      06      Q.   And you meant at this time period; right?
      07      A.   I would assume so, yes.
      08      Q.   Okay.  In April of 2010, did you have an
      09  understanding as to what the purpose of those research
      10  studies were?
      11      A.   My understanding was so that we could better
      12  support any customers working with different
      13  configurations.
      14      Q.   All of these configurations are using a POP7;
      15  correct?
      16      A.   If I'm understanding the subject line correctly,
      17  yes.
      18      Q.   Okay.  Look at the first sentence of the email.
      19  Where it references I ran an STR kits (positive controls
      20  and allelic ladders) on the 3500 research box in he 600
      21  building using a 50cm POP7 configuration.
      22      And I believe there's a typo.  It should read on
      23  the 3500 research box in the 600 building.  But I read it
      24  the way it was written.
      25      Does that refresh your recollection that all of
00159:01  the STR kits were run on a POP7 configuration?
```

**34. PAGE 159:04 TO 159:17 (RUNNING 00:00:42.936)**

```
      04      A.   According to what Lisa typed, yes, that's what
      05  she's telling me.
      06      Q.   And if it was a POP7, again those are non-HID;
      07  correct?
      08      A.   Correct, on the 3500 that is a correct
      09  statement.
      10      Q.   The second to the last sentence of that
      11  paragraph says:  This is to get a better feel for what
      12  the data looked like for our non-HID customers who want
      13  to try this.  Do you see that?
      14      A.   I do.
      15      Q.   Were you aware at the time of non-HID customers
      16  who were interested in trying any of those
      17  configurations?
```

**35. PAGE 159:19 TO 159:24 (RUNNING 00:00:22.224)**

```
      19      A.   Not specifically, but it was only a matter of
      20  time for customers to start taking their STRs and running
      21  them on the 3500.  The 3130s are within five years will
```

PTX1352_0010

## Promega Corporation v. Life Technologies Corporation

```
         22  be discontinued.
         23       Q.   Okay.  So was the research that Lisa Ortuno was
         24  doing relating to a newer version of the instrument?
```

**36.  PAGE 160:01 TO 160:02  (RUNNING 00:00:06.563)**

```
00160:01       A.   Yes, a 3500 is a newer version of a capillary
      02  electrophoresis instrument.
```

**37.  PAGE 178:03 TO 178:14  (RUNNING 00:00:38.246)**

```
         03       A.   I recall this document and it was to several
         04  people.
         05       Q.   From Lisa Ortuno; correct?
         06       A.   Correct.
         07       Q.   And it was her research on the 3500 using
         08  several of the STR kits and a POP7; correct?
         09       A.   And a 50 centimeter array.
         10       Q.   Yes.  And in the second line of the email,
         11  there's reference to Building 600, do you see that?
         12       A.   I do.
         13       Q.   Did you know if that is a Life Technologies or
         14  Applied Biosystems facility that she's referring to?
```

**38.  PAGE 178:17 TO 178:22  (RUNNING 00:00:16.283)**

```
         17       A.   It was an Applied Biosystems building and now is
         18  a Life Technologies building.
         19       Q.   Okay.  And where is that located?
         20       A.   That is Foster City.
         21       Q.   And Building 600, is that the laboratory
         22  building?
```

**39.  PAGE 178:24 TO 179:03  (RUNNING 00:00:16.434)**

```
         24       A.   Building 600, if I have my numbers correct, is
         25  our training facility in which we have instruments to our
00179:01  disposal.
      02       Q.   So it's the building in which this research was
      03  performed; correct?
```

**40.  PAGE 179:05 TO 179:05  (RUNNING 00:00:03.000)**

```
         05       A.   According to Lisa, that's what she's stating.
```

**41.  PAGE 211:06 TO 212:09  (RUNNING 00:01:38.501)**

```
         06       Q.   You have stated several times today that what
         07  you've referred to as validated protocols.  What do you
         08  mean by validated protocols?
         09       A.   For the forensic community, we run our samples
         10  under a certain criteria or chemistry so that this way
         11  when we show them to the customers, the forensic
         12  community, they know that we have run a set of samples
         13  with the chemistry, the instrument and the software and
         14  gotten accurate results, okay?  So that's -- by doing all
         15  that, that's a validated procedure.
         16       Q.   Okay.  Are you aware of any forensic customer of
         17  Applied Biosystems that does not use validated protocols
         18  for its forensic lab work?
         19       A.   Yes, I am.
         20       Q.   Which ones?
         21       A.   I can tell you what I know that they change.  I
         22  don't know exactly which labs do what.  I wouldn't trust
         23  my memory on that.
         24       Q.   Okay.  What do you know about what they changed?
         25       A.   Some labs will reduce reactions, the volume of
00212:01  the amplification reaction, they will reduce that.  So
      02  let's say for Profiler Plus the reaction volume is
      03  50 microliters, they will reduce it to 25.
```

PTX1352_0011

## Promega Corporation v. Life Technologies Corporation

```
04            So what happens when this lab wants support,
05      they're troubleshooting their data.  One of the first
06      things we are going to ask them to do is run it under the
07      full reaction, remove the variable and then we'll
08      troubleshoot from there because we have no data to
09      support that 25 microliter reaction.
```

### 42. PAGE 213:03 TO 213:16  (RUNNING 00:00:49.525)

```
03            Q.   Are you aware of any other modification or
04      variance from the validated protocols used by the
05      forensic customers of Applied Biosystems?
06            A.   Some labs may change how long they inject a
07      sample for versus the default times we have on our
08      instruments.  Some labs do that due to the overall
09      sensitivity of the instrument.  And then some labs do it
10      sample specific.
11            When it's sample specific, the issue isn't
12      really the sensitivity of the instrument, it's the
13      amplification of the sample to begin with, so
14      scientifically they should go back and re-amp.  So that
15      would be a modification that we don't necessarily
16      support.
```

TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:35:51.080)

CONFIDENTIAL

PTX1352_0012

**Promega Corporation v. Life Technologies Corporation**

 **Kurutz, Keith (Vol. 01) - 11/16/2011**                      1 CLIP  (RUNNING 00:28:53.184)

 QC020412



**KURUDES**                    **49 SEGMENTS  (RUNNING 00:28:53.184)**

**1. PAGE 4:03 TO 5:13  (RUNNING 00:01:17.619)**

```
03              THE VIDEOGRAPHER:  We are on the record
04      at 9:04 a.m.  Today's date is November 16th, 2011.
05      This is disk No. 1 of the deposition of Peter
06      Kurutz.  This deposition is being taken in the
07      matter of Promega Corporation vs. Life Technologies
08      Corporation, et al.  This matter is pending in the
09      United States District Court for the Western
10      District of Wisconsin, Case No. 10-CV-281.
11              This deposition is taking place at the
12      offices of Brown & Jones Reporting located at
13      735 North Water Street, Milwaukee, Wisconsin.
14              My name is John Spohnholtz, Videographer
15      for Brown & Jones Reporting, and the Court Reporter
16      is Peggy Mitchell.
17              Will counsel please state their
18      appearances, and whom they represent, beginning with
19      Plaintiff's counsel, and then the Reporter will
20      swear in the witness.
21              MR. CARROLL:  Pete Carroll representing
22      Promega.
23              MR. McCARTHY:  Michael McCarthy
24      representing Defendant Life Technologies and the
25      witness, Keith Kurutz.
00005:01              KEITH KURUTZ, called as a witness herein,
02      having been first duly sworn on oath, was examined
03      and testified as follows:
04                      EXAMINATION
05   BY MR. CARROLL:
06   Q   Good morning, Mr. Kurutz.
07   A   Good morning.
08   Q   Are you currently employed?
09   A   Yes, I am.
10   Q   And where is that?
11   A   Life Technologies.
12   Q   Okay.  And where do you currently live?
13   A   Brookfield, Wisconsin.
```

**2. PAGE 6:06 TO 7:01  (RUNNING 00:00:50.601)**

```
06   Q   All right.  Why don't we just go over your
07       background a little bit.
08              Where did you do your undergrad?
09   A   University of Wisconsin-Madison.
10   Q   Okay.  And what did you do it in?
11   A   Degree in biology with an emphasis on molecular
12       biology.
13   Q   And did you do any lab work in the course of that
14       undergrad experience?
15   A   Yes.
16   Q   Okay.  Did that lab work involve biology?
17   A   Yes.
18   Q   Any PCR?
19   A   No.
20   Q   Okay.  And what were the years of your undergrad
21       period?
```

**CONFIDENTIAL**                                                                page 1

**PTX1353**                                              PTX1353_0001

## Promega Corporation v. Life Technologies Corporation

```
         22  A    2003 to 2007.
         23  Q    And then, when you finished your undergrad at
         24       UW-Madison, where'd you go?
         25  A    I worked for a -- a company called Menards for a few
00007:01          months until I was employed with Life Technologies.
```

**3. PAGE 7:18 TO 7:21  (RUNNING 00:00:08.298)**

```
         18            Okay.  So we're up to the point where
         19       you've joined Life Technologies.  What was your
         20       position at that time?
         21  A    Quality control analyst.
```

**4. PAGE 7:22 TO 8:07  (RUNNING 00:00:28.850)**

```
         22  Q    And what year was this now?
         23  A    2008.
         24  Q    So it was in that 2007/2008 period that you worked
         25       at that other company?
00008:01  A    Correct.
         02  Q    Okay.  Now, quality control, what did the quality
         03       control position entail?
         04  A    All of the various HLA product lines that our
         05       business produced.  I was responsible for testing
         06       all those product lines to make sure they met
         07       certain release criteria.
```

**5. PAGE 17:20 TO 18:07  (RUNNING 00:01:18.493)**

```
         20  Q    Okay.  Let me mark as Exhibit 1 something I found on
         21       the website.
         22            (Exhibit No. 1 was marked)
         23  BY MR. CARROLL:
         24  Q    Okay.  Let me show you what's been marked Exhibit 1,
         25       Mr. Kurutz.  At the bottom of this single page it's
00018:01          Bates stamped PRO072696.  And if you can just take a
         02       look at it.  My first question will be have you seen
         03       this before.
         04  A    Yes.
         05  Q    Okay.  And when have you seen this?
         06  A    It's from our website, as you state.  And I've been
         07       to our website before on various occasions.
```

**6. PAGE 20:16 TO 21:07  (RUNNING 00:00:46.754)**

```
         16  Q    And in the context of transplants then, these kits
         17       that are being sold, they're for real life cases
         18       where patients are getting transplants?
         19  A    Which kits in particular?
         20  Q    Well, you mentioned that one, for example, the renal
         21       biomarker.  That's for real life cases?
         22  A    It can be used for both clinical applications and
         23       research applications.
         24  Q    Okay.  What about the SeCore?
         25  A    Same thing.  Clinical and research.
00021:01  Q    Okay.  And in the case where it's used for clinical,
         02       that could be a transplant lab that's actually doing
         03       transplants?
         04  A    Correct.
         05  Q    Okay.  And would SeCore be used only before
         06       transplant?
         07  A    Yes.
```

**7. PAGE 23:23 TO 24:20  (RUNNING 00:01:02.238)**

```
         23  Q    Okay.  Now, did there come a time when you left this
         24       QC position and moved on to another position at Life
         25       Tech?
00024:01  A    Yes.
```

**CONFIDENTIAL**                                                                           **page 2**

## Promega Corporation v. Life Technologies Corporation

```
02   Q    And when was that?
03   A    Spring, summer time frame of 2009.
04   Q    And how did that happen?
05   A    There was a position, a field applications
06        specialist position open, and I applied for it.
07   Q    And what's a field application specialist?
08   A    We are tasked with assisting customers,
09        troubleshooting, product demonstrations, product
10        trainings, et cetera.
11   Q    Okay.  And would these field application specialists
12        do tech support?
13   A    At the time of hire, yes.
14   Q    That's changed?
15   A    Correct.
16   Q    And when did that change?
17   A    Beginning of this year.
18   Q    Okay.  And why did that change?
19   A    To align ourselves more with the rest of the field
20        application specialists within Life Technologies.
```

**8. PAGE 25:19 TO 26:17  (RUNNING 00:00:44.945)**

```
19   Q    Okay.  Now, I take it you got this position, the
20        field application specialist position?
21   A    Yes.
22   Q    And in that role did you have occasion to visit
23        labs?
24   A    Yes.
25   Q    Okay.  And did you have occasions to visit
00026:01       transplant labs?
02   A    Yes.
03   Q    And did these transplant labs purchase the HLA kits
04        we've been talking about this morning?
05   A    Yes.
06   Q    Okay.  And did you learn that these transplant labs
07        were using these kits in real life situations?
08   A    Yes.
09   Q    And these were in the context of testing donors and
10        recipients for transplants?
11   A    Yes.
12   Q    Bone marrow transplants?
13   A    Yes.
14   Q    Kidney transplants?
15   A    Yes.
16   Q    Any other transplants?
17   A    Liver, heart, lung.
```

**9. PAGE 35:18 TO 36:08  (RUNNING 00:00:28.762)**

```
18   Q    Okay.  Lisa Ortuno.  Do you see that name?
19   A    Yes.
20   Q    Have you interacted with her?
21   A    Yes.
22   Q    In the past?
23   A    Yes.
24   Q    And in what context?
25   A    Same as Ellen.  Various, you know, face-to-face
00036:01       company meetings.  Spoken to her on the phone also.
02   Q    Okay.
03   A    E-mail communication.
04   Q    Any communications of a technical nature involving
05        products?
06   A    Lisa, yes.
07   Q    And what were those products?
08   A    In particular human identification STR kits.
```

CONFIDENTIAL                                                                                        page 3

**Promega Corporation v. Life Technologies Corporation**

**10. PAGE 36:09 TO 36:10  (RUNNING 00:00:05.242)**

```
09   Q    And how did that come about?  How did you happen to
10        be speaking with Lisa about STR kits?
```

**11. PAGE 36:12 TO 37:18  (RUNNING 00:01:31.023)**

```
12             THE WITNESS:  Our HLA customers and
13        Lisa's HID customers have a common interest with the
14        type of tests that they carry out, in particular the
15        instrument that it's run on, the CE instrumentation.
16             Our HLA customers, when we go to
17        demonstrate our SeCore product line in particular,
18        like to know whether or not the STR products will
19        also run with minimal configuration on the same
20        piece of instrumentation.
21   BY MR. CARROLL:
22   Q    And why is that?
23   A    It -- most -- most labs, HLA labs in particular,
24        don't have the money to purchase multiple pieces of
25        instrumentation.  So they want to be able to run
00037:01   both assays on the same instrument with as little
02        work as necessary.
03   Q    Okay.  So it's a convenience and financial issue?
04   A    Yes.
05   Q    Okay.  And, in fact, for the SeCore product that
06        we've talked about this morning, are there
07        instruments that you can run that SeCore HLA test on
08        that you can also run STR kits on?
09   A    Yes.
10   Q    And what instrument is that?
11   A    The 3500 series.
12   Q    Okay.
13   A    3130 series.  3100 series.  3730 series.  CE
14        instrumentation.
15   Q    What about the 310?
16   A    Yes.  It's very rarely used, though.
17   Q    Kind of an old machine?
18   A    Yes.
```

**12. PAGE 37:19 TO 38:07  (RUNNING 00:00:44.939)**

```
19   Q    Okay.  Now, you mentioned there's a -- these
20        customers, these clinical customers, have this
21        common interest between HLA testing and STR testing.
22        Why is that?
23   A    HLA customers use STR products for a particular type
24        of test that they carry out in their HLA labs.
25   Q    And what's that?
00038:01   A   Chimerism testing.
02   Q    And how did you learn about that?
03   A    Various discussions with labs that I visited.
04   Q    So is it fair to say you would go into a lab as an
05        HLA FAS guy, and be talking about the HLA kits, and
06        you would also learn about what the clinical lab
07        would be doing with STR kits?
```

**13. PAGE 38:09 TO 38:09  (RUNNING 00:00:00.787)**

```
09             THE WITNESS:  Sure.
```

**14. PAGE 38:11 TO 39:06  (RUNNING 00:00:58.580)**

```
11   Q    And how would you learn that?
12   A    Through what I just mentioned.  So a demonstration
13        of, you know, our SeCore kit in particular might
14        lead to a discussion or a question from the customer
15        simply asking, you know, will this instrument also
16        be able to run STR chemistry as well, with minimal
```

PTX1353_0004

## Promega Corporation v. Life Technologies Corporation

```
        17          changes to configuration, et cetera.
        18   Q      Okay.  So let's do some examples.  While you've been
        19          working for Life Tech, have you gone to a lab where
        20          they already have a machine that they're doing STR
        21          work on?
        22   A      Yes.
        23   Q      Okay.  And would this be a clinical lab?
        24   A      Yes.
        25   Q      And this would be for transplantation?
00039:01   A      Yes.
        02   Q      And you would come in and demo the HLA kits?
        03   A      Yes.
        04   Q      Okay.  And they would say great, but can we run that
        05          HLA kit you've demoed on this same machine we're
        06          doing the STR kits on?
```

**15. PAGE 39:08 TO 39:08 (RUNNING 00:00:00.873)**

```
        08                    THE WITNESS:  Correct.
```

**16. PAGE 56:07 TO 57:02 (RUNNING 00:01:00.636)**

```
        07   Q      Okay.  Can you name any other labs, other than
        08          Sharon Adams' lab, where you did a demonstration of
        09          the SeCore kit where the lab was a clinical
        10          transplant lab?
        11   A      DCI Laboratories.
        12   Q      Let's stop there.  What's DCI Laboratories?
        13   A      Dialysis Clinic, Inc.
        14   Q      Okay.  Where are they located?
        15   A      Nashville, Tennessee.
        16   Q      And you did a demo there for SeCore?
        17   A      Correct.
        18   Q      And they're a transplant lab?
        19   A      Correct.
        20   Q      And do they do real life donors and recipients?
        21   A      Yes.
        22   Q      And what kind of transplants?
        23   A      I'm not a hundred percent sure.
        24   Q      Okay.  Kidney?
        25   A      I don't know.
00057:01   Q      Okay.  And so you demoed the kit.  Did they have an
        02          ABI instrument already?
```

**17. PAGE 57:04 TO 57:11 (RUNNING 00:00:14.245)**

```
        04                    THE WITNESS:  Yes.
        05   BY MR. CARROLL:
        06   Q      And what were they using that instrument for?
        07   A      They were using it for HLA sequencing using our
        08          competitor's product.  They also use it for
        09          chimerism studies.
        10   Q      Using STR kits?
        11   A      Yes.
```

**18. PAGE 57:12 TO 57:17 (RUNNING 00:00:14.737)**

```
        12   Q      And were they ABI STR kits?
        13   A      I don't know.
        14   Q      And was this one of the customers that asked you,
        15          when you demoed, will your SeCore kit work on our
        16          ABI instrument?
        17   A      I don't recall.
```

**19. PAGE 58:17 TO 59:13 (RUNNING 00:00:51.283)**

```
        17   Q      Okay.  I interrupted you after DCI.  Go ahead.  Is
        18          there any other lab that you can recall?
        19   A      Georgetown University.
```

PTX1353_0005

**Promega Corporation v. Life Technologies Corporation**

```
       20  Q    Okay.  And is that in Washington?
       21  A    Yes.
       22  Q    And what kind of lab did you demo there?
       23  A    It's an HLA lab.
       24  Q    Okay.  Transplant?
       25  A    Yes.
00059:01  Q    Do you know the kind of transplants?
       02  A    No, I don't.
       03  Q    And were they using a competitor product?
       04  A    No.
       05  Q    How did you have occasion to do the demo there?
       06  A    This particular lab wanted to get into HLA
       07        sequencing, so they were new to HLA sequencing.
       08  Q    Did they have an ABI instrument?
       09  A    They purchased one from us.
       10  Q    Oh.  After your demo?
       11  A    Prior to.
       12  Q    Okay.  And why did they purchase it prior to?
       13  A    For the --
```

**20. PAGE 59:16 TO 59:21 (RUNNING 00:00:08.894)**

```
       16              THE WITNESS:  With the intent of bringing
       17        on an HLA sequencing assay.
       18  BY MR. CARROLL:
       19  Q    Okay.  Any other assays?
       20  A    They intend to bring on chimerism studies in the
       21        future.
```

**21. PAGE 76:17 TO 76:22 (RUNNING 00:00:21.641)**

```
       17  Q    Okay.  Now, of the four we've talked about, DCI,
       18        Georgetown, Miami, University of North Carolina, did
       19        any of those individuals ask you, during either the
       20        demo or the training, about the ability of the
       21        SeCore kit to work on the same machine because they
       22        were doing STRs on it?
```

**22. PAGE 76:24 TO 77:11 (RUNNING 00:00:28.615)**

```
       24              THE WITNESS:  Yes.
       25
00077:01  BY MR. CARROLL:
       02  Q    And which one was that?
       03  A    Georgetown.
       04  Q    Okay.  And what did you say?
       05  A    First off, Georgetown, again, was a new customer,
       06        new to sequencing.  They purchased the instrument
       07        for the purpose of sequencing, and they had an
       08        interest in bringing on chimerism studies in the
       09        future.  So their question was as simple as will
       10        this instrument work for both applications.  To
       11        which I responded yes.
```

**23. PAGE 79:06 TO 80:09 (RUNNING 00:01:01.118)**

```
       06  Q    So we've done DCI, Georgetown, Miami, North Carolina
       07        and Temple.  Any others?
       08  A    Stony Brook University.
       09  Q    Okay.  That's on Long Island?
       10  A    Yes.
       11  Q    And is that a clinical transplant lab?
       12  A    Yes.
       13  Q    Is that Larry Usher?
       14  A    Correct.
       15  Q    And you went on-site?
       16  A    Yes, I did.
       17  Q    To do a demo?
       18  A    Demo, correct.
```

CONFIDENTIAL                                                                                       page 6

## Promega Corporation v. Life Technologies Corporation

```
      19  Q    Demo.  And when was that, approximately?
      20  A    I believe it was this year.
      21  Q    Okay.
      22  A    That's as best as I can remember.
      23  Q    And you went into the lab to do the demo of the
      24       SeCore HLA kit?
      25  A    Yes.
00080:01  Q    And was Larry there?
      02  A    Yes, he was.
      03  Q    And did he attend the demo?
      04  A    Yes.
      05  Q    Were there others who attended the demo?
      06  A    Yes.
      07  Q    And who were they?
      08  A    Serafin.  And then also their director was in and
      09       out.
```

**24. PAGE 80:13 TO 81:06  (RUNNING 00:00:42.948)**

```
      13            And you said this was a demo.
      14  A    Yes.
      15  Q    And this was the SeCore HLA kit?
      16  A    Correct.
      17  Q    Okay.  And they already had a machine?
      18  A    Yes.
      19  Q    And what machine did they have?
      20  A    3500.
      21  Q    Okay.  Any initials after the 3500?
      22  A    Xl.
      23  Q    Xl.  Okay.  And what were they using the 3500 for?
      24  A    Chimerism at the time.
      25  Q    And was this with ABI STR kits?
00081:01  A    At the time of the demo, yes.
      02  Q    Okay.  And did they ask you whether the HLA SeCore
      03       kit could run on the 3500?
      04  A    Yes.
      05  Q    And what did you say?
      06  A    That's why I was there for the demo.
```

**25. PAGE 81:07 TO 82:02  (RUNNING 00:01:13.657)**

```
      07  Q    Did they end up purchasing -- putting a purchase
      08       order in for the SeCore HLA kit?
      09  A    It's to be determined still.
      10  Q    Okay.  Is that recent?
      11  A    It's -- it's been ongoing.
      12  Q    Okay.  Now, how do you kind of function in that time
      13       period where you've done the demo and they haven't
      14       made a decision?  Do you have any more to do in the
      15       lab?  Do you pass the baton to somebody else, a
      16       sales rep or something?  How -- or do you just leave
      17       the customer alone?
      18  A    I leave the customer alone outside of any questions
      19       they might have for whatever reason.
      20  Q    Okay.  Now we've done Stony Brook.  Any further ones
      21       that you've demoed the kit, the SeCore HLA kit?
      22  A    Not that I -- none that are coming to mind right
      23       now, no.
      24  Q    Okay.  Let me just run a couple by you.  Have you
      25       ever demoed HLA SeCore kit at Marshall
00082:01       University?
      02  A    No.
```

**26. PAGE 87:15 TO 88:07  (RUNNING 00:00:31.536)**

```
      15  Q    Labs, Inc.?
      16  A    Which state?
      17  Q    I think Colorado.
```

CONFIDENTIAL                                                                     page 7

## Promega Corporation v. Life Technologies Corporation

```
        18  A    Okay.
        19  Q    Do you know them?
        20  A    Yes.
        21  Q    Okay.  How do you know them?
        22  A    I carried out a SeCore demo there.
        23  Q    And when was that?
        24  A    This year.
        25  Q    Recently?
00088:01  A    I believe it was earlier in the year.
        02  Q    Okay.  Did they have an ABI machine?
        03  A    Yes.
        04  Q    And were they using it for STRs?
        05  A    Yes.
        06  Q    And you learned that when you did the demo?
        07  A    Correct.
```

**27. PAGE 88:08 TO 88:10 (RUNNING 00:00:09.981)**

```
        08  Q    And did they ask you whether the HLA SeCore kit
        09       could be used on that machine?
        10  A    I don't recall.
```

**28. PAGE 107:21 TO 108:09 (RUNNING 00:00:26.145)**

```
        21  Q    Sure.
        22  A    I just want to provide further clarification on
        23       something we were talking about before.
        24            So when we were talking about Stony Brook
        25       University?
00108:01  Q    Mm-mm.
        02  A    You had asked whether at the time of the demo they
        03       were using STR kits, AB STR kits.
        04  Q    Mm-mm.
        05  A    I said yes.  To just provide further clarification,
        06       the lab has since transitioned and are currently
        07       using Promega's STR kits for their chimerism
        08       studies.
        09  Q    Okay.  Thank you.
```

**29. PAGE 112:14 TO 112:18 (RUNNING 00:00:12.410)**

```
        14  Q    Okay.  So when you would do a demo, you wouldn't
        15       also do, like, a PowerPoint or video presentation?
        16  A    We do PowerPoints, yes.
        17  Q    That would be part of the demo?
        18  A    It can be, yes.
```

**30. PAGE 113:11 TO 113:16 (RUNNING 00:00:17.027)**

```
        11  Q    Okay.  In that PowerPoint, is the feature that the
        12       HLA SeCore kit can be run on the same ABI instrument
        13       as that for STRs pointed out?
        14  A    There is no such statement.
        15  Q    No such statement?
        16  A    No.
```

**31. PAGE 113:17 TO 114:14 (RUNNING 00:00:50.603)**

```
        17  Q    Why is that?
        18  A    I deal specifically with HLA products.  I have
        19       nothing to do with HID STR chemistry whatsoever.  So
        20       I have no right to speak to such a product.
        21  Q    Right.  But the customer wants to know.  You said
        22       earlier this morning the customer wants to know
        23       whether they have to buy a new machine or whether
        24       they can still use this HLA SeCore on the same
        25       machine they're STR testing on.
00114:01  A    Mm-mm.
        02  Q    Right?
```

## Promega Corporation v. Life Technologies Corporation

```
03   A    Mm-mm.
04   Q    It'll help if you say yes just because she doesn't
05        do very well with a mm-mm.
06   A    Okay.
07   Q    So that was your earlier testimony, right?
08   A    Yes.
09   Q    So if that's going to be a question, why wouldn't
10        they put that on the PowerPoint as one of the
11        features?
12   A    The STR -- again, the HID STR products are not one
13        of our HLA products.
14   Q    Right.
```

**32. PAGE 114:09 TO 114:14  (RUNNING 00:00:14.133)**

```
09   Q    So if that's going to be a question, why wouldn't
10        they put that on the PowerPoint as one of the
11        features?
12   A    The STR -- again, the HID STR products are not one
13        of our HLA products.
14   Q    Right.
```

**33. PAGE 114:15 TO 115:03  (RUNNING 00:00:50.196)**

```
15   A    Sure, it is an interest of our customers, the HID
16        STR products.  But, you know, it's up to the
17        customer in the end as to how to make that HID STR
18        product work on the CE instrument that is also
19        running our SeCore product.  All we train the
20        customer to is how to use that SeCore product on
21        that CE instrument.
22   Q    Right.  But if -- if the customer doesn't want to
23        buy a new machine, and they're using a competitor
24        product that does work on the machine they're doing
25        STRs, the natural question's going to be does your
00115:01   SeCore product also work on the instrument that
02        we're doing the STRs, right?
03   A    It can come up, yes.
```

**34. PAGE 115:04 TO 115:05  (RUNNING 00:00:02.989)**

```
04   Q    Okay.  But you don't have that in the PowerPoint?
05   A    No.
```

**35. PAGE 116:23 TO 117:04  (RUNNING 00:00:28.262)**

```
23   Q    How then did you learn about chimerism?
24   A    Through various discussions with our HLA customers.
25        So, you know, again, our HLA customers use our HLA
00117:01   specific products and then they also use HID's STR
02        chemistry as well.  So we hear about it from our
03        customers.  The fact that they use it.
04   Q    Okay.
```

**36. PAGE 128:09 TO 128:19  (RUNNING 00:00:22.387)**

```
09   Q    Mr. Kurutz, the Court Reporter has marked as
10        Exhibit 8 a single page document Bates stamped at
11        the bottom right corner Life-0124421.  Do you see
12        that?
13   A    Yes.
14   Q    And this appears to be an e-mail you authored?
15   A    Correct.
16   Q    On the from line there is Kurutz comma Keith?
17   A    Yes.
18   Q    That's you?
19   A    Yes.
```

CONFIDENTIAL

PTX1353_0009

**Promega Corporation v. Life Technologies Corporation**

**37. PAGE 129:07 TO 130:11 (RUNNING 00:01:49.379)**

```
07   Q    Do you recall the circumstances of this e-mail?
08   A    Yes, I do.
09   Q    And what was that?
10   A    So here's the case before where we brought up Stony
11        Brook University.  Prior to the demo that I
12        conducted, Stony Brook was using STR chemistry on
13        their 3500xl instrument.  They were looking to bring
14        on our SeCore assay.  And, again, the main question
15        that we get from our HLA customers when we go to
16        demo our SeCore on a CE instrument that is also
17        being used for chimerism is, you know, will -- will
18        these two assays work on the same instrument, and
19        what can be done to make that as easy as possible
20        for us.
21              So, essentially, what I was doing here
22        with this particular e-mail to Lisa was asking her
23        whether -- so we have a particular configuration or
24        a setup that we need on the CE instrument.  In this
25        case I mention 50-centimeter -- in this case, in
00130:01  this e-mail, I mention a 50-centimeter array with
02        POP6 or POP7 polymer.  That is a particular
03        configuration that we need for SeCore sequencing.
04        However, that is outside of how the HID division
05        intends their product to be used.
06              So my question to Lisa is whether or not,
07        you know, if the customer switches from a
08        36-centimeter array POP4, which is the validated
09        intended use with their -- their HID products, will
10        the HID products work with a 50-centimeter array of
11        POP6 or POP7.
```

**38. PAGE 139:11 TO 139:14 (RUNNING 00:00:15.016)**

```
11   Q    Okay.  Why do customers go to the POP6/POP7
12        50-centimeter configuration for STR kits?
13   A    So that they can run both STR kits and HLA
14        sequencing kits on the same instrument.
```

**39. PAGE 140:07 TO 140:20 (RUNNING 00:00:53.821)**

```
07   Q    Okay.  But one way to use what you have validated
08        for HLA SeCore is to switch over to POP6/POP7 in the
09        50-centimeter configuration?
10   A    With this particular instrument, yes.
11   Q    Okay.  But now the customer who does that, who's
12        working with STR kits, is no longer using what was
13        validated for STR kits, am I right?
14   A    Correct.
15   Q    So basically the customer has to make a choice.
16        They're either going to use the STR kits in the
17        validated configuration, and use the SeCore HLA in a
18        nonvalidated configuration, or use the SeCore HLA in
19        a validated configuration, and use the STR kits in a
20        nonvalidated configuration.
```

**40. PAGE 140:22 TO 140:22 (RUNNING 00:00:00.861)**

```
22              THE WITNESS:  Yes.
```

**41. PAGE 142:09 TO 143:02 (RUNNING 00:00:53.602)**

```
09   Q    Now, on the second sentence of this e-mail, you said
10        to Lisa, "I've spoken to you in the past when I had
11        questions about our HLA customers wanting to run our
12        sequencing kits," and I'm going to skip what's in
13        parentheses, "with the Identifiler kits for
14        chimerism studies."  Do you see that?
```

## Promega Corporation v. Life Technologies Corporation

```
        15  A    Yes.
        16  Q    Do you, in fact, recall speaking to Lisa in the past
        17       on this topic?
        18  A    We've spoke before.  I don't remember any particular
        19       discussions, though.
        20  Q    Okay.  Do you remember why you would've spoken to
        21       her before about HLA customers wanting to run the
        22       sequencing kits with the Identifiler kits for
        23       chimerism studies?
        24  A    Same explanation as this particular scenario.  So
        25       customer is running the sequencing assay with an STR
 00143:01        assay on the same instrument, how can they make that
        02       work.
```

**42.  PAGE 172:10 TO 172:14  (RUNNING 00:00:20.455)**

```
        10  Q    Mr. Kurutz, the Court Reporter has marked a
        11       three-page document Exhibit 12.  It's Bates stamped
        12       in the bottom right corner Life-0144409 and it goes
        13       to 44411.  If you just take a look at that.
        14  A    Yes.  Okay.
```

**43.  PAGE 174:14 TO 175:08  (RUNNING 00:00:58.585)**

```
        14  Q    I'm going to skip over the next part for just a
        15       second.  We'll come back to it.  The next paragraph
        16       says "There are of course many other HLA sites using
        17       the AB capital HID kits on either -- sorry, on other
        18       CE instruments."  Do you see that?
        19  A    Yes.
        20  Q    And what were you communicating there?
        21  A    So, again, "other CE instruments" being 3100 series,
        22       3130 series.
        23  Q    And you were saying there are many other HLA sites
        24       where the customer is using the ABI STR kits on the
        25       instrument as well?
 00175:01  A    You know what?  AB or Promega, but yes.
        02  Q    But this says AB.
        03  A    This particular e-mail, yeah.
        04  Q    Is it accurate?
        05  A    Yes.  There are HLA labs that use AB STR kits as
        06       well as Promega.
        07  Q    Many other as you say here?
        08  A    Yes.
```

**44.  PAGE 179:15 TO 180:04  (RUNNING 00:00:38.887)**

```
        15  Q    And just so we get the terminology right.  In that
        16       third paragraph at the top of the first page of what
        17       we've marked Exhibit 12, when you say AB HID kits,
        18       you mean STR kits from ABI?
        19  A    Yes.  Again, this is how I wrote this particular
        20       e-mail.
        21  Q    Okay.
        22  A    But, again, HLA labs use, you know, either AB or
        23       Promega.
        24  Q    Mm-mm.  Okay.  I just meant from terminology that
        25       HID kits means STR kits.
 00180:01  A    Yes.
        02  Q    And AB means Applied Bio.
        03  A    Yes.
        04  Q    Okay.
```

**45.  PAGE 188:15 TO 188:24  (RUNNING 00:00:34.900)**

```
        15  Q    I see.  Okay.  And is it fair to say this is a --
        16       not uncommon occurrence where you would come and do
        17       your HLA work, but you'd actually find out something
        18       about what they're doing with STR kits in the lab?
```

**CONFIDENTIAL**

## Promega Corporation v. Life Technologies Corporation

```
    19  A    Sure.  I mean, we overhear conversation all the time
    20       while we're in labs.
    21  Q    And then if it related to the STR kits, you'd try to
    22       relay that back to whoever in the HID team was
    23       responsible, you'd give them that information?
    24  A    If it's warranted.
```

**46. PAGE 188:25 TO 189:10 (RUNNING 00:00:32.527)**

```
    25  Q    Okay.  And, on occasion, you did?
00189:01  A  I can't recall anything specifically, but I may
    02       have.
    03  Q    Okay.  Did you visit other labs in a similar way as
    04       to this scenario with Stony Brook where you went in
    05       for the demo and you found out, to your surprise,
    06       about an issue with regard to STR kits that they
    07       brought up?
    08  A    No.  This is the only one that stands out.
    09  Q    Okay.  Can't remember any others?
    10  A    No.
```

**47. PAGE 205:21 TO 206:01 (RUNNING 00:00:15.118)**

```
    21  Q    Okay.  So basically this is a case where, in the
    22       course of you doing your -- and working out when
    23       you're going to do your HLA demo, you are able to
    24       provide the HID team some information about what the
    25       lab was doing with STR kits.
00206:01  A  Correct.
```

**48. PAGE 224:12 TO 224:18 (RUNNING 00:00:15.365)**

```
    12  Q    What do you mean by that, a research use only
    13       result?
    14  A    The instrument is intended to be used for research
    15       use only.
    16  Q    But it's sold to clinical labs.
    17  A    Yeah.
    18  Q    So it's not just being used for research.
```

**49. PAGE 224:21 TO 225:02 (RUNNING 00:00:13.221)**

```
    21            THE WITNESS:  The product is labeled as
    22       such.  We don't police our customers on how they use
    23       the product.
    24  BY MR. CARROLL:
    25  Q    But you've testified earlier today you know that
00225:01     some of your customers use it for clinical purposes.
    02  A    Correct.
```

TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:28:53.184)

CONFIDENTIAL

PTX1353_0012

## Promega Corporation v. Life Technologies Corporation

 **Ortuno, Lisa (Vol. 01) - 10/28/2011**                        1 CLIP  (RUNNING 01:45:49.703)

 QC020412



OV                              89 SEGMENTS  (RUNNING 01:45:49.703)

**1. PAGE 12:13 TO 12:16  (RUNNING 00:00:08.239)**

```
        13      Q.   Can you state your full name for the record.
        14      A.   Yes.  Lisa Marie Ortuno.
        15      Q.   Okay.  And where is your residence currently?
        16      A.   I live in Columbia, South Carolina.
```

**2. PAGE 14:23 TO 16:21  (RUNNING 00:01:44.389)**

```
        23      Q.   Okay.  Let's start with your background.  What
        24  did you get your undergraduate degree in?
        25      A.   In biology.
00015:01        Q.   Okay.  Any specific area?
        02      A.   No.  It was just general biology.
        03      Q.   Okay.  And where was that?
        04      A.   Kennesaw State University, north of Atlanta.
        05      Q.   Okay.  And what year?
        06      A.   That was in 19- -- what year was that?  It was
        07  a long time ago.  '92.
        08      Q.   Okay.  And then after undergrad, where did you
        09  go?
        10      A.   I worked for a while.  And then I went to the
        11  University of South Carolina to get my master's degree
        12  and then my Ph.D.
        13      Q.   Okay.  Where did you work, was it technical?
        14      A.   It was; at Emory University.
        15      Q.   Okay.  What type of work?
        16      A.   I was a lab technician.
        17      Q.   All right.  Was there a particular discipline
        18  that you were working at, at Emory?
        19      A.   It was in the neurology lab.
        20      Q.   Okay.  Did you have occasion to do PCR up to
        21  that point?
        22      A.   No.
        23      Q.   Okay.  So then you went on to the University of
        24  South Carolina, and what year was that?
        25      A.   That would have been 1996.
00016:01        Q.   Okay.  And you said first to get a master's
        02  degree?
        03      A.   Uh-huh.
        04      Q.   And what was that in?
        05      A.   That was also in biology with an emphasis on
        06  molecular biology and evolution.
        07      Q.   Okay.  Any particular aspect of molecular
        08  biology and evolution that you worked on?
        09      A.   Yeah.  It was mating systems in American
        10  alligators.
        11      Q.   All right.  Okay.  In the course of your work,
        12  your molecular biology work, did you have occasion to do
        13  PCR there?
        14      A.   Yes.  Quite a bit.
        15      Q.   Okay.  And then you said from your master's,
        16  you went on for more schooling.  Where was that?
        17      A.   I just stayed in the same lab.
        18      Q.   Same lab.  Okay.  Went on and got your Ph.D.?
        19      A.   I did.
        20      Q.   Okay.  And what year was that?
```

**PTX1354**                              PTX1354_0001

**Promega Corporation v. Life Technologies Corporation**

21      A.    2002.

**3.  PAGE 17:03 TO 17:10  (RUNNING 00:00:18.407)**

03      Q.    Okay.  So at this point, you're in South
04  Carolina, 2002, you're done with your Ph.D.  Where did
05  you go?
06      A.    I was actually hired by Applied Biosystems two
07  weeks before I got my Ph.D.
08      Q.    How did that happen?
09      A.    They came and did a road show, and I told them
10  I was going to need a job soon and I was hired.

**4.  PAGE 18:12 TO 19:11  (RUNNING 00:00:50.046)**

12      Q.    Okay.  And this job, was it still in South
13  Carolina or was it somewhere else?
14      A.    It was based out of my home in South Carolina,
15  but I traveled throughout the southeast and sometimes
16  throughout the country.
17      Q.    Okay.  And did you have kind of a set district
18  near your home that you were --
19      A.    For the most part.  It changed a little bit,
20  but yes, for the most part.
21      Q.    And that's southeast United States?
22      A.    That's correct.
23      Q.    As far as Florida?
24      A.    Yes.
25      Q.    Okay.  And you said it was customer service?
00019:01    A.    Yes.  It was training customers in their labs
02  whenever they would receive equipment from us.
03      Q.    Okay.  So if I understand that, then, there
04  would first be a salesperson who would sell something to
05  the customer?
06      A.    That's correct.  And we would assist with that
07  sometimes.
08      Q.    Okay.  And then when that equipment got into
09  the lab, then somebody had to train them how to use it,
10  and that was your job?
11      A.    Yes.

**5.  PAGE 20:06 TO 23:02  (RUNNING 00:03:13.374)**

06      Q.    So still in the 2002 period.  How long did you
07  keep the same position?  In other words, was this
08  something that went on for a number of years before you
09  changed positions or was this something just initial and
10  did you get increased responsibilities over time from
11  2002?
12      A.    So from 2002 to 2007, I worked in the same job,
13  and that title was field applications specialist.  And
14  that was this job that I was telling you about.  So I
15  did the -- what was, again, called fragment analysis
16  support and also sequencing support.  And these were for
17  government labs, university labs, research labs.  It was
18  mainly research labs, but not only research labs.  Then
19  in 2007, I changed roles and I went in-house to do
20  technical support for the forensics group.
21      Q.    Now, what do you mean by going "in-house"?  I
22  mean, weren't you in-house?
23      A.    Yeah.  I can clarify that.  So perhaps that
24  wasn't really accurate.  What I meant by that is I
25  changed roles.  I still worked out of my own home, but
00021:01  now instead of going out into the field to do trainings,
02  I worked out of my home where I received calls.  So they
03  wired up my home to receive calls from customers that
04  were working in forensics labs and other related labs,
05  so I can receive phone calls and answer questions and do

PTX1354_0002

## Promega Corporation v. Life Technologies Corporation

```
06    troubleshooting from home.
07       Q.   Okay.  With that kind of as bookends, the 2002
08    and then the 2007, let's talk about in the middle before
09    we go to the transition in 2007.
10       A.   Okay.  Excuse me.
11       Q.   This CE training that you would do, it would be
12    more than just how to run the column, I would presume.
13    Would it also involve read-out?
14       A.   Understanding the data, is that what you mean
15    by that?
16       Q.   Right.
17       A.   Yes.  Yes.
18       Q.   Okay.  And was there a software system that you
19    were familiar with for that?
20       A.   There was.  There were a couple of different
21    software packages, depending upon what the customer was
22    doing.
23       Q.   Okay.
24       A.   What kind of work they were doing.
25       Q.   Now, were you familiar with those software
00022:01    programs before you took the job at ABI?
02       A.   I was.
03       Q.   And how was that?
04       A.   Because, as a graduate student, I used them.
05       Q.   Okay.  Had you had occasion to get training in
06    software writing or software editing prior to working at
07    ABI?
08       A.   I'm not sure I understand.
09       Q.   Well --
10       A.   The actual software -- writing the software
11    itself?
12       Q.   Right.  So that you could actually change it or
13    customize it for the customer.
14       A.   No.
15       Q.   Okay.  So as part of this training when the
16    customer got a CE set up, you would go in and show them
17    how to read the data?
18       A.   I would show them how to use the software, how
19    to understand how it works with their data.  We didn't
20    do data interpretation necessarily, because that really
21    wasn't within the scope of what we were supposed to do,
22    but we explained to them how it worked and what the
23    output was supposed to look like, especially if we were
24    doing troubleshooting.  So oftentimes we were doing
25    troubleshooting, and if a customer had a problem, didn't
00023:01    understand something, then we would try to explain that
02    to them.
```

**6.  PAGE 28:12 TO 28:17  (RUNNING 00:00:12.595)**

```
12       Q.   You had mentioned forensic labs?
13       A.   Yes.
14       Q.   What about customers that were clinical labs,
15    had clinical in their name, did you have those types of
16    customers now also in this transition?
17       A.   I did.
```

**7.  PAGE 31:07 TO 34:20  (RUNNING 00:04:06.819)**

```
07       Q.   Okay.  Well, if we move away then from the
08    military and just talk about clinical customers using
09    the kits.  Let's clarify what the kits are.  The kits
10    are STR kits?
11       A.   Yes.
12       Q.   Okay.  And these clinical customers were using
13    the STR kits how?
14       A.   So -- may I make a clarification?
```

CONFIDENTIAL                                                                                    page 3

**Promega Corporation v. Life Technologies Corporation**

15      Q.   Oh, sure.
16      A.   Okay.  Or ask a question maybe.  So as far as
17  the term "clinical," I don't come from a background -- a
18  clinical or diagnostics background, so I don't know
19  specifically what that means.  So to me -- so what I'll
20  say is there were, for example, hospitals that were
21  using the kits.  Is that what you're referring to?
22      Q.   Sure.  That's fine.  It might say in the
23  customer name something clinic, it might say a
24  transplant lab, it might say a cancer center, it might
25  say a hospital or a --
00032:01      A.   Okay.
02      Q.   -- something like that.
03      A.   I just want to make sure we were talking about
04  the same thing.
05      Q.   Yeah.  No.  That's fine.
06      A.   Okay.  So, yes, people from hospitals or
07  facilities like you mentioned might call in and say that
08  they're interested in doing this application and I would
09  speak with them about that.
10      Q.   Okay.  And "this application" would be this use
11  of STR kits?
12      A.   Yes.
13      Q.   Okay.  Now, would these people, at this time
14  where you're now wired up at your home, would they --
15  these clinical customers, would they call you again
16  directly through this number?
17      A.   They would, or e-mail, because we had an e-mail
18  address as well.
19      Q.   Okay.  And how did you get positioned to
20  receive the clinical customers?  Was that something from
21  what you call the queue, I think, or was that something
22  that all of the people in support were getting at this
23  time?
24      A.   So it would depend on what time you're
25  referring to.  So again, I started in 2007, and so, very
00033:01  slowly over time, I would get more of these.  And what
02  ended up happening was that, since I had the research
03  background and experience using a variety of
04  applications, right, not just forensic applications, it
05  came to be understood that I understood the needs of
06  these customers maybe a little bit better.  And so
07  people would start coming to me over time about it.
08          It wasn't that there weren't any other people
09  in our group that would answer these questions or assist
10  in these types of applications, but I believe I was the
11  main contact for that, but not the only contact.
12      Q.   Okay.  And when you say your background was
13  better suited to these clinical customers, we talked a
14  little bit about your Ph.D.  Was there an aspect there
15  that helped out in particular with these clinical
16  customers from your Ph.D. work that gave you this
17  background?
18      A.   Yes.  You could say that.  So in the forensics
19  community, they're what's called a validated market.
20  And so the workflow is very streamlined.  You can't
21  deviate from the protocol.  You have to treat the DNA in
22  this way at this step and this way at this step, and you
23  can't deviate.  So other customers don't have those
24  restrictions.  And so perhaps one of these labs, like a
25  hospital, for example, was not willing to quantify the
00034:01  DNA in the way that we recommend as the validated
02  protocol for an HID lab.  Well, I might understand how
03  to do that.
04      Q.   Okay.
05      A.   Even something as simple as using what's called

## Promega Corporation v. Life Technologies Corporation

```
06   a spectrophotometer.
07      Q.   Okay.
08      A.   Right.  And the people in our HID group might
09   not have any experience with that.
10      Q.   I see.
11      A.   So it is a very simple thing like that.
12      Q.   Okay.  So in the case of -- if I understand
13   your testimony, in the case of a forensic lab, they
14   would have a specific way of quantitating the nucleic
15   acid that they were going to multiplex with the STR kit,
16   but the clinical labs could use some other technique for
17   quantitating?
18      A.   That's correct.
19      Q.   Okay.  And you could help them with that?
20      A.   That's true.
```

**8.  PAGE 36:10 TO 36:13  (RUNNING 00:00:21.025)**

```
10      Q.   Okay.  Let's start with 2006 and then I'm
11   moving into 2007.  In the 2006 time frame, were you
12   aware of clinical labs using ABI STR kits for a
13   nonforensic use?
```

**9.  PAGE 37:03 TO 37:09  (RUNNING 00:00:14.681)**

```
03          THE WITNESS:  I believe I was.
04   BY MR. CARROLL:
05      Q.   Okay.  Had you supported any of those yourself?
06      A.   I believe I did.
07      Q.   Okay.  And how would you do that in this period
08   before the transition?  Would you go into their labs?
09      A.   Yes.
```

**10.  PAGE 38:03 TO 38:25  (RUNNING 00:01:29.340)**

```
03      Q.   Dr. Ortuno, this is -- been marked by the
04   reporter as Exhibit 6A.  It's a single-page exhibit,
05   Bates stamped Life-0514984.  And this is just to see if
06   this rings a bell and helps you recall any of the
07   clinical customers that we've been talking about in
08   2006.
09      A.   Okay.  All right.
10      Q.   You had a chance to look it over?
11      A.   I did.
12      Q.   Okay.  So we're talking about Exhibit 6A.  And,
13   Dr. Ortuno, this e-mail talks about a Canadian, I
14   believe, customer, Saskatchewan Cancer Agency.  Do you
15   see that?
16      A.   I do.
17      Q.   Does that help you recall whether -- is a
18   potential customer that you might have worked with?
19      A.   Yes.
20      Q.   Okay.  And did you have occasion to go to
21   Saskatchewan Cancer Agency and work with them?
22      A.   No.  I've never been to Saskatchewan.
23      Q.   All right.  Did you have occasion to work with
24   them over the phone?
25      A.   The name looks familiar, so I believe I did.
```

**11.  PAGE 39:10 TO 39:19  (RUNNING 00:00:37.353)**

```
10          (Exhibit 6B was marked for identification.)
11   BY MR. CARROLL:
12      Q.   Okay.  Dr. Ortuno, let me show you what's been
13   marked Exhibit 6B.  This is, again, from the same period
14   and to see whether you would recognize this as a
15   potential customer of this clinical nature that you
16   might have worked with.
17      A.   Okay.  All right.
```

CONFIDENTIAL                                                                   page 5

## Promega Corporation v. Life Technologies Corporation

```
18      Q.   Did you have a chance to look at that?
19      A.   I did.
```

**12. PAGE 40:04 TO 41:05  (RUNNING 00:01:23.153)**

```
04      Q.   Okay.  And the subject line talks about GM 4.0.
05  Is that GeneMapper?
06      A.   It is.
07      Q.   Okay.  And is the 4.0 indicating some kind of
08  level?
09      A.   It indicates a particular version of
10  GeneMapper.
11      Q.   Okay.  And is that version of GeneMapper useful
12  for all uses, some uses?  How -- are they classified in
13  that kind of way on a use base?
14      A.   So GeneMapper, there -- what evolved are two
15  lines, what I call are types of GeneMapper software.
16  For a long time, there was only what we would internally
17  call the research version.  There was nothing official
18  about that.  We just kind of referred to it internally.
19      Q.   And that was the research version.  Did it have
20  a number?
21      A.   So like any software, it goes through several
22  versions.  Right?  So from 1.0 all the way through --
23  and at some point, they split.  Okay.  So GeneMapper 4.0
24  was a version that was sold primarily into research type
25  labs, okay, or nonforensic labs, any lab that was not
00041:01  doing forensic kits.
02      Q.   Okay.
03      A.   Versus the forensic version of GeneMapper,
04  which came to be known first as GeneMapper ID and then
05  another one called GeneMapper ID-X.
```

**13. PAGE 45:19 TO 49:07  (RUNNING 00:04:52.778)**

```
19      Q.   Okay.  So I skipped over Exhibit 5.  So let me
20  show this to you, Dr. Ortuno.  Exhibit 5 has been marked
21  by the reporter.  It's a two-page document, Bates
22  stamped Life-0223716 to 17.
23      A.   Okay.  2006.  All right.
24      Q.   Okay.  So we're talking about Exhibit 5.  And
25  let's go to the "Cc" line first, on the first page,
00046:01  which ends with the Bates Number 16.  Do you see that
02  you're listed as Lisa M. Davis there?
03      A.   I do.
04      Q.   And do you recall receiving this e-mail?
05      A.   Vaguely.
06      Q.   Okay.  Any question in your mind that this is a
07  standard e-mail from the company?
08      A.   No.
09      Q.   Okay.  Now, if you look at the "From" line,
10  that's a Catherine M. Caballero, C-a-b-a-l-l-e-r-o.
11  Who's that?
12      A.   She used to work for Applied Biosystems in the
13  HID group.  She was a field applications specialist for
14  a while, and I think she then did training, but she
15  hasn't been with Applied Biosystems for some years now.
16      Q.   Okay.  So at this time period, and it indicates
17  the e-mail was sent September 16, 2006, Ms. Caballero
18  would have been senior to you?
19      A.   Probably.  Yes.
20      Q.   Okay.  And then this is written to Thomas J.
21  McElroy.  Who is that?
22      A.   He worked in-house, meaning in Foster City at
23  Applied Biosystems, I believe, at that time, although
24  he -- yeah, I believe he was.  And he might have been
25  the GeneMapper manager or product manager, but I don't
```

## Promega Corporation v. Life Technologies Corporation

```
00047:01   know.
      02         Q.   Okay.  Was he senior to Ms. Caballero?
      03         A.   I don't know.
      04         Q.   Okay.  Not somebody you interacted with on a
      05   general basis?
      06         A.   No.  Not a whole lot.
      07         Q.   Okay.  Now on the "To" line -- sorry.  On the
      08   "Cc" line, there is a Melissa Kotkin.  Is that somebody
      09   you worked with extensively?
      10         A.   Yes.
      11         Q.   Okay.  Was she support or sales?
      12         A.   Support.
      13         Q.   Okay.  And then Michelle Shepherd, was she your
      14   supervisor?
      15         A.   She was when I left.  Yes.
      16         Q.   Okay.  How many years was Michelle Shepherd
      17   your supervisor?
      18         A.   From 2007, when I was hired into that position,
      19   until I left.
      20         Q.   Okay.  So she was on the hierarchy superior to
      21   you?
      22         A.   Yes.
      23         Q.   Okay.  Melissa, was she kind of at your level?
      24         A.   Yes.
      25         Q.   Okay.  And then Michael J. Hughes, where did he
00048:01   fit in?
      02         A.   He was a field applications specialist for the
      03   research side, so the side that I worked in previously.
      04   So we were -- we had the same position, field
      05   applications specialist, under what was called the
      06   genetic analysis group.
      07         Q.   Okay.  And I may have just picked up on it now,
      08   because I'm a little slow, but you said in your previous
      09   position, the research side.  Let me ask you about what
      10   you mean by that.
      11         A.   Okay.  So the company has several divisions,
      12   right, and so genetic analysis -- which is what it used
      13   to be called.  I don't know what it's called now -- was
      14   the group that would sell into the government market and
      15   academic universities.  And then we, as field
      16   applications specialists, would go do our training in
      17   those kinds of labs.
      18         Q.   Okay.
      19         A.   Then the -- another business unit was the human
      20   identification business unit, which came under different
      21   titles, depending on what date it was.
      22         Q.   Okay.  All right.  So with respect to Michael
      23   Hughes and the research side of the business, you think
      24   he might have come from that?
      25         A.   That's where he worked.
00049:01         Q.   That's where he worked.  You're sure about
      02   that?
      03         A.   Yes.
      04         Q.   Okay.  And then there is you, Lisa M. Davis.
      05         A.   Uh-huh.
      06         Q.   Okay.  That was your name at the time of 2006?
      07         A.   Yes.
```

**14. PAGE 53:19 TO 59:19  (RUNNING 00:07:16.144)**

```
      19         Q.   Here, let me help you again.  No problem.
      20         A.   Okay.
      21         Q.   The second paragraph of this asks about -- and
      22   I'm just reading now the second line -- "the work-around
      23   that Lisa Davis compiled for both GM version 3.7 and
      24   GM version 4.0."
      25         A.   Yes.
```

CONFIDENTIAL                                                        page 7

**Promega Corporation v. Life Technologies Corporation**

```
00054:01        Q.   This is why I thought you might be a code
      02   writer, by the way, when I saw this.
      03        A.   I can see why you'd think that.
      04        Q.   Okay.  So when I saw this, I assumed you had
      05   done something to the GeneMapper software in some way.
      06   I didn't know --
      07        A.   Okay.
      08        Q.   -- what it was referring to --
      09        A.   Okay.
      10        Q.   -- but it sounded like you modified it or done
      11   something --
      12        A.   Yeah.
      13        Q.   -- with the word "work-around" --
      14        A.   Okay.
      15        Q.   -- and they attributed it to you.  So again, I
      16   thought you're doing some kind of magic with the
      17   software to make it work.  So maybe you can explain.
      18        A.   No.  The magic, as you call it, was just
      19   providing those customers with files that they would
      20   import into GeneMapper and then you can make the
      21   analysis work.
      22        Q.   Okay.  And what were those files?  Where did
      23   those come from?
      24        A.   They came out of the forensic version of
      25   GeneMapper.
00055:01        Q.   Okay.
      02        A.   You would take them out of that program and
      03   send them to the customer and they would import them and
      04   then it would work.
      05        Q.   Okay.  So again, bear with me because I'm not a
      06   software guy, why would the GeneMapper version 4.0,
      07   which you said kind of split off for nonforensic --
      08        A.   Uh-huh.
      09        Q.   -- why would that need anything such as these
      10   files from the forensic?  In other words, now I'm kind
      11   of like, why did you split it off?  You see what I'm
      12   saying?  I'm trying to understand what is missing.  Why
      13   would you make a version for nonforensic and then have
      14   to go back and get some files to make it work?
      15        A.   Well, I can't speculate on why specifically
      16   what you're asking.  I just know that there was a
      17   version that was made specifically for forensics that
      18   was branched off from what was classically, again, I
      19   call the research version, and I imagine they had
      20   different programmers who had different scopes.
      21        Q.   Okay.
      22        A.   But I don't know why they made those decisions.
      23        Q.   Okay.  So we'll talk about why you made this
      24   decision.  Why did you go do this work-around?  Why --
      25   what prompted you to go get these files for these
00056:01   nonforensic customers and put it into GeneMapper 4.0?
      02        A.   Because these customers were running the HID
      03   kits and in order to do the analysis of the data, they
      04   needed to -- the full analysis of the data, they needed
      05   the files in order to complete that.
      06        Q.   Okay.
      07        A.   So as a part of customer service, I provided
      08   those files.
      09        Q.   And how did you learn that they needed these
      10   files to complete that work, if you recall?
      11        A.   You know, I don't recall exactly how I learned
      12   that, because I came in to the forensics group already
      13   knowing how to do that, and I don't recall if I learned
      14   it from another field applications specialist or where
      15   that initial knowledge came from.
      16        Q.   Okay.  Now, we've talked about GeneMapper
```

## Promega Corporation v. Life Technologies Corporation

```
17   version 4.0.  This is GeneMapper version 3.7.  Where
18   does that fit in the tree of GeneMappers?  Is that on
19   the forensic side or the nonforensic?
20       A.   Nonforensic side.
21       Q.   Okay.  And how does GeneMapper 3.7 differ from
22   GeneMapper 4.0, if you recall?
23       A.   So clearly 3.7 is an earlier version.  And then
24   for 4.0, the major difference was it enabled what's
25   called client server configuration.  So it was just some
00057:01  feature upgrades that the research -- again, I'm calling
02   them researchers -- those customers had been asking for.
03       Q.   Okay.
04       A.   Just the next version.
05       Q.   And these would have been these hospitals we're
06   talking about, et cetera, they'd be asking for this?
07       A.   They would have been given the option to choose
08   which version that they wanted, most likely.  And --
09   but, again, when I think of GeneMapper 4.0, the vast
10   majority of people that purchase that software are
11   probably researchers doing research fragment analysis or
12   those types of customers, but --
13       Q.   Okay.
14       A.   -- the hospital people got it as well.
15       Q.   Okay.  Now earlier when you said -- I didn't
16   stop you or interrupt you, but you used the frame -- the
17   term "HID kits," you're referring to the STR kits;
18   right?
19       A.   Yes.
20       Q.   Okay.  I just wanted to make clear --
21       A.   Sorry.
22       Q.   -- because we've got shorthand going on today.
23       A.   Yeah.
24       Q.   I'll be doing the same thing.
25       A.   We had multiple STR kits.
00058:01      Q.   Okay.  So now let me try to put together the
02   subject line and what's going on in this second
03   paragraph.  The second paragraph at the beginning says,
04   "The main issue that we need resolution on is whether or
05   not we can supply customers with" this "work-around."
06   And this is in the context of this, what Ms. Caballero
07   is calling nontraditional HID.  Do you remember this
08   episode at your time at ABI?
09       A.   I remember discussions about this.
10       Q.   Okay.
11       A.   What specifically about this he was thinking
12   about when trying to decide whether or not we would
13   provide this, I don't know.
14       Q.   Okay.  I assume -- well, I'll ask you:
15   Ms. Caballero, by referring to "nontraditional HID," is
16   referring to nontraditional human identification that
17   would be nonforensic?
18       A.   That's correct.
19       Q.   Okay.  So that would be for purposes other than
20   for human identification?
21       A.   Well, the kits are always used for some kind of
22   human identification, right, so for purposes of other
23   than DNA forensics labs and paternity labs.
24       Q.   Okay.  Now, the third sentence of the second
25   paragraph says, "We have been told by Eric Vennemeyer."
00059:01  Who is Eric Vennemeyer?
02       A.   He was another, I'll say, in-house person at
03   Applied Biosystems.  I don't know what his role was at
04   that time.
05       Q.   Okay.  So it goes on and says, "to hold off on
06   providing this work-around...until it is tested."  Do
07   you recall that?
```

**CONFIDENTIAL**

## Promega Corporation v. Life Technologies Corporation

```
08       A.   That is starting to sound familiar, yes.
09       Q.   Okay.  And did you want to provide it to the
10  customer at the time, if you recall?
11       A.   I wanted to help customers generate their data.
12       Q.   Okay.
13       A.   So...
14       Q.   And obviously if you generated this
15  work-around, you thought they needed it?
16       A.   It would help them.
17       Q.   Okay.  And then it goes on and says, "Because
18  these customers are already using nonvalidated systems."
19  What does she mean by that?
```

**15. PAGE 59:22 TO 61:13  (RUNNING 00:01:39.850)**

```
22           THE WITNESS:  So these labs -- okay.  So let me
23  explain "validated" one more time.
24  BY MR. CARROLL:
25       Q.   Okay.
00060:01     A.   Right.  So as I had mentioned earlier, the
02   forensic workflow we provide to customers for forensic
03   labs, we test every step along the way.  And it's every
04   minute detail.  And so, as I had mentioned, the hospital
05   labs might do something a little bit different, like
06   they're not going to quantify the same way.  They may
07   not run the CE instrument exactly the same way that we
08   recommend in the HID group.  And so that's what he's
09   referring to, that these hospitals are probably not
10   quantifying, using our Quantifiler kits.  They may not
11   be using the same polymer that we recommend, that kind
12   of thing.
13       Q.   Okay.  Just so we're clear on "polymer," this
14   would be the material that actually goes into the
15   capillary electrophoresis column?
16       A.   That's correct.
17       Q.   Okay.  And I take it ABI sold a variety of
18   polymer types?
19       A.   We did.
20       Q.   Okay.  And would some of those polymer types be
21   more suited to forensic uses versus nonforensic uses?
22   Did they separate out like that?
23       A.   There was only one polymer that was validated
24   for forensic use.
25       Q.   Oh.  And what was that?
00061:01     A.   It was called POP4.
02       Q.   POP4?
03       A.   Uh-huh.
04       Q.   P-O-P 4?
05       A.   That's correct.
06       Q.   Okay.  But there were other polymers that ABI
07   sold?
08       A.   There were.
09       Q.   Okay.  And were these polymers sold preloaded
10   or was this something the customer had to pour into the
11   capillary column?
12       A.   The customer chose that and put it on the
13   instrument themselves.
```

**16. PAGE 61:23 TO 62:19  (RUNNING 00:01:02.373)**

```
23       Q.   Okay.  And then the last part of that sentence
24   says, "they are willing to use a software work-around
25   that has not been tested."  Do you recall that, that
00062:01  customers, such as hospital customers who are going to
02   use STR kits, they were willing to use things that you
03   could help them with that weren't necessarily validated
04   for forensics?
```

**Promega Corporation v. Life Technologies Corporation**

```
05      A.   That's correct.
06      Q.   Okay.  And then the last sentence says, "For
07  what it is worth, customers have been successfully using
08   GM version 3.7 and GM version 4.0 for over a year now
09   with the files provided by Lisa and Mike."  Do I take it
10  then that, although they're talking about whether they
11  can do it, in fact, you've already got customers out
12  there doing it?
13      A.   Yes.
14      Q.   And this was as of 2006?
15      A.   Yes.
16      Q.   So essentially, you had already provided
17  nonforensic customers, like hospitals doing STR work,
18  this so-called work-around?
19      A.   Yes, I did.
```

**17. PAGE 63:05 TO 63:14 (RUNNING 00:00:35.327)**

```
05      Q.   Dr. Ortuno, before the break, we were looking
06   at Exhibit 5, and if we could still look at that a
07   little bit.  Down at the bottom of that document on the
08   first page, which ends with the Bates Numbers 16, there
09   is, up from the bottom, be like three lines, it says,
10  "Melissa and Michelle Shepherd will also maintain a
11  list" -- and I think there should be an "of" there -- of
12  "NTH customers and how often they are requiring
13  support."  Do you see that?
14      A.   I do.
```

**18. PAGE 63:15 TO 63:21 (RUNNING 00:00:25.083)**

```
15      Q.   Was such a list made, to your knowledge?
16      A.   Not that I've ever seen.
17      Q.   Okay.  So you didn't operate, at your time --
18  at any time when you were at ABI, with a list that would
19  identify nontraditional customers such as hospitals that
20  were using STR kits?
21      A.   No.
```

**19. PAGE 63:22 TO 64:16 (RUNNING 00:00:49.367)**

```
22      Q.   Okay.  And today we've been talking about those
23  customers as nonforensic customers, so let me just get a
24  little clarity around that.  Those nonforensic
25  customers, what type of purpose would they be putting
00064:01  the kit to in those hospitals?
02      A.   They would have done an application called bone
03  marrow engraftment monitoring.
04      Q.   Okay.
05      A.   Also called chimerism or BME.  Another
06  application, something called MCC --
07      Q.   Okay.
08      A.   -- which stands for maternal cell
09  contamination.
10      Q.   Okay.
11      A.   And another application that I supported was
12  something called cell line authentication.
13      Q.   Okay.  Anything else?
14      A.   Sample ID.
15      Q.   Okay.
16      A.   Just simple sample ID was another one.
```

**20. PAGE 65:21 TO 67:08 (RUNNING 00:01:51.446)**

```
21      Q.   Okay.  Okay.  All right.  Now, back to
22  Exhibit 5, the second line up from the bottom on the
23  first page that's Bates stamped for the number that ends
24  16, it says, "HID Tech Support forwards all NTH calls to
25  Melissa."  Do you see that?
```

PTX1354_0011

**Promega Corporation v. Life Technologies Corporation**

```
00066:01      A.   I do.
      02      Q.   Now, again, this document's marked September --
      03  dated September 16th, 2006.  Was that the way things
      04  were routed, to your knowledge, in 2006, that Melissa
      05  was getting all these nonforensic customer calls?
      06      A.   Well, I wasn't a part of the group at that
      07  time.
      08      Q.   Right.
      09      A.   Right.  So I don't remember being aware of that
      10  specifically.
      11      Q.   Okay.
      12      A.   But if that's how they did it, then...
      13      Q.   Well, let me ask you this:  In the transition
      14  when they wired your home up, how did Melissa, if at
      15  all, how did she fit into this group that was going to
      16  handle calls from nonforensic customers?
      17      A.   So when I joined, I became the second or third
      18  person doing remote tech support for HID.
      19      Q.   Okay.
      20      A.   Melissa was a field applications specialist,
      21  along with a handful of others, who would go out and do
      22  the training on site to these labs.  And so clearly,
      23  Melissa was doing a lot of that support for these labs
      24  before I came onboard and then we all just worked
      25  together --
00067:01      Q.   Okay.
      02      A.   -- to help them.
      03      Q.   And in your work with Melissa at ABI for the
      04  whole period, based on that, can you tell me if
      05  Melissa -- and this is Melissa Kotkin -- would she have
      06  then knowledge, prior to your transition in 2007, of how
      07  ABI supported these nonforensic labs, like hospitals for
      08  STR kits?
```

**21. PAGE 67:11 TO 67:25  (RUNNING 00:00:44.336)**

```
      11           THE WITNESS:  I don't know to what detail she
      12  would have been able to do that.
      13  BY MR. CARROLL:
      14      Q.   Okay.  And the reason I ask the question that
      15  way, just so you can see, I assume when you joined, you
      16  know, all of us have joined new teams, that you try to
      17  find out who your teammates are, ask what they know,
      18  what have they been doing in the past, have you ever
      19  seen this kind of thing before.  And so I'm asking the
      20  total knowledge that you got from joining that team and
      21  interacting with Melissa Kotkin.  On the basis of that,
      22  can you tell me:  Would she have had knowledge of how
      23  ABI supported nonforensic labs for STR kits prior to
      24  your transition into the team?
      25      A.   I believe she --
```

**22. PAGE 68:02 TO 68:02  (RUNNING 00:00:01.454)**

```
      02           THE WITNESS:  -- would have had some.
```

**23. PAGE 68:04 TO 68:14  (RUNNING 00:00:36.504)**

```
      04      Q.   Okay.  I had one more question on this
      05  document.  I just forgot it.  Oh, yes.  I've looked in
      06  other documents for this phrase "nontraditional."  Is
      07  that a phrase -- once you joined and made this
      08  transition, is that a phrase you used, this
      09  nontraditional language to indicate nonforensic
      10  customers?
      11      A.   Yes.  I'm sure I did.  And there were several
      12  ways that we designated them from nontraditional to
      13  nonforensic to non-HID.  There was no official
```

## Promega Corporation v. Life Technologies Corporation

```
    14   terminology.
```

**24. PAGE 84:10 TO 85:05  (RUNNING 00:01:00.861)**

```
    10        Q.   All right.  Dr. Ortuno, let me show you what
    11   the court reporter has marked as Exhibit Number 12.  It
    12   is a single-page document, Life-0253767.
    13        A.   Okay.
    14        Q.   Have you seen this document before?
    15        A.   Yes.
    16        Q.   And in what context?
    17        A.   This is an org chart, and it could have been
    18   shown at a meeting.  It could have been shown on a
    19   conference call.  There are any number of times and
    20   places that something like this would have been shown.
    21        Q.   Okay.  Now, at the bottom of the organizational
    22   chart, there is a date there.  I think it's 2006.  Do
    23   you see that?
    24        A.   Yes.
    25        Q.   And at that time -- you have a little box
00085:01   there, "Lisa Ortuno."  Do you see that?
    02        A.   Yes.
    03        Q.   And you're under "Michelle Shepherd" in this
    04   organizational chart?
    05        A.   Yes.
```

**25. PAGE 87:16 TO 88:09  (RUNNING 00:00:51.153)**

```
    16        Q.   Okay.  Did you have occasion to also keep
    17   informed some salespeople of your activities --
    18        A.   Yes.
    19        Q.   -- in this regard?
    20             And who would those people be?
    21        A.   They would be the sales reps that happened to
    22   be the account managers for that particular institution
    23   that I was working with.
    24        Q.   Okay.  And on this organizational chart, which
    25   we have marked as Exhibit 12, is the sales team that you
00088:01   just referred to that you interacted with represented?
    02        A.   There's been some change, but yes, many of the
    03   people are represented here.
    04        Q.   Okay.  So I see Dawn Waltman on the left side.
    05        A.   Correct.
    06        Q.   That's somebody you were interacting with
    07   regularly for these nonforensic customers for STR kit
    08   use?
    09        A.   Yes.
```

**26. PAGE 89:06 TO 89:13  (RUNNING 00:00:14.046)**

```
    06        Q.   All right.  And what about Annie Ingold?
    07        A.   Amie; yes.
    08        Q.   Amie?
    09        A.   I believe she is with the company, and I did
    10   interact with her frequently.
    11        Q.   For nonforensic customer support?
    12        A.   For all kinds of forensic and nonforensic
    13   customer support.
```

**27. PAGE 91:25 TO 92:13  (RUNNING 00:01:07.988)**

```
    25        Q.   Dr. Ortuno, I've got what's been marked by the
00092:01   court reporter Exhibit Number 14.  It is a single-page
    02   document, Bates stamped Life-0031290.  If you can take a
    03   look at that.
    04        A.   Okay.
    05        Q.   Okay.  Dr. Ortuno, on this particular document,
    06   the "From" line indicates Lisa M. Ortuno.  Do you see
    07   that?
```

PTX1354_0013

## Promega Corporation v. Life Technologies Corporation

```
08      A.   Yes.
09      Q.   And do you recall composing this e-mail?
10      A.   Very vaguely.
11      Q.   Okay.  No question in your mind, though, that
12 this is something you composed?
13      A.   No, no question.
```

**28. PAGE 92:21 TO 94:17 (RUNNING 00:02:42.489)**

```
21      Q.   Okay.  And the "To" line is Candia L. Brown.
22 Who is that?
23      A.   So Candia was a employee -- was an employee of
24 Applied Biosystems for a number of years.  She worked on
25 a number of products.  She was not specific to the HID
00093:01 group and, to my knowledge, she has not been there for
02 some years.
03      Q.   Okay.  And for what reason were you
04 communicating with Candia, if you recall?
05      A.   So stem cell work was a focus of the company
06 for a while and I imagine is still the same thing.  And
07 there are a number of applications and technologies that
08 are used for various facets of stem cell work, and she
09 was clearly involved with that.  And so I believe that
10 was the purpose of this interaction.
11      Q.   And was one of the relevant technologies to
12 stem cell work cell line authentication with ABI STR
13 kits?
14      A.   So it was mentioned as a tool that could be
15 used for identifying the cells, yes.
16      Q.   Okay.  Now, in the "Cc" line, there is
17 "Michelle Shepherd," who was your supervisor at this
18 time?
19      A.   This is 2008.  So yes, that's correct.
20      Q.   So was it your habit to copy Michelle Shepherd
21 in this way so she'd stay informed with what you were
22 doing?
23      A.   Yes, I often did.
24      Q.   Okay.  And at this point, you're married and
25 name is now Lisa Ortuno?
00094:01      A.   Yes.
02      Q.   Okay.  Now, in the second paragraph, it says,
03 "Anyway, I am not sure if you are aware, but Dawn
04 Waltman is the Sales Lead for the" HID's -- "HID
05 group's," quote, "Non-HID," space, "HID," all caps,
06 close quote, "accounts."  Do you see that?
07      A.   I do.
08      Q.   What on earth does "Non-HID HID" mean?
09      A.   So as I had referred to earlier, we've used
10 various terminology for institutions that are using
11 these HID kits, but they're not DNA forensic labs.  And
12 so this is another one of those terminologies, non-HID,
13 nontraditional, nonforensic HID accounts.
14      Q.   Got it.  Okay.  How was it that Dawn Waltman
15 became the sales lead for these non-HID accounts, if you
16 know?
17      A.   She was assigned that.
```

**29. PAGE 94:18 TO 95:03 (RUNNING 00:00:19.326)**

```
18      Q.   By whom?
19      A.   By Gerry Andros, is my understanding.
20      Q.   Okay.  So Gerry Andros, just so we get back --
21      A.   I'm sorry.  I need to pause for just a moment.
22      Q.   That's okay.
23      A.   I need to retract that.
24      Q.   Okay.
25      A.   Because I don't know that for sure.
```

CONFIDENTIAL                                                    page 14

**Promega Corporation v. Life Technologies Corporation**

```
00095:01      Q.   Okay.  You suspect it?
      02      A.   I'd just like to retract it, because I really
      03  am not sure at all about it.
```

**30.  PAGE 95:04 TO 97:04  (RUNNING 00:02:15.741)**

```
      04      Q.   Okay.  Not having worked in the company,
      05  though, I still have to ask you:  This doesn't just
      06  happen because Dawn Waltman wants to do something;
      07  right?  She has to get approval?
      08      A.   So all the sales reps are given opportunity to
      09  choose different projects that they would like to work
      10  on, specifically, projects or instruments or product
      11  lines.
      12      Q.   Okay.
      13      A.   So somehow within the sales group, they were --
      14  it was determined which salesman would do which thing.
      15      Q.   Okay.  But something like that would have to
      16  have been blessed by somebody senior to Dawn?
      17      A.   Yes.
      18      Q.   Okay.  Based on your experience at the company?
      19      A.   Yes.
      20      Q.   All right.  Now, the next sentence says, "This
      21  means she is a point person for sales for accounts using
      22  STR kits in nonforensics settings."  What does that mean
      23  to be a point person?  Is that internal, external?  What
      24  does that mean?
      25      A.   So what that means is whenever you're a point
00096:01  person for one of these applications or products, that
      02  means that if other people have a question about it,
      03  about the details of it, they would be the one that they
      04  would go to.
      05      Q.   So internally, another salesperson has a
      06  question, they go to Dawn?
      07      A.   Yes.
      08      Q.   Okay.  What about externally, is the point
      09  person still -- term still applicable here for Dawn?
      10      A.   Yes.  I think the accounts, depending on what
      11  was going on with them, if they were in a different
      12  territory, Dawn might have been notified of that.
      13      Q.   Okay.  Okay.  And then you go on and say, and
      14  this is your e-mail, you're saying, "I am now working in
      15  the HID group and I am the Tech Support Lead for these
      16  accounts as well."  Do you see that?
      17      A.   Yes.
      18      Q.   And was that accurate?
      19      A.   Yes.
      20      Q.   Okay.  And how did that happen?  How did you
      21  become the tech support lead for these non-HID accounts?
      22      A.   Michelle, my manager, and I talked about that.
      23      Q.   Okay.  And how did that go?
      24      A.   Because of my experience in the previous group,
      25  and she was aware of my background, not just being in
00097:01  forensics, she thought I would be an asset to the team
      02  because I had knowledge -- knowledge and skills --
      03  knowledge base and skill-set that the other members of
      04  the team didn't have.
```

**31.  PAGE 97:20 TO 98:07  (RUNNING 00:00:39.367)**

```
      20      Q.   Okay.  So is it fair to say that the decision
      21  regarding you becoming the tech support lead for these
      22  nonforensic customers, that would include supporting
      23  activities, such as STR kit use for bone marrow
      24  engraftment, that that was something that Michelle
      25  Shepherd, as your superior, understood?
00098:01      A.   Yes.
```

**CONFIDENTIAL**                                                                 page 15

## Promega Corporation v. Life Technologies Corporation

```
02      Q.   Okay.  No question in your mind?
03      A.   No.
04      Q.   Okay.  Did you have numerous conversations over
05 the time you were at ABI with regard to those duties as
06 tech support lead?
07      A.   We did.
```

**32. PAGE 98:24 TO 99:19 (RUNNING 00:00:55.765)**

```
24      Q.   Okay.  Now, the next sentence, in parentheses,
25 confuses me, but that's just because I don't understand
00099:01 the organization here.  It says, "(Melissa Kotkin is the
02 FAS lead)."  How is Melissa Kotkin the FAS lead, which
03 is field applications specialist, when you're the tech
04 support lead?  I thought field applications specialists
05 did tech support?
06      A.   No.  No.  They're two different roles.
07      Q.   Oh, help me out.  What is Melissa doing?
08      A.   So field applications specialists are the ones
09 that go out and do trainings in the field all the time.
10      Q.   Okay.
11      A.   They don't stay at home and man the phones.
12 Tech support are the people who tend to stay at home and
13 take calls.
14      Q.   Okay.  And you indicated earlier in your
15 testimony, you interacted in your years at ABI with
16 Melissa Kotkin?
17      A.   Yes.
18      Q.   Extensively?
19      A.   Yes.
```

**33. PAGE 99:20 TO 99:23 (RUNNING 00:00:11.928)**

```
20      Q.   Okay.  Based on that, did she, in fact, go out
21 to nonforensic customers and train?
22      A.   I don't know of a specific example that she did
23 that.
```

**34. PAGE 100:05 TO 100:14 (RUNNING 00:00:25.110)**

```
05      Q.   Did you -- do you recall Melissa Kotkin ever
06 coming to you, saying, "Hey, Lisa.  I've got a
07 nonforensic customer.  I've got some questions.  Can you
08 help me"?
09      A.   I'm sure that happened.
10      Q.   Okay.  Now, you mentioned that this e-mail was
11 prompted by a desire to go to a meeting.  The next
12 sentence passed Melissa Kotkin, says:  I'd like to
13 attend the stem cell symposium.  Do you see that?
14      A.   I do.
```

**35. PAGE 100:15 TO 100:16 (RUNNING 00:00:06.913)**

```
15      Q.   And do you recall the circumstances of this?
16      A.   Not so much, because we ended up not going.
```

**36. PAGE 100:22 TO 101:19 (RUNNING 00:01:17.271)**

```
22      Q.   Okay.  And it indicates you were aware of some
23 papers and you mention a Nardone paper?
24      A.   Yes.
25      Q.   What paper is that?
00101:01      A.   So I don't remember the reference exactly, but
02 there was a "white paper" by Roland Nardone in which
03 he -- it was "A Call To Action" for principal
04 investigators using cell culture and cell lines, where
05 it has been shown repeatedly that the cells that
06 researchers think they're using are, in fact, not the
07 cells that they're working with because of
```

PTX1354_0016

## Promega Corporation v. Life Technologies Corporation

```
08   contamination.  And so that was the paper --
09        Q.   Okay.
10        A.   -- I'm referring to.
11        Q.   And is that what is driving now the cell line
12   authentication market is this desire to straighten this
13   out and make sure you're working with the cells that you
14   think you're working with?
15        A.   Absolutely.
16        Q.   Okay.  In your experience while you were at
17   ABI, did that market grow, STR kit use for cell line
18   authentication?
19        A.   It did, but not immensely.
```

**37. PAGE 101:20 TO 101:24  (RUNNING 00:00:16.912)**

```
20        Q.   Okay.  Did you have occasion to be familiar
21   with other publications, other than the Nardone one,
22   that describe the use of STR kits for cell line
23   authentication?
24        A.   It's not coming to mind.
```

**38. PAGE 127:19 TO 129:03  (RUNNING 00:01:26.071)**

```
19        Q.   Okay.  Did you have occasion to train
20   university core labs on STR kit use?
21        A.   I'm thinking.  On general STR kit use?
22        Q.   Yes.
23        A.   I'm thinking.  So, okay.  I just want to make
24   sure we're accurate.  When you say "train" them, do you
25   mean provide them with presentation material or just
00128:01   talk to them about STR kit use?
02        Q.   Talking is fine.
03        A.   Yes.  I've done that.
04        Q.   Okay.  And so when you would talk to them about
05   STR kit use -- this is these university core labs --
06   would you discuss a specific use such as cell line
07   authentication?
08        A.   Usually what -- yes, what they were
09   particularly interested in, in university settings, was
10   often cell line authentication, yes.
11        Q.   Okay.  And any particular universities you can
12   remember that you had these types of conversations?
13        A.   Duke.
14        Q.   Okay.
15        A.   UNC Chapel Hill.
16        Q.   Okay.
17        A.   Oh, goodness.  MD Anderson.
18        Q.   Okay.
19        A.   University of Colorado, Christopher Korch's
20   lab.
21        Q.   Okay.
22        A.   And there were others, but I can't remember
23   right offhand.
24        Q.   Okay.  And after you had these conversations,
25   did any of those particular ones that you mentioned, in
00129:01   fact, purchase an ABI STR kit for cell line
02   authentication?
03        A.   They did.
```

**39. PAGE 129:12 TO 129:15  (RUNNING 00:00:18.239)**

```
12        Q.   Okay.  When you left ABI, Life Tech recently,
13   were you aware of university core labs purchasing STR
14   kits for cell line authentication?
15        A.   Yes.
```

CONFIDENTIAL

## Promega Corporation v. Life Technologies Corporation

**40.  PAGE 129:19 TO 130:04  (RUNNING 00:00:23.199)**

```
       19      Q.    You mentioned Duke, Chapel Hill, a couple
       20   others.  I take it the total customer base for cell line
       21   authentication for ABI STR kits for university core labs
       22   is larger than that?
       23      A.    Yes.
       24      Q.    Okay.  Can you give me a sense of how much
       25   larger?
  00130:01      A.    I really don't know for sure.  I don't know.
       02    15 or 20.
       03      Q.    Okay.  And these are across the United States?
       04      A.    Uh-huh.
```

**41.  PAGE 132:13 TO 134:05  (RUNNING 00:03:00.974)**

```
       13      Q.    Dr. Ortuno, let me show you what's been marked
       14   Exhibit 17.  It's a three-page document, Bates stamped
       15   Life-0309952 to 54.
       16      A.    Okay.
       17      Q.    Okay.  Now, when we were looking at Exhibit 15
       18   a minute ago, we talked about the fact that Dawn had
       19   mentioned the need for a PowerPoint.  And that was in
       20   September of 2008.  This exhibit is from 2009.  And if
       21   you go to the last -- second to last page, as is typical
       22   with e-mail, the first e-mail starts on the bottom of
       23   that and carries over.  It appears to be from Guido
       24   Sandulli.  Do you see that?
       25      A.    Yes.  Okay.  I see that.
  00133:01      Q.    And he says, "Team," and if you look at the
       02    "To" line, you're on there, Lisa M. Ortuno.  Do you see
       03    that?
       04      A.    Yes.  Okay.  Yes.
       05      Q.    It says, "Team -- see the draft PowerPoint I
       06    put together."  Do you see that?
       07      A.    Yes.
       08      Q.    Do you recall receiving this e-mail from Guido?
       09      A.    Not specifically.
       10      Q.    Okay.  Do you know why he was putting this
       11   PowerPoint together?
       12      A.    I don't recall.
       13      Q.    Okay.  Now, if you go to the first page of
       14   Exhibit 17.
       15      A.    Okay.
       16      Q.    This is an e-mail you authored; right?
       17      A.    Yes.  Yes.
       18      Q.    And this is an e-mail back to Guido Sandulli
       19   with your comments on his PowerPoint; correct?
       20      A.    That's what it looks like.
       21      Q.    Do you recall this?
       22      A.    I don't recall specifically writing it, but I'm
       23   familiar with this content --
       24      Q.    Okay.
       25      A.    -- what he's talking about.
  00134:01      Q.    Okay.  And any question that this is an e-mail
       02    that you authored?
       03      A.    No.
       04      Q.    No doubt?
       05      A.    Huh-uh.
```

**42.  PAGE 134:18 TO 135:09  (RUNNING 00:00:40.203)**

```
       18      Q.    Okay.  Now, the subject line of the e-mail that
       19   you authored says, "STR kits for cell line ID."  Do you
       20   see that?
       21      A.    Yes.
       22      Q.    And that's cell line authentication?
       23      A.    Yes.
```

CONFIDENTIAL                                                                    **page 18**

## Promega Corporation v. Life Technologies Corporation

```
      24       Q.    Okay.  And do you recall whether you were
      25    looking at slides of the PowerPoint and commenting?
00135:01       A.    Yes, I must have, because there are slide
      02    references.
      03       Q.    Okay.  And in the second paragraph, you comment
      04    on Slide 3, you say, "Maternal cell contamination is
      05    another 'clinical' assay."  Do you see that?
      06       A.    I do.
      07       Q.    Do you recall communicating that?
      08       A.    I don't recall specifically writing this, but I
      09    don't deny that I did.
```

**43.  PAGE 135:10 TO 135:12  (RUNNING 00:00:05.962)**

```
      10       Q.    Okay.  And is maternal cell contamination
      11    another clinical assay?
      12       A.    I really don't know if it is or not.
```

**44.  PAGE 135:13 TO 138:19  (RUNNING 00:03:49.799)**

```
      13       Q.    Okay.  Now, you give some examples of
      14    customers, including Emory University, Genzyme, Artemis
      15    and others.  Do you see that?
      16       A.    Yes.
      17       Q.    And I take it at this time, in 2009 when you
      18    were writing this, these were examples of ABI customers
      19    using STR kits for maternal cell contamination?
      20       A.    Yeah.  That must have been what I was thinking
      21    at that time, yes.
      22       Q.    Okay.  And then under that Slide 3, you
      23    indicate you spoke with Katherine Hale at MD Anderson.
      24    Do you see that?
      25       A.    Yes.
00136:01       Q.    Did you, in fact, speak with Katherine Hale at
      02    MD Anderson?
      03       A.    I did.
      04       Q.    Who is Katherine Hale?
      05       A.    She was the -- I believe was the director of
      06    one of the core labs at MD Anderson.
      07       Q.    Okay.  And it goes on, it says, she's "going to
      08    implement a cell line ID service."  Do you see that?
      09       A.    Yes.
      10       Q.    And that, again, is a cell line authentication
      11    service?
      12       A.    Yes.
      13       Q.    And as a service, this would be something that
      14    other people could come to, to get their cell lines
      15    authenticated?
      16       A.    Yes.
      17       Q.    Okay.  Did, in fact, MD Anderson create such a
      18    service?
      19       A.    That was my understanding, yes.
      20       Q.    Okay.  And did you help Katherine Hale?
      21       A.    I did.
      22       Q.    And what did you do?
      23       A.    I worked with the technicians in the lab to
      24    understand how to use the kit, as I would with any
      25    forensic customer, provided the protocol, and explained
00137:01    about the data analysis using GeneMapper.  I don't
      02    remember which version it was.  And just helped them get
      03    their workflow going.
      04       Q.    Okay.  Do you remember what kit it was?
      05       A.    I don't.
      06       Q.    And we mentioned a bunch of them.
      07       A.    Yeah.
      08       Q.    It would have been one of those, Identifiler --
      09       A.    Yes.
```

## Promega Corporation v. Life Technologies Corporation

```
10      Q.   -- something like that?
11      A.   Yes.
12      Q.   Okay.  Slide 4, if you look for that down the
13 left side, you bring up the topic of "homebrew."  Let's
14 talk about that.  Did you, at your time in ABI, wide
15 open, total time, run into prospective customers who
16 were doing cell line authentication with home-brew
17 assays?
18      A.   Yes.
19      Q.   And what type of assay is a home-brew assay for
20 cell line authentication?
21      A.   So any time they're using a noncommercial kit,
22 generally speaking, is a home-brew assay.  So they may
23 have their own primers that they use that are going to
24 do generally the same thing, so generate a unique
25 identifier for that sample.  So anything of that sort.
00138:01      Q.   Okay.  And while you were at ABI, total time
02 period, did you have occasion to convince these
03 home-brew -- these labs using the home-brew kit for --
04 maybe I should say home-brew assay for cell line
05 authentication, did you have occasion to convince them
06 to switch over to a commercial kit, such as an ABI STR
07 kit?
08      A.   I believe I did.  I can't remember specifically
09 which of those labs were doing that.
10      Q.   Okay.  And what would be the advantages of a
11 commercial kit like an ABI STR kit for cell line
12 authentication versus home-brew?
13      A.   They're easy to use.  They're like cookbook
14 recipe in the protocol.  The reagents are QC'd.  Those
15 types of advantages.
16      Q.   Okay.  So the home-brew stuff, they don't have
17 a quality control department at these nonforensic labs.
18 They're just kind of making it up as they go?
19      A.   Right.
```

**45. PAGE 140:16 TO 140:22  (RUNNING 00:00:20.061)**

```
16      Q.   Okay.  Now, going back to the first page of
17 Exhibit 17, there is some numbered paragraphs at the
18 bottom.  First one is to "Continue to collaborate with
19 thought leaders to determine which...kits will provide
20 the solution."  And is the solution for cell line
21 authentication?
22      A.   Yes.
```

**46. PAGE 141:08 TO 142:23  (RUNNING 00:01:36.970)**

```
08      Q.   As you mentioned.  Okay.  Okay.  Paragraph
09 Number 2 on the front page of Exhibit 17 says, "Keep a
10 close eye on Promega as they are aggressively going
11 after this market."  Do you see that?
12      A.   I do.
13      Q.   Do you remember communicating that?
14      A.   I'm sure I did.  I don't remember typing it,
15 but I did.
16      Q.   Okay.  And was it accurate at the time?
17      A.   I believe so.
18      Q.   Okay.  And how did you know that Promega was
19 aggressively going after the market?
20      A.   Because customers would call in and they would
21 say sometimes that they're using Promega chemistry or
22 they're considering using Promega chemistry, so they
23 told us.
24      Q.   Okay.  And did you have an occasion to interact
25 with such a customer and try to convince them to drop
00142:01 Promega and use ABI STR kits for cell line
```

PTX1354_0020

**Promega Corporation v. Life Technologies Corporation**

```
02   authentication?
03        A.   Yes.
04        Q.   Okay.  And did Ms. Shepherd know you were
05   making such suggestions?
06        A.   Yes.
07        Q.   Did upper management know?
08        A.   Who is "upper management"?
09        Q.   Andros.  I may be saying his name wrong.
10        A.   Gerry?
11        Q.   Yes.
12        A.   I imagine he did.
13        Q.   Okay.  And were you ever successful in
14   convincing a customer, who was using Promega for cell
15   line authentication, to switch to ABI STR kits?
16        A.   I get confused whether it is a BME lab or a
17   cell line lab making switches, so I can't remember
18   specifically.
19        Q.   Okay.  So let's be more general.  Without
20   regard to whether it was cell line authentication or
21   BME, did you have occasion to convince a customer using
22   Promega STR kits to switch to ABI STR kits?
23        A.   I did.
```

**47.  PAGE 142:24 TO 143:01  (RUNNING 00:00:05.373)**

```
24        Q.   Okay.  And do you remember any particular
25   customer?  I know that's hard.
00143:01      A.   I can't.
```

**48.  PAGE 144:05 TO 145:14  (RUNNING 00:01:14.240)**

```
05        Q.   And at the end of that, it says, "Promega says
06   Identifiler is overkill."  Do you see that?
07        A.   Yes.
08        Q.   Do you remember communicating that?
09        A.   Yes.
10        Q.   How did you learn that?
11        A.   Because that's what customers told us.
12        Q.   And that's why they were working -- they told
13   you that's why they were using Promega kits for cell
14   line authentication?
15        A.   Yes, because Promega produced -- I don't know
16   if they still do -- a kit that had a smaller number of
17   markers.
18        Q.   Okay.
19        A.   And Identifiler had more markers, so Promega
20   said, "You don't need that many.  It's overkill."
21        Q.   And from a technical standpoint, was it true
22   that Identifiler probably had more markers than you
23   needed?
24        A.   It depends.
25        Q.   Okay.
00145:01      A.   It's one of those where it depends on the
02   situation.
03        Q.   Okay.  In some cases, Identifiler was just what
04   somebody needed for cell line authentication?
05        A.   Right.
06        Q.   Okay.  Now, going back to the front page,
07   Number Paragraph 5, says, "Provide training to the
08   support staff," parentheses, "(HID FAS) on this market
09   and how to train these customers."  Do you see that?
10        A.   Yes.
11        Q.   Do you remember communicating that?
12        A.   Vaguely.
13        Q.   Did this happen?
14        A.   No.
```

CONFIDENTIAL                                                                          page 21

## Promega Corporation v. Life Technologies Corporation

**49. PAGE 172:15 TO 173:22  (RUNNING 00:01:32.510)**

```
    15      Q.   Okay.  All right.  Dr. Ortuno, the court
    16   reporter has marked as Exhibit 23 a two-page document,
    17   Bates stamped 0522672 to 73.  Let me show you that.
    18   Okay.  Now, this is an e-mail where the second page
    19   appears to be identical to the exhibit we just saw.  Do
    20   you see that?
    21      A.   I do.
    22      Q.   Okay.  However, the front page is Michelle
    23   Shepherd responding to your e-mail.  Do you see that?
    24      A.   I do.
    25      Q.   Okay.  Do you recall Michelle Shepherd sending
00173:01   you this?
    02      A.   Not specifically.
    03      Q.   Okay.  She seems to be pretty pleased with your
    04   work here; is that right?
    05      A.   It looks like it.
    06      Q.   "Great work here."  Was she frequently saying
    07   that to you in e-mails?
    08      A.   Yes.  She's a very good manager and she pumps
    09   up her team.
    10      Q.   That's great.  And she noted that you caught
    11   the problem with the ramp time changes we just talked
    12   about.  Do you see that?
    13      A.   Yes.
    14      Q.   Does this help you recall this communication?
    15      A.   I recall the event.  I just didn't recall
    16   specifically this e-mail.  Yes.
    17      Q.   Okay.  So Michelle Shepherd was clearly aware
    18   of your attempts to get ATCC to get the Identifiler to
    19   work for cell line authentication?
    20      A.   That's correct.
    21      Q.   In fact, was quite pleased with your efforts?
    22      A.   Yes, she was.
```

**50. PAGE 176:05 TO 177:06  (RUNNING 00:01:46.955)**

```
    05      Q.   Okay.  Dr. Ortuno, let me show you an exhibit
    06   that's been marked Number 25.  It is a two-page exhibit,
    07   Life-0150859 to 60.  Let me show you that.  Let's start
    08   on the front page.  Is that an e-mail you authored?
    09      A.   It is.
    10      Q.   To Dawn Waltman?
    11      A.   Yes.
    12      Q.   In the ordinary course of communicating with
    13   Dawn while you were at ABI?
    14      A.   Yes.
    15      Q.   Okay.  And does this discuss, at least in part,
    16   your efforts to get ATCC to use the ABI STR kit for cell
    17   line authentication?
    18      A.   Yes.
    19      Q.   Okay.  Now, there are a number of paragraphs
    20   that are numbered.  The first one says that part of the
    21   agenda you're recommending is a discussion of, quote,
    22   "our internal cell line profiling project."  Do you see
    23   that?
    24      A.   I do.
    25      Q.   What's that referring to?
00177:01      A.   That's refer -- excuse me -- referring to a
    02   project that I believe was headed by Manohar Furtado,
    03   which they did cell line profiling.  They ordered the
    04   cell lines from NCI, National Cancer Institute, and from
    05   ATCC and used the Identifiler kit to profile them, so
    06   they just did an internal project.
```

PTX1354_0022

## Promega Corporation v. Life Technologies Corporation

**51. PAGE 192:12 TO 193:07  (RUNNING 00:01:41.819)**

```
        12      Q.   Dr. Ortuno, let me show you what the court
        13   reporter has marked as Exhibit Number 28.  It's a
        14   three-page document, Bates stamped Life-0023210 and
        15   going to the last page, which is 23212.
        16           You know what, see if I can get a better
        17   opening here so I can pass you documents.  There we go.
        18           Okay.  Doctor, did you have a chance to look at
        19   it?
        20      A.   Give me just a moment.
        21      Q.   Sure.
        22      A.   Okay.
        23      Q.   Okay.  So we're looking at Exhibit 28.  And
        24   let's start at the bottom of the first page.  Again,
        25   these e-mails are kind of broken up on the pages.  Do
  00193:01   you see on the "From" line your name Lisa Ortuno?
        02      A.   Yes.
        03      Q.   And this next page, which is Bates stamped 11,
        04   is the content of a e-mail that you authored?
        05      A.   Yes.
        06      Q.   No doubt about it?
        07      A.   No.
```

**52. PAGE 194:07 TO 197:24  (RUNNING 00:04:00.792)**

```
        07           Q.   Okay.  And so your subject line is "Potential
        08   Cell Line Authentication Seminar at MD Anderson."  Do
        09   you see that?
        10      A.   Yes.
        11      Q.   But, in fact, if you look at the text here,
        12   that potential presentation is talked about at the
        13   bottom, but the lead-off is that you did a paid online
        14   training for Vivian Gabisi at MD Anderson.  So you were
        15   already interacting with them?
        16      A.   Oh, yes.  I had been for a while.
        17      Q.   Okay.  So tell me about these paid online
        18   trainings.  How do they work?
        19      A.   So we offer, for the cost of $500, to a lab who
        20   wants to -- generally it's used to do software training
        21   online.  So they pay for that specific part number, and
        22   then we use the WebEx, or whatever service that we have
        23   at the time, to meet online and we go over software
        24   training.
        25      Q.   Okay.
  00195:01      A.   And that's what I did for this lab.
        02      Q.   So it isn't just like a video that plays?
        03      A.   No.
        04      Q.   Okay.  It's you online interacting?
        05      A.   That's correct.
        06      Q.   Do you have training materials that you share?
        07      A.   We share the GeneMapper program itself.
        08      Q.   Okay.
        09      A.   There are no presentations generally.  It's
        10   just: Here is GeneMapper and here is how you add files
        11   and analyze the data.
        12      Q.   Okay.
        13      A.   Excuse me.
        14      Q.   And I take it Katherine Hale supervised Vivian
        15   Gabisi.  Who was the senior person?
        16      A.   Katherine is the senior person.  There's some
        17   structure there at the MD Anderson that I'm not sure of.
        18      Q.   Okay.  But was Vivian Gabisi going to be the
        19   hands-on person for analyzing the data?
        20      A.   Yes.
        21      Q.   Okay.  And it says further, as you go down to
        22   this e-mail, that "Vivian is running the cell line
```

## Promega Corporation v. Life Technologies Corporation

```
        23   authentication samples...working with the core lab," and
        24   then there is a parentheses, "(373-48)."  What does that
        25   mean?
00196:01        A.   Well, first of all, it's a misspelling.  It's
        02   supposed to say 3730-48, which refers to one of our CE
        03   instrument models.
        04        Q.   Okay.  Thank you.  All right.
        05             And then it goes on to say, "She told me that
        06   all the researchers there using cell lines now have to
        07   authenticate them, so she is getting more and more
        08   business."  Do you see that?
        09        A.   Yes.
        10        Q.   And again, we talked about that earlier as a
        11   reason why cell line authentication grew a bit?
        12        A.   Yes.
        13        Q.   Okay.  And then you go on to talk about things
        14   that are in the need of assistance.  Did they get that
        15   assistance?
        16        A.   I'm sorry.  I'm trying to find -- where is
        17   that?
        18        Q.   Sure.  After the discussion about "more and
        19   more business," a sentence on the right starts, "There
        20   are several aspects of this that" they "are in need of
        21   assistance."
        22        A.   Oh, got it.  Okay.
        23        Q.   Okay.  Go ahead and take your time to look it
        24   over.
        25        A.   Thank you.
00197:01             Okay.  Yes.  I understand.  So often, core
        02   labs, their primary function is to do sequencing, and
        03   they're very, very familiar with that.
        04             This type of application, which falls under the
        05   category of fragment analysis, many labs have no
        06   experience doing.  So they don't know how to set up the
        07   instrument.  They don't understand a lot of the details
        08   needed to get good data.  And so that was some of the
        09   things I was referring to.
        10        Q.   Okay.  And did you, in fact, get an opportunity
        11   to provide them with this assistance?
        12        A.   I did.
        13        Q.   Okay.  And how did you do that?
        14        A.   Over the phone.
        15        Q.   Okay.  And that was subsequent to this e-mail?
        16        A.   I don't know.  I worked with her a lot.
        17        Q.   Okay.  So it would have been numerous phone
        18   calls?
        19        A.   Yes.
        20        Q.   Okay.  And over what kind of time period?
        21        A.   I don't recall.
        22        Q.   No, I don't mean datewise.  Was it weeks,
        23   months, days?
        24        A.   Months.

53. PAGE 198:25 TO 199:25  (RUNNING 00:00:56.165)

        25        Q.   Okay.  All right.  Now, if we go back to the
00199:01   first page of this exhibit, Joe Varlaro is e-mailing you
        02   and complimenting you, saying, "Great news."  Do you see
        03   that?
        04        A.   On Page 1?
        05        Q.   Yes.  The first page that's Bates stamped with
        06   a number ending 10.
        07        A.   I see where it says, "that's fantastic."
        08        Q.   Right.  Right above it, he says, "Thanks for
        09   the message, and the great news."
        10        A.   Yes.  I'm sorry.  Yes, I see it.
        11        Q.   Okay.  But I'll go with "that's fantastic."
```

## Promega Corporation v. Life Technologies Corporation

```
12   That's even better.  So Joe was pretty excited with your
13   efforts?
14        A.   It looks like it.
15        Q.   Okay.  And he's copied about everybody here,
16   including Michelle Shepherd, your supervisor?
17        A.   He did.
18        Q.   Okay.  So everyone was aware of your activities
19   and your success?
20        A.   Yes, they were.
21        Q.   Were they pleased with you?
22        A.   I think they were.
23        Q.   Okay.  And were you pleased with how the job
24   was going?
25        A.   I was.
```

**54. PAGE 200:12 TO 200:19  (RUNNING 00:00:23.520)**

```
12        Q.   Now, here in January of 2010, this exhibit
13   where they're saying "fantastic" and "great news" and
14   everybody's pleased with you, that seemed to me to
15   indicate that upper management was in complete support
16   of your activities?
17        A.   I would say so.
18        Q.   That was your understanding?
19        A.   I would say yes.
```

**55. PAGE 203:04 TO 204:03  (RUNNING 00:02:08.137)**

```
04        Q.   Dr. Ortuno, I want to show you what the court
05   reporter has marked as Ortuno Exhibit Number 29.  It is
06   a multi-page document, beginning Life-0006939 to 6943.
07        A.   Okay.
08        Q.   All right.  Let's start on the second page of
09   Exhibit 29, and that's the page Bates stamped 6942.  And
10   mercifully, it looks like just about the whole beginning
11   of the e-mail is connected with the actual text this
12   time.  Do you see the "From" line, Lisa Ortuno?
13        A.   Yes.
14        Q.   And that's you?
15        A.   That's me.
16        Q.   And this is an e-mail you authored?
17        A.   Yes.
18        Q.   Okay.  And the subject line is "SAIC," all
19   caps, slash, "NCI," all caps, "Cell Line Authentication
20   Support."
21        A.   Yes.
22        Q.   And do you remember this e-mail?
23        A.   I remember the situation.
24        Q.   Okay.  What was the situation?
25        A.   So the National Cancer Institute up at
00204:01   Fort Detrick had a lab there led by Tim Sheehy, who does
02   a lot of cell line authentication for the labs up there,
03   and I was going to do a training for them.
```

**56. PAGE 204:24 TO 205:09  (RUNNING 00:00:27.980)**

```
24        Q.   Okay.  And what caused you to interact with the
25   folks at SAIC?
00205:01        A.   So they were running this application.  There
02   are several groups at NCI that are doing this.
03        Q.   And that's cell line authentication?
04        A.   Yes.
05        Q.   Okay.
06        A.   Sorry.  And this was the first one that I
07   interacted with, and they needed some training.
08        Q.   And did you give them the training?
09        A.   I did.
```

PTX1354_0025

## Promega Corporation v. Life Technologies Corporation

**57. PAGE 205:25 TO 206:09  (RUNNING 00:00:24.773)**

```
        25      Q.   Okay.  All right.  And what did you teach them
00206:01   in this training?
        02      A.   So in this training, I don't remember every
        03   detail, but typically a training like this would entail
        04   amplifying samples.  Actually, they would do that ahead
        05   of time.
        06      Q.   Okay.
        07      A.   Running them on one of the instruments,
        08   explaining to them the caveats of running on an
        09   instrument, and then looking at the data in GeneMapper.
```

**58. PAGE 208:18 TO 211:17  (RUNNING 00:03:13.591)**

```
        18      Q.   It says that NCI had genotyping failures, and
        19   it looks like 40 to 60 percent in the past?
        20      A.   Yes.
        21      Q.   Isn't that a little high?
        22      A.   Oh, it's ridiculously high.
        23      Q.   What was going on?
        24      A.   They made up their own protocol.
        25      Q.   Okay.  And what would constitute a genotyping
00209:01   failure?
        02      A.   Just not getting an amplified product, perhaps
        03   something being very unbalanced so you don't get a full
        04   profile, those sorts of things.
        05      Q.   All right.  And if you don't get a full
        06   profile, you can't tell enough about the cell line to
        07   say, "I can say it's authentic"?
        08      A.   Oftentimes, yeah.
        09      Q.   Okay.  Okay.  So that's a failure?
        10      A.   Uh-huh.
        11      Q.   All right.  Now, you say, "My understanding of
        12   the protocols that NCI have been using is they are
        13   operating way outside our recommended protocols."  And
        14   do you remember communicating that?
        15      A.   I do.
        16      Q.   And what was the basis of that?
        17      A.   I'm pretty sure that -- very, very, like
        18   99 percent sure, they were using reduced reaction
        19   volumes, which is not uncommon for labs using these kits
        20   in a nonforensic way.  I'm sure -- that was one big
        21   component of it.  And I believe they may have even been
        22   using modified thermal cycling conditions.
        23      Q.   Why would they use reduced reaction volumes?
        24      A.   To save money.
        25      Q.   Okay.  All right.  Now, it says that Tim wants
00210:01   to do what it takes to drop this failure rate and put
        02   good quality data together, but there are some
        03   challenges here and you may have to find an acceptable
        04   middle ground.  What are you saying there?
        05      A.   Let's see.
        06      Q.   That's at the end of that big paragraph we've
        07   been looking at.
        08      A.   Yes.  Okay.  I'm sorry.  Restate the question.
        09      Q.   Sure.  It says that the lab is posing some
        10   technical challenges with regard to the validated
        11   protocols, but this guy, Tim, he wants to drop the
        12   failure rate, and so you may have to find some
        13   acceptable middle ground.  What did you mean by an
        14   "acceptable middle ground"?
        15      A.   Oh, oftentimes that refers to the
        16   quantification step.
        17      Q.   Okay.
        18      A.   So the validated HID workflow includes the use
        19   of realtime PCR for quantifying DNA.  That is a
```

PTX1354_0026

## Promega Corporation v. Life Technologies Corporation

```
20  time-consuming and costly step.
21      Q.   Okay.
22      A.   But it's required for forensics labs.
23      Q.   Got it.
24      A.   Labs outside of forensics don't want to do
25  that.
00211:01    Q.   Okay.
02      A.   So that would have been part of that.
03      Q.   So the acceptable middle ground then would have
04  been you're trying to get Tim to do a protocol that's a
05  little closer to what's validated, but some of the
06  aspects, like this quantification, might still be left
07  out, so it's a middle ground --
08      A.   Yeah.
09      Q.   -- it's not an exact validated protocol?
10      A.   That would have been part of the middle ground.
11      Q.   Okay.  Did this type of middle ground thing
12  happen with these types of customers in your experience
13  over your time at ABI?
14      A.   Yes.
15      Q.   They wouldn't adopt the whole validated
16  protocol?
17      A.   Correct.
```

**59. PAGE 213:10 TO 213:13  (RUNNING 00:00:06.893)**

```
10      Q.   Okay.  And then it says, "We profiled all
11  NCI 60 cell line DNA."  Was this that internal project
12  we were talking about?
13      A.   Yes.
```

**60. PAGE 216:24 TO 219:02  (RUNNING 00:02:47.776)**

```
24      Q.   Okay.  Dr. Ortuno, let me show you what's been
25  marked by the reporter as Ortuno Exhibit Number 30.
00217:01  It's just a two-page document, Bates stamped
02  Life-0123782 to 83.
03      A.   Okay.
04      Q.   All righty.  Okay.  Let's start on the second
05  page.  And this appears to have a complete e-mail
06  authored by you.  Do you see that?
07      A.   Yes.
08      Q.   Lisa Ortuno on the "From" line?
09      A.   Yes.
10      Q.   And you wrote this to a number of people, and
11  you copied your supervisor, Michelle Shepherd?
12      A.   I did.
13      Q.   Okay.  Any question that you authored this
14  e-mail?
15      A.   No.
16      Q.   Okay.  And the subject is "NCI and Cell Line
17  Authentication."  Do you see that?
18      A.   Yes.
19      Q.   Okay.  And this talks about the phone call with
20  this Tim gentleman again and that you had a fruitful
21  conversation.  Do you see that?
22      A.   Yes.
23      Q.   Do you recall this e-mail?
24      A.   Vaguely.  Yes.
25      Q.   Do you recall the circumstances leading up to
00218:01  it?
02      A.   Not exactly.  Generally I do, but not exactly.
03      Q.   Okay.  It looks like he's talking about a very
04  large project they're about to undertake with NCI?
05      A.   Yes.
06      Q.   Do you recall the nature of that project?
07      A.   Yes.  Generally, I do.
```

**CONFIDENTIAL**                                                                                   page 27

## Promega Corporation v. Life Technologies Corporation

```
08      Q.   And what was that?
09      A.   So as I mentioned earlier, the way that their
10  workflow goes at NCI for doing this cell line
11  authentication, they're different labs.  So they -- this
12  lab was, they explained to me, is called the staging
13  lab, and that means a certain part of their workflow.
14  And then there was another lab, I think in a distant
15  location -- I can't remember where it was -- that was
16  also doing some cell line authentication.
17           And they interacted with each other, and I
18  didn't understand the nature of that interaction, but if
19  I recall, there was some talk about pulling more of the
20  workflow into their lab, into Tim's lab.  And so they
21  wanted to do more and more samples at this location, if
22  I recall correctly.  And let's see here.
23           Yeah.  So I think that was what was going on at
24  this time, I believe.
25      Q.   And so this was an opportunity to get more
00219:01  business?
02      A.   Yes, it was.
```

**61. PAGE 231:02 TO 231:20  (RUNNING 00:01:56.954)**

```
02      Q.   Okay.  Dr. Ortuno, I want to show you Exhibit
03  Number 33, which has been marked Life-0171477 to 81.
04  Now, if you can take a look at this, I'll ask you some
05  questions about it.
06      A.   Okay.  Okay.
07      Q.   Okay.  So let's start at the second to last
08  page, and this ends with a Bates Number -- this has a
09  Bates Number ending with the Number 80.  And there's --
10  for the most part, the whole e-mail is there, to you
11  from a person Aviva, A-v-i-v-a, Nestler.  Do you see
12  that?
13      A.   Yes.
14      Q.   November 5, 2010, to you, Ortuno, Lisa?
15      A.   Yes.
16      Q.   And the subject line is "cell line
17  authentication."  Do you recall this e-mail?
18      A.   Generally, yes.
19      Q.   Okay.  Any question you received it?
20      A.   No.
```

**62. PAGE 233:09 TO 233:20  (RUNNING 00:00:27.674)**

```
09      Q.   So we're on now -- I'm going to give the whole
10  Bates number, 171479, of Exhibit 33.  And unfortunately,
11  your e-mail only starts on that page and goes back over,
12  but at least we can start there.
13      A.   Okay.
14      Q.   Do you see at the bottom there, your e-mail to
15  Aviva?
16      A.   Yes.
17      Q.   And you authored it?
18      A.   Yes.
19      Q.   No doubt about it?
20      A.   No.
```

**63. PAGE 234:24 TO 235:07  (RUNNING 00:00:37.486)**

```
24      Q.   Let's finish off your e-mail that is carried
25  over now.  I'll give you the whole Bates number, 171480.
00235:01  That continues, "But our HID sales reps are talking to
02  people about it and our support team (mainly me) is
03  providing technical support."  Is that indicating to
04  Aviva that the company is definitely selling for cell
05  line -- cell line authentication and you are supporting
06  cell line authentication as part of the technical group?
```

PTX1354_0028

## Promega Corporation v. Life Technologies Corporation

```
        07      A.   Yes.
```

**64. PAGE 236:05 TO 237:01 (RUNNING 00:00:33.893)**

```
        05      Q.   Okay.
        06      A.   I said, "Please go talk to your friends in
        07   other hospitals that are doing this kind of thing
        08   because they can give you their protocols."  That was
        09   common.
        10      Q.   So would you refer a customer to Korch?
        11      A.   Yes.
        12      Q.   Okay.  Any others?  Would you refer them to any
        13   other people doing this?
        14      A.   There was an occasion where I was working with
        15   Emory University Hospital.
        16      Q.   Okay.
        17      A.   Which is in Atlanta.
        18      Q.   Right.
        19      A.   And so is Northside Hospital.  So I got those
        20   two together.
        21      Q.   Okay.
        22      A.   They were in the same city.  "You guys answer
        23   each others' questions."
        24      Q.   Okay.  Now, was that for cell line
        25   authentication or BME?
00237:01      A.   I'm sorry.  That was for BME.
```

**65. PAGE 240:17 TO 241:05 (RUNNING 00:00:41.054)**

```
        17      Q.   Well, let me take it in pieces.  This is
        18   November 8th, 2010.  Was what you say here valid a year
        19   prior to this?
        20      A.   Yes.
        21      Q.   A year prior to that?
        22      A.   2010.  2009.  Yes.
        23      Q.   And a year prior to that?
        24      A.   2008, because I was in the forensics group
        25   then, yes.
00241:01      Q.   Okay.  So at least for a couple of years, this
        02   statement about selling into and supporting the cell
        03   line authentication market, as you've set forth here, is
        04   a valid statement?
        05      A.   I think so, yes.
```

**66. PAGE 244:22 TO 245:01 (RUNNING 00:00:10.589)**

```
        22      Q.   Okay.  So I'll say it another way then.  If you
        23   are going to run it under HID, the 3500 has to be
        24   configured one way, and if you're going to run it under
        25   non-HID, the 3500 has to be configured another way?
00245:01      A.   Right.
```

**67. PAGE 245:17 TO 246:16 (RUNNING 00:00:59.362)**

```
        17      Q.   Okay.  So if I understand you right, they get
        18   the 3500, they get the software that goes for the
        19   nonforensic, if that's what they're going to do, they
        20   might want to do sequencing, which is not an STR-related
        21   thing?
        22      A.   Correct.
        23      Q.   But then they might want to run STR kits too?
        24      A.   Exactly.
        25      Q.   If they got the training for the sequencing and
00246:01   now they want to run the STR kits on the machine,
        02   they're going to have to pay for that training?
        03      A.   That's right.
        04      Q.   And did you do that kind of training?
        05      A.   I did.
        06      Q.   Okay.  And it was paid training?
```

CONFIDENTIAL                                                                    page 29

## Promega Corporation v. Life Technologies Corporation

```
07      A.   In some cases.
08      Q.   Okay.  And it would be for teaching them how to
09  use that 3500 for cell line authentication?
10      A.   It was to -- it was always in the context of
11  here is the workflow geared towards training to the kit
12  as a forensics kit.
13      Q.   Okay.
14      A.   All right.  And so in cases for nonforensics
15  labs, if they needed to understand how to do that with a
16  different configuration, I would help them with that.
```

**68. PAGE 249:10 TO 250:17  (RUNNING 00:02:10.675)**

```
10      Q.   Okay.  All right.  Dr. Ortuno, let me show you
11  what's been marked Exhibit 35.  It's a two-page
12  document, Bates stamped Life-0134344 to 45.  And,
13  Doctor, the first page appears to be a e-mail authored
14  by you?
15      A.   Yes.
16      Q.   And authored to Dawn?
17      A.   Yes.
18      Q.   And do you recall this communication?
19      A.   You're referring to the one at the very top?
20      Q.   Right.
21      A.   Right.  Okay.  I don't remember that
22  specifically.
23      Q.   Any question that it went out from you?
24      A.   No.
25      Q.   Okay.  And then the next one down is one from
00250:01  you to Manohar.  We've been talking about Manohar?
02      A.   Yes.
03      Q.   Okay.  Let's go to that second paragraph of
04  that second e-mail on the first page of this exhibit.
05  You say, "In your phone message you asked about other
06  applications that use our STR kits.  I am not sure
07  exactly what you are asking for.  You are aware of the
08  chimerism, maternal cell contamination, sample ID
09  applications, et cetera."  My question is:  Are those
10  nonforensic applications that you were supporting during
11  your time at ABI for use of STR kits?
12      A.   Yes.
13      Q.   Okay.  And were there any other nonforensic
14  applications that you supported while you were at ABI?
15      A.   Using those kits?
16      Q.   Right.
17      A.   I think that was it.
```

**69. PAGE 255:12 TO 255:14  (RUNNING 00:00:11.669)**

```
12      Q.   Okay.  Dr. Ortuno, the court reporter has
13  marked as Exhibit 38 a three-page document, Bates
14  stamped Life-0028378 to 80.
```

**70. PAGE 255:24 TO 256:20  (RUNNING 00:00:59.854)**

```
24      Q.   All righty.  Let's go to the second page in the
25  middle.  And this appears to be an e-mail from your
00256:01  supervisor, Michelle Shepherd, to a variety of people,
02  including you.
03      A.   Yes.
04      Q.   Do you see that?
05      A.   I do.
06      Q.   And it talks about Anna at Northside Hospital.
07  Do you see that down towards the bottom of the second
08  page of this exhibit?
09      A.   I do.
10      Q.   And this was Michelle e-mailing you about the
11  fact that Anna at Northside Hospital in Atlanta uses PP
```

## Promega Corporation v. Life Technologies Corporation

```
        12   and CO for BME.  What is she saying there?
        13       A.   Uses Profiler Plus and Cofiler, two of our STR
        14   kits, for bone marrow engraftment.
        15       Q.   Okay.  So ABI STR kits?
        16       A.   Yes.
        17       Q.   For bone marrow engraftment?
        18       A.   Correct.
        19       Q.   So Michelle knew this?
        20       A.   Yes.
```

**71. PAGE 257:12 TO 257:15  (RUNNING 00:00:13.945)**

```
        12       Q.   Okay.  So it's fair to say that Michelle
        13   Shepherd knew about specific clients who are using ABI
        14   STR kits for bone marrow engraftment monitoring?
        15       A.   Yes.
```

**72. PAGE 257:18 TO 259:10  (RUNNING 00:02:01.215)**

```
        18       Q.   Okay.  Dr. Ortuno, the court reporter has
        19   marked as Exhibit 39 a two-page document, Bates stamped
        20   Life-0453342 and 43.
        21       A.   All righty.
        22       Q.   All right.  Okay.  On the first page,
        23   mercifully, you've got a whole e-mail intact.  Do you
        24   see the "From" line as Lisa Ortuno?
        25       A.   I do.
00258:01       Q.   And this is to Robert Rossi?
        02       A.   Yes.  Yes.
        03       Q.   And this is a different Rossi than the Emory
        04   Rossi?
        05       A.   It is.
        06       Q.   Right.  Robert Rossi is part of Life Tech?
        07       A.   Yes.
        08       Q.   Sales guy?
        09       A.   Yes.
        10       Q.   Okay.  And do you recall drafting this e-mail?
        11       A.   Vaguely, yes.
        12       Q.   Okay.  No question that you drafted it?
        13       A.   No.
        14       Q.   Okay.  And in the body of the e-mail, you point
        15   out that you spoke at length with Stacey DiSanto at
        16   Roswell Park Cancer Center in Buffalo about cell line
        17   profiling for post-transplant monitoring?
        18       A.   Yes.
        19       Q.   What I want to ask about is:  May I understand
        20   that what you mean by "cell line profiling for
        21   post-transplant monitoring" is what today we've been
        22   calling STR kit use for BME?
        23       A.   Yes.
        24       Q.   Okay.
        25       A.   That was unusual wordage there.
00259:01       Q.   Okay.  And looks like the Profiler Plus kit was
        02   being used?
        03       A.   That's what it looks like.
        04       Q.   And do you recall speaking with Stacey DiSanto
        05   at Roswell about this?
        06       A.   I remember that I did.  I don't remember the
        07   conversation specifically.
        08       Q.   Okay.  How much did you interact with Stacey or
        09   other people at Roswell?
        10       A.   Several times.
```

**73. PAGE 260:15 TO 262:06  (RUNNING 00:02:13.899)**

```
        15       Q.   And the employer is Roswell Park.  Do you see
        16   that?  It's about two-thirds of the way down from the
        17   top.
```

PTX1354_0031

**Promega Corporation v. Life Technologies Corporation**

```
    18      A.   Yes.
    19      Q.   Okay.  And there is a summary in the middle
    20  under a reference number, "Possible Inhibitor in DNA."
    21  Do you see that?
    22      A.   I do.
    23      Q.   Okay.  Do you recall a circumstance where
    24  Stacey conveyed a problem with a possible inhibitor?
    25      A.   That's quite possible.
00261:01      Q.   Okay.  Looking at the last page, just take a
    02  quick look at that and see if that jogs your memory.
    03      A.   Okay.  Okay.
    04      Q.   All right.  And then if you go to the first
    05  page, some kind of curious things appear.  In the middle
    06  of the page, Michelle Shepherd writes an e-mail on -- on
    07  Monday, the 22nd, at 11:15 a.m., and she sends it off to
    08  the technical support group and Ellen Bishop, and she
    09  says, "Shall we pass this one to Lisa O?  Or someone
    10  else?"  Do you see that?
    11      A.   I do.
    12      Q.   Then if you go to the e-mail above that, Ellen
    13  writes back to Michelle, "Lisa O. is aware of it.  I
    14  think she has been waiting to respond due to the recent
    15  uncertainty of our role in these types of applications."
    16  And you're copied on that?
    17      A.   Yes.
    18      Q.   Do you have any idea what they're talking
    19  about?
    20      A.   With what's being passed or with --
    21      Q.   "The recent uncertainty of our role."
    22      A.   Yes, I do.
    23      Q.   And what's that?
    24      A.   There had been raised the question as to
    25  whether or not we should be -- we should be promoting
00262:01  these kits in nonforensic environments.
    02      Q.   And that had come up recently?
    03      A.   I don't know exactly the date was when that had
    04  come up.
    05      Q.   2010 early, some part of 2000- --
    06      A.   It was before 2010.
```

**74. PAGE 264:08 TO 265:22  (RUNNING 00:02:26.243)**

```
    08      Q.   All righty.  Dr. Ortuno, the court reporter has
    09  marked as Exhibit 42 a four-page document, Bates stamped
    10  Life-0142343 and the last page ends with the numbers
    11  346.
    12      A.   Okay.
    13      Q.   Okay.  Let's start on the second page, and in
    14  the top third of that page, kind of towards the middle
    15  is an e-mail from you.  Do you see that?
    16      A.   Yes.
    17      Q.   And that's to Michelle?
    18      A.   Yes.
    19      Q.   And also to Jose Arboleda?
    20      A.   Correct.
    21      Q.   A-r-b-o-l-e-d-a.  Who is Jose?
    22      A.   He's a service engineer who does instrument
    23  installs and repairs.
    24      Q.   Okay.  And you authored this e-mail?
    25      A.   I did.
00265:01      Q.   No doubt about it?
    02      A.   No.
    03      Q.   Do you recall it?
    04      A.   Basically.
    05      Q.   Okay.  And you contacted Jose and asked him
    06  when he's going to do the install.  Do you see that?
    07      A.   Correct.
```

PTX1354_0032

## Promega Corporation v. Life Technologies Corporation

```
08      Q.   Was it your practice for you to interact with
09   the field service engineers where a piece of equipment
10   was going to be installed where you were going to be
11   responsible for training?
12      A.   Yes.
13      Q.   And why is that?
14      A.   So you can organize the timeline for training
15   with the customer.
16      Q.   Okay.  And depending on the use, would the
17   training -- would you dovetail the training to the
18   particular use?
19      A.   Yes.
20      Q.   Okay.  And did you do that in the case of Stony
21   Brook?
22      A.   I did.
```

**75. PAGE 265:25 TO 266:20  (RUNNING 00:01:34.515)**

```
25         Q.   Okay.  Dr. Ortuno, the court reporter has
00266:01   marked as Exhibit 43 a two-page document, Bates stamped
02         Life-0022961 to 22962.  If you can just look that over.
03         A.   Okay.
04         Q.   On the front page, there appears to be an
05      e-mail authored by you to a K-e-o Sullivan.
06         A.   Ken O. Sullivan.  Yes.
07         Q.   Okay.  And who is Ken Sullivan?
08         A.   He was -- I believe he was in a either director
09      or lab manager type position at Stony Brook.
10         Q.   Okay.  And is this a contact to Ken in advance
11      of the install?
12         A.   Or -- definitely in advance of the training.
13         Q.   Okay.
14         A.   I'm not sure about the install.  Let me see.  I
15      have to read it.  Instrument will be installed.  So yes,
16      it would have been.
17         Q.   Okay.  Is it fair to say this is a case where
18      ABI knew of the use of the instrument before the
19      instrument was installed?
20         A.   Yes.
```

**76. PAGE 267:22 TO 268:17  (RUNNING 00:01:30.274)**

```
22         Q.   Dr. Ortuno, the court reporter has marked as
23      Exhibit 44 a four-page document, beginning with
24      Life-0022965 and going to 22969.  If you could have a
25      look at that.
00268:01   A.   Okay.
02         Q.   Okay.  Let's start with the second page, which
03      is Bates stamped 22966.  There is an e-mail from you
04      there to, again, Jose Arboleda.  Do you see that?
05         A.   Yes.
06         Q.   Starts, "Hola Jose, Muchas gracias."  Do you
07      see that?
08         A.   Yes.
09         Q.   Do you recall this e-mail?
10         A.   Generally, yes.
11         Q.   Did -- were you pretty familiar with Jose?
12         A.   Yeah, I knew him pretty well.
13         Q.   Okay.  You had interacted with him on other
14      installs?
15         A.   On a few, yes.
16         Q.   Okay.  And any question you wrote this e-mail?
17         A.   No.
```

**77. PAGE 269:16 TO 270:04  (RUNNING 00:00:36.309)**

```
16         Q.   Okay.  Was it your habit to tell Jose the
17      particular configuration for a particular install in a
```

PTX1354_0033

## Promega Corporation v. Life Technologies Corporation

```
18  particular case?
19      A.   It was habit for you or someone doing a
20  training to communicate with the engineer to make sure
21  that you are on the same page with that.
22      Q.   Okay.
23      A.   So in this case, because of some of the
24  complexities I mentioned to you about the 3500
25  specifically, and this is probably the first 3500 I had
00270:01  worked with, we were really overcommunicating on that --
02      Q.   Okay.
03      A.   -- to make sure everybody knew exactly what was
04  going on.
```

**78. PAGE 278:17 TO 279:02  (RUNNING 00:01:00.571)**

```
17      Q.   Okay.  Doctor, the court reporter has marked as
18  Exhibit Number 48 a two-page document, Bates stamped
19  Life-0455838 to 839.
20      A.   Okay.
21      Q.   On the first page, it appears to be an e-mail
22  that you authored to a Samantha Allen.  Do you see that?
23      A.   I do.
24      Q.   Do you recall this e-mail?
25      A.   I recall generally speaking with her.
00279:01  Q.   Okay.  Any question that you authored this?
02      A.   No.
```

**79. PAGE 280:04 TO 281:08  (RUNNING 00:01:36.641)**

```
04      Q.   So I took it that you've got a new lab at Stony
05  Brook doing chimerism, you've got an existing customer
06  who is doing something similar, and you thought it would
07  be good for them to interact?
08      A.   Yes.  That was probably what I was thinking.
09      Q.   Okay.  So this would be somewhat similar to the
10  Northside/Emory situation in Atlanta where you
11  introduced two chimerism customers together?
12      A.   Right.
13      Q.   Okay.  And again, this was to help them help,
14  for example, a new chimerism lab like Stony Brook to get
15  answers to specific technical questions?
16      A.   To -- well, possibly.  When I did the training
17  for Stony Brook, Larry Usher, who was the lead
18  technician in that lab, actually did not attend the
19  training.  It was attended by three lower-level
20  technicians who were struggling quite a bit.  And there
21  were conversations about additional help and other
22  resources.
23      Q.   Okay.  But coming back now to just what Sam
24  would do if she talked to the people at Stony Brook, was
25  the idea here that Sam would be able to answer some of
00281:01  their questions at Stony Brook?
02      A.   Generally.  The idea was that the two different
03  labs have similar workflow or they have similar things
04  that they are doing.  They're doing the same kind of
05  work, so they have the same issues.  So if you get them
06  together, then they can work on those together.
07      Q.   And that might help one or both of them out?
08      A.   Correct.
```

**80. PAGE 329:20 TO 330:13  (RUNNING 00:01:00.148)**

```
20      Q.   Did Michelle Shepherd ever instruct you to
21  provide support for nonforensic customers by giving them
22  information outside the validated protocol?
23      A.   It was made clear to me that my role as a
24  non-HID point person, I was to support them as best as I
25  could -- as best as I could.
```

PTX1354_0034

## Promega Corporation v. Life Technologies Corporation

```
00330:01      Q.   And did you receive any -- ever receive any
      02   specific instructions from Michelle or from anyone else
      03   within that business unit as to specifically how you
      04   were to do that?
      05      A.   That's exactly what I asked for clarification
      06   on.  And they would just insist that to always try to
      07   get them to run the validated protocol, but then she
      08   would say -- and I was commended in my reviews
      09   repeatedly, which exist in the databases, for my support
      10   of these customers in helping them to get online, which
      11   they knew meant running things like POP6 and GeneMapper
      12   4.0 and providing the files that they needed to analyze
      13   the data.
```

**81. PAGE 330:14 TO 330:19 (RUNNING 00:00:18.658)**

```
      14      Q.   Do you recall any specific instructions, again,
      15   either from Michelle or any of her superiors, with
      16   respect to specifically how you were to support
      17   nonforensic customers outside of the protocol?
      18      A.   When you say "specific," I guess I would have
      19   to say no.
```

**82. PAGE 338:18 TO 338:23 (RUNNING 00:00:17.115)**

```
      18      Q.   Do you know what percentage -- and I'm talking
      19   now about the '07 time period forward.  Do you know what
      20   percentage of Applied Biosystems STR kits were sold for
      21   forensic uses as opposed to nonforensic uses?
      22      A.   The overwhelming majority was used for forensic
      23   uses.
```

**83. PAGE 340:02 TO 340:09 (RUNNING 00:00:15.707)**

```
      02      Q.   But if the kit was being purchased online, then
      03   would it be correct that there wouldn't be a sales rep
      04   that would know that?
      05      A.   Yeah.  They may not necessarily know.  Yeah.
      06   They wouldn't know of a online purchase.
      07      Q.   And wouldn't know what the -- what the online
      08   purchaser was using the kit for?
      09      A.   No, not necessarily.
```

**84. PAGE 340:10 TO 341:01 (RUNNING 00:00:49.169)**

```
      10      Q.   Did you ever -- have you ever had a reason or
      11   an occasion to conduct any sort of market studies
      12   regarding the various types of use of Applied Biosystems
      13   STR kits?
      14      A.   No.  That's not in the scope of my job
      15   description.
      16      Q.   And would you have had access to or would you
      17   have viewed that information while you were employed at
      18   Applied Biosystems?
      19      A.   I received a document with a list of users of
      20   HID kits, I believe it was from Guido Sandulli, listing
      21   all the people that had purchased STR kits specifically
      22   for nonforensic use.
      23      Q.   For what purpose did you receive that document?
      24   Do you know?
      25      A.   I think he was trying to ascertain how much
00341:01   money they bring in.
```

**85. PAGE 341:02 TO 341:17 (RUNNING 00:00:54.812)**

```
      02      Q.   Do you have any basis to know -- again, looking
      03   at nonforensic segments of the market, do you have any
      04   basis to know how large those segments are or if they
      05   would be growing or not?
```

PTX1354_0035

**Promega Corporation v. Life Technologies Corporation**

```
06      A.    It's -- an extremely small percentage of our
07   revenue comes from those.  It was growing.  I can tell
08   you I was getting more and more calls about it in the
09   past two years.  But still, it was a case where they
10   took up a lot of time, but they don't buy a whole lot.
11   They may buy a couple of kits a year.  Very low volume.
12      Q.    And would that be true for all nontraditional
13   users?
14      A.    The bone marrow engraftment labs probably would
15   comprise the highest sales, but still, even they were
16   very, very small amount of revenue.  I mean, oftentimes
17   the HID reps wouldn't even worry with it.
```

**86. PAGE 347:13 TO 347:15 (RUNNING 00:00:09.622)**

```
13      Q.    In fact, didn't we see today that Ms. Shepherd
14   didn't just sit back, she actually participated
15   sometimes in the training of nonforensic customers?
```

**87. PAGE 347:17 TO 347:17 (RUNNING 00:00:00.729)**

```
17            THE WITNESS:  Yes.
```

**88. PAGE 348:18 TO 348:22 (RUNNING 00:00:15.431)**

```
18      Q.    Oh, okay.  Yeah.  No.  No.  In other words,
19   this wasn't some company policy that you were aware of
20   that you couldn't support outside of the validated
21   protocol?
22      A.    No.
```

**89. PAGE 351:05 TO 351:11 (RUNNING 00:00:14.535)**

```
05            Would you characterize yourself as being a very
06   customer support oriented person?
07      A.    Yes.
08      Q.    Wanted to do whatever you could to support the
09   customer?
10      A.    Yes, but not to the extent that I don't do what
11   the company wants me to do.
```

TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 01:45:49.703)

CONFIDENTIAL

PTX1354_0036

## Promega Corporation v. Life Technologies Corporation

 **Rossi, Robert (Vol. 01) - 11/22/2011**                    1 CLIP  (RUNNING 01:00:45.684)

 QC020412



**ROSSDES**                    50 SEGMENTS  (RUNNING 01:00:45.684)

1. PAGE 6:03 TO 7:17  (RUNNING 00:01:01.410)

```
        03            This is the videotape
        04    deposition of Robert Rossi, taken by
        05    the Plaintiff, in the matter of
        06    Promega Corporation, et al. versus
        07    Life Technologies Corporation, et
        08    al.,  United States District Court,
        09    Western District of Wisconsin, Case
        10    No. 10-CV-281, held at the conference
        11    rooms of the Hanover Marriott,
        12    located in Whippany, New Jersey, on
        13    Tuesday, November 22nd, 2011, at
        14    9:20 a.m.
        15            I am Max Stein, the
        16    videographer.  The court reporter is
        17    Kathy McHugh.  We are from the firm
        18    of Amicus Court Reporting,
        19    Incorporated, in Chicago, Illinois.
        20            Counsel will now introduce
        21    themselves.
        22            MR. CARROLL:  Pete Carroll
        23    representing Promega.
        24            MR. McCARTHY:  Michael
00007:01    McCarthy representing Defendant Life
        02    Technologies.
        03            VIDEO OPERATOR:  The court
        04    reporter will now swear in the
        05    witness.
        06            ROBERT ROSSI, having been
        07    duly sworn, was examined and
        08    testified as follows:
        09                    EXAMINATION
        10    BY MR. CARROLL:
        11        Q.   Good morning.
        12        A.   Good morning.
        13        Q.   Can you give me your full
        14    name for the record.
        15        A.   Robert Rossi.
        16        Q.   And your residence?
        17        A.   Sparta, New Jersey.
```

2. PAGE 9:04 TO 12:11  (RUNNING 00:02:26.032)

```
        04        Q.   Okay.  Little bit of
        05    background.
        06            Let's start with college.
        07    What was your degree?
        08        A.   I have a Bachelor's in
        09    biology from what used to be North
        10    Adams State College, which is now
        11    Massachusetts College of Liberal
        12    Arts.
        13        Q.   Okay.  Way out in Western
        14    Mass.
        15        A.   Yes.
        16        Q.   I've been out there.
```

**CONFIDENTIAL**                                                             page 1

**PTX1355**                              PTX1355_0001

**Promega Corporation v. Life Technologies Corporation**

```
17          And what year was that?
18     A.   That was 1984.
19     Q.   Okay.  And any graduate
20  school?
21     A.   No.
22     Q.   And where did you go after
23  college?
24     A.   I had taken a position with
00010:01  a company called Yankee Oxygen at the
02  time, and that was a sales position
03  in the Boston area.
04     Q.   Okay.  How long did you
05  stay with them?
06     A.   One year.
07     Q.   All right.  And then where
08  did you go?
09     A.   From there, I went to a
10  company called Sarstedt.
11     Q.   And what's Sarstedt?
12     A.   They are a company that was
13  involved in manufacturing consumables
14  for the life sciences market.
15     Q.   Okay.  Another sales
16  position?
17     A.   Yes.
18     Q.   All right.  And how long
19  did you stay with them?
20     A.   Over three years.
21     Q.   And then where did you go?
22     A.   Then I went to a company
23  called Dawson Company, and I had a
24  sales role with them as well.
00011:01     Q.   Okay.  How many years with
02  them?
03     A.   Three years.
04     Q.   Okay.  And then where?
05     A.   And then to Becton-
06  Dickinson.
07     Q.   Okay.  What did you do
08  there?
09     A.   I was in sales, as well as
10  sales training, and that was also in
11  the Boston area.
12     Q.   Okay.  And if you can give
13  me a roundabout date for Becton-
14  Dickinson.
15     A.   I was there roughly six
16  years.
17     Q.   Okay.  From when to when,
18  roughly?
19     A.   Let's see.  Let's back up.
20  '98 is when I started with Applied
21  Biosystems, so it must have been '92,
22  '93 time frame.
23     Q.   Okay.  Now, let's just take
24  that time frame you just mentioned,
00012:01  '92, '93 to '98.
02          During that period or prior
03  to that, had you learned about
04  amplification of DNA?
05     A.   No, I have not.
06     Q.   Okay.  So then you joined
07  Applied Biosystems in 1998?
08     A.   Yes.
09     Q.   And what's your position
10  there?
```

**CONFIDENTIAL**

PTX1355_0002

**Promega Corporation v. Life Technologies Corporation**

```
      11      A.    Sales representative.
```

**3. PAGE 12:12 TO 13:19  (RUNNING 00:01:00.441)**

```
      12      Q.    Okay.  And what did you do
      13  in 1998?  What kind of sales?  What
      14  kind of products?
      15      A.    At that time, it was
      16  primarily realtime PCR technology.
      17      Q.    Okay.  And if you hadn't
      18  had any PCR prior to that, how did
      19  you pick that up?
      20      A.    Through training from -- at
      21  the time, it was PE Biosystems.
      22      Q.    Oh, okay.  And did they
      23  have some kind of formal training for
      24  new people?
00013:01      A.    Yes.
      02      Q.    Oh, and what did that
      03   entail?
      04      A.    That was, more or less,
      05   training in the basics, initially
      06   starting with PCR, in terms of some
      07   of the history, as well as the
      08   methodology of PCR.
      09            And then from there, there
      10  was some additional training in
      11  realtime PCR, more or less theory, as
      12  well as fundamentals and chemistry.
      13      Q.    Okay.  Did you get a chance
      14  to actually perform PCR?
      15      A.    No.
      16      Q.    Okay.  And just for the
      17  record, PCR is the polymerase chain
      18  reaction?
      19      A.    Yes.
```

**4. PAGE 14:16 TO 18:17  (RUNNING 00:03:04.257)**

```
      16      Q.    All right.  Great.
      17            So the first position at
      18  ABI in 1998 was a sales position
      19  involving realtime PCR.  How long did
      20  you stay in that position?
      21      A.    That was roughly three
      22  years.
      23      Q.    Okay.  And what caused you
      24  to change that position?
00015:01      A.    Within Applied Biosystems,
      02   there was another opportunity as a
      03   sales representative and that was
      04   more along the lines of automated
      05   cell culture technology, as well as
      06   cell-based assays that we had a new
      07   platform that we were promoting.
      08      Q.    Okay.  And approximately
      09   when was that?
      10      A.    That was -- must have been
      11  19 -- or just right around 2000 was
      12  the first year that I started in that
      13  role.
      14      Q.    Now, let's talk about those
      15  two roles.  The one in '98 and then
      16  the one in 2000 or so.
      17            Those were both sales
      18  positions, but did they involve going
      19  out on the road and meeting with
```

PTX1355_0003

## Promega Corporation v. Life Technologies Corporation

```
    20  potential customers or was it some
    21  kind of other sales position?
    22     A.   No.  It would be with
    23  meeting with customers, potential
    24  customers, to utilize that
00016:01  technology.
    02     Q.   Okay.  And in this second
    03  position now with the, I think you
    04  said, cell culture, did I hear that
    05  right?
    06     A.   Yes.  Cell culture
    07  automated assays.
    08     Q.   Okay.  Now, did you get
    09  some training for that?
    10     A.   That was more on-the-job
    11  types of training, but there wasn't
    12  formal training, per se.
    13     Q.   Okay.  And then how long
    14  did you keep that position?
    15     A.   Five years.
    16     Q.   Okay.  And then what did
    17  you do?
    18     A.   And then I came back into
    19  more of the core business, still as a
    20  sales representative, and that was
    21  more, again, in realtime PCR, as well
    22  as PCR, and that was primarily in the
    23  New York, New Jersey area.
    24     Q.   Okay.  Again, a sales
00017:01  position?
    02     A.   Yes.
    03     Q.   Okay.  And how long did you
    04  have that position?
    05     A.   Three years.
    06     Q.   All right.  And then that
    07  brings us up to 2008, somewhere
    08  around there?
    09     A.   Yes.
    10     Q.   And then what did you do?
    11     A.   And then it was more of a
    12  hybrid role, I believe is what they
    13  called it, more as a strategic
    14  account manager.
    15     Q.   Okay.
    16     A.   So I covered primarily
    17  pharmaceutical and biotech accounts
    18  and it was still, more or less,
    19  selling the realtime PCR technology.
    20     Q.   Okay.  That was 2008?
    21     A.   Yes.
    22     Q.   Okay.  Has that stayed the
    23  same or have things changed?
    24     A.   Now, in this current role,
00018:01  I am more as -- still as a sales
    02  representative, but more on the human
    03  identification forensics marketplace.
    04     Q.   Okay.  And when
    05  approximately did that happen?
    06     A.   That happened in 2010.
    07     Q.   Okay.  And what caused you
    08  to take that position, if anything?
    09     A.   Just, more or less, an
    10  interest in the market.
    11     Q.   Okay.
    12     A.   And an opening within that
    13  area.
```

PTX1355_0004

## Promega Corporation v. Life Technologies Corporation

```
14      Q.   Okay.  And so now the
15  product in this new position -- and
16  it's your current position?
17      A.   Yes.
```

**5.  PAGE 40:05 TO 44:21  (RUNNING 00:03:55.851)**

```
05          Q.   Okay.  And my question is,
06  since January of 2010, have you had
07  occasion to find somebody new, a new
08  entity, who previously was not buying
09  ABI STR kits, but through your sales
10  activity now buys ABI STR kits?
11      A.   Yes.
12      Q.   Okay.  And who is that?
13      A.   That would be Dartmouth
14  Medical College or Mary Hitchcock
15  Medical Center.
16      Q.   All right.  So I've seen
17  that name in a variety of formats.
18          I've seen Dartmouth-
19  Hitchcock Medical Center.  Is that
20  one of the names for that institution
21  you're talking about?
22      A.   Yes.
23      Q.   Okay.  And what do they do?
24      A.   At that facility they do --
00041:01  well, I guess, could you be a little
02  bit more specific in terms of the --
03  because there are several customers
04  there that also do a number of --
05          Q.   Okay.  So let's talk
06  with -- about your initial sales
07  approach to -- I'll call it
08  Dartmouth-Hitchcock Medical Center.
09  Is that okay?
10      A.   Yes.
11      Q.   Your initial sales
12  approach, who did you -- who did you
13  contact there?
14      A.   Well, that was through one
15  of my colleagues that I work with at
16  Applied Biosystems.
17      Q.   Who was that?
18      A.   That was Aviva Nestler.
19      Q.   Okay.  And what does Aviva
20  Nestler do?
21      A.   She's my counterpart, but
22  she primarily sells the genetic
23  analyzers to the pharmaceutical, the
24  research, the academic types of
00042:01  accounts.
02          Q.   Okay.  Does she also
03  involve herself in selling HLA kits?
04      A.   HLA kits?
05      Q.   Yes.
06      A.   No.
07          Q.   Okay.  So Aviva introduced
08  you to this Dartmouth-Hitchcock
09  Medical Center?
10      A.   Yes.
11      Q.   And how did that happen?
12      A.   Aviva had sold some
13  instrumentation to the laboratory for
14  doing a couple of tests for, I
15  believe it was -- and I'm not 100
16  percent certain, but I believe it was
```

## Promega Corporation v. Life Technologies Corporation

```
17  a test called KRAS.
18      Q.   Okay.  And what kind of lab
19  was this?
20      A.   That was a clinical
21  laboratory.
22      Q.   Okay.  And what did the
23  clinical laboratory do?
24      A.   General types of work that
00043:01  you'd find in a traditional clinical
02  lab setting.
03      Q.   Okay.
04      A.   So they did various types
05  of hematological-type work, as well
06  as some genetic work as well in this
07  particular case.
08      Q.   Any transplant work?
09      A.   They -- I believe that they
10  were just beginning to do some of
11  that.
12      Q.   Okay.  And then Aviva
13  introduced you to somebody there?
14      A.   Yes.
15      Q.   And who was that?
16      A.   I believe it was Samantha.
17      Q.   Samantha Allen?
18      A.   Yes.
19      Q.   Okay.  And did you actually
20  physically meet with her?
21      A.   Yes.
22      Q.   And where is that?
23  Lebanon, New Hampshire, I think.
24      A.   That's right.
00044:01      Q.   Okay.  So you went up to
02  Lebanon, New Hampshire and met with
03  Samantha Allen?
04      A.   Yes.
05      Q.   Was Aviva there at the
06  meeting?
07      A.   Yes.
08      Q.   Okay.  And what happened at
09  that meeting?
10      A.   Aviva had introduced me to
11  the folks in the laboratory, and it
12  was my understanding that they were
13  looking to do some testing in
14  addition to the KRAS types of tests
15  that they had originally purchased
16  the equipment for.
17          They were also looking to
18  do some additional testing on the
19  instrument.  And I believe it was the
20  engraftment type of work that they
21  were looking to do.
```

**6.  PAGE 45:09 TO 46:11  (RUNNING 00:00:55.748)**

```
09          Just so we get our hands
10  around engraftment, because, again,
11  there's a lot of terminology there.
12  I'm aware, for example, with bone
13  marrow engraftment that they refer to
14  engraftment where they transplant
15  bone marrow and then they see whether
16  it takes in the recipient and they
17  call that engraftment.
18          Is that your understanding,
19  too?
```

CONFIDENTIAL                                             page 6

## Promega Corporation v. Life Technologies Corporation

```
20      A.   Basically, yes.
21      Q.   Okay.  And so was it your
22  understanding that Samantha Allen was
23  interested in using ABI STR kits to
24  monitor bone marrow engraftment?
00046:01      A.   I -- I believe monitor
02  might be the correct term, but I
03  can't be 100 percent certain.
04      Q.   Okay.  And so what did you,
05  if anything, tell Samantha Allen
06  about ABI STR kits?
07      A.   I just, more or less,
08  informed her on what we had
09  available --
10      Q.   Okay.
11      A.   -- for that.
```

**7. PAGE 48:08 TO 49:05  (RUNNING 00:00:46.560)**

```
08           I'll start with Samantha
09  Allen.  Did she buy ABI STR kits?
10      A.   I believe she did.
11      Q.   Okay.  She ordered them up?
12      A.   I believe so.
13      Q.   Okay.  And do you know what
14  machine she used them on, what
15  instrument?
16      A.   I believe it was the same
17  instrument that Aviva had sold to
18  her.
19      Q.   And that was a...?
20      A.   That was the 3500 Genetic
21  Analyzer.
22      Q.   Okay.  So that was a newer
23  machine in the summer of 2010?
24      A.   Yes.
00049:01      Q.   Okay.  And do you know if
02  that laboratory is today purchasing
03  ABI STR kits to monitor bone marrow
04  engraftment?
05      A.   I believe that they do.
```

**8. PAGE 52:22 TO 53:08  (RUNNING 00:00:28.285)**

```
22      Q.   Okay.  Any nonforensic
23  entities of that type that you
24  developed on your own, through your
00053:01  own sales activities, since January
02  of 2010?
03      A.   I believe it would be --
04  that would purchase product, I
05  believe it would be Dartmouth and the
06  Stony Brook, would really be the two
07  that come to mind that I would call
08  customers.
```

**9. PAGE 60:10 TO 63:16  (RUNNING 00:04:48.479)**

```
10      Q.   Mr. Rossi, the court
11  reporter has marked as Exhibit 5 a
12  multipage document, Bates stamped
13  Life-0001748 to 1761.
14           If you'd take a second to
15  look at that, I'll ask you some
16  questions.
17      A.   (Witness reviews document.)
18  Okay.
19      Q.   Have you seen this document
```

**Promega Corporation v. Life Technologies Corporation**

```
20  before?
21      A.   Yes.
22      Q.   And on what occasion?
23      A.   I would have to believe it
24  was during the time when we had our
00061:01  forecast reporting.
02      Q.   Okay.  And Dave Oehler was
03  preparing those?
04      A.   I don't know if he directly
05  prepared these or if they were
06  prepared for him.
07      Q.   Okay.  But, from time to
08  time, you would see these types of
09  forecasts?
10      A.   Periodically.
11      Q.   Okay.  And I notice that
12  the salespeople along the top are the
13  salespeople we saw before in the
14  organizational chart of Exhibit 2.
15      A.   Yes.
16      Q.   Okay.  So, I take it, this
17  was in the 2010 period when you were
18  still reporting to Dave Oehler?
19      A.   Yes.
20      Q.   Okay.  And staying with the
21  first page, which is Bates stamped
22  1748, the third column from the far
23  right, there's Rossi.
24          Do you see that?
00062:01      A.   Yes.
02      Q.   And that's you?
03      A.   Yes.
04      Q.   Okay.  And what is being
05  represented in the two boxes where
06  you have your name on the upper box,
07  which appears to say, on the far
08  left -- sorry -- Q2 forecast.  And
09  then down in the second box, it says,
10  Q2 upside.
11          What's being communicated
12  there, if you know?
13      A.   Forecast would be what's
14  projected for that quarter.
15      Q.   Okay.
16      A.   Upside would be defined as
17  what is in the funnel, to use a sales
18  term --
19      Q.   Okay.
20      A.   -- but not necessarily
21  forecasted.
22      Q.   Okay.  So help me
23  understand that phrase "in the
24  funnel."  Is that something that's
00063:01  further out on the horizon or more
02  sure, a sure bet?
03      A.   It's -- it's an ambiguous
04  term.  It could cover that area.
05      Q.   Okay.
06      A.   You could -- because things
07  could potentially change, of course.
08      Q.   All right.  Okay.  Now, it
09  looks in the upper box -- and, again,
10  I'm just looking at your box, Rossi,
11  if I line that up right, and I can
12  read this small print, it looks like
13  80,000 in revenue is forecast for CE
```

## Promega Corporation v. Life Technologies Corporation

```
14  instruments, parentheses, HID, close
15  parentheses; is that right?
16     A.  Yes.
```

**10.  PAGE 64:03 TO 65:05  (RUNNING 00:00:59.427)**

```
03            Is this forecasting an
04  $80,000 instrument that you think you
05  may sell to a customer for running
06  ABI STR kits?
07     A.  It potentially could be for
08  additional applications as well.
09     Q.  Okay.  But I saw that
10  parentheses, HID, so I assumed, at
11  least, ABI STR kits was involved,
12  right?
13     A.  Yes.
14     Q.  Okay.  And the CE stands
15  for capillary electrophoresis?
16     A.  Yes.
17     Q.  Okay.  And help me out.  At
18  this time, assuming this is 2010,
19  what instrument would run around
20  $80,000 that could run ABI STR kits?
21     A.  It could be a couple of
22  different instruments.
23     Q.  Okay.  3130?
24     A.  Yes.
00065:01     Q.  That's in that price range,
02  around?
03     A.  Yes.
04     Q.  Okay.  For a single
05  instrument?
```

**11.  PAGE 76:14 TO 77:04  (RUNNING 00:02:54.213)**

```
14     Q.  Mr. Rossi, the court
15  reporter has marked as Exhibit 6 a
16  multipage document, Bates stamped
17  Life-0249533 and going to 560.
18            Can you take a look at that
19  and I can ask you a question or two
20  about it.
21     A.  (Witness reviews document.)
22  Okay.
23     Q.  Have you had occasion to
24  see this document before?
00077:01     A.  Yes.
02     Q.  And on what occasion?
03     A.  I believe monthly, at a
04  minimum.
```

**12.  PAGE 78:19 TO 80:02  (RUNNING 00:01:27.687)**

```
19     Q.  Okay.  So, on this first
20  page, which is Bates stamped 249533,
21  it looks like looking down from --
22  actually, let's go from the bottom
23  up.  Going up one line from the Grand
24  Total line, it says, Robert Rossi.
00079:01            Do you see that?
02     A.  Yes.
03     Q.  So these are sales specific
04  to you?
05     A.  Yes.
06     Q.  Okay.  So these are sales
07  numbers for the entities within your
08  region?
```

**CONFIDENTIAL**

PTX1355_0009

## Promega Corporation v. Life Technologies Corporation

```
09        A.   Yes.
10        Q.   Okay.  And with respect to
11   that, let's go three pages in to the
12   page that's Bates stamped 249535.
13             Do you see that?
14        A.   Yes.
15        Q.   Okay.  And was this part of
16   the report familiar to you, too?
17        A.   Yes.
18        Q.   So this was more of the
19   details of the sales, whereas, the
20   front page is the summary?
21        A.   Yes.
22        Q.   Okay.  And are the entities
23   listed on what's been Bates stamped
24   249535 entities you're responsible
00080:01   for in your territory?
02        A.   Yes.
```

**13. PAGE 80:22 TO 81:02  (RUNNING 00:00:08.377)**

```
22        Q.   Okay.  And then the next
23   entry is Esoterix Genetic
24   Laboratories.
00081:01             Do you see that?
02        A.   Yes.
```

**14. PAGE 82:03 TO 82:19  (RUNNING 00:00:45.090)**

```
03        Q.   Okay.  Do they use ABI STR
04   kits?
05        A.   Yes.
06        Q.   And do they use it for
07   maternal cell contamination testing?
08        A.   I believe so.
09        Q.   Okay.  And what is maternal
10   cell contamination, if you know?
11        A.   My understanding, and I'm a
12   salesperson, not a technical person,
13   per se, but my understanding is, it
14   is a method that they utilize to
15   determine if there is any of the
16   mother's blood that is coming into
17   contact with the fetus, and it's,
18   more or less, a quality control type
19   of a test that's done.
```

**15. PAGE 84:05 TO 86:08  (RUNNING 00:01:50.624)**

```
05        Q.   Okay.  And before the
06   break, you had mentioned that they
07   use ABI STR kits for maternal cell
08   contamination?
09        A.   Yes.
10        Q.   And you had mentioned you
11   had visited the lab.  When was the
12   last time you visited them?
13        A.   I believe it would have
14   been several months ago.
15        Q.   Okay.  But this year?
16        A.   It actually could have been
17   in 2010.  It could have even been
18   further back.
19        Q.   Okay.  And did you have
20   occasion to meet the people in the
21   lab?
22        A.   Generally, it would just be
23   one individual that I would meet
```

## Promega Corporation v. Life Technologies Corporation

```
      24  with.
00085:01          Q.   And who would that be?
      02          A.   That would be Sue
      03  Countryman.
      04          Q.   Okay.  That's your primary
      05  contact?
      06          A.   Yes.
      07          Q.   Okay.  And you had occasion
      08  to interact personally when you
      09  visited?
      10          A.   Yes.
      11          Q.   And is it -- do you keep in
      12  contact with her electronically when
      13  you're not visiting?
      14          A.   Yes.
      15          Q.   And when she wants more ABI
      16  STR kits for maternal cell
      17  contamination testing, does she
      18  e-mail you and tell you that?
      19          A.   Yes.
      20          Q.   Okay.  And then do you
      21  arrange to have the kits shipped out?
      22          A.   I'm a link in the process,
      23  yes.
      24          Q.   Okay.  And, according to
00086:01  this, the sales involved $61,787 in
      02  2010.
      03          A.   Yes.
      04          Q.   Does that comport with your
      05  recollection about the size of their
      06  business with respect to buying ABI
      07  STR kits?
      08          A.   I believe so, yes.
```

**16. PAGE 87:14 TO 89:06  (RUNNING 00:01:04.238)**

```
      14          Q.   Okay.  And then there's the
      15  Hackensack University Medical Center.
      16          Do you see that?
      17          A.   Yes.
      18          Q.   Have you visited them?
      19          A.   Yes.
      20          Q.   And when was that,
      21  approximately?  This year?  Last
      22  year?
      23          A.   That would be this year.
      24          Q.   This year.  Okay.
00088:01          And do you have a primary
      02  contact there, too?
      03          A.   Yes.
      04          Q.   And who is that?
      05          A.   Dr. Tao Hong.
      06          Q.   Okay.  And is he the head
      07  of the lab?
      08          A.   I don't know if he's the
      09  head of the laboratory, but he's --
      10  he's my primary contact.
      11          Q.   Okay.  And what does his
      12  lab do?
      13          A.   They are -- they're a
      14  clinical pathology laboratory.
      15          Q.   Okay.
      16          A.   So they do a number of
      17  classical clinical types of testing.
      18          Q.   Okay.  And do they use ABI
      19  STR kits?
      20          A.   Yes.
```

PTX1355_0011

## Promega Corporation v. Life Technologies Corporation

```
21      Q.   And do you know for what
22  purpose they use those kits?
23      A.   I believe that these would
24  be used for bone marrow monitoring.
00089:01    Q.   Okay.  Like we talked about
02  earlier?
03      A.   Um-hum.
04      Q.   Bone marrow engraftment
05  monitoring?
06      A.   Um-hum.  Yes.
```

**17. PAGE 93:01 TO 93:18  (RUNNING 00:00:25.475)**

```
00093:01    Q.   All right.  Children's
02  Hospital at Boston.
03          Do you see that?
04      A.   Yes, I do.
05      Q.   Have you visited them?
06      A.   Yes, I have.
07      Q.   And do they buy ABI STR
08  kits?
09      A.   I believe that they do.
10      Q.   Okay.  And do you know how
11  they use them?
12      A.   I believe with Children's
13  it's in a research type of an
14  application.
15      Q.   Okay.
16      A.   But I can't really be
17  specific in terms of the type of
18  research that they do there.
```

**18. PAGE 96:20 TO 97:13  (RUNNING 00:00:24.613)**

```
20      Q.   All right.  Then there's
21  the University of Medicine &
22  Dentistry of New Jersey.
23          Do you see that?
24      A.   Yes.
00097:01    Q.   Have you visited them?
02      A.   Not in my current role.
03      Q.   Okay.  Do you know if they
04  buy ABI STR kits?
05      A.   I believe that they have in
06  the past.
07      Q.   Okay.
08      A.   I don't know what their
09  current situation is right now.
10      Q.   Do you know how they used
11  them in the past?
12      A.   I believe it was in a
13  research application as well.
```

**19. PAGE 99:05 TO 99:14  (RUNNING 00:00:14.004)**

```
05      Q.   Okay.  Have you visited
06  University of Connecticut?
07      A.   In my past role, I have.
08      Q.   But not in your current?
09      A.   Not in my current role.
10      Q.   Do you know if they buy ABI
11  STR kits?
12      A.   I believe that they had
13  applications in the research
14  facility.
```

**CONFIDENTIAL**                                                                **page 12**

## Promega Corporation v. Life Technologies Corporation

**20. PAGE 100:05 TO 100:14  (RUNNING 00:00:17.122)**

```
05        Q.    Okay.  So we'll stick with
06  Dartmouth Medical School for a
07  second.
08             Have you visited them?
09        A.   I have not visited them.
10        Q.   Do you know if they buy ABI
11  STR kits?
12        A.   I believe that they have
13  purchased a kit for a research
14  application.
```

**21. PAGE 102:05 TO 103:13  (RUNNING 00:01:08.742)**

```
05        Q.    Okay.  University of New
06  Haven.  Do you see that?
07        A.    Yes.
08        Q.    Have you ever visited?
09        A.    Yes.
10        Q.    In your current role?
11        A.    Yes.
12        Q.    Okay.  And do you have a
13  contact person there?
14        A.    Yes.
15        Q.    And who is that?
16        A.    I'm drawing a blank on her
17  name, but I have visited.
18        Q.    Okay.  If you think of it,
19  we'll get back to it.
20             Do they buy ABI STR kits?
21        A.    Yes, they do.  They have a
22  forensics program on-site there, so
23  they do use some of our chemistries.
24        Q.    Do they use any ABI STR
00103:01  kits for research?
02        A.    That, I -- I don't know.
03        Q.    Okay.  Do you know if they
04  use ABI STR kits for any clinical
05  testing?
06        A.    I don't believe so.  My
07  recollection is that they used these
08  kits as a tool for teaching for their
09  crime program or their forensics
10  program.
11        Q.    Okay.  So they would
12  actually use them in the classroom?
13        A.    I -- or the laboratory.
```

**22. PAGE 104:01 TO 105:20  (RUNNING 00:01:09.828)**

```
00104:01        Q.    Okay.  We'll skip over
02  Niagara County Sheriff's Department,
03  and go to Yale University.
04             Do you see that?
05        A.    Yes.
06        Q.    And have you visited Yale?
07        A.    Yes, I have.
08        Q.    In your current role?
09        A.    In my current role, but
10  mostly in my previous role.
11        Q.    Okay.  And do they buy ABI
12  STR kits?
13        A.    I believe that they do, but
14  I'm not certain if this is actually
15  Yale, per se, that actually is
16  purchasing.
17        Q.    Oh.  It could be another
```

PTX1355_0013

## Promega Corporation v. Life Technologies Corporation

```
    18  entity?
    19       A.   It could be another entity.
    20       Q.   And who would that be?
    21       A.   It -- it might be the VA
    22  that is associated with Yale.
    23       Q.   Okay.  And that's the
    24  Veterans Administration Hospital?
00105:01       A.   Yes.
    02       Q.   Okay.  And, to your
    03  knowledge, does the Veterans
    04  Administration Hospital buy ABI STR
    05  kits?
    06       A.   I believe there is a
    07  laboratory that does.
    08       Q.   Okay.  And do you know for
    09  what purpose?
    10       A.   I know that it's more in
    11  the research area.
    12       Q.   Okay.
    13       A.   But I don't recall the
    14  specific application.
    15       Q.   Have you visited the VA?
    16       A.   Yes, I have.
    17       Q.   Okay.  And is there a
    18  contact person there?
    19       A.   I believe it is Ann Marie
    20  Lacabelle.
```

**23. PAGE 109:03 TO 109:17  (RUNNING 00:00:24.996)**

```
    03       Q.   Okay.  Columbia University.
    04  Do you see that?
    05       A.   Yes.
    06       Q.   Ever visited?
    07       A.   Yes.
    08       Q.   Do you have a contact
    09  person there?
    10       A.   I do.  And I'm -- I don't
    11  recall her name.
    12       Q.   Okay.  Is she a researcher?
    13       A.   She is a researcher, yes.
    14       Q.   Okay.  And she buys ABI STR
    15  kits for research?
    16       A.   I believe it's a research
    17  project that they do there, yes.
```

**24. PAGE 109:22 TO 112:24  (RUNNING 00:02:10.981)**

```
    22       Q.   Okay.  Do you know if
    23  Columbia University buys ABI STR kits
    24  for any other purpose but research?
00110:01       A.   I don't believe there's any
    02  other purpose other than research.
    03       Q.   Okay.  MIT Lincoln
    04  Laboratory.  Do you see that?
    05       A.   Yes.
    06       Q.   And that's the one in
    07  Cambridge, Mass?
    08       A.   I don't believe so.
    09       Q.   Oh.  Where is it located?
    10       A.   I believe this would be in
    11  Lexington.
    12       Q.   Okay.  Outside Boston?
    13       A.   Yes.
    14       Q.   All right.  Have you
    15  visited?
    16       A.   Yes.
```

PTX1355_0014

## Promega Corporation v. Life Technologies Corporation

```
17      Q.   And do you have a contact
18   there?
19      A.   Yes.
20      Q.   One person or several
21   people?
22      A.   One main person.
23      Q.   Okay.  Who is that?
24      A.   And that would be Martha
00111:01   Petrovick.
02      Q.   Okay.  And is she a
03   researcher?
04      A.   She is a researcher.
05      Q.   Okay.  And what does she
06   do?
07      A.   I really don't know.
08      Q.   Okay.
09      A.   At that facility, I don't
10   know if they really let you know what
11   they do there, because -- well,
12   because of the contract, military
13   types of contracts that they have
14   there.  I don't know what they really
15   do there.
16      Q.   Okay.  Have you discussed
17   -- well, let me ask you first.  Do
18   they use ABI STR kits?
19      A.   I believe they do, yes.
20      Q.   Okay.  And have you talked
21   to your contact there about the use
22   of those kits for her purpose?
23      A.   I've had a discussion
24   and -- but I do not know what the
00112:01   purpose is for their use.
02      Q.   Okay.  Do you know
03   generally whether it's a research
04   purpose or a clinical purpose?
05      A.   I believe it would have to
06   be a research purpose.
07      Q.   Okay.  And then there's
08   part -- oh, let me ask you about MIT
09   Lincoln Lab.  $41,795 in sales in
10   2010.
11           Does that comport with your
12   recollection about the size of the
13   business there?
14      A.   That sounds about right,
15   yes.
16      Q.   Okay.  And then 60,000 year
17   to date, 2011.  Does that sound about
18   right?
19      A.   Yes.
20      Q.   Okay.  So the work there is
21   increasing?
22      A.   Yes.  I would say -- I
23   would say so, based -- just based on
24   the numbers.
```

**25. PAGE 114:03 TO 114:23  (RUNNING 00:00:40.299)**

```
03      Q.   Okay.  And have you visited
04   Mass General?
05      A.   Yes.
06      Q.   And do you have a contact
07   there?
08      A.   Yes.
09      Q.   And is it clinical or
10   research?
```

CONFIDENTIAL

PTX1355_0015

## Promega Corporation v. Life Technologies Corporation

```
11      A.   I believe it is clinical.
12      Q.   Okay.  And who's the
13 contact?
14      A.   I believe that's Jessica
15 Reid.
16      Q.   Okay.  And do you know what
17 clinical application they use?
18      A.   I believe one of the -- one
19 of the applications, they're a tissue
20 typing laboratory.
21      Q.   Okay.  So do they buy ABI
22 STR kits for tissue typing?
23      A.   I believe that they may.
```

**26. PAGE 115:08 TO 116:12  (RUNNING 00:00:43.679)**

```
08      Q.   Okay.  Let's go to Brigham
09 and Women's Hospital, which you said
10 was also part of the Partners Group.
11           Have you visited there?
12      A.   Yes.
13      Q.   Okay.  Do you have a
14 contact there?
15      A.   Yes.
16      Q.   And who is that?
17      A.   That would be Earl Smith.
18      Q.   All right.  And who is Earl
19 Smith?
20      A.   He is more of an
21 administrator.
22      Q.   Okay.  And do they buy ABI
23 STR kits at Brigham and Women's
24 Hospital?
00116:01      A.   Yes.
02      Q.   And how do they use those
03 kits?
04      A.   I'm not 100 percent
05 certain, because I pretty much deal
06 directly with Earl.
07      Q.   Okay.
08      A.   It is in a tissue typing
09 laboratory.
10      Q.   Okay.  So it would be for a
11 clinical purpose?
12      A.   It may.
```

**27. PAGE 116:13 TO 116:17  (RUNNING 00:00:08.448)**

```
13      Q.   Okay.  Rhode Island
14 Department of Health, is that a
15 clinical entity or a forensic entity?
16      A.   That would be a forensics
17 entity.
```

**28. PAGE 116:18 TO 117:14  (RUNNING 00:00:37.295)**

```
18      Q.   Okay.  Rutgers State
19 University.  Do you see that?
20      A.   Um-hum.
21      Q.   Have you visited?
22      A.   Yes.
23      Q.   Recently?
24      A.   Within the past six months.
00117:01      Q.   Okay.  And do they buy ABI
02 STR kits?
03      A.   I believe they do.
04      Q.   Okay.  And do you have a
05 contact there?
```

PTX1355_0016

## Promega Corporation v. Life Technologies Corporation

```
06      A.   I believe that's Amrik
07   Sahota.
08      Q.   Okay.  And who's Amrik
09   Sahota?
10      A.   I believe he is a
11   researcher.
12      Q.   Okay.  And is he the one
13   buying the ABI STR kits?
14      A.   I believe so.
```

**29. PAGE 117:15 TO 117:17  (RUNNING 00:00:02.821)**

```
15      Q.   And do you know what kind
16   of research he does?
17      A.   That, I do not know.
```

**30. PAGE 124:09 TO 125:12  (RUNNING 00:01:27.097)**

```
09      A.   Yes.  It would denote the
10   instrument configuration.
11      Q.   Okay.  And then the last
12   header before the Grand Total is STR
13   Kits.
14           Do you see that?
15      A.   Yes.
16      Q.   Okay.  And on that line, it
17   indicates that STR kits sales in 2010
18   were approximately $279,000.
19           Does that comport with your
20   recollection for your sales in 2010
21   of the ABI STR kits?
22      A.   No, it does not.
23      Q.   And what's your
24   recollection?
00125:01     A.   This document would really
02   only contain what would be considered
03   shared territory for my sales.  This
04   would not encompass all of the crime
05   laboratories that I also support as
06   well.
07           So this figure would -- the
08   way the question was asked, this
09   figure really would not assume what
10   my total sales were within my total
11   territory based on -- based on this
12   information.
```

**31. PAGE 125:23 TO 126:19  (RUNNING 00:01:12.041)**

```
23      Q.   Okay.  Is it a list of all
24   your research customers?
00126:01     A.   Yes.  This would be a mix
02   of research, as well as some
03   forensics.
04      Q.   And would this be a list of
05   all your clinical customers?
06      A.   It would be a list, as you
07   defined clinical customers being
08   mine.  I would say that I support
09   some of those customers.
10           I do have counterparts that
11   also would cover these customers, and
12   they would sell, as mentioned
13   earlier, things like sequencing types
14   of chemistries, realtime PCR types of
15   chemistries.
16           So I would not necessarily
17   be the only person or salesperson
```

**CONFIDENTIAL**                                    page 17

**Promega Corporation v. Life Technologies Corporation**

```
        18  that would touch these customers, per
        19  se.
```

**32.  PAGE 127:15 TO 127:18  (RUNNING 00:00:05.968)**

```
        15      Q.   And so what's really
        16  missing here is your other forensic
        17  clients?
        18      A.   Yes.
```

**33.  PAGE 133:23 TO 134:13  (RUNNING 00:01:36.681)**

```
        23      Q.   Mr. Rossi, the court
        24  reporter has marked as Exhibit 7 a
  00134:01  multipage document, Bates stamped
        02  Life-0002063 and it goes to 2068.
        03          Do you see that?
        04          If you could just take a
        05  look at that, I'll ask you a couple
        06  of questions.
        07      A.   Okay.
        08          (Witness reviews document.)
        09  Okay.
        10      Q.   And do you recognize this
        11  document?
        12      A.   I've probably seen it at
        13  some time.
```

**34.  PAGE 136:12 TO 137:03  (RUNNING 00:00:42.007)**

```
        12      Q.   So when I looked at this, I
        13  assumed that this was tracking what's
        14  going on in these various entities
        15  with regard to evaluating and
        16  deciding whether to adopt the
        17  Identifiler Plus STR kit.
        18          Is that your understanding,
        19  too?
        20      A.   It looks like that's what
        21  it would imply, yes.
        22      Q.   Now, was the Identifiler
        23  Plus a new kit?
        24      A.   Yes.
  00137:01      Q.   Okay.  Did it come out in
        02  2010?
        03      A.   I believe so.
```

**35.  PAGE 141:13 TO 142:20  (RUNNING 00:01:08.393)**

```
        13      Q.   Okay.  Turning now to
        14  what's been Bates stamped 2065.  It's
        15  about the third page in on this.  And
        16  going all the way to the bottom.
        17  There's a bold header, Nonforensic
        18  HID Opportunities.
        19          Do you see that?
        20      A.   Yes.
        21      Q.   Okay.  And then down below,
        22  there's the name Mike, next to
        23  Northwestern University.
        24          Do you see that?
  00142:01      A.   Yes.
        02      Q.   And then Rob, next to SUNY
        03  Stony Brook.
        04          Do you see that?
        05      A.   Yes.
        06      Q.   And that's you, Rob Rossi?
        07      A.   Yes.
        08      Q.   Okay.  And we talked a
```

**CONFIDENTIAL**

## Promega Corporation v. Life Technologies Corporation

```
09   little bit about Stony Brook today?
10       A.   Yes.
11       Q.   And then there's MGH.  That
12   stands for Mass General Hospital,
13   right?
14       A.   Yes.
15       Q.   And, again, your name, Rob
16   Rossi, next to that?
17       A.   Yes.
18       Q.   And have you seen this
19   before, this page?
20       A.   I may have at one point.
```

**36. PAGE 148:04 TO 150:08  (RUNNING 00:03:13.003)**

```
04          Q.   Mr. Rossi, the court
05   reporter has marked a three-page
06   document Exhibit 8.  It's Bates
07   stamped Life-0001695 and it goes to
08   1697.
09          If you can have a look at
10   this.
11       A.   (Witness reviews document.)
12   Okay.
13       Q.   Okay.  So let's start on
14   the second page, if we can.  These
15   e-mail trains kind of go from back to
16   front, so we'll do that, too.
17          If you start at the bottom
18   of what's been Bates stamped 1696,
19   you'll see there's an e-mail from a
20   Carolyn Pressman to you, Robert
21   Rossi.
22          Do you see that?
23       A.   Yes.
24       Q.   Do you recall this e-mail?
00149:01     A.   I did receive it.  I don't
02   quite recall the level of detail.
03       Q.   Okay.
04       A.   I did receive it.
05       Q.   So Carolyn Pressman, is
06   that a Life Tech employee?
07       A.   A former Life Tech
08   employee.
09       Q.   Okay.  And she e-mailed you
10   about cell line authentication for
11   BMS.
12          Do you see that?
13       A.   Yes.
14       Q.   And who's BMS?
15       A.   I believe that would be
16   Bristol-Myers Squibb.
17       Q.   Okay.  And she asked
18   whether you cover all accounts when
19   it comes to HID.
20          Do you see that?
21       A.   Yes.
22       Q.   Okay.  And, now, up above
23   on the page Bates stamped 1696, is an
24   e-mail that you authored back to
00150:01   Carolyn Pressman.
02          Do you see that?
03       A.   Yes.
04       Q.   And do you recall this
05   e-mail?
06       A.   This is also part of the
07   same e-mail chain, so, as I mentioned
```

## Promega Corporation v. Life Technologies Corporation

```
        08   earlier, I do recall receiving it.
```

**37.  PAGE 150:14 TO 151:15  (RUNNING 00:01:00.096)**

```
        14        Q.   Okay.  And so you write
        15   back and you say, I do cover New York
        16   and New England for HID accounts such
        17   as crime labs.
        18             And then you go on and say,
        19   and nonHID accounts where products
        20   may be used for cell line
        21   authentication, identification,
        22   transplantation, et cetera.
        23             Do you see that?
        24        A.   Yes.
00151:01        Q.    And what were you
        02   communicating to Carolyn Pressman
        03   with that sentence?
        04        A.   I would say, just as the
        05   sentence implies, that the area that
        06   I cover, as well as the types of
        07   accounts that I would cover.
        08        Q.   Okay.  And we had talked
        09   about earlier, when we were looking
        10   at lists of customers, that you have
        11   responsibility for some forensic
        12   customers, like crime labs?
        13        A.   Um-hum.
        14        Q.   Is that right?
        15        A.   Yes.
```

**38.  PAGE 152:02 TO 153:19  (RUNNING 00:01:52.686)**

```
        02             The nonHID accounts, these
        03   are the accounts that use ABI STR
        04   kits for things like bone marrow
        05   transplant engraftment monitoring
        06   like we talked about this morning?
        07        A.   In addition -- and I would
        08   say, in addition to when you
        09   mentioned Stony Brook, a fair number
        10   of other products that we would also
        11   offer to them as well, yes.
        12        Q.   Okay.  But just looking at
        13   ABI STR kits, those areas that you
        14   list here of cell line
        15   authentication, transplantation,
        16   those are -- as we discussed earlier
        17   today, those are accounts that would
        18   use ABI STR kits for purposes such as
        19   bone marrow engraftment monitoring?
        20        A.   Yes.  And in this case, and
        21   with respect to this memo, I just
        22   also want to point out that this was
        23   dated March the 25th.
        24        Q.   Um-hum.
00153:01        A.   So this was, more or less,
        02   just about three months into my new
        03   role.
        04        Q.   Okay.
        05        A.   So -- and this -- some of
        06   this comes from based on what I would
        07   understand to be the areas that I
        08   would cover.
        09             So this is -- this is very
        10   early on into my role and I was
        11   primarily more focused in and around
```

**CONFIDENTIAL**

PTX1355_0020

## Promega Corporation v. Life Technologies Corporation

```
    12  the crime laboratories, as them being
    13  my primary focus within human
    14  identification forensics.
    15      Q.   Okay.  Now, as your time
    16  has gone on from March 25th, 2010, is
    17  it still true that you handle both
    18  crime labs and nonHID accounts?
    19      A.   Yes.
```

**39. PAGE 159:12 TO 160:20  (RUNNING 00:01:25.848)**

```
    12      Q.   Okay.  Putting aside this
    13  document for a second, what was your
    14  understanding, in January of 2010, as
    15  to what customers you should target
    16  for ABI STR kits?
    17      A.   The primary customers that
    18  I should target would be the crime
    19  laboratories.
    20      Q.   Anyone else?
    21      A.   And the secondary targets
    22  may be the researchers, clinical
    23  types of researchers.
    24      Q.   Okay.  Anyone else?
00160:01    A.   And then, again, as you saw
    02  earlier, some of the accounts that
    03  may utilize our kits, such as, say, a
    04  Mass General, where they've been, I
    05  want to say an existing customer in
    06  my role, in my role as, more or less,
    07  to be able to service those existing
    08  customers.
    09      Q.   Okay.  And those existing
    10  customers would be of what type?
    11      A.   They could be of a number
    12  of types.  Again, the crime type
    13  laboratories would be primary.  And
    14  then, also, basic research types of
    15  customers that would be utilizing our
    16  technology.
    17          And then there are clinical
    18  laboratories that were using our
    19  chemistry.  But it wouldn't be
    20  exclusive to just those customers.
```

**40. PAGE 181:24 TO 182:15  (RUNNING 00:01:00.240)**

```
    24      Q.   Mr. Rossi, the court
00182:01  reporter has marked as Exhibit 15 a
    02  two-page document, Bates stamped
    03  Life-0002027 to 2028.
    04          And my first question is,
    05  do you recognize it?
    06      A.   Yes, I believe I've seen
    07  this.
    08      Q.   Okay.  And let's start at
    09  the bottom of the first page.  Is
    10  that an e-mail you authored?
    11      A.   Yes.
    12      Q.   And do you recall the
    13  circumstances?
    14      A.   (Witness reviews document.)
    15  Yes.
```

**41. PAGE 183:05 TO 184:21  (RUNNING 00:01:24.942)**

```
    05      Q.   Okay.  And you wrote this
    06  e-mail about the fact that Stony
```

PTX1355_0021

## Promega Corporation v. Life Technologies Corporation

07  Brook was going to buy a 3500 XL
08  instrument?
09      A.   Yes.
10      Q.   And that's an expensive
11  instrument.  How costly is that?
12      A.   That would be in the
13  range -- for the instrument itself
14  would be right around $165,000.
15      Q.   Okay.  And then would there
16  be other charges for software?
17      A.   Yes.
18      Q.   And what would that be?
19      A.   That would be in the range
20  of, I want to say, $15,000.
21      Q.   Okay.  And this is the 3500
22  that we talked about that Stony Brook
23  actually purchased?
24      A.   Yes, it is.
00184:01      Q.   Okay.  And, now, at the top
02  of this document, on the first page
03  that's marked 2027, there's an e-mail
04  back to you from Dave Oehler.
05          Do you see that?
06      A.   Yes.
07      Q.   And that was April 16th,
08  2010.
09          Do you see that?
10      A.   Yes.
11      Q.   And at this time Dave
12  Oehler was your boss, like we talked
13  about?
14      A.   Yes.
15      Q.   Okay.  And he comes back,
16  Great, exclamation point.  This is an
17  HID instrument, right?
18          And then he says, Good
19  job.  Dave.
20          Do you see that?
21      A.   Yes.

**42.  PAGE 185:22 TO 186:10  (RUNNING 00:00:26.213)**

22      Q.   Okay.  And going down to
23  the sentence that connects -- bridges
24  over to the second page, you see your
00186:01  sentence that says, Their application
02  is for monitoring bone marrow
03  transplants using STRs.
04          Do you see that?
05      A.   Yes.
06      Q.   And so Dave Oehler was
07  aware that that was the use you
08  understood they were going to put the
09  machine and the kits to?
10      A.   Initially, yes.

**43.  PAGE 186:11 TO 187:06  (RUNNING 00:01:00.940)**

11      Q.   Okay.  And who's Dr. Allen
12  Norin?
13      A.   He is one of the scientists
14  or doctors that came on board after a
15  lot of this transaction was in place.
16          So -- and this is where
17  it's more the case originally they
18  were looking to generate one
19  application.  And Dr. Norin had come

CONFIDENTIAL                                                                    page 22

## Promega Corporation v. Life Technologies Corporation

```
        20   on board, and based on some of the
        21   difficulties that they were having,
        22   it turned out that they did not adopt
        23   this technology to do this particular
        24   type of test.
00187:01        Q.   Okay.
        02        A.   This is where Dr. Norin had
        03   decided that realtime PCR may be a
        04   better approach be than utilizing the
        05   3500 for the human identification
        06   application here.
```

**44.  PAGE 187:07 TO 187:11  (RUNNING 00:00:17.770)**

```
        07        Q.   Okay.  Was it your custom,
        08   as a salesperson, to know in advance
        09   of the purchase of an instrument what
        10   the customer was going to do with it?
        11        A.   In most cases, yes.
```

**45.  PAGE 188:05 TO 189:15  (RUNNING 00:01:14.912)**

```
        05        Q.   Okay.  And do you see the
        06   first paragraph, last sentence,
        07   starting with, Two main applications
        08   for this will be engraftment and HLA?
        09        A.   Yes.
        10        Q.   And you authored that?
        11        A.   Yes.
        12        Q.   And at the time that was
        13   your belief as to how the Stony Brook
        14   lab would utilize the instrument?
        15        A.   As to which would be
        16   primary for them and which would be
        17   secondary, I think, even in the case
        18   at Stony Brook, I don't think that
        19   they were certain which one, based on
        20   the information that I received.
        21        Q.   Right.
        22             So, putting aside secondary
        23   or primary.  At the time you wrote
        24   this e-mail, it was your
00189:01   understanding that bone marrow
        02   engraftment monitoring and HLA
        03   testing were two of the applications
        04   they were going to put this
        05   instrument to?
        06        A.   At initial purchase, I
        07   believe, it was going to be
        08   engraftment.  And then, at a later
        09   date, it seemed to be that it could
        10   be for HLA as well.
        11        Q.   Okay.  And you were
        12   communicating this to your boss at
        13   the time, Dave Oehler, again, in the
        14   To line?
        15        A.   Yes.
```

**46.  PAGE 194:20 TO 195:09  (RUNNING 00:00:35.686)**

```
        20        Q.   Mr. Rossi, the court
        21   reporter has marked a two-page
        22   document Exhibit 17.  It's Bates
        23   stamped Life-0227939 to 940.
        24             And starting on the first
00195:01   page, I'd ask whether you recognize
        02   it?
        03        A.   Yes.
```

PTX1355_0023

## Promega Corporation v. Life Technologies Corporation

```
      04       Q.   And how is it that you
      05  recognize it?
      06       A.   I authored it.
      07       Q.   Okay.  And do you recall
      08  authoring it?
      09       A.   Yes.
```

**47.  PAGE 197:03 TO 198:22  (RUNNING 00:01:29.953)**

```
      03       Q.   Okay.  And then you went on
      04  and you said, This is a competitive
      05  opportunity to convert customer that
      06  currently uses Promega for bone
      07  marrow engraftment.
      08            Do you see that?
      09       A.   Yes.
      10       Q.   And how did you have that
      11  information?
      12       A.   I believe that would have
      13  come from customer interaction.
      14       Q.   Okay.  And so is this an
      15  attempt at marketing a customer to
      16  capture some of Promega's business
      17  regarding bone marrow engraftment
      18  monitoring?
      19       A.   I think also from a
      20  standpoint of training, we would have
      21  had to train the customer utilizing
      22  our chemistry as well.
      23       Q.   Okay.  Oh, is that why the
      24  discount?
00198:01       A.   That would be the discount,
      02  yes.
      03       Q.   Okay.  So to make it a
      04  little easier to make the switch?
      05       A.   Our application scientists
      06  could not train utilizing another
      07  chemistry.
      08       Q.   So they couldn't do
      09  Promega?
      10       A.   They could not utilize
      11  Promega, no.
      12       Q.   Okay.  So they needed an
      13  ABI STR kit in order to train the
      14  customer?
      15       A.   That would be correct, yes.
      16       Q.   Okay.  And then if the
      17  customer thought that the ABI STR kit
      18  was better, then maybe you could get
      19  them to convert over to ABI, instead
      20  of Promega?
      21       A.   If that would be the way
      22  they would chose to go, yes.
```

**48.  PAGE 203:24 TO 204:13  (RUNNING 00:01:32.879)**

```
      24       Q.   The exhibit is marked 19.
00204:01  It's Bates stamped Life-0160242 and
      02  it goes to 43.
      03            If you could have a look at
      04  that.
      05       A.   (Witness reviews document.)
      06       Q.   Okay?
      07       A.   Okay.
      08       Q.   So do you recognize the
      09  document?
      10       A.   Yes.
```

CONFIDENTIAL                                                                 page 24

PTX1355_0024

**Promega Corporation v. Life Technologies Corporation**

```
        11        Q.    This is an e-mail you
        12   authored?
        13        A.    Yes.
```

**49. PAGE 205:14 TO 206:08 (RUNNING 00:00:35.816)**

```
        14        Q.    Okay.  And you say, The
        15   group will be doing BM engraftment.
        16   That's bone marrow engraftment
        17   monitoring?
        18        A.    Yes.
        19        Q.    With ABI STR kits?
        20        A.    Yes.
        21        Q.    Okay.
        22        A.    Well, this -- let me
        23   re-qualify that.
        24             This is something where
  00206:01   looking at the date they were just
        02   starting out, so I was assuming that
        03   they would be doing some of this
        04   work.  It hadn't been completely
        05   confirmed yet prior to our meeting.
        06        Q.    And eventually it did
        07   become confirmed, right?
        08        A.    Yes.
```

**50. PAGE 210:05 TO 211:12 (RUNNING 00:01:17.491)**

```
        05        Q.    Okay.  Did you use Lisa
        06   Ortuno for technical support of some
        07   of your accounts while she was still
        08   with the company?
        09        A.    Yes, I did.
        10        Q.    Okay.  And you would
        11   communicate with her similarly to
        12   this, you would give her information
        13   in an e-mail?
        14        A.    In some cases, yes.
        15        Q.    Did you ever interact with
        16   Lisa Ortuno face-to-face?
        17        A.    Yes.
        18        Q.    Okay.  And did she support
        19   some of your clinical accounts?
        20        A.    Could you be more specific
        21   with respect to the clinical
        22   accounts?
        23        Q.    Sure.
        24             Is there any particular
  00211:01   account in your territory that you
        02   can recall that used ABI STR kits for
        03   clinical purposes that you asked Lisa
        04   Ortuno to help you with?
        05        A.    So I believe the Dartmouth-
        06   Hitchcock may have been one of them.
        07        Q.    Okay.
        08        A.    And, also, I believe the
        09   SUNY Stony Brook for that human
        10   identification application, I believe
        11   that would have been another one as
        12   well.
```

TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 01:00:45.684)

CONFIDENTIAL

PTX1355_0025

**Promega Corporation v. Life Technologies Corporation**

 **Waltman, Dawn (Vol. 01) - 09/30/2011**          1 CLIP (RUNNING 00:22:15.716)

 QC020412

**WALTDES**                    **41 SEGMENTS (RUNNING 00:22:15.716)**          

**1. PAGE 3:03 TO 4:03 (RUNNING 00:01:03.818)**

```
03            THE VIDEOGRAPHER:  This is Tape No. 1 in
04     the video deposition of Dawn Waltman in the matter
05     of Promega Corporation versus Life Technology
06     Corporation, et al, filed in the United States
07     District Court for the western district of
08     Wisconsin.
09            Today's date is Friday, September 30,
10     2011, the time is now 9 o'clock a.m.
11            We are located at the Hampton Inn White
12     Marsh, 8225 Town Center Drive, Baltimore, Maryland
13     21236.
14            At this time will counsel please
15     identify themselves for the record, beginning with
16     the attorney giving notice.
17            MR. CARROLL:  Pete Carroll and Jerry
18     O'Neil for Medlen & Carroll and Troupis law firm.
19            MR. McCARTHY:  Michael McCarthy for
20     Parsons, Behle & Latimer, appearing on behalf of
21     Defendant, Life Tech.
22            THE VIDEOGRAPHER:  Also present are the
23     court reporter, Angie Kilby, representing Amicus
24     Court Reporting, and the videographer, Steven
00004:01   Jones, also representing Amicus Reporting.
02            At this time the court reporter will
03     please swear in the witness.
```

**2. PAGE 4:12 TO 4:19 (RUNNING 00:00:09.678)**

```
12            Q.  Good morning.
13            A.  Good morning.
14            Q.  Can you state your full name for the
15     record?
16            A.  Dawn Annette Waltman.
17            Q.  Your current address?
18            A.  1217 Greystone Road, Bel Air, Maryland
19     21015.
```

**3. PAGE 6:02 TO 6:05 (RUNNING 00:00:06.585)**

```
02            Q.  Who are you currently employed by?
03            A.  Life Technologies.
04            Q.  How long have you been employed there?
05            A.  16 years.
```

**4. PAGE 9:12 TO 9:19 (RUNNING 00:00:22.302)**

```
12            Q.  So account manager happened how long ago
13     and for which company?
14            A.  It was Applied Biosystems at the time,
15     and it's been six years.
16            I took -- in that 16 years with the
17     company, I took four months to try something else
18     and came back.  And when I came back, I came back
19     to a different division as an account manager.
```

**CONFIDENTIAL**                                                          **page 1**

**PTX1356**                                              PTX1356_0001

## Promega Corporation v. Life Technologies Corporation

**5. PAGE 9:20 TO 10:04 (RUNNING 00:00:21.134)**

```
      20           Q.  About what year was that, so we can get
      21      a period?
      22           A.  1999 through 2005.
      23           Q.  Okay.
      24           A.  1999 is when I took my four months.
00010:01           Q.  Okay.
      02           A.  No, I take that back, I'm sorry.
      03                It was 2005, March, I took four months
      04      and came back in June 2005.
```

**6. PAGE 10:05 TO 10:24 (RUNNING 00:00:32.773)**

```
      05           Q.  Okay.  At that time you became account
      06      manager?
      07           A.  Correct.
      08           Q.  Okay.  And who was that for?  What
      09      company at that time?
      10           A.  Applied Biosystems.
      11           Q.  And what were your duties in that
      12      position in 2005?
      13           A.  As account manager.
      14           Q.  Right.  What kind of duties would that
      15      have?
      16           A.  To sell instrumentation and reagents to
      17      forensic accounts.
      18           Q.  Okay.  Now, these forensics accounts,
      19      these are crime labs?
      20           A.  Correct.
      21           Q.  Sheriff departments?
      22           A.  Correct.
      23           Q.  Police, that kind of stuff?
      24           A.  Correct.
```

**7. PAGE 11:01 TO 11:05 (RUNNING 00:00:20.608)**

```
00011:01           Q.  Any sales to nonforensic accounts in
      02      2005?
      03           A.  In 2005 I would probably say very
      04      little, maybe one percent of sale -- total sales
      05      maybe went to a non-forensics.
```

**8. PAGE 11:06 TO 11:09 (RUNNING 00:00:14.212)**

```
      06           Q.  And what type of entity would the
      07      nonforensic customer be?
      08           A.  It would be somebody that was doing
      09      basic research at a university type of atmosphere.
```

**9. PAGE 11:10 TO 11:17 (RUNNING 00:00:17.053)**

```
      10           Q.  Okay.  Any clinical labs?
      11           A.  No.
      12           Q.  Okay.  Did you at some point from 2005
      13      onward begin to sell into clinical labs?
      14           A.  No.
      15           Q.  You, yourself, haven't sold into
      16      clinical labs?
      17           A.  No.
```

**10. PAGE 12:09 TO 12:21 (RUNNING 00:00:53.660)**

```
      09      BY MR. CARROLL:
      10           Q.  So the court reporter has marked as
      11      Exhibit 1 a document that's been Bates stamped
      12      Life-0212055.
      13                Why don't you take a second to look that
      14      over.
```

PTX1356_0002

**Promega Corporation v. Life Technologies Corporation**

```
        15              Have you had a chance to look at it?
        16      A.  Yes, sir.
        17      Q.  Do you recognize it?
        18      A.  Yes, sir.
        19      Q.  It is -- looks like an e-mail you
        20  created?
        21      A.  Yes.
```

**11. PAGE 33:02 TO 33:07  (RUNNING 00:00:12.131)**

```
        02              Q.  What about 2006?  Did you do sales in
        03  2006?
        04      A.  Yes.
        05      Q.  And were those limited to forensic labs
        06  in 2006?
        07      A.  99 percent, yes.
```

**12. PAGE 33:11 TO 35:07  (RUNNING 00:01:06.876)**

```
        11      Q.  2007, were you still selling?
        12      A.  Yes.
        13      Q.  STR kits?
        14      A.  Yes.
        15      Q.  Forensic labs?
        16      A.  Yes.
        17      Q.  Any non-forensic?
        18      A.  About 2 percent.
        19      Q.  Okay.  2008, were you still selling STR
        20  kits?
        21      A.  Yes.
        22      Q.  Yourself, personally?
        23      A.  Yes.
        24      Q.  Okay.  And to forensics labs?
00034:01      A.  Yes.
        02      Q.  Any non-forensic labs?
        03      A.  About 2 percent.
        04      Q.  2009, were you still selling?
        05      A.  Yes.
        06      Q.  STR kits?
        07      A.  Yes.
        08      Q.  Into forensic labs?
        09      A.  Yes.
        10      Q.  Any non-forensic sales?
        11      A.  About 2 percent.
        12      Q.  2010, were you still selling?
        13      A.  Yes.
        14      Q.  And were you selling STR kits?
        15      A.  Yes.
        16      Q.  To forensic labs?
        17      A.  Yes.
        18      Q.  And non-forensic?
        19      A.  Yes.
        20      Q.  What percentage at that point?
        21      A.  Maybe 2 to 3 percent.
        22      Q.  Okay.  2011, this year, are you still
        23  selling?
        24      A.  Yes.
00035:01      Q.  STR kits?
        02      A.  Yes.
        03      Q.  Non-forensic labs or non-forensic
        04  customers?
        05      A.  About 2 to 3 percent.
        06      Q.  Okay.  And forensic customers as well?
        07      A.  Make up the other 97, 98 percent.
```

**13. PAGE 37:05 TO 38:06  (RUNNING 00:01:24.647)**

```
        05              Q.  Okay.  Coming back to Exhibit 1, which
```

## Promega Corporation v. Life Technologies Corporation

```
06    is 2008, and you've indicated you were selling at
07    that time, did you have occasion to sell STR kits
08    to customers for basic research bone marrow
09    engraftment?
10         A.  In research environment, yes.
11         Q.  Okay.  And do you recall who those
12    customers were in 2008?
13         A.  Umm, yes.
14         Q.  Who were they?
15         A.  Johns Hopkins.  That's --
16         Q.  Anybody else?
17         A.  For basic research with bone marrow
18    engraftment, not that I can recall.
19         Q.  Okay.  And who, if anyone, did you
20    interact with at Johns Hopkins in connection with
21    sales of STR kits for basic research bone marrow
22    engraftment?
23         A.  For STR kits and basic research for bone
24    marrow engraftment, I dealt with Dr. Eshleman.
00038:01        Q.  And who is Dr. Eshleman?
02         A.  He is a molecular pathologist who runs a
03    research lab at the university and is also a
04    gastroenterologist.
05         Q.  Okay.  That was in 2008?
06         A.  Correct.
```

**14. PAGE 38:07 TO 39:09  (RUNNING 00:01:24.035)**

```
07         Q.  Do you still sell to Johns Hopkins in
08    regard to STR kits with regard to research bone
09    marrow engraftment?
10         A.  I couldn't tell you the last time they
11    bought a kit.  But in the last several months, no.
12         Q.  Okay.  So from 2008 -- let's use this
13    date, September 17, 2008 -- forward, did you have
14    occasion to visit Dr. Eshleman's lab at Johns
15    Hopkins in connection with his use of STR kits for
16    basic research bone marrow engraftment?
17         A.  Since 2008, yes.
18         Q.  Okay.  And this would be an actual
19    onsite visit at the lab where you would show up?
20         A.  Actually, it would be a place for coffee
21    at the university.
22         Q.  Okay.  What was the purpose of such a
23    visit by you to Johns Hopkins?
24         A.  For this customer, first and foremost,
00039:01   was personal --
02         Q.  Okay.
03         A.  -- because I have known him for way
04    before the 2008 time frame.
05         Q.  Okay.
06         A.  And, second would be to follow up on
07    publications I have seen on the pub med website --
08         Q.  Okay.
09         A.  -- about his research.
```

**15. PAGE 39:10 TO 40:10  (RUNNING 00:01:32.195)**

```
10         Q.  All right.  Continuing on with Paragraph
11    1 of what we've marked as Exhibit 1, the sentence
12    says, we have some old application notes, but we
13    need something with just the basics of what STRs
14    are and how they work.
15         What were the old application notes you
16    were referring to there?
17         A.  Application notes are internal documents
18    that explain different applications, kind of a
```

PTX1356_0004

## Promega Corporation v. Life Technologies Corporation

```
       19    one-page quick definition.
       20         Q.  And was this indicating here in Exhibit
       21    1 that internally you had some kind of write-up on
       22    STR kits for basic research bone marrow
       23    engraftment?
       24         A.  For basic research, yes.
00040:01         Q.  And did you also have some kind of
       02    internal write-up for STR kit use for cell line
       03    authentication?
       04         A.  In the research, yes.
       05         Q.  Okay.  Now, have those internal
       06    documents continued through the years to be
       07    something you've used since this date of September
       08    17, 2008?
       09         A.  Probably have looked at them.  Used them
       10    very rarely.
```

**16. PAGE 40:11 TO 41:06  (RUNNING 00:00:57.477)**

```
       11         Q.  Okay.  What about the Power Point
       12    referred to in Paragraph 2?  Was that, in fact,
       13    ever created, to your knowledge?
       14         A.  Yes.
       15         Q.  And who created that?
       16         A.  I think it started with somebody, Mary
       17    Bozini (phonetic) and Lisa Calandro (phonetic) and
       18    Lisa Ortuno put together the basic STR 101 Power
       19    Point.
       20         Q.  Okay.  So, in fact, it happened?
       21         A.  Yes.
       22         Q.  And did you end up using the Power Point
       23    they put together?
       24         A.  For some trainings on -- to basic
00041:01    researchers on basic STR 101.
       02         Q.  Okay.
       03         A.  What an STR was.
       04         Q.  All right.  Did you use it kind of as a
       05    sales tool?
       06         A.  No, it was more of an education tool.
```

**17. PAGE 41:14 TO 42:06  (RUNNING 00:00:44.409)**

```
       14              What I am trying to understand in terms
       15    of the use of these as a sales tool or not, as a
       16    sales tool or as a training, at what stage in the
       17    selling process would you use something like this?
       18    Would it be after you've already made the sale?
       19    Before they've committed to a sale?
       20              That's what I am trying get at.
       21         A.  It varied.
       22         Q.  So it might, in fact, be training you
       23    did after they had already committed to purchase a
       24    STR kit?
00042:01         A.  Correct.
       02         Q.  Okay.  Would you come into the lab and
       03    do this presentation for the technical people?
       04         A.  I personally wouldn't be the one to do
       05    that.  Somebody like Lisa Ortuno or somebody that
       06    was more technical than I would.
```

**18. PAGE 42:07 TO 42:10  (RUNNING 00:00:07.728)**

```
       07         Q.  Okay.  But did you ever have occasion to
       08    use this Power Point yourself?
       09              MR. McCARTHY:  Objection to form.
       10              THE WITNESS:  In what manner?
```

CONFIDENTIAL

## Promega Corporation v. Life Technologies Corporation

**19. PAGE 42:12 TO 42:13  (RUNNING 00:00:02.711)**

```
12          Q.  With a customer, or prospective
13     customer.
```

**20. PAGE 42:15 TO 42:17  (RUNNING 00:00:02.225)**

```
15              THE WITNESS:  I never went through it
16     with a customer.
17     BY MR. CARROLL:
```

**21. PAGE 44:05 TO 44:20  (RUNNING 00:00:53.238)**

```
05          Q.  And has that title changed since 2008?
06          A.  It is still HID account manager.  Now
07     they say it is senior, supposed to mean the same
08     as executive.  It is now senior HID account
09     manager.
10          Q.  Okay.
11          A.  It is the same.
12          Q.  Do you have any title, official, not
13     official, with regard to non-HID activities?
14          A.  What do you mean, non-official?
15          Q.  Umm, I have seen reference in some
16     documents to people being lead, whatever that
17     means, on certain areas.  Some people are lead in
18     one thing, some people are lead in non-HID.
19              Do you have any kind of designation like
20     that that you are lead in either HID or non-HID?
```

**22. PAGE 44:22 TO 45:02  (RUNNING 00:00:14.890)**

```
22              THE WITNESS:  Lead -- I was a contact
23     person for both forensics and nonforensic
24     applications for generalist sales.  I was a point
00045:01    of contact.
02     BY MR. CARROLL:
```

**23. PAGE 45:03 TO 45:11  (RUNNING 00:00:34.630)**

```
03          Q.  Help me with that.  If you are a point
04     of contact, does that mean other salespeople, when
05     they would have a question, would consider you the
06     person to first go with that question for that
07     particular topic?
08          A.  In the mid Atlantic area.
09          Q.  Okay.  So are you the point of contact
10     for non-HID sales of STR kits in the mid Atlantic?
11          A.  Yes.
```

**24. PAGE 45:22 TO 46:05  (RUNNING 00:00:34.750)**

```
22          Q.  Miss Waltman, before the break we had
23     talked about you being kind of a point of contact
24     for non-HID sales of STR kits in the mid Atlantic.
00046:01         A.  (Responded by nodding head.)
02          Q.  In that capacity, have you interacted
03     with other salespeople from Life Technologies and
04     been asked to assist in that context of non-HID
05     sale?
```

**25. PAGE 46:07 TO 46:11  (RUNNING 00:00:08.535)**

```
07              THE WITNESS:  Yes and yes.
08     BY MR. CARROLL:
09          Q.  What do you mean, yes and yes?
10          A.  Yes, reps would contact me, and, yes, I
11     would assist them.
```

PTX1356_0006

**Promega Corporation v. Life Technologies Corporation**

**26. PAGE 46:17 TO 48:04 (RUNNING 00:01:40.623)**

```
        17          Q.  The non-forensic, non-HID application.
        18              Was it because they were not familiar?
        19  What would cause them to contact you on a non-HID
        20  matter?
        21          A.  Most of the time it was to gather
        22  reference material.
        23          Q.  Okay.  And so these are salespeople from
        24  Life Tech?
00047:01          A.  Correct.
        02          Q.  And they would want this reference
        03   material as a sales tool?
        04          A.  More of information gathering for
        05   themselves.
        06          Q.  Okay.  So they could understand the
        07   non-HID use?
        08          A.  Correct.
        09          Q.  Did you have such materials?
        10          A.  Sometimes I had materials, sometimes I
        11  told them to look at pub med --
        12          Q.  Okay.
        13          A.  -- on the internet.
        14          Q.  As you sit here today in 2011, do you
        15  have a stash of materials on non-HID STR use?
        16          A.  Yes.
        17          Q.  And do you share that, again, in the
        18  2011 period, with salespeople that use you as a
        19  point of contact in the mid Atlantic states for
        20  non-HID matters?
        21          A.  Yes.
        22          Q.  What is in that stash of materials, if
        23  you could tell me?  Again, we are using 2011,
        24  today.
00048:01          A.  Sure.  Basic material, these application
        02   notes, the basic STR 101 Power Point, and some
        03   research papers that you can get off the internet
        04   that are quite dated.
```

**27. PAGE 99:15 TO 99:18 (RUNNING 00:00:18.042)**

```
        15          Q.  At any time you've been at Life Tech,
        16  have you been informed of potential legal issues
        17  with regard to sales of STR kits for cell line
        18  authentication or bone marrow engraftment?
```

**28. PAGE 99:23 TO 100:14 (RUNNING 00:00:41.973)**

```
        23  BY MR. CARROLL:
        24          Q.  Just for the start, I am asking for a
00100:01  yes or no, whether you've had any information.
        02              I wouldn't ask yet what the information
        03   is.
        04          A.  Okay.  Yes.
        05          Q.  Okay.  Who communicated that information
        06   to you?
        07          A.  I don't recall.  It came through an
        08   e-mail.  I skipped through it.  I didn't --
        09          Q.  It is not this e-mail?
        10          A.  No.
        11          Q.  It is another e-mail?
        12          A.  Yes.
        13          Q.  And do you recall, was that an e-mail
        14  that was company-wide?
```

**29. PAGE 100:17 TO 100:17 (RUNNING 00:00:01.101)**

```
        17              THE WITNESS:  I don't know.
```

**CONFIDENTIAL**

**Promega Corporation v. Life Technologies Corporation**

---

**30.  PAGE 101:11 TO 101:12  (RUNNING 00:00:05.981)**

```
11          Q.  As you sit here today, do you have an
12    understanding of what prompted the communication?
```

**31.  PAGE 101:15 TO 101:15  (RUNNING 00:00:01.038)**

```
15              THE WITNESS:  Yes.
```

**32.  PAGE 101:22 TO 101:23  (RUNNING 00:00:08.289)**

```
22          Q.  Okay.  Did it have anything to do with
23    the lawsuit between Promega and Life Tech?
```

**33.  PAGE 102:02 TO 102:14  (RUNNING 00:00:38.223)**

```
02              THE WITNESS:  Yes.
03    BY MR. CARROLL:
04          Q.  Okay.  In this communication, were you
05    instructed in any way as to how to sell STR kits
06    for cell authentication or bone marrow
07    engraftment?
08          A.  No.
09          Q.  No?
10          A.  (Responded by shaking head.)
11          Q.  In this communication, was there
12    communicated a policy change at Life Tech with
13    regard to the sale of STR kits into non-forensic
14    fields?
```

**34.  PAGE 102:21 TO 103:13  (RUNNING 00:00:47.008)**

```
21              THE WITNESS:  I don't recall.
22    BY MR. CARROLL:
23          Q.  You don't recall the -- whether there
24    was a policy change?
00103:01        A.  I don't recall who it came from.
02          Q.  Who it came from, okay.  All right.
03              And the time period for this
04    communication, was it this year?  Last year?
05          A.  I don't recall.  A year, maybe.
06          Q.  Okay.  As a result of this
07    communication, have you changed the way you sell
08    STR kits in any way?
09          A.  No.
10          Q.  As a result of this communication, are
11    you aware of anyone else in the sales team who's
12    changed the way they sell STR kits?
13          A.  No.
```

**35.  PAGE 132:09 TO 132:12  (RUNNING 00:00:15.053)**

```
09          My question is, is there any group
10    within Life Tech, or any initiative ongoing today
11    to increase sales for the non-forensic side of the
12    business of STR kits?
```

**36.  PAGE 132:14 TO 133:09  (RUNNING 00:00:51.383)**

```
14              THE WITNESS:  Yes.
15    BY MR. CARROLL:
16          Q.  Okay.  Can you describe that?
17          A.  The initiative is to grow the business
18    in all areas.
19          Q.  Okay.
20          A.  Not one versus the other.  But forensic,
21    non-HID, all areas.
22          Q.  The whole thing?
23          A.  Whole thing.  That is all.
24          Q.  Who is behind that initiative?
```

PTX1356_0008

**Promega Corporation v. Life Technologies Corporation**

```
00133:01          A.  Jerry Andros.
      02          Q.  Andros.  How do you spell that?
      03          A.  A-N-D-R-O-S.
      04          Q.  What is his title?
      05          A.  I believe today it is director of
      06    applied markets.
      07          Q.  How does he communicate that initiative
      08    to the troops out there?
      09          A.  Through e-mail.
```

**37. PAGE 133:20 TO 134:10  (RUNNING 00:00:37.678)**

```
      20          Q.  Mm-hmm.  Is there anything like that
      21    that you or your group looks at, in terms of
      22    whether or not the business is growing and you are
      23    satisfying the initiative?
      24          A.  Yes.
00134:01          Q.  And how do you do that?
      02          A.  A report is sent monthly of sales
      03    history from this year versus last year in shared
      04    accounts, in forensic accounts.
      05          Q.  Okay.  And the first part of that, you
      06    said a report is done monthly and it is -- did you
      07    say it was shipped?  Or sent?
      08          A.  It is e-mailed.
      09          Q.  E-mailed?
      10          A.  Mm-hmm.
```

**38. PAGE 136:23 TO 137:06  (RUNNING 00:00:17.110)**

```
      23          Q.  Okay.  Do you personally stand to gain
      24    from meeting your quota?
00137:01          A.  Personally, yes.
      02          Q.  How does that work?
      03          A.  Compensation.
      04          Q.  Okay.  Do you stand to lose if you don't
      05    make your quota?
      06          A.  Yes.
```

**39. PAGE 138:02 TO 138:05  (RUNNING 00:00:07.375)**

```
      02          Q.  So as far as you are concerned, the more
      03    sales, the better, because that gets you closer to
      04    your quota?
      05          A.  Yes.
```

**40. PAGE 138:06 TO 138:22  (RUNNING 00:00:47.284)**

```
      06          Q.  Okay.  Is there any initiative you are
      07    taking right now to try to make that happen?
      08          A.  Yes.
      09          Q.  Okay.  What is that?
      10          A.  Sending flyers and monthly e-mail
      11    newsletters to my forensic customers.  Umm, you
      12    know, following up with new products that come out
      13    and sending that information to my forensic
      14    customers.
      15          Q.  Okay.  Any of that effort headed towards
      16    the non-forensic side by you?
      17          A.  Not right now.
      18          Q.  Have you done it in the past?
      19          A.  In the past, but it is not given -- I am
      20    not -- it has not given me enough revenue to spend
      21    my time.  I don't have the time to spend doing
      22    that.
```

**41. PAGE 140:22 TO 141:11  (RUNNING 00:00:35.255)**

```
      22          Q.  In your view, is the cell line
```

**CONFIDENTIAL**                                                                        **page 9**

**Promega Corporation v. Life Technologies Corporation**

```
    23      authentication business, in the context of using
    24      STR kits from Life Tech, growing?
00141:01              A.  No.
    02                Q.  No?
    03                A.  No.
    04                Q.  Steady state?
    05                A.  Steady, maybe declining.
    06                Q.  Same question with regard to bone marrow
    07      engraftment using STR kits.  Is that a growing
    08      business for Life Tech?
    09                A.  No.
    10                Q.  Okay.
    11                A.  No.
```

TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:22:15.716)

CONFIDENTIAL

PTX1356_0010

**Promega Corporation v. Life Technologies Corporation**

 **Hall, Daniel H. (Vol. 01) - 07/26/2011 [Hall, Daniel]**      1 CLIP (RUNNING 00:01:38.069)

 Hall Clip 2



HALL2                    1 SEGMENT (RUNNING 00:01:38.069)

1. PAGE 52:25 TO 54:04 (RUNNING 00:01:38.069)

```
     25      Q.  And do you recall what Philip said?
00053:01      A.  He said he thought that they wanted to do a
     02 bone marrow transplant application, but that he did
     03 not give them information around our Identifiler
     04 direct kit because it wasn't an appropriate
     05 application.
     06      Q.  Identifiler's not appropriate for bone
     07 marrow transplant?
     08      A.  As far as the RUO label is concerned.
     09      Q.  As far as what?
     10      A.  The research-use-only label is concerned.
     11      Q.  Oh, okay.  Does that label prevent you from
     12 selling Identifiler into laboratories that use that
     13 STR kit for bone marrow transplant monitoring?
     14      A.  It's not clear to me exactly what the
     15 boundaries are around that, so I intentionally don't
     16 discuss that as an application, and we don't support
     17 it, and we don't have any tools or promotional
     18 activities around that as an application.
     19      Q.  Is that because of regulatory issues with
     20 the FDA?
     21      A.  No.
     22      Q.  Well, then, what's the concern?
     23      A.  It's my understanding that it's not
     24 licensed for that.
     25      Q.  Licensed from whom?
00054:01      A.  Promega.
     02      Q.  Is that something everyone knows in the
     03 sales department?
     04      A.  Yes.
```

TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:01:38.069)

**PTX1357**                    PTX1357_0001

## Promega Corporation v. Life Technologies Corporation

 **Czar, Phillip (Vol. 01) - 12/16/2011**                    1 CLIP  (RUNNING 00:00:23.459)

 Okay.  Now, can you give me a sense of the ...



**CZAR13**                        **1 SEGMENT  (RUNNING 00:00:23.459)**

**1. PAGE 132:08 TO 132:14  (RUNNING 00:00:23.459)**

```
08          Q    Okay.  Now, can you give me a sense of the
09     proportion of these sales that are going to non-crime
10     labs?  Are more of those sales coming from the GS
11     group than the HID group?
12          A    Well, I don't think there's a clear answer to
13     that because -- because there are -- we share the
14     customer.  So, does that answer your question?
```

```
        TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:00:23.459)
```

CONFIDENTIAL                                                          page 1

**PTX1358**                                    PTX1358_0001

**Promega Corporation v. Life Technologies Corporation**

 **Sandulli, Guido (Vol. 01) - 01/13/2012**                                        1 CLIP  (RUNNING 00:00:38.265)



Sandulli Clip 1   30(b)(6)

| SAND1 | 1 SEGMENT  (RUNNING 00:00:38.265) |
|---|---|

**1. PAGE 101:08 TO 101:24  (RUNNING 00:00:38.265)**

```
08        Q.   Turn to page 11, if you would, of the
09   exhibit, please.
10        A.   I'm there.
11        Q.   The sixth line from the bottom, could you
12   read that where it says bulk.
13        A.   Bulk amylogen and primer.
14        Q.   And that has a U.S. identifier number next
15   to it?
16        A.   Yes.
17        Q.   And that shows .038 milliliters at .97
18   USD; correct?
19        A.   Yes.
20        Q.   And so that would have been a component
21   part that would have at some point come from the
22   United States?
23        A.   Yes.  That would have gone into the primer
24   mix.
```

 **Sandulli, Guido (Vol. 01) - 12/14/2011**                                        1 CLIP  (RUNNING 00:00:30.947)

 Sandulli Clip 2



| SAND2 | 1 SEGMENT  (RUNNING 00:00:30.947) |
|---|---|

**1. PAGE 159:12 TO 159:23  (RUNNING 00:00:30.947)**

```
12        Q.   And where are those -- first of all, what
13   do you know that is manufactured of the primers in the
14   United States?
15        A.   I know that some of the labeled and
16   mobility modified alligoes are produced at -- are
17   synthesized at least in our Pleasanton facility.
18   Where they get their DNTP's and other raw materials
19   from, I don't know.
20        Q.   When you say "our Pleasanton facility" --
21        A.   Life Technologies Pleasanton facility.
22        Q.   Okay.  And that's in what state?
23        A.   Pleasanton, California.
```

> **TOTAL: 2 CLIPS FROM 2 DEPOSITIONS (RUNNING 00:01:09.212)**

**PTX1363**                                                                            PTX1363_0001

**Promega Corporation v. Life Technologies Corporation**

 **Shepherd, Michelle (Vol. 01) - 07/26/2011 [Shepherd, Michelle]**   1 CLIP  (RUNNING 00:04:42.843)

THE VIDEOGRAPHER: Good morning. This ...



| SHEP | 5 SEGMENTS  (RUNNING 00:04:42.843) | |
|------|------|------|

**1. PAGE 5:05 TO 6:16  (RUNNING 00:01:25.250)**

```
05              THE VIDEOGRAPHER:  Good morning.  This
06    marks the beginning of Volume I, Videotape No. 1, in
07    the deposition of Life Technologies Corporation, by
08    the 30(b)(6) witness, Michelle Shepherd, in the
09    matter entitled "Promega Corporation, et al., versus
10    Life Technologies Corporation, et al.," filed in the
11    Superior Court -- excuse me, in the United States
12    District Court for the Western District of
13    Wisconsin.  This is Case No. 10-CV-281.  Today's
14    date is July 26, 2011.  Time on the video monitor is
15    ten o'clock.
16              The video operator today is Fritz Sperberg,
17    a notary public contracted by Merrill Legal
18    Solutions at 20750 Ventura Boulevard, Woodland
19    Hills, California.  This video deposition is taking
20    place at 725 South Figueroa Street in Los Angeles,
21    and was noticed by Pete Carroll of Medlen & Carroll.
22              Counsel, please identify yourselves and
23    state whom you represent.
24              MR. CARROLL:  Pete Carroll and Tom Howerton
25    for Promega.
00006:01          MS. JOHNSON:  Kristine Johnson and Amy Sun
02    for the defendants.
03              THE VIDEOGRAPHER:  Our court reporter today
04    is Philip Norris of Merrill.
05              Would the reporter please swear in the
06    witness.
07
08                  MICHELLE S. SHEPHERD
09              having been first duly sworn, was
10              examined and testified as follows:
11
12                      EXAMINATION
13
14    BY MR. CARROLL:
15        Q.  Good morning.
16        A.  Good morning.
```

**2. PAGE 7:09 TO 7:23  (RUNNING 00:00:24.280)**

```
09        Q.  All right.  Great.  Can you state your full
10    name?
11        A.  Michelle Slay Shepherd.
12        Q.  Okay.  And are you currently employed?
13        A.  I am.
14        Q.  And where is that?
15        A.  By Life Technologies.
16        Q.  Okay.  Now, can I use today an abbreviation
17    for that?  LTI or Life Tech, if I use those
18    abbreviations, will you understand that to be Life
19    Technologies?
20        A.  Yes.
21        Q.  Okay.  And how many years have you been at
22    LTI?
23        A.  Just over 12.
```

**PTX1364**                                                PTX1364_0001

**Promega Corporation v. Life Technologies Corporation**

3. **PAGE 26:08 TO 27:12  (RUNNING 00:00:55.146)**

```
08          Q.  Okay.  All right.  Well, the reporter has
09     kindly premarked an exhibit, Exhibit 1 there, so why
10     don't we pull that out.
11          A.  Okay.
12               (The document referred to was marked by the
13     reporter as Exhibit 1 for identification and is
14     attached hereto.)
15               MR. CARROLL:  Now that I have an
16     understanding of what you do, we can talk a little
17     bit about some of these topics.
18          Q.  You understand that this is litigation and
19     that Life Tech is one of the parties in the
20     litigation?
21          A.  Yes.
22          Q.  And you understand this is in a federal
23     court?
24          A.  Yes.
25          Q.  And you understand that this is a
00027:01   deposition where you speak for the company?
02          A.  Yes.
03          Q.  So it's not just your knowledge, it's the
04     collective knowledge of the company?
05          A.  Yes.
06          Q.  Okay.  And are there steps you took before
07     today to kind of acquire that collective knowledge
08     of the company?
09          A.  Yes.
10          Q.  And what were those steps?
11          A.  I reviewed some documents.  I spoke with
12     our attorneys.
```

4. **PAGE 65:03 TO 65:14  (RUNNING 00:00:37.896)**

```
03          Q.  Okay.  Since you go there, let me take you
04     to what's been marked as Exhibit 1, and take you to
05     paragraph -- the numbered paragraph -- 14.  You
06     mentioned Foster City as where the kits are
07     manufactured?
08          A.  Components of the kits are manufactured in
09     Foster City.
10          Q.  And these are the STR kits?
11          A.  Yes.
12          Q.  Okay.  What components?  If you know.
13          A.  The allelic ladders.
14               Allelic is a-l-l-e-l-i-c.
```

5. **PAGE 68:01 TO 69:10  (RUNNING 00:01:20.271)**

```
00068:01         Q.  So that's the final configuration of the
02     kit?  The box is sealed, nothing more is going to go
03     into the kit?  It's going to come out of Foster City
04     and go to a client, go to a customer?
05          A.  No.  And I'm not certain there -- all of
06     these varieties of AmpFLSTR kits are assembled in
07     Foster City.  They may be assembled in Warrington.
08          Q.  Oh, really?
09          A.  Yes.
10          Q.  Okay.  So some complete kits may be shipped
11     out of England to a customer?
12          A.  They would be shipped to a warehouse in the
13     States, and from there be shipped to a customer.
14          Q.  Okay.  So let's say I'm a customer in
15     Germany.
16          A.  Okay.
17          Q.  Would I ever get a kit directly from
18     England, or would it go to this warehouse in the
```

CONFIDENTIAL

PTX1364_0002

**Promega Corporation v. Life Technologies Corporation**

```
        19  United States and then back out?
        20       A.  I'm only able to speak to the U.S. shipping
        21  and manufacturing.
        22       Q.  Okay.  So for -- or how about Canada,
        23  that's one of your areas?
        24       A.  Yes.
        25       Q.  So if I'm -- if I'm in Montreal --
00069:01       A.  Okay.
        02       Q.  -- and I order an STR kit --
        03       A.  Yes.
        04       Q.  -- I may very well have components from
        05  that kit come from England?
        06       A.  Yes.
        07       Q.  But it will be assembled in the -- it will
        08  be warehoused, sorry, in the United States and
        09  shipped to me from that warehouse?
        10       A.  Correct.
```

> **TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:04:42.843)**

PTX1364_0003

**Promega Corporation v. Life Technologies Corporation**

 **Shewale, Jaiprakash (Vol. 01) - 11/30/2011 [Shewale, Jaiprakash]**   1 CLIP (RUNNING 00:00:55.314)

 Shewale Clip 7

**SHE7**                    **1 SEGMENT  (RUNNING 00:00:55.314)**              

**1. PAGE 138:17 TO 139:10  (RUNNING 00:00:55.314)**

```
        17          Q.    It says, Hi Manohar, sorry I missed your
        18    call.  Anyway, I heard your message and got this
        19    one.  I will work with Jai on getting updated
        20    presentation material.  Do you see that?
        21          A.    Uh-huh.
        22          Q.    Do you recall this email?
        23          A.    I recall this email.
        24          Q.    Okay.  And did you work with Lisa on
        25    getting upgraded presentation material for this
  00139:01    upcoming meeting?
        02          A.    I gave her slides onto the data, but I
        03    don't remember exactly which presentation she has
        04    used those data and slides.
        05          Q.    Okay.  But these data and slides had to do
        06    with your profiling of the NCI cell line DNA that
        07    we've been talking about today?
        08          A.    Yes.  That's correct.
        09          Q.    And the ATCC cell lines?
        10          A.    Yes.
```

**TOTAL: 1 CLIP FROM 1 DEPOSITION (RUNNING 00:00:55.314)**

**PTX1365**                                                              PTX1365_0001