UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

PROMEGA CORPORATION,

Plaintiff,

MAX-PLANCK-GESELLSCHAFT ZUR FORDERUNG DER WISSENSCHAFTEN E.V.,

Involuntary Plaintiff,

v.

LIFE TECHNOLOGIES CORPORATION, INVITROGEN IP HOLDINGS, INC., and APPLIED BIOSYSTEMS, LLC,

Defendants.

Case No.: 10-CV-281

**DEFENDANTS' OPENING BRIEF REGARDING SCOPE OF REMAND PURSUANT TO THE COURT'S APRIL 17, 2015 ORDER**

# TABLE OF CONTENTS

**Page**

THE MARCH 31, 2015 STATUS CONFERENCE ..... 1

INTRODUCTION ..... 2

PROCEDURAL HISTORY ..... 4

ARGUMENT ..... 8

I. Life Plans To Seek Supreme Court Review And The Remand Proceedings Should Be Deferred In The Interim ..... 8

II. The Federal Circuit Mandate Directs This Court To Determine On Remand The Damages That Flow From Infringement Of The Tautz Patent ..... 8

A. The Language Of The Two Relevant License Agreements Demonstrates That Promega Has Fewer Enforceable Rights In The Tautz Patent ..... 9

B. The Jury Awarded Damages For Sales In Fields Where Promega Does Not Have Standing To Assert The Tautz Patent ..... 11

C. Promega's Actions Post-Trial Confirm That Promega Does Not Have The Right To Assert The Tautz Patent Across The Cell Line Authentication Field ..... 13

III. Footnote 16 Of The Federal Circuit's Opinion Was Not A Waiver Finding ..... 14

IV. Life's Outstanding JMOL Motions Must Be Decided If The Court Chooses To Reinstate The Verdict ..... 16

CONCLUSION ..... 16

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Life Techs. et al. v. Promega Corp.*,
No. 12-cv-02987-JAH-KSC (S.D. Cal. filed Dec. 17, 2012) ....... 14

*Mars, Inc. v. Coin Acceptors, Inc.*,
527 F.3d 1359 (Fed. Cir. 2008) ....... 11

*Microsoft Corp. v. AT & T Corp.*,
550 U.S. 437 (2007) ....... 3

*Promega Corp. v. Life Techs. Corp.*,
773 F.3d 1338 (Fed. Cir. 2014) ....... passim

**Statutes**

35 U.S.C. § 271 ....... passim

Pursuant to the Court's April 17, 2015 Order, defendants Life Technologies Corporation, Invitrogen IP Holdings, Inc., and Applied Biosystems, LLC (collectively, "Life") submit this brief regarding the proper scope of the Federal Circuit's remand.

**THE MARCH 31, 2015 STATUS CONFERENCE**

On March 31, 2015, this Court held a telephonic status conference to set a trial date for this matter on remand from the Federal Circuit. As the Court recognized, the Federal Circuit remanded this case so damages tied specifically to the Tautz patent can be determined afresh given that four of the five patents upon which the original verdict was based were invalidated. *See Promega Corp. v. Life Techs. Corp.*, 773 F.3d 1338, 1358 (Fed. Cir. 2014).

At the status conference, Promega argued that the invalidation of four of the five patents-in-suit was irrelevant to the $52 million verdict and thus that the verdict should be reinstated. Specifically, Promega contended that Life waived its argument that Promega has fewer enforceable rights in the Tautz patent than it did in the four now-invalid Promega patents, and that remand proceedings are thus unnecessary.

In response, Life explained at the status conference that Promega's position is flatly inconsistent with the Federal Circuit mandate. The Federal Circuit directed this Court on remand to determine the damages specific to the lone remaining Tautz patent. Life also explained that there was no waiver and that Promega's waiver argument is inconsistent with the plain terms of the Federal Circuit's mandate vacating the verdict and directing this Court to determine on remand the damages specifically tied to the Tautz patent.

After hearing this debate, the Court invited this briefing to address the proper scope of the retrial on remand.

## INTRODUCTION

As the Court recognized at the status conference, the Federal Circuit remanded this case so damages tied specifically to the Tautz patent can be determined afresh given that four of the five patents upon which the original verdict was based were invalidated:

> Since the challenged claims of four of the five asserted patents on which the jury based its damages verdict are invalid, we vacate the jury's damages award. We also vacate the district court's denial of Promega's motion for a new trial, and we remand to the district court to determine damages due to LifeTech's infringement of the Tautz patent.

*Promega*, 773 F.3d at 1358. Plain from this, the Federal Circuit expressly ordered the jury's verdict "vacate[d]," not as Promega encourages, reinstated. Moreover, this clear mandate should not be disturbed because the invalidation of four of the five patents-in-suit has, contrary to Promega's contention, reshaped the liability landscape here and the way the parties will litigate the case.

The reason for this is that Promega has standing to assert the Tautz patent in just a few narrow fields. The Tautz patent originated not at Promega, but at the Max Planck Institute in Germany. Promega's rights in the Tautz patent stem from a 1996 Cross License agreement, pursuant to which Promega obtained exclusive rights ***solely*** in the [REDACTED] As a matter of law, these are the only fields where Promega can sue for infringement of the Tautz patent, and they do not encompass numerous commercially important fields where many of the allegedly infringing kits were sold.

As just one example, there can be no dispute that Promega does not hold exclusive rights for all cell line authentication purposes.[1] Yet, at trial, Promega built the majority of its damages

---

[1] Numerous other fields exist where Promega does not hold exclusive rights in the Tautz patent, these fields include such things as anthropological research, milk testing, and animal/pet identification.

case on this field and was expressly permitted to collect damages for all cell line authentication uses of Life's kits. *See, e.g.*, Dkt. No. 522 [Trial Tr. Vol. 2-A] at 9:19-10:19 (Promega asserts that cell line authentication is a practice that has become "critical" on a "worldwide" basis."); Dkt. No. 572 [Trial Tr. Vol. 7-B, Jury Instructions] at 59:11-61:3. Because Promega holds far fewer rights in the Tautz patent than it did the four other patents that were central to Promega's case at trial and that have now been invalidated, the scope of damages must be evaluated without treating the Promega patents as though they were valid.

Before the parties and Court plunge into this effort, however, Life reports that it plans to seek Supreme Court review of the Federal Circuit's split opinion regarding the proper interpretation of § 271(f)(1). As this Court may recall, Promega relied upon a broad interpretation of § 271(f)(1) to attempt to collect damages on Life's foreign sales. This Court rejected that attempt post-verdict and entered judgment in favor of Life, refusing to interpret § 271(f)(1) broadly.

Life is convinced that this Court correctly interpreted § 271(f)(1). Although the panel majority disagreed with this Court's interpretation, Chief Judge Prost in dissent agreed with this Court and explained that the majority's "conclusion runs counter to unambiguous Supreme Court precedent." *Promega*, 773 F.3d at 1358. The Supreme Court has previously granted review when the Federal Circuit has construed § 271(f)(1) broadly. *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454-455 (2007) ("The presumption that United States law governs domestically but does not rule the world applies with particular force in patent law."). Based on the potential for Supreme Court review—which could moot a remand trial regarding the scope of damages—Life plans to seek a stay.

In any event, this Court should not accept Promega's attempt to side-step the remand proceedings expressly contemplated by the Federal Circuit mandate. The only argument Promega has made to the contrary is a meritless waiver argument based on a footnote in the Federal Circuit's opinion. The Federal Circuit did not find waiver; it expressly found that remand proceedings were warranted.

Finally, Life identifies for the Court the pending motions that would have to be addressed if the Court were to accept Promega's argument that the verdict should be reinstated.

**PROCEDURAL HISTORY**

Promega filed this suit alleging that Life's genetic testing products infringed five different patents. Four of the patents (U.S. Patent Nos. 5,843,660; 6,221,598; 6,479,235; and 7,008,771) originated at Promega (collectively, the "Promega patents") and are owned by it. The fifth patent (No. Re 37,984) originated at the Max-Planck Institute in Germany ("Tautz patent"). As addressed further below, Promega obtained limited rights to assert the Tautz patent. Those rights do not include all uses of cell line authentication as well as other fields for which the Court originally allowed Promega to collect damages.

Prior to the original trial, the Court granted Promega's motion for summary judgment that the four Promega patents were not invalid. *See* Dkt. No. 345 at 32. Among other things, the Court rejected as a matter of law Life's position that the Promega patents were not enabled and entered summary judgment against that defense. The Court also granted Promega's motion for summary judgment of "infringement" by finding that the claims read on certain products, and made a series of rulings regarding licensing issues.

Trial was held in February 2012. To attempt to collect damages for not only Life's domestic sales, but also for Life's foreign sales for products made abroad, Promega initially

contended that it did not need to show a violation of § 271 because of this Court's summary judgment order. When the Court made clear that it had not decided whether there were § 271 violations as part of the summary judgment process, Promega mid-trial invoked § 271(f)(1) to attempt to cover foreign sales, and sought damages for Life's sales wherever they took place.

The jury returned a verdict in Promega's favor, awarding $52 million in damages and finding willful infringement. Dkt. No. 567 at 3. Promega did not ask the jury to distinguish among the patents in assessing damages or finding willfulness and the jury did not do so. *See id.* at 3-4.

After the verdict, Life filed the following six motions challenging the verdict:

1. A motion for judgment as a matter of law or a new trial challenging Promega's failure of proof under § 271(a) and (f)(1), including the improper inclusion of foreign sales. *See* Dkt. No. 580.
2. A motion seeking judgment as a matter of law or a new trial on the jury's willfulness finding. *See* Dkt. No. 588.
3. A motion seeking judgment as a matter of law or a new trial on the grounds that Promega's lost profits case was erroneously based on Promega's own lost profits. *See* Dkt. No. 578.
4. A motion seeking a new trial based on an erroneous allocation of burden of proof regarding whether Life's sales were licensed. *See* Dkt. No. 582.
5. A motion seeking a new trial due to numerous errors that stemmed from the erroneous allocation of burden of proof regarding whether Life's sales were licensed. *See* Dkt. No. 586.
6. A motion seeking a new trial (or in the alternative amendment of the judgment) on the ground that the jury failed to deduct from its damages award royalties that Life had previously paid to Promega. *See* Dkt. No. 584.

This Court granted judgement as a matter of law in Life's favor based on Promega's failure of proof (the first listed motion above), including its improper inclusion of Life's foreign sales based on § 271(f)(1). The Court rejected Promega's attempt to broadly interpret § 271(f)(1). It found that § 271(f)(1) could not be satisfied by arguing that a party induced itself to

infringe and, also, could not be infringed by virtue of the export of a single component given the statute uses the plural term "components" repeatedly. The Court thus concluded that Promega "failed to submit admissible evidence at trial showing that all the sales at issue satisfied [the] requirements" of § 271(a) or (f)(1). *See* Dkt. No. 684 at 2. Having granted judgment as a matter of law for Life, the Court ruled that Life's remaining five motions challenging the verdict were moot. *Id.* at 21-22.

Promega also filed a number of post-trial motions with the aim of reversing the Court's JMOL order and reinstating the $52 million verdict. This Court denied those motions. *See generally* Dkt. No. 770. In response to the Court's JMOL order, Life appealed to the Federal Circuit seeking to reverse the Court's summary judgment determination that the Promega patents were not invalid. Dkt. No. 686. Promega cross-appealed.

On appeal, the Federal Circuit ruled in Life's favor that, as a matter of law, the four Promega patents are invalid because they are not enabled. Thus, of the five patents tried below, and that were the basis for the jury's award, only one (the Tautz patent) survived the Federal Circuit appeal.

As to the Tautz patent, the Federal Circuit, in a split vote, disagreed with this Court's interpretation of § 271(f)(1) and gave that statute a broad interpretation that would allow an infringement finding for foreign activity on the theory that one can induce itself to infringe and based upon the export of a single staple commodity. Chief Judge Prost in a strong dissent agreed with this Court's narrower interpretation of § 271(f)(1).

Because it invalidated four allegedly infringed patents which were the basis for the infringement verdict, the Federal Circuit made clear that the verdict was vacated and that damages specific to the Tautz patent would have to be decided on remand:

> Since the challenged claims of four of the five asserted patents on which the jury based its damages verdict are invalid, we vacate the jury's damages award. We also vacate the district court's denial of Promega's motion for a new trial, and we remand to the district court to determine damages due to LifeTech's infringement of the Tautz patent.

*Promega*, 773 F.3d at 1358.

Following the Federal Circuit's opinion, Promega filed a petition for panel rehearing. Promega argued that the invalidation of the four Promega patents did not require the jury's damage award to be vacated:

> Although a remand is often appropriate when there is a partial reversal on appeal, the scope of the Tautz patent and the nature of the damages award mean that this general rule does not apply in the circumstances of this case. To the extent the Court may not have focused on the posture of this case, Promega respectfully requests that the Court omit the reference to vacating the jury's damages award, and instead reinstate the jury verdict and pre-JMOL judgment (other than the portion finding the Promega patents valid) and remand for proceedings not inconsistent with the Court's opinion.

Exh. 1 [Promega Petition] at 9.

Life also filed a petition for en banc rehearing, explaining that this Court had correctly interpreted § 271(f)(1) and that the panel majority's broad interpretation conflicted with Supreme Court authority. Multiple amici supported this position. Life alternatively requested panel rehearing explaining that Promega might attempt to misuse a footnote in the Federal Circuit opinion on remand and asking the Court to clarify that footnote. Exh. 2 [Life Petition] at 12 ("Although Life believes the District Court would be able to properly understand the mandate, removal of the erroneous footnote avoids complication.").

The Federal Circuit denied all the rehearing petitions.

## ARGUMENT

### I. Life Plans To Seek Supreme Court Review And The Remand Proceedings Should Be Deferred In The Interim

Life plans to file a petition for Supreme Court review of the Federal Circuit's interpretation of 35 U.S.C. § 271(f)(1). In that petition, Life will explain that this Court interpreted that statute correctly and its ruling for Life should be affirmed. The Federal Circuit's decision greatly expands the scope of liability under § 271(f)(1) in uncontemplated ways, holding that one can induce oneself to infringe. As Chief Judge Prost wrote in her dissenting opinion, "we have never before held—in the context of either § 271(f) or § 271(b)—that a party can induce itself to infringe. And for good reason: this conclusion runs counter to unambiguous Supreme Court precedent." *Promega*, 773 F.3d at 1358. The Federal Circuit's decision that the export of a single component can lead to world-wide liability also greatly expanded § 271(f)(1). Given the importance of the issues and the clear discord between the Federal Circuit's unprecedented interpretation of § 271(f)(1) and Supreme Court authority, there is a reasonable likelihood that the Supreme Court will grant review and resurrect this Court's judgment as a matter of law in favor of Life.

Because the Supreme Court's disposition of Life's Petition will likely happen by the fall and the reversal of the Federal Circuit decision would render the remand proceedings moot, Life plans to request that this Court stay the remand proceedings until then.

### II. The Federal Circuit Mandate Directs This Court To Determine On Remand The Damages That Flow From Infringement Of The Tautz Patent

Promega argued vociferously in its appeal briefing, at oral argument, and in its rehearing petition that the invalidation of four of the five patents-in-suit was irrelevant to the proper amount of damages. Yet, the Federal Circuit's mandate was unqualified that remand was necessary for this Court to determine the damages relating specifically to the Tautz Patent:

> Since the challenged claims of four of the five asserted patents on which the jury based its damages verdict are invalid, we vacate the jury's damages award….we remand to the district court to determine damages due to LifeTech's infringement of the Tautz patent.

*Promega*, 773 F.3d at 1358. This decision was correct. The parties obviously would have tried different cases if the Promega patents had been treated as valid in the original trial. The case is different and a new trial is deserved.

As documented below, Promega has fewer exclusive rights in the Tautz patent and thus the damages flowing from that patent are necessarily lesser than the damages that Promega sought based on the now-invalid Promega patents. As such, the Court cannot reinstate the damages award.

**A. The Language Of The Two Relevant License Agreements Demonstrates That Promega Has Fewer Enforceable Rights In The Tautz Patent**

There are two relevant license agreements between Promega and defendants: (1) a 1996 License Agreement, and (2) a 2006 Cross License. As relevant to this litigation, the 1996 License Agreement concerns only the Tautz patent, while the 2006 Cross License concerns both the Tautz patent and Promega patents.

In the 2006 Cross License, Promega licensed Applied Biosystems, LLC ("AB") to practice both the Promega patents and the Tautz patent for [REDACTED] *See* Dkt. No. 233-61 [Cross License (Exh. 25)] §§ 1.6-1.7, 1.11, 2.1.2. At trial, the Court listed fields that this license grant to AB did ***not*** encompass, including, most notably, cell line authentication. *See* Dkt. No. 572 [Trial Tr. Vol. 7-B, Jury Instructions] at 59:11-61:3. The jury was instructed that Promega could collect damages for all of defendants' sales in the cell line authentication field. *Id.*

The 1996 Cross License, on the other hand, is the source of Promega's rights in the Tautz patent. Research Genetics was the original licensee of the Tautz patent. In 1996, Research

Genetics granted Promega an exclusive license to the Tautz patent in limited fields, but only a non-exclusive license in other fields. Research Genetics retained a non-exclusive license to the Tautz patent for ***all*** non-exclusively licensed fields. *See* Dkt. No. 233-47 [License Agreement (Exh. 11)] at 2; *id.* § 7.11 [REDACTED] Subsequently, Research Genetics' retained rights in the Tautz patent were assigned to Life Technologies Corporation by virtue of a series of corporate transactions.

Pursuant to the 1996 License agreement, the only fields where Promega holds an exclusive license are the [REDACTED] *See* Dkt. No. 233-47 [License Agreement (Exh. 11)] at 2; *id.* § 7.1 [REDACTED] Promega does not contest that it holds only limited exclusive rights in the Tautz patent. *See, e.g.*, Dkt. No. 527 [Trial Tr. Vol. 2-C] at 49:5-18; Dkt. No. 4 at 6 (Promega asserts in briefing that pursuant "to the terms of the 1996 License Agreement, Research Genetics granted to Promega an [REDACTED] Dkt. No. 62 at 7 n.6 ("exclusive fields of use did not encompass [REDACTED] and that as "to those other fields, the rights of each party were non-exclusive.").

**B. The Jury Awarded Damages For Sales In Fields Where Promega Does Not Have Standing To Assert The Tautz Patent**

As documented above, Promega has exclusive rights to the Tautz patent in only two fields. The 1996 Cross License makes clear that Promega's exclusive rights in the "[REDACTED] [REDACTED] [REDACTED] *See* Dkt. No. 233-47 [License Agreement (Exh. 11)] § 1.13. Likewise, Promega's exclusive rights in the [REDACTED] [REDACTED] *Id.* § 1.14. It is black letter law that these are the only two fields where Promega may assert the Tautz patent. *See, e.g.*, *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1367 (Fed. Cir. 2008) ("Only a patent owner or an exclusive licensee can have constitutional standing to bring an infringement suit; a non-exclusive licensee does not.").

The record is clear, however, that Promega was awarded damages for sales outside its two exclusive fields, most notably in the area of cell line authentication. Promega's exclusive rights in the Tautz patent cannot possibly span the entire space of cell line authentication uses. As Promega acknowledged at trial, cell line authentication is a general technique that allows researchers to confirm that cells they are studying are pure and not contaminated with other types of cells. *See* Dkt. No. 522 [Trial Tr. Vol. 2-A] at 9:19-10:19. It thus finds use in numerous research activities that do not fall within Promega's two exclusive fields.

For instance, Promega's Chief Technical Officer, Randall Dimond, testified at trial that research is "a very broad endeavor" and that cell line authentication has found use in research fields as wide ranging as cell biology and the anthropological study of human remains. *See* Dkt. No. 527 [Trial Tr. Vol. 2-C] at 63:19-64:24. Likewise, at trial, Promega did not contend that all university research activity is [REDACTED]. *See*,

*e.g.*, Dkt. No. 530 [Trial Tr. Vol. 3-A] at 14:21-15:2 ("You pretty much know what people in hospitals are going to be doing: They're going to be taking care of patients; they're going to be doing clinical research; they're going to be doing clinical diagnostic activities. Universities' main activity, other than general teaching, is research and so those are the activities that predominantly go on there."). Further, Promega distinguished the research market from clinical diagnosis, and made clear that cell line authentication was in the research market, which it characterized as a different market than clinical diagnosis. Dkt. No. 530 [Trial Tr. Vol. 3-A] at 16:11-17:18 ("The left-hand side is just the list of institutions; then forensic uses; paternity testing uses; clinical diagnosis; research, and of course cell authentication, which is really a part of the research market."); Exh. 3 [Plaintiffs Trial Exh. No. 341].

Consistent with this, Promega's website notes that numerous scientific journals require cell line authentication before publication. *See* Journals Requiring Cell Line Authentication *available at* https://www.promega.com/products/pm/cell-authentication/journals/. The journals listed on Promega's website focus on basic research that does not necessarily include a clinical component. As just one example, the mission statement of the journal Cell Biochemistry and Biophysics is not clinical, but is instead to foster "progress in comprehending the nature of the biochemical and biophysical mechanisms underlying the control of cellular physiological homeostasis and the consequences of its perturbation." *See* Cell Biochemistry and Biophysics *available at* http://link.springer.com/journal/12013. Thus, Promega's exclusive rights in the Tautz patent—which are limited to the human genetic identity market and the human clinical market—cannot under any reasonable reading be understood to encompass the full scope of cell line authentication activities.

Yet, in view of Promega's broader rights in its own patents (under the 2006 Cross License) that were invalidated on appeal, the jury instructions expressly stated that Promega could collect damages for all Life kits that were sold for any cell line authentication purpose. *See* Dkt. No. 572 [Trial Tr. Vol. 7-B, Jury Instructions] at 59:11-61:3. For instance, Promega was permitted to collect damages for sales to universities and research centers that carry out the kind of pure research activities that are not within the scope of Promega's exclusive rights under the 1996 License Agreement. Indeed, in successfully moving for summary judgment, Promega pointed to the "Numerous Universities and Research Centers" and argued that "[c]ell line authentication has become an important matter for universities and research institutions as a consequence of proliferation federal regulations and regulations imposed by publications requiring that there be clear proof that the cell line being discussed is, in fact, the cell line identified." *See* Dk. No. 228 at 40.

Although these sales cannot all be within Promega's exclusive rights in the Tautz patent, Promega was nonetheless allowed to seek damages for all of these sales, and they account for much of the $52 million in damages that the jury ultimately awarded. While Promega may contend that this was appropriate based on the rights it held in the now-invalidated Promega patents, it is certainly not appropriate now based on the far limited set of rights it holds in just the Tautz patent.

### C. Promega's Actions Post-Trial Confirm That Promega Does Not Have The Right To Assert The Tautz Patent Across The Cell Line Authentication Field

Promega's actions since trial confirm that Promega cannot assert the Tautz patent across the entire cell line authentication field. Beginning in late 2012, Life began selling a new line of genetic testing kits under the tradename AuthentiFiler™. To promptly resolve any disputes over whether the AuthentiFiler™ products infringed the Tautz patent, Life filed a declaratory

judgment action in the Southern District of California seeking a judgment of non-infringement. *See* Exh. 4 [Tautz Complaint, *Life Techs. et al. v. Promega Corp.*, No. 12-cv-02987-JAH-KSC (S.D. Cal. filed Dec. 17, 2012)].

The basis for Life's declaratory judgment request was that the Authentifiler™ products were labeled as being only "For Cell Line Authentication use excluding Forensic, Paternity, Diagnostic, and Therapeutic applications." *See* Exh. 4 [Tautz Complaint] ¶¶ 4, 14-21. That is, the Authentifiler™ kits were expressly labeled and marketed for use in an application Promega does not hold exclusive rights to. *See supra* p. 11. In response to Life's declaratory judgment action, Promega declined to pursue any claims against Life for infringement by the AuthentiFiler™ products. Rather, Promega gave Life a release and covenant not to sue, stating that Promega has "determined that it will not assert that the AuthentiFiler™ Product…infringes … or otherwise violates any of Promega's exclusive rights under the 1996 Agreement." Exh. 5 [Promega CNS].

## III. Footnote 16 Of The Federal Circuit's Opinion Was Not A Waiver Finding

Promega has not denied that it has narrower rights in the Tautz patent. Promega essentially asks this Court to ignore this and the plain terms of the Federal Circuit mandate and to reinstate the verdict based on an alleged waiver finding in a footnote of the Federal Circuit's opinion. *See Promega*, 773 F.3d at 1357 n.16. Promega did not identify any other reason for this Court to reinstate the verdict. That footnote is unexplained and unsupported and does not constitute a waiver finding in any event. That footnote states as follows: "In its Reply Brief, LifeTech argued for the first time that it has broader licensing rights to the Tautz patent based on a 1996 agreement. Reply Br. 8. We will not consider this untimely argument." *Promega*, 773 F.3d at 1357 n.16.

Promega's waiver argument is meritless. It ignores the reason why Promega's narrower rights in the Tautz patent were raised on appeal. Footnote 16 refers to Life's explanation in its reply brief about why its enablement appeal was important. The issue of Promega's narrower rights in the Tautz patent arose only in response to Promega's erroneous claims that the invalidity of the Promega patents was irrelevant to the legal viability of the $52 million verdict. Specifically, in response to Life's appeal brief explaining why the four Promega patents are invalid for lack of enablement, Promega argued that such a ruling would not justify disturbing the verdict. *See* Exh. 6 [Promega Brief] at 5 (Promega asserts on appeal that its "right to relief does not depend upon the outcome of Life's invalidity appeal. Life does not contest the validity of [the Tautz patent], which all the accused products infringe."). Life replied that Promega has fewer rights in the Tautz patent than it does in the Promega patents so that the invalidation of the Promega patents would indeed have a substantial effect on the verdict. *See* Exh. 7 [Life Reply Brief] at 7-9.

Thus, Life's reply merely responded to Promega's argument that it did not matter whether the Promega patents were invalidated. *See id.* Life was not seeking appellate review of the 1996 license in making that point. In that light, the Federal Circuit's reference to untimeliness is unexplained. The Federal Circuit did not find any "waiver" or other knowing relinquishment of rights. This is proven by not only the absence of any waiver analysis, but its refusal to reinstate the verdict in the face of Promega's argument that the verdict is unaffected by the invalidation of the Promega patents.

Promega's attempt to suggest that Life was obligated, on pain of waiver, to raise the absence of Promega's enforceable rights outside the exclusively licensed fields as part of its (in)validity appeal ignores that this Court had entered judgment in favor of ***Life*** on infringement

liability. A finding by the appeal court that Promega never had the right to assert the Tautz patent outside exclusive fields would not have changed the relief that Life had received, given it prevailed on liability totally. There was no appeal issue to waive. Promega's waiver argument should be rejected.

## IV. Life's Outstanding JMOL Motions Must Be Decided If The Court Chooses To Reinstate The Verdict

If the Court were to consider reinstating the verdict, as Promega seeks, Life respectfully advises the Court that the five outstanding Life JMOL motions numbered 2-6 above must be decided. *See supra* p. 5. None of these remaining motions have been mooted by the Federal Circuit's decision. That being said re-briefing may make sense because those motions can likely be refined and focused in view of the Federal Circuit's opinion. If the Court chooses not to reinstate the verdict, the outstanding JMOL motions need not be revisited, though, one or more issues raised may need to be addressed when the contours of the case crystallize as we move towards the remand trial.

## CONCLUSION

For the foregoing reasons, the Court should not reinstate the verdict, but should implement the Federal Circuit's mandate and initiate proceedings so that damages tied specifically to the Tautz patent can be determined afresh.

Dated: May 1, 2015

Respectfully submitted,

*/s/ Michael J. Modl*

Michael J. Modl
Andrew J. Clarkowski
Steven M. Streck
Axley Brynelson, LLP
2 E. Mifflin Street, Suite 200
Madison, WI 53703
Ph: 608-283-6705
mmodl@axley.com
aclarkowski@axley.com
sstreck@axley.com

Edward R. Reines (Admitted pro hac vice)
Derek C. Walter (Admitted pro hac vice)
Weil, Gotshal & Manges, LLP
201 Redwood Shores Parkway
Redwood Shores, CA 94065
Ph: 650-802-3000
edward.reines@weil.com
derek.walter@weil.com

Carter G. Phillips (Admitted *pro hac vice*)
Sidley Austin LLP
1501 K Street, N.W.
Washington, DC 20005
Ph: 202-736-8000
cphillips@sidley.com